UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AALAELDIN KHIRAWI,
Plaintiff

v.

GETRONICS WANG CO., LLC,
a/k/a/ and d/b/a GETRONICS,
Defendant

CIVIL ACTION NO. 05-11877WGY

## DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Local Rule 56.1, Defendant Getronics Wang Co., LLC a/k/a and d/b/a Getronics ("Getronics" or the "Company") submits this Statement of Undisputed Material Facts in support of its Motion for Summary Judgment. The pleadings of record, the deposition testimony of the parties and witnesses, and the relevant documentary exhibits (all of which are attached to the accompanying Declaration of Erik J. Winton), and the Declaration of Wayne Ogg filed herewith, establish the following undisputed material facts.[1]

### General Background

1.    Getronics is an Information and Communications Technology ("ICT") company with its North America headquarters located in Billerica, Massachusetts. (Ogg Dec., ¶3). Plaintiff Aalaeldin Khirawi ("Plaintiff") was an employee of Getronics in its Tewksbury, Massachusetts office, from August 2000 until his termination on October 26, 2004, effective October 27, 2004. (Plaintiff's Complaint (hereafter "Complaint"), ¶¶ 9,12,23).

---

[1] Citations to the Winton and Ogg Declarations and Exhibits are noted herein as "Winton Dec., Ex. _" and "Ogg Dec., ¶_". Citations to the deposition transcripts of the Plaintiff, Ruby Miles and Jameson ("Jamie") Graceffa are noted herein as "Pl. Tr. _, p. _," "Miles Tr., p. _," and "Graceffa Tr., p. _," respectively.

2.    Getronics' business is divided among several different business lines.  Prior to his termination, Plaintiff was employed as a Quality Representative in the IT Sourcing Services Group.  The IT Sourcing Services Group provides enterprise, networking and technical support services for client ICT systems.  (Ogg Dec., ¶4).

### Plaintiff's Introduction To Getronics As A Temporary Worker And Ultimate Full-Time Hiring

3.    Plaintiff, who is a black Muslim from Sudan, was first introduced to Getronics in May 1999, when he was assigned to work at Getronics through his employer, a temporary agency named Tech-Aid.  Plaintiff was one of several Tech-Aid temporary employees working at Getronics at that time.  (Ogg Dec., ¶5).

4.    Plaintiff was hired by Getronics on August 29, 2000 as a full-time Customer Service Representative in its IT Sourcing Services Group, to work out of Getronics' Tewksbury, Massachusetts office.  (Ogg Dec., ¶6).

### Plaintiff's First Initial Complaint Of Discrimination

5.    Prior to being hired by Getronics as a full-time employee, Plaintiff made an internal complaint of religious discrimination.  Specifically, on August 8, 2000, via a letter from the Council on American-Islamic Relations, Plaintiff alleged that the reason he had not been hired as a full-time employee earlier was because of his religion.  (Ogg Dec., ¶7).

6.    Getronics investigated Plaintiff's complaint and found that no discrimination had occurred.  Specifically, Getronics investigation found that budgetary restrictions, not religion-based animus, were responsible for the length of time Plaintiff remained in temporary status.  In addition, there were several other white, non-Muslim co-workers who remained in temporary status for an extended--indeed longer--period of time.  (Ogg Dec., ¶8).

## Plaintiff's Positive Performance Reviews, Promotion And Raise

7.     Once he became a full-time Getronics employee, Plaintiff received adequate performance reviews. (Compl. ¶13). Throughout the course of Plaintiff's tenure as a temporary and full-time employee, Getronics did not question his ability to perform the technical aspects of his job(s). (Ogg Dec., ¶9).

8.     On September 1, 2003, Plaintiff was promoted to the position of Quality Representative. (Pl. Tr. I, p. 152). In this new position, Plaintiff was to report to Ruby Miles, Quality Manager in the Customer Support Group. (Miles Tr., p. 11). Ms. Miles, who is an African-American woman, worked out of Getronics' Houston, Texas office. Because Plaintiff worked out of Getronics' Tewksbury, Massachusetts worksite, Ms. Miles was assigned to supervise Plaintiff remotely. Plaintiff was the only employee Ms. Miles ever supervised remotely. (Miles Tr. p. 176).

9.     Plaintiff's promotion was delayed for several months due to a "freeze" in hiring and raises instituted by new Getronics management at the time. (Miles Tr., pp. 51-52). Notwithstanding this delay, prior to the formal promotion date, Plaintiff was permitted to perform some of the duties of the Quality Representative position. (Id., p. 29).

10.     In conjunction with this promotion, Plaintiff received a 33% salary increase, from approximately $27,000 to $36,000 per year. (Pl. Tr. I, p. 152). A raise of this magnitude is very uncommon at Getronics. (Miles Tr., p. 169).

## Plaintiff's Second Internal Complaint Of Discrimination

11.     On December 18, 2003, Plaintiff brought his second internal discrimination complaint, this time against a Getronics Human Resources employee named Terence Freeman, for refusing Plaintiff's request for tuition reimbursement. (Pl. Tr. I, p. 179). Mr. Freeman denied the request, telling Plaintiff that the courses were not job-related and there were budgetary

constraints at the time. The denial of this request was in accordance with Getronics' policy on tuition reimbursement, a policy that is uniformly and consistently enforced. (Ogg Dec., ¶10).

12.    Plaintiff alleged that Mr. Freeman, a black male, had treated him with "unexplained hostility and bias." (Pl. Tr. I, pp. 181-82). Although Plaintiff requested an investigation and accused Mr. Freeman of being "biased," at his deposition Plaintiff admitted that Mr. Freeman did not discriminate against him on the basis of some protected category. (Pl. Tr. II, p. 103).

13.    Plaintiff's complaint also referenced what he perceived as a discriminatory delay in receiving his promotion and the pay raise allegedly promised by his supervisor, Ms. Miles. (Pl. Tr. I, p. 137).

14.    Getronics once again investigated Plaintiff's complaint and found that no discrimination had occurred.  Defendant reported such findings to Plaintiff in a memo dated January 15, 2004. (Winton Dec., Ex. C).

### Plaintiff Engages In Inappropriate Behavior Resulting In His First Written Warning

15.    On February 23, 2004, Plaintiff sent an email to his work "team" in which he told a co-worker named Patrick McHenry that McHenry was "wasting [Plaintiff's] time" and demanded an apology from Mr. McHenry for allegedly telling Plaintiff to "shut up" during a teleconference. (Winton Dec., Ex. D). Ms. Miles investigated Plaintiff's allegation and learned from both Mr. McHenry and Tiffiny Anderson-Jones, another Getronics employee who was on the call with Plaintiff and Mr. McHenry, that Mr. McHenry had not told Plaintiff to "shut up." (Miles Tr., pp. 90-91).

16.    As a result, Ms. Miles sent an email to the team in response, apologizing on behalf of Plaintiff. (Winton Dec., Ex. D).

17.    Plaintiff responded to Ms. Miles' email by again emailing the whole team, stating "Ruby, My tone was professional enough and I did not ask you to apologize for me." (Winton Dec., Ex. D).

18.    As a result of this exchange, on March 1, 2004 Getronics issued Plaintiff a written reprimand, which he refused to sign. (Winton Dec., Ex. E).

19.    On March 9, 2004, after receiving the reprimand, Plaintiff emailed a rebuttal to his supervisor, Ms. Miles, and to Getronics' Human Resources in which he stated: "you have proven to me time and again that I can not trust your judgment as manager and here is why: . . . Ruby Miles, trust and weakness are both subjective terms in their concept and their meaning, and taking all the points and facts into consideration, I would not rate your performance as strong." (Winton Dec., Ex. F).

20.    Plaintiff eventually apologized to Ms. Miles for calling her "weak", as he believed he was inappropriate in saying this. (Pl. Tr. I, p. 147-149).

## Plaintiff Receives His Performance Appraisal

21.    On or about March 1, 2004, Plaintiff was given a performance appraisal, which was completed by Ms. Miles. (Winton Dec., Ex. G). The review was a "3" out of "4," which Plaintiff considered favorable. (Pl. Tr. I, p. 169-70). In completing this review, Ms. Miles conferred with Plaintiff's peers in Tewksbury. (Miles Tr., p. 94). Ms. Miles completed this review based strictly on Plaintiff's technical work in Tewksbury, and purposely did not address any of his attitude or behavior issues. (Id.). Ms. Miles believed, as was the case, that the inappropriate and insubordinate conduct was being addressed in other documents. (Id., p. 150).

**Plaintiff Continues His Insubordinate And Disruptive Behavior And
Is Issued A Cease And Desist Communication From Human Resources**

22.    On March 18, 2004, Plaintiff engaged in another drawn-out email exchange with
Ms. Miles, this time over a simple question she asked about whether he was working from home
on Mondays. (Winton Dec., Ex. H).

23.    On March 19, 2004 Getronics' Human Resources department requested that
Plaintiff cease and desist his inappropriate behavior towards his supervisor and that he stop
abusing Getronics' complaint procedures, as Getronics had already investigated Plaintiff's
complaints and found no discrimination or retaliation. (Winton Dec., Ex. I).

24.    In this email communication, Plaintiff was advised not to respond by email, as he
would be contacted by Human Resources to outline expectations for proper workplace conduct.
The request specifically stated, "Do not respond to this email.  We will be in contact with you to
issue disciplinary steps and to outline our expectations and requirements for your workplace
conduct."  Plaintiff ignored this request, emailing several responses to the email from Human
Resources. (Id.).

**Plaintiff Is Put On A Performance Improvement Plan**

25.    As a follow up to the March 19 cease and desist request, on March 23, 2004,
Plaintiff was placed on a Performance Improvement Plan ("PIP"). (Winton Dec., Ex. J).  The PIP
referenced Plaintiff's failure to address the issues relayed in his written reprimand of March 4,
2004, and set forth the expectations and requirements for Plaintiff going forward.  Specifically,
The PIP required Plaintiff to:  (a)  attend all meetings requested by his manager; (b)  respond
immediately and politely to all requests and directives from his manager; (c)  cease and desist
from his deluge of email; (d)  use discretion, care and caution when using the words "retaliation,"
"discrimination" or "harassment;" (e)  take care to not abuse Getronics' complaint procedures; (f)

immediately answer his manager's question regarding whether or not he works from home on Mondays; (g) communicate with his manager in a professional and measured manner; and (h) focus on his job without anger. Plaintiff refused to sign the PIP. (Id.)

26.    Following receipt of the PIP, Plaintiff finally emailed Ms. Miles in response to her inquiry about whether he was working from home on Mondays as follows: "The answer is NO." (Winton Dec., Ex. K).

### Plaintiff's Continued Insubordinate Behavior And Second Written Warning

27.    Plaintiff took an approved leave of absence from March 29, 2004 to April 26, 2004. Upon his return from this leave of absence on April 26, 2004, Plaintiff requested and received a further partial leave of absence, through May 17, 2004. (Pl. Tr. I, p. 156; Ogg Dec., ¶11).

28.    On May 17 and 18, 2004, immediately following his return from the leaves of absence, Plaintiff and Ms. Miles communicated by e-mail concerning Plaintiff's reporting of his hours. (Winton Dec., Ex. L). Specifically, Ms. Miles had been told by Plaintiff's co-workers in Tewksbury that he was not in the office during some of the hours he had reported he was. (Id.). Plaintiff demanded to know which co-workers had reported that he was not in the office. (Id.). Ms. Miles emailed Plaintiff stating, among other things, that "This discussion is closed for now. . . I do not want repetitive cycles of emails over this topic. . . Again, this discussion is closed." (Id.).

29.    On May 18, 2004, despite this clear directive, Plaintiff emailed back in response stating that "it is clear that you are out of control and now this conversation is closed." (Id.).

30.    Following his insubordinate email exchange with Ms. Miles on May 18, Plaintiff emailed Getronics' Vice President of Human Resources, Wayne Ogg. (Winton Dec., Ex. M). In

his email to Mr. Ogg, Plaintiff stated "My performance has never been the issue, and thus I would conclude that my ethnicity, background and religion have." (Id.).

31.    Following his behavior on May 17 and 18, Plaintiff received his second written reprimand on May 21, 2004 (Winton Dec., Ex. N). Once again, Plaintiff refused to sign the reprimand. (Id.). The reprimand reminded Plaintiff that he was still subject to a PIP, and that as a result, the scrutiny of his workplace conduct would be increased. He was also given detailed specific instructions regarding his work schedule and conduct. (Id.)

32.    Plaintiff was told, among other things, to email Ms. Miles upon his arrival and departure from the office every day, because she was in another city and had no way of knowing when he was at work, and to complete a weekly status report to Ms. Miles regarding his work. (Id.)

33.    Plaintiff's work schedule was also revised requiring that he work in the office, and not from home, on Fridays. (Pl. Tr. I, p. 171). Plaintiff requested and received a religious accommodation of a two hour break each Friday in order to attend religious services. (Id., p. 159).

### Plaintiff Initially Refuses To Return The Company's Laptop Computer

34.    As a result of his no longer working at home and his insubordination, Plaintiff was also directed to return the company's laptop computer on May 24, 2004. (Pl. Tr. I, p. 172). When Defendant attempted to retrieve the laptop from Plaintiff, Plaintiff initially refused to accept Ms. Miles' authority and return the computer. (Id.). Instead, Plaintiff stated he would resolve the matter with Paul Galipeau, Plaintiff's former manager in Tewksbury. (Pl. Tr. I, p. 172; Winton Dec., Ex. O). He claimed that since he received the laptop from Mr. Galipeau, Ms. Miles could not demand its return. Eventually, at Mr. Galipeau's urging, Plaintiff returned the laptop computer to Getronics. (Id.).

**Plaintiff Files A Charge Of Discrimination With The EEOC**

35.     On or about June 10, 2004, Plaintiff filed a *pro se* claim of race, religion and retaliation discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was jointly filed with the Massachusetts Commission Against Discrimination ("MCAD") (Compl., ¶21; Winton Dec., Ex. P).

**Plaintiff's Failure To Adhere To The PIP And Continued Inappropriate Behavior**

36.     On August 5, 2004, Plaintiff sent an email to Ms. Miles with a suggestion for monthly meetings.  (Winton Dec., Ex. Q).  Ms. Miles responded to Plaintiff, stating that he needed to focus on her pending requests that he continued to ignore, rather than suggesting new items.  (Id.).  After detailing her pending requests yet again, Ms. Miles wrote, "Please do not respond to this email.  That is a directive.  I will not tolerate back and forth discussion on these or any other directives."  (Id.).  Plaintiff did not heed this warning and continued to respond repeatedly to Ms. Miles' email, questioning her directives.  (Winton Dec., Exs. Q through R).  One of Plaintiff's responses stated, among other things, "I do not understand that you keep giving me directive after directive." (Winton Dec., Ex. R).

37.     In the same email chain, Ms. Miles directed Plaintiff to contact Ms. Anderson-Jones by telephone.  Plaintiff refused, stating that he "prefer[s] emails." (Id.).

38.     Following this email exchange, on Friday August 6, 2004 Plaintiff requested that Getronics' internal "Helpdesk" investigate whether Ms. Anderson-Jones had left Plaintiff a voicemail message that she claimed he had not returned.  (Winton Dec., Ex. S).

39.     Ms. Miles cancelled this investigation, as Plaintiff did not have the authority to request such an investigation, it is an expensive exercise, and the service is not meant for employees' personal use.  (Id., Miles Tr., pp. 157-58).

## Plaintiff Is Given A Performance Expectations Document

40.    Two weeks later, on August 19, 2004, Plaintiff met with Jamie Graceffa, another Getronics Human Resources Representative. (Pl. Tr. I, p. 199). James Hoffman, Ms. Miles' supervisor, also attended this meeting, by telephone. (Pl. Tr. I, pp. 129, 199). Plaintiff was assigned to work with Mr. Graceffa because he had not worked effectively with other members of the Human Resources department, and Mr. Graceffa has a background in conflict resolution. (Graceffa Tr., p. 33).

41.    Getronics had prepared a Performance Expectations Document for use at this meeting. (Winton Dec., Ex. T). During the meeting, Mr. Graceffa and Mr. Hoffman discussed the contents of the Performance Expectations Document with Plaintiff. (Pl. Tr. I, p. 200). Plaintiff was essentially told that his employment was in jeopardy as a result of his prior inappropriate and insubordinate behavior. (Winton Dec., Ex. T).

42.    Mr. Graceffa had a pile of papers in front of him at this meeting, and gave Plaintiff some documents at the end of the meeting. (Pl. Tr. I, p. 199-200). Plaintiff's obligations going forward were discussed at this meeting. (Pl. Tr. I, p. 200). In addition to the expectations of professional workplace conduct that had been reiterated to Plaintiff on numerous occasions, Mr. Hoffman and Mr. Graceffa advised Plaintiff of several requirements; Plaintiff was to send arrival/departure emails to Mr. Graceffa; Plaintiff was to send his weekly status reports to Mr. Graceffa; and Plaintiff was to complete a log of his daily work activity on an hourly basis. (Winton Dec., Ex. T; Pl. Tr. I, pp. 199-200; Graceffa Tr., p. 72).

## Plaintiff's Charge Of Discrimination Is Dismissed

43.    After an attempt to mediate the discrimination claim failed, Getronics submitted a Position Statement to the EEOC on September 24, 2004. (Ogg Dec., ¶12). On October 8, 2004,

the EEOC dismissed Plaintiff's claim stating it could not conclude that the information obtained established violations of the statutes. (Winton Dec., <u>Ex. U</u>). On or about October 26, 2004, the Massachussetts Commission Against Discrimination ("MCAD") issued a Notice of Final Disposition, advising of the EEOC's lack of probable cause finding. (Winton Dec., <u>Ex. V</u>).

### **Plaintiff's Third Written Warning**

44.    Following the August 19, 2004 meeting between Plaintiff, Mr. Graceffa and Mr. Hoffman, Plaintiff failed to consistently send Mr. Graceffa emails upon Plaintiff's arrival and departure from his office, as required in the August 19, 2004 Performance Expectations document. (Graceffa Dep., p. 75).

45.    In September 2004, Plaintiff told Mr. Graceffa that he never received the Performance Expectation document dated August 19, 2004. (Winton Dec., <u>Ex. W</u>). Mr. Graceffa disagreed with Plaintiff and told him he gave the document to Plaintiff at the August 19 meeting. (<u>Id</u>.). Plaintiff continued to disagree with Mr. Graceffa concerning this point. (Winton Dec., <u>Exs. W</u> through <u>Y</u>). Eventually, Plaintiff was given another copy of the PIP on September 28, 2004. (Pl. Tr. I, pp. 198-99). Plaintiff continued to insist he did not receive the August 19 PIP even after Mr. Graceffa insisted that he stop arguing about this issue. (Winton Dec., <u>Exs. W</u> through <u>Y</u>).

46.    Specifically, in email communications from September 27 through September 30, Plaintiff continuously denied having received the August 19 Counseling on August 19. (Winton Dec., <u>Exs. W through Y</u>). On September 28, after numerous emails regarding this issue, Mr. Graceffa stated, "For the last time I write to you: this discussion is closed. Do not respond to this email. That is a directive." Notwithstanding this directive, Plaintiff replied, "Dear Jamie, Your statement is not true and you know that very well." (Winton Dec., <u>Ex. X</u>).

11

47.    On September 29, Mr. Graceffa stated:

"I will repeat for the last time: this issue is closed. You should understand, my directive to you yesterday was for you to relent on your insistence that you never saw the document previously. That is a fabrication. You continue to argue the point. If you respond to the point of when you first received the document one more time, you will receive a written warning."

(Winton Dec., Ex. Y). Once again, Plaintiff did not follow the directive and emailed a reply stating, "It is not fabrication Mr. Graceffa, and you very well know that. And no amount of accusations and threats from your part would change this fact." (Id.).

48.    On September 30, Mr. Graceffa again emailed Plaintiff on this subject, stating:

"You continue to press this point with me notwithstanding my clear directive that you cease. You will receive a written warning on this matter. This is an example of unprofessional and inappropriate conduct. Please be advised that your immediate and sustained improvement is a requirement of continued employment with Getronics . . . this matter is closed. Please do not reply to this email. That is a directive."

(Winton Dec., Ex. Y). Plaintiff once again refused to abide by the directive, emailing a reply stating, "you can issue warnings and more than that, but that would not change the fact that, you have not been correct when you said the document was presented to me in the meeting on Thursday the 19th." (Id.).

49.    As a result of Plaintiff's failure to adhere to the August 19, 2004 Performance Expectation document, Plaintiff was told by Mr. Graceffa on or about September 30, 2004, that he would be receiving another written warning. (Winton Dec., Ex. Y). On or about October 12, 2004, Mr. Graceffa attempted to schedule a teleconference to discuss this warning with Plaintiff. (Winton Dec., Ex. Z).

50.    On October 19, 2004, Mr. Graceffa emailed Plaintiff again regarding the scheduling of a meeting to discuss Plaintiff's third written warning. (Winton Dec., <u>Ex. AA</u>). In this email, Mr. Graceffa wrote:

> "You are reminded that you are an employee of Getronics and that you are directed to treat its managers and all other employee with the appropriate level of respect and courtesy. Your manner toward me will not be tolerated. You may not lash out and argue with me or any other manager or supervisor as you have in the past. This discussion is closed. If you write back to me or argue in any other forum on this point, you will be disciplined."

(<u>Id</u>.). Despite yet another clear directive not to argue or write back, Plaintiff emailed in response, "Once again, you are twisting and changing the facts. That is all what I will say at this time." (<u>Id</u>.). Eventually, the meeting was scheduled for October 26, 2004, and a third written warning was prepared. (Winton Dec., <u>Ex. BB</u>).

51.    The third written warning addressed the following performance issues:   (a) Plaintiff's denial of the existence of a "performance expectations" document, which Mr. Graceffa stated was presented to him during the meeting on August 19, 2004 and again on September 28, 2004; (b) Plaintiff's unwillingness and/or inability to acknowledge a differing viewpoint; (c) his unwillingness and/or inability to cease an argument and stop his relentless cycles of email even after explicitly being directed to do so; and (d) his argumentative, rude and disrespectful communication style. (Winton Dec., <u>Ex. BB</u>).

52.    The document stated, among other things, that Plaintiff cease debating the issue of when he received the August 19 warning. (<u>Id</u>.). Specifically, it stated: "There will be no further debate on this issue. This subject is closed. **You will cease to argue this fact**." . (<u>Id</u>.).

53.    In addition, the document set forth the following directives in clear bolded writing.

   •    **"You will respect the views of others."**

- "You will abide future directives to cease discussion."

- "You will improve your argumentative, rude and disrespectful communication style."

- "You will behave professionally in the workplace."

(Id.). The document also stated, "None of the above conduct is acceptable. You must improve on each of these points immediately. Your job is in jeopardy." (Id.).

54.    At approximately 9:46 a.m. on October 26, 2004, Mr. Graceffa forwarded the third written warning to Plaintiff via email. (Pl. Tr. II, p. 43).

55.    In his email with the warning, Mr. Graceffa requested that Plaintiff print the written warning and bring it with him to a private conference room Plaintiff was to reserve for the call with Mr. Graceffa, scheduled for 10:00 a.m. (Winton Dec., Ex. CC). Notwithstanding this request, Plaintiff refused to go to a private room, and called Mr. Graceffa from his desk. (Pl. Tr. I, p. 116).

56.    At 10:01 a.m., after reviewing the warning and immediately prior to calling Mr. Graceffa, Plaintiff sent an email to Mr. Graceffa. Despite the clear directive concerning this issue, Plaintiff's email to Mr. Graceffa in response to the October 26 written reprimand stated that he had not received the August 19 warning on August 19. (Winton Dec., Ex. CC). Specifically, Plaintiff's email stated,

> "Jamie, I have read it and I am really trouble by your continuous effort to change the facts and the events that took place between us. Here is my response in writing and to protect my record: (1) I did not receive any papers or documents that you mentioned in item number (1). You know that and there is no amount of affirmations from your side would change this fact; (2) All my facts are correct 100% and to the best of my knowledge; (3) All my contacts with you are were highly professional and

will be any future contact; and (4) I have not been
rude with you."

(Id.).

57.    After sending the 10:01 a.m. email, Plaintiff called Mr. Graceffa.  During the call,

Plaintiff continued to insist that he had not received the August 19 warning on that date.  Plaintiff

admits that he "kept saying [he] never received" the August 19 Performance Expectations Plan

on August 19.  (Pl. Tr. I, p. 197).

> Q:    What did you say exactly, that I disagree?
>
> A:    I think I was – no, I was saying, "No, sir.  No, sir.  You did
>        not.  No, sir.  You did not."  And I – I just kept saying that,
>        I think.
>
> Q:    "No sir.  You did not."?
>
> A:    Yeah.  "No sir.  You did not."
>
> Q:    And when you say, "You did not," meaning, you did not
>        give me that document on August 19, 2004?
>
> A:    Correct.
>
> Q:    Did you tell him that what was written in the October 26,
>        2004 reprimand, Exhibit 14, was untrue?
>
> A:    I said, "They are not facts."
>
> Q:    You said that what was written in that written reprimand
>        was not facts?
>
> A:    Correct.

(Pl. Tr. II, pp. 52-53).

58.    Mr. Graceffa asked Plaintiff more than once during the call if Plaintiff would let

him finish going over the October 26, 2004 Written Reprimand.  (Graceffa Dep., p. 89).  Plaintiff

raised his voice during this call, and Mr. Graceffa felt his tone of voice was disrespectful and

"menacing."  (Graceffa Tr., p. 101).  Plaintiff himself admits there was disagreement between he

and Mr. Graceffa during this call and that Mr. Graceffa was upset.  (Pl. Tr. II, p. 56).

59.    The teleconference ended when Mr. Graceffa told Plaintiff he would complete the communication in writing, and Plaintiff hung up the phone on him. (Graceffa Tr., p. 90). Mr. Graceffa felt "very uncomfortable" and concerned for his personal safety as a result of this call, to such an extent that for the rest of that week he would not leave work alone to walk to his car. (Graceffa Tr., p. 101).

60.    Prior to or during the October 26, 2004 call with Mr. Graceffa, Plaintiff was not told that his employment was going to be terminated. (Pl. Tr. I, p. 195).

### Plaintiff's Termination

61.    Immediately after the call with Plaintiff, Mr. Graceffa reported what he considered Plaintiff's insubordinate, threatening and inappropriate behavior during the call to Getronics' upper-management. (Graceffa Tr., p. 94). Upon consideration of Mr. Graceffa's report and knowledge of all the prior discipline, Getronics decided to terminate Plaintiff's employment immediately, on the basis of his continued and flagrant inappropriate conduct. (Ogg Dec., ¶13). The final decision to terminate Plaintiff's employment at that time was made by Getronics' Vice President of Human Resources, Wayne Ogg. (Ogg Dec., ¶13). Plaintiff was so flagrant in his refusal to abide by the October 26 written reprimand, that Mr. Ogg felt he had no choice but to terminate his employment immediately. (Ogg Dec., ¶13). Mr. Graceffa and Ms. Miles were not involved in the decision to terminate Plaintiff's employment. (Ogg. Dec., ¶14).

62.    Within 10 to 15 minutes of Plaintiff's October 26th call with Mr. Graceffa, Plaintiff was advised of his termination by Paul Galipeau. (Pl. Tr. I, p. 195). Thereafter, Plaintiff was sent a letter confirming his termination would be effective the next day, October 27, 2004. The letter stated that Plaintiff was terminated due to his "continued and flagrant inappropriate conduct in the workplace." (Winton Dec., Ex. DD). Plaintiff admits that prior to his termination he had received all of the written reprimands, performance improvement plans,

and performance expectations documents dated March 1, 2004, March 23, 2004, May 21, 2004, August 19, 2004 and October 26, 2004. (Pl. Tr. I, p. 202).

63.    At his deposition, Plaintiff admitted he (1) was insubordinate and inappropriate in the workplace at Getronics, (Pl. Tr. I, pp. 148-49, 174-75), (2) responded to emails from his supervisors or human resources even though he was directed not to do so, (Pl. Tr. I, p. 154), and (3) although he acknowledged he was required to do so, he did not always abide by the directives of his superiors at Getronics. (Pl. Tr. I, pp. 155, 176).

64.    Plaintiff also admitted that Getronics had a right to discipline and even terminate him for insubordination and inappropriate conduct. (Pl. Tr. II, pp. 94-95).

65.    Plaintiff is not aware of any employee who behaved in the way that he did and was not terminated by Getronics. (Pl. Tr. I, p. 155).

### Plaintiff's Lawsuit and After-Acquired Evidence of Misconduct

66.    On April 11, 2005 Plaintiff filed a charge of retaliation at the Massachusetts Commission Against Discrimination ("MCAD"). (Compl. ¶ 26). Plaintiff filed the instant lawsuit after receiving a right to sue letter on or about July 20, 2005. (Id., ¶ 29).

67.    During the course of discovery, Plaintiff has admitted that he lied on his signed job application to Getronics, as well as in his sworn interrogatory answers. (Pl. Tr. I, pp. 93, 97, 151). Specifically, Plaintiff misled Getronics about his termination from a prior job at Key Bank. (Pl. Tr. I, p. 93) Although he admitted at his deposition that he was involuntarily terminated from this job, his sworn interrogatory answers state "Bank closed down" and his Getronics' job application misleadingly states he left Key Bank to join New Hampshire College. (Id., p. 151; Winton Dec., Exs. EE and FF).

68.    Had Getronics not already terminated Plaintiff, it would have terminated his employment for his job application misrepresentation. (Ogg Dec. ¶15). Getronics has terminated other employees for lying on their job applications. (Ogg Dec. ¶16).

### Other Miscellaneous Allegations By Plaintiff

69.    Plaintiff alleges that in the summer of 2003, when he asked Ms. Miles why there was a delay in his promotion, she said "Because it is all racial Aalaeldin, it's because you are black....welcome to the club of suffering." (Pl. Tr. I, p. 126). Getronics and Ms. Miles deny this was ever said. (Miles Tr., pp. 63-64).

70.    Although Plaintiff alleges this statement was made in the summer of 2003, Plaintiff did not report it to Getronics' Human Resources until January 2004. (Pl. Tr. I, p. 124). Plaintiff believes that Ms. Miles began to retaliate against him after he reported that she made this alleged comment. (Pl. Tr. I, p. 123). Plaintiff testified that this retaliation by Ms. Miles started in approximately January 2004 and continued until his employment was terminated in October 2004. (Pl. Tr. I, p. 131).

71.    Plaintiff also alleges that Ms. Miles promised him a raise greater than the one he received in conjunction with his promotion. (Pl. Tr. I, p. 119). Plaintiff alleges that the raise he was promised was in the $38,000 - $40,000 range, as opposed to the $36,000 he received. (Compl., ¶14). Plaintiff admits, however, that he later learned that Ms. Miles did not have the authority to make the offer he thought she made. (Pl. Tr. I, p. 120). Further, Plaintiff admits that Ms. Miles did not discriminate against him. (Id., p. 123).

72.    Plaintiff alleges that Getronics Human Resources Department told Ruby Miles to retaliate against him, however, he has no direct evidence of this allegation. (Pl. Tr. I, p. 168).

73.    The only Getronics employees Plaintiff believes retaliated against him are Ms.

Miles and Mr. Graceffa.    (Pl. Tr. II, pp. 64-65).    With respect to Mr. Graceffa, the basis of

Plaintiff's allegations of retaliation is purely speculative, as follows:

> Q:    So your testimony is that everything that Mr. Graceffa did to you was a result of you having brought that discrimination complaint?
>
> A:    Correct.
>
> Q:    Because you can't imagine any other basis for why he did what he did?
>
> A:    Correct.

(Pl. T. II, p. 64).

74.    Likewise, with respect to Getronics' Human Resources department, Plaintiff's

allegations of retaliation are also purely speculative, as follows:

> Q.    Are you testifying that HR told Ruby Miles to retaliate against you?
>
> A.    I think so.
>
> Q.    And you have no direct evidence of that, correct?
>
> A.    I wouldn't know.

(Pl. T. I, p. 168).

Respectfully submitted,

GETRONICS WANG CO., LLC,
a/k/a/ and d/b/a GETRONICS
By its attorneys,


/s/ Erik J. Winton
Andrew C. Pickett, BBO # 549872
Erik J. Winton, BBO #600743
Jackson Lewis LLP
75 Park Plaza
Boston, MA 02116
Dated:  March 15, 2007          (617) 367-0025

19

## CERTIFICATE OF SERVICE

This hereby certifies that on this 15th day of March, 2007, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Erik J. Winton
Jackson Lewis LLP