UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AALAELDIN KHIRAWI,
Plaintiff

v.

GETRONICS WANG CO., LLC,
a/k/a/ and d/b/a GETRONICS,
Defendant

CIVIL ACTION NO. 05-11877WGY

## DECLARATION OF ERIK J. WINTON IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Erik J. Winton, on oath, deposes and says as follows:

1.  I am an attorney with Jackson Lewis LLP, a firm with an office at 75 Park Plaza, Boston, Massachusetts. I have been involved in the defense of this action on behalf of the Defendant.

2.  I conducted the first day of the deposition of Plaintiff Aalaeldin Khirawi ("Plaintiff") on July 26, 2006. Pertinent excerpts of the transcript of this deposition are attached hereto as Exhibit A. I completed the second day of Plaintiff's deposition on December 28, 2006. Pertinent excerpts of the transcript of this deposition are attached hereto as Exhibit B.

3.  At his deposition, Plaintiff denied that anyone else accessed his Getronics' email account or sent emails from such account. (Plaintiff's Deposition Transcript, Volume I, pages 162-63 (hereinafter cited as "Pl. Tr. I, p. __")). Attached hereto as Exhibits D, F, H-I, K-M, O, Q-S, W-AA, and CC are true and accurate copies of email communications between Plaintiff and employees at Getronics, sent and received from Plaintiff's Getronics email account.

4.  Attached hereto as Exhibit C is a true and accurate copy of a January 15, 2004 memorandum from Joan Anderson of Getronics' Human Resources Department to Plaintiff,

responding to Plaintiff's allegations of discrimination against Getronics. A copy of this document was produced by Plaintiff in response to Defendant's First Request for Production of Documents.

5. Attached hereto as Exhibits E, J, N, T, and BB are true and accurate copies of disciplinary memoranda given to Plaintiff by Getronics during his employment. (Pl. Tr. I, p. 202).

6. Attached hereto as Exhibit G is a true and accurate copy of Plaintiff's Getronics performance appraisal, dated March 1, 2004. (Pl. Tr. I, p. 168).

7. On or about June 10, 2004, Plaintiff filed a charge of race, national origin and retaliation discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Massachusetts Commission Against Discrimination ("MCAD"). A true and accurate copy of this charge is attached hereto as Exhibit P.

8. On or about October 13, 2004, the EEOC dismissed Plaintiff's charge, stating it could not conclude that the information obtained established violation of the statutes. A true and accurate copy of the EEOC dismissal is attached hereto as Exhibit U.

9. On October 26, 2004, the MCAD issued a "Lack of Probable Cause Finding" regarding Plaintiff's charge. A true and accurate copy of the "Lack of Probable Cause Finding" Notice is attached hereto as Exhibit V.

10. On October 26, 2004, Plaintiff was terminated from his job at Getronics. A true and accurate copy of Getronics termination letter is attached hereto as Exhibit DD.

11. On July 15, 2006, Plaintiff served sworn answers to Getronics' First Set of Interrogatories. A true and accurate copy of Plaintiff's interrogatory answers are attached hereto as Exhibit EE.

12.    On September 8, 2000, Plaintiff filled out and signed a Getronics job application. A true and accurate copy of Plaintiff's Getronics job application is attached hereto as <u>Exhibit FF</u>.

13.    On August 2, 2006, Plaintiff deposed Getronics employee Ruby Miles. Pertinent excerpts of the transcript of this deposition are attached hereto as <u>Exhibit GG</u>.

14.    On August 11, 2006, Plaintiff deposed former Getronics employee Jameson ("Jamie") Graceffa. Pertinent excerpts of the transcript of this deposition are attached hereto as <u>Exhibit HH</u>.

Signed under the pains and penalties of perjury this 15th day of March, 2007.

/s/ Erik J. Winton

Erik J. Winton

EXHIBIT A

ORIGINAL

VOLUME:    I
PAGES:     1-207
EXHIBITS:  1-20

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. 05-11877REK

AALAEDIN KHIRAWI,              (
          Plaintiff,           (
                              (
     vs.                       (
                              (
GETRONICS WANG CO., LLC A/K/A  (
AND D/B/A GETRONICS,           (
          Defendant.           (

VIDEOGRAPHIC DEPOSITION OF

AALAEDIN KHIRAWI, a witness called on

behalf of the Defendant, pursuant to the

provisions of the Massachusetts Rules of

Civil Procedure, before Jill Shepherd,

Registered Professional Reporter and Notary

Public, in and for the Commonwealth of

Massachusetts, at the offices of Jackson,

Lewis, LLP, 75 Park Plaza, Boston,

Massachusetts, on Wednesday, July 26, 2006,

commencing at 10:18 a.m.

AMBASSADOR LEGAL SERVICES (800) 486-9868

1   Q.  When was that?

2   A.  1997 or '98.

3   Q.  So you were terminated from KeyBank?

4   A.  I was, yeah.

5   Q.  Okay.  You see, if you turn the page before,

6       Interrogatory No. 4, subparagraph G, "The

7       reason for the termination or conclusion of

8       each employment, business relationship,

9       training, including, but not limited to, a

10      statement of whether the severance of such

11      employment was voluntary or involuntary."

12      Do you see that?

13  A.  Yes, I do.

14  Q.  And for KeyBank, you wrote here, "Bank

15      closed down and has no operation in NH"; is

16      that correct?

17  A.  Yes.

18  Q.  But actually you were terminated?

19  A.  I was terminated.

20  Q.  Involuntarily, correct?

21  A.  Involuntarily, yeah.

22  Q.  But you didn't write that here?

23  A.  I did not.

24  Q.  Why not?

25  A.  Because there was no -- I mean, you have to

97

```
 1   Q.   So it wasn't true what you wrote here?
 2   A.   It was a mistake.
 3   Q.   But was it true or not, sir?
 4   A.   The reason was not -- is not true, right.
 5        But it was a mistake for my part.
 6   Q.   That's all I'm asking you.  Please answer
 7        the question I ask you.  The reason you
 8        wrote here --
 9   A.   Um-hum.
10   Q.   -- was not true, correct?
11   A.   Correct.
12   Q.   And then you signed the last page of this
13        that you signed this under the pains and
14        penalties of perjury; isn't that correct?
15   A.   Yes.
16   Q.   And you read this before you signed it?
17   A.   I did.
18   Q.   All right.  Yet, you didn't tell the truth
19        in here?
20   A.   I made a mistake, correct.
21   Q.   You made a mistake by not telling the truth?
22   A.   I made a mistake.
23             MR. COHEN:  Objection.
24   Q.   But you're telling the truth today?  And
25        it's your intention to tell the truth?
```

116

1   appointment, meeting, with him, and I was on

2   vacation. And I came back after a week and

3   that was the first thing I did in the

4   morning. One of the first things to do in

5   the morning, calling him, and I was pretty

6   relaxed after my vacation, I remember.

7   Q.  Did he -- withdrawn. Where did you make

8   that call from?

9   A.  My office.

10  Q.  Did you have a private office?

11  A.  I do. Not private, but you can call it

12  that. It's in the open, but with partition.

13  Q.  Did he ask you to make that call from a

14  conference room?

15  A.  He gave me the choice. Either conference

16  room -- if I'm not very comfortable in there

17  to use the conference room, but I was

18  comfortable making it from the office.

19  Q.  Did you call him a liar during that call?

20  A.  I did not.

21  Q.  And you're testifying under oath that you

22  did not call him a liar --

23  A.  I did not call him --

24  Q.  Please wait for me to finish my question.

25  A.  Okay.

1    following what -- the plan I gave you on
2    August 19th," which he did not give me that.
3    So that was -- you asked me a question
4    like that.
5    Q.  Like what?  You didn't say a question.
6    A.  Yeah.
7    Q.  What question did he ask you?
8    A.  Did you -- "Didn't I give you" -- stuff like
9    that, "Didn't I give you the" -- what do you
10    call this -- "the plan?"  And I will say,
11    "Oh, on that meeting" -- and he would say,
12    "Did I or didn't I?"  And stuff like that.
13    Very, very, very loud and angry man.
14    Q.  Did you raise your voice during that
15    telephone call?
16    A.  I don't recall that.  He was doing the
17    raising of the voice, actually.
18    Q.  You don't recall, but you could have?
19    A.  I cannot recollect that.  I cannot make any
20    speculation about that.  I could have.  But
21    I did not, I think, because he was doing all
22    the yelling.
23    Q.  Is it your testimony that Ruby Miles
24    promised you a certain raise at some point?
25    A.  Yes.

119

AMBASSADOR LEGAL SERVICES (800) 486-9868

120

1   Q.  And how did she promise you a raise?  What
2       did she say exactly?
3   A.  Not a raise.  When I interviewed with her in
4       October 2003 -- 2002, I had a one-hour
5       interview with her.  She went over my
6       credentials, my background, the job
7       requirements.  And then she said, "Usually,
8       we pay people within the group a certain
9       amount of money."  I don't know, but she
10      said, "With your background, I am going to
11      pay you the range of 38 to 40, and then if
12      not, it's going to start at 38 with stock
13      options."  And I took that as part of the
14      deal and I went with it.  And I said,
15      "Okay."  And she asked me to say if I am
16      going to take the job because it's required
17      now, and they couldn't afford to have it
18      right away.  So I said, "Yes, I will take
19      the job."  And then I think she hired me on
20      the spot.
21  Q.  Did she represent to you that she had the
22      authority to pay you a certain amount?
23  A.  Yes.
24  Q.  Tell me exactly what she said.
25  A.  She said, "My group, I pay my group between

1  ·      yeah.

2      Q.   Do you believe that Ruby Miles discriminated

3      against you?

4      A.   She discriminated against me?  No, I don't

5      believe that.

6      Q.   Okay.  Do you believe the Ruby Miles

7      retaliated against you?

8      A.   Yes, she did.

9      Q.   What did she retaliate against you for?

10     A.   Because I brought that issue to HR and I

11     brought the statement that she made on June,

12     I think -- I think in June of 2004 or '3,

13     that she attributed everything I have been

14     going through to my race.   And that was

15     just -- I mean, I think she was put on the

16     spot to defend her statement, and then I

17     think -- I think -- that -- I mean, it was

18     HR after that, because her demeanor changed

19     after we had the meeting with HR with me.

20     Became confrontational, setups, things just

21     made my life hard in there.

22          And I know, I knew it then, she just

23     wanted to get rid of me because I think she

24     got the okay from HR or the company, I

25     think.

123

124

1    Q.    Why did she want to get rid of you?

2    A.    Because I reported her statement to HR.

3    Q.    When did you make that report?

4    A.    January of 2005.  2005?  '4?  2004.  That

5          was my last year there.  I am still hanging

6          on, 2004.  I think January, yes, because, at

7          the beginning, when I did not receive the

8          raise.

9    Q.    And your allegation is that she made that

10         comment to you in June of 2003?

11   A.    I don't recall when she make it, but my

12         recollection would tell me on June 2003 why,

13         because that's the time when we were

14         training for the job, and that's now when

15         she told me, just -- she just lost

16         confidence in the people who were running

17         this hiring processсion.  She said that in

18         one of e-mails that "used to do business

19         with handshake, but now you can't trust

20         anybody."

21   Q.    She never said any -- withdrawn.  She never

22         communicated in any e-mail that she thought

23         your issues related to race, correct?

24   A.    She did not.

25   Q.    You are alleging that there was one

126

```
 1          job."  And -- because I got that from Paul
 2          Galipeau, as I said before.  So she just --
 3          and she could feel that.  She was emotional.
 4          She said, "You know what?  Because" -- "it's
 5          because of your race, Aalaeldin, because you
 6          are black.  Welcome to the club of
 7          suffering."  To that effect.  Something to
 8          that effect.  And I was shocked then.
 9      Q.  Any other discussions with her about this?
10      A.  Her assistant came in right away.
11      Q.  So the answer is no?
12      A.  After that, no.
13      Q.  And this happened in June of 2003, but you
14          didn't report it to anyone until January of
15          2004?
16      A.  I did not.  That's true.
17      Q.  Why not?
18      A.  I -- because at that time she told me that
19          she gave -- I mean, this is not at her hand,
20          I mean, the decision now.  So you have to go
21          to, I think, a guy named Steve -- Steve, not
22          Gayla.  I don't remember his last name, but
23          he's the director or VP and vice
24          president, and he came over to -- came over
25          to Tewksbury to meet with me -- Tewksbury,
```

129

```
 1   Q.   You just testified that he said, "We'll try
 2        to find a way to do it for you?"
 3   A.   Yes.
 4   Q.   That's what you believe is a promise?
 5   A.   He said that, "It happened to Amy Callion and
 6        other people, and we're going to find a way
 7        to do it for you."
 8   Q.   Even though Mr. Gallipeau was no longer your
 9        manager, you thought he could promise you a
10        raise?
11   A.   He's the director if -- I still worked
12        under.
13   Q.   Not with that position, you didn't work
14        under him.
15   A.   Still.
16   Q.   It's your testimony that once you accepted
17        the position with Ruby Miles' group, you
18        were still working under Paul Gallipeau?
19   A.   Not under him.  But he is the director of --
20        one team.  He's the director of the team I
21        worked with.
22   Q.   Wasn't Jim Hoffman Ruby Miles' supervisor?
23   A.   Yes.
24   Q.   Okay.  So Ruby Miles did not report to Paul
25        Gallipeau, right?
```

AMBASSADOR LEGAL SERVICES (800) 486-9868

1  Q.  He did it for other people in his
2      department, correct?
3  A.  I'm not quite sure who.  I don't have the
4      list, all the lists.
5  Q.  Do you believe that Paul Galipeau
6      discriminated against you?
7  A.  No.
8  Q.  Do you believe that he retaliated against
9      you?
10 A.  No.
11 Q.  So it's your testimony that after you
12     brought the attention of human resources
13     what you allege Ruby said about race, that
14     Ruby Miles started to harass and retaliate
15     against you?
16 A.  Correct.
17 Q.  And that started around January 2004?
18 A.  Correct.
19 Q.  And did that continue from that point until
20     the end of your employment?
21 A.  Correct.
22 Q.  At any point during that time did she take
23     any actions that weren't in retaliation?
24 A.  What kind of action?  I did not get the
25     question.

AMBASSADOR LEGAL SERVICES (800) 486-9868

137

```
 1   2004 is you believe she hasn't given you
 2   what you say you were promised?
 3   A.  Let me -- let me -- if I said that, I wasn't
 4   accurate.
 5   Q.  Is that correct?
 6   A.  No.  Let me tell you exactly what happened.
 7   I wrote --
 8   Q.  I'm not asking you exactly what happened.
 9   I'm asking you -- so that's not correct?
10   A.  Not correct.
11   Q.  Did you bring a complaint against Ruby in
12   January of 2004?
13   A.  I did.
14   Q.  Okay.  What was your complaint against Ruby
15   for in January 2004?
16   A.  That she was -- I was not paid the money I
17   was promised to be paid by the company.  And
18   she made a statement attributing my
19   situation to my race.  That was my
20   complaint, I think.
21   Q.  How's that a complaint?  What are you
22   complaining about?
23   A.  I need an investigation.  Is my race a
24   problem of me getting the package she
25   promised me?
```

147

1     ask me, you didn't call me and say, 'What
2     was going on with this meeting?' You are
3     the one who assigned me to do the meeting."
4     MR. WINTON: We need to take a
5     quick break.
6     THE VIDEOGRAPHER: The time is
7     2:56. We're off the record.
8     (A recess was taken from
9     2:56 p.m to 3:10 p.m.)
10    (Exhibit No. 5 marked.)
11    THE VIDEOGRAPHER: This is the
12    beginning of tape no. 4. We're back on the
13    record. The time is 3:10.
14    Q. You are still under oath; you understand
15    that?
16    A. Yeah, I do.
17    Q. I'm going to ask so that we don't spend too
18    much time on questions, if you listen
19    carefully to my questions and answer the
20    questions I have asked --
21    A. Okay.
22    Q. -- I am sure your attorney will agree;
23    that's what he wants as well.
24    A. Okay.
25    Q. You just admitted that at one point you, in

148

1          a conversation with Ruby Miles, either
2     called her weak or said she had a weakness?
3     A. To that effect, yeah.
4     Q. And then later you apologized for that
5          statement; is that what you are taking to
6          get to?
7     A. Yes.
8     Q. When did you apologize; during that call?
9     A. No, not during that call. Later. I don't
10         recall when, but I did.
11    Q. You apologized during a telephone call or
12         through e-mail?
13    A. Through e-mail, I think, if I am right.
14    Q. And you apologized because you thought
15         calling her weak or saying she had a
16         weakness was not appropriate?
17    A. Yes.
18    Q. Okay. So when I asked you earlier if you've
19         ever been inappropriate in the workplace --
20         so you have been inappropriate, correct?
21    A. Yes.
22    Q. Okay. But before you said you hadn't,
23         correct?
24    A. I have not been --
25    Q. Remember earlier I asked you had you ever

149

1. acted inappropriately in the workplace and
2. you said "I can't recall having" --
3. A. Now I recall. This is one of them, yeah.
4. Q. Okay. Well -- so this is one of them? So
5. there's more than one you have acted
6. inappropriately?
7. A. One of the things that, yeah, people think
8. inappropriate and I apologized for it, yeah.
9. Q. Not "people think." You think are
10. inappropriate.
11. A. I think it was inappropriate and I think I
12. said so in the e-mail.
13. Q. Okay.
14. A. To her.
15. Q. When I asked earlier when we were discussing
16. Exhibit No. 3, the letter from Wayne Ogg,
17. where he says that you were terminated due
18. to your continued and flagrant inappropriate
19. conduct in the workplace, I asked you if you
20. thought you were ever inappropriate in the
21. workplace, and what was your response then?
22. A. I think I don't recall, right?
23. Q. Right. But now you are recalling when you
24. were?
25. A. Yes.

151

1  it says "Company name, KeyBank."  Do you see

2  that?

3  A.  Yeah.

4  Q.  It says "Reasons for leaving," what did you

5  write?

6  A.  "Joining New Hampshire College."

7  Q.  Okay.  Earlier you testified that the reason

8  you left KeyBank was because you were

9  involuntarily terminated, correct?

10  A.  Yes.

11  Q.  So this is actually not true, is it --

12  A.  Yes, it's not true.

13  Q.  On the second page in the second paragraph

14  on the bottom, the language says, "I hereby

15  or affirm that I have supplied complete and

16  correct information to the above questions

17  to the best of my knowledge and belief.  I

18  understand that any misrepresentation of

19  this information may result in refusal or

20  separation of employment."

21  Do you see that?

22  A.  Yes, I do.

23  Q.  And you read that before you signed it?

24  A.  I did.

25  Q.  Now, in August 2003, you did receive a

152

1. promotion from Getronics, correct?

2. A. I applied for a job, yeah.

3. Q. Sir, I'm going to ask you to listen to the

4. question I ask, and if it can be answered in

5. a yes or no, please do so.

6. In August of 2003, you did receive a

7. promotion from Getronics, correct?

8. A. Yes.

9. Q. And along with that promotion, you received

10. a raise of 33 percent of your salary,

11. correct?

12. A. I don't know the percentage, but, yes, I

13. did.

14. Q. You received a raise from $27,000 to

15. $36,000, correct?

16. A. Yes, I did.

17. Q. And do you know how far up the corporate

18. chain the approval for that raise and

19. position was required at Getronics?

20. A. I don't know.

21. Q. On October 26, 2004, we've already discussed

22. your telephone conversation with

23. Mr. Greeffa. Do you recall that?

24. A. On the October 26, 2004, my last day, yes.

25. Q. Prior to that telephone call with

AMBASSADOR LEGAL SERVICES (800) 486-9868

154

1.     telephone conference with Mr. Greceffa?

2.   A.  It does.

3.   Q.  And you did receive that warning, did you

4.     not?

5.   A.  Yes.

6.   Q.  And then you were supposed to call him at

7.     10 a.m. that morning, correct?

8.   A.  I believe so.

9.   Q.  And you e-mailed him at 10:01, isn't that

10.     correct?

11.   A.  10:01? Yes. Yes, that's correct.

12.   Q.  Did you ever respond to Ms. Miles or anyone

13.     in human resources by e-mail when they

14.     directed you not to respond by e-mail?

15.   A.  Yes, I did.

16.   Q.  And they were your supervisors, correct?

17.   A.  Some of them are.

18.   Q.  Well, you need to take directives either

19.     from Ms. Miles or from human resources,

20.     correct?

21.   A.  My understanding is Miles, yes. I'm not

22.     quite sure about HR.

23.   Q.  So you don't think you need to take a

24.     directive from HR?

25.   A.  I said I'm not quite sure.

AMBASSADOR LEGAL SERVICES (800) 486-9868

155

```
 1   Q.  You worked for Getronics for a number of
 2       years.  What was your thought as to when
 3       HR told you you needed to do something?
 4   A.  You need to do something?  I will do it,
 5       yes.
 6   Q.  So then you were required to take directives
 7       from HR, correct?
 8   A.  I think I am required to take directives
 9       from HR, yes.
10   Q.  And yet you did not always take those
11       directives when people told you not to
12       e-mail them?
13   A.  Yes, correct.
14   Q.  Are you aware of any other Getronics
15       employee who has behaved in the same manner
16       that you have who was not terminated?
17       MR. COHEN:  Objection.  You can
18       answer.
19       THE WITNESS:  I can answer?
20   A.  I don't know.
21   Q.  Getronics made religious accommodations for
22       you, did it not?
23   A.  Yes and no.
24   Q.  Did they make religious accommodations for
25       you?
```

AMBASSADOR LEGAL SERVICES (800) 486-9868

1    A.   Yes and no.

2    Q.   Well, they did, correct?

3    A.   Yes and no.

4    Q.   Well, my --

5    A.   It's my answer.

6    Q.   I'm asking if they ever did.

7    A.   They ever did, yeah, sometimes.

8    Q.   When did they not make a religious

9         accommodation for you?

10   A.   That was May -- I think May 2004, I was out

11        with a disability for seven weeks and I had

12        -- part of my deal with Mrs. Miles was to

13        work four days, 10-hour shifts.  And that

14        was applicable to everybody in the group.  I

15        mean -- and she is included sometimes, I

16        think.

17             I sat down I think, when -- she

18        visited us, and I sat down and I said to

19        her, "Okay.  I will deal with this."  She

20        said, "There is a way of cutting the cost of

21        driving every day 40 miles" and stuff like

22        that.  I said, "That's good and that will

23        work out her me."  And I told her a

24        story about us as Muslims, the community, in

25        the United States after the calamity of the

AMBASSADOR LEGAL SERVICES (800) 486-9868

159

```
 1            that time?
 2   A.   Not every time as I used to on Friday, of
 3        course.
 4   Q.   So some Fridays you didn't go to the mosque?
 5   A.   I didn't stay there for the ceremony until
 6        the end.
 7   Q.   Because you had to go to work?
 8   A.   Yeah.
 9   Q.   Okay.  And was that the mosque -- how far
10        was that mosque from your workplace?
11   A.   Methuen is four, five -- five miles, six
12        miles.  I'm not quite sure.  It was not a
13        final answer.
14   Q.   And you are saying this is in May of 2004?
15   A.   Correct.
16        (Exhibit No. 7 marked.)
17   Q.   I show you what's been marked as -- you are
18        reviewing what's been marked as Exhibit 7.
19        And this is an e-mail chain between you and
20        Ruby Miles at the end of May 2004 regarding
21        your hours.
22   A.   That's true.
23   Q.   And it also records your accommodation,
24        correct?
25   A.   Yes.
```

162

```
 1    A.   Racist?  Yes.
 2    Q.   What other statement?
 3    A.   By a manager of mine named Gerald Tracy.
 4    Q.   When was this?
 5    A.   This was on -- between 1999, actually,
 6    after -- I think right after the calamity of
 7    September 11th.
 8    Q.   Okay.  Is there any other statement other
 9    than those two?
10    A.   No.
11    Q.   Is there any statement by anyone at
12    Getronics that you claim is evidence of
13    religious discrimination?
14    A.   Gerald Tracy too.
15    Q.   And that's, again, back in 1999, 2000?
16    A.   After the calamity of the September 11th,
17    yes.
18    Q.   Is that when he was your manager?
19    A.   Yes.  My team leader.
20    Q.   Team leader.  Any other statements that you
21    believe evidence religious discrimination?
22    A.   No, I don't recall.
23    Q.   At any time did anyone else access, to your
24    knowledge, your Getronics e-mail account and
25    send e-mails as if they were sending them
```

```
 1          from you?
 2     A.   From me?  I wouldn't know.
 3     Q.   To your knowledge, sir.
 4     A.   Yes.  I think there is -- I was told that
 5          after I left just 15 minutes there were
 6          three people in my cubicle for three hours
 7          going over my computer.  So I wouldn't know
 8          what they did.  Other time I will leave it.
 9          It's open.  You can't lock it.
10     Q.   Have you had a chance to review the
11          documents that Getronics provided to your
12          attorney?
13     A.   Not all of them.
14     Q.   Many e-mails in those documents?
15     A.   Yeah, I did not have the chance to go over
16          all of them.
17     Q.   Did you have a chance to go over any of
18          them?
19     A.   Maybe one.
20     Q.   One e-mail out of 1,000 documents?
21     A.   Yes.
22     Q.   Which one?
23     A.   I don't even recall which one, but just one,
24          I think.
25     Q.   The e-mails that you provided to your
```

191

```
 1        working together from that time on to get
 2        rid of me.
 3   Q.   Are you testifying that HR told Ruby Miles
 4        to retaliate against you?
 5   A.   I think so.
 6   Q.   And you have no direct evidence of that,
 7        correct?
 8   A.   I wouldn't know.
 9   Q.   That's correct, you have no direct evidence?
10   A.   Yeah, just from the evidence of the
11        encounters with HR, with vice president of
12        HR, yeah.  All will bring that knowledge to
13        me.
14   Q.   You have no direct evidence, meaning you
15        didn't see someone from HR tell Ms. Miles --
16   A.   No, I did not.
17        (Exhibit No. 8 marked.)
18   Q.   I show you what's been marked as Exhibit 8.
19        Is that the appraisal that Ruby Miles gave
20        to you in March 2004?
21   A.   (Witness reading.)  Correct.
22   Q.   And it's your testimony that Ms. Miles was
23        retaliating against you at that time?
24   A.   No.
25   Q.   You said she was retaliating against you at
```

169

```
 1                the end of February 2004.
 2   A.    I said immediately after the time of this.
 3   Q.    So the first retaliation against you is the
 4         -- related to the phone call of Mr. McHenry,
 5         correct?  Right?
 6   A.    That's correct.
 7   Q.    And do you agree with me, sir, that if
 8         Ms. Miles wanted to retaliate against you,
 9         she would have given you a bad appraisal,
10         wouldn't she?
11               MR. COHEN:  Objection.
12   A.    I would not agree with you.
13   Q.    Why wouldn't she have given you a bad
14         appraisal?
15   A.    Just because my 90 percent work is not with
16         Ms. Miles.  It's with the people in
17         Tewksbury.  I was a representative of
18         Mrs. Miles in Tewksbury taking care 90
19         percent of my time with trying to improve
20         the quality of the service of Tewksbury.  I
21         worked, directly worked, with Paul Galipeau
22         and other managers to do that.  Ruby Miles,
23         yes, is my manager.
24   Q.    She's the one that drafted the appraisal,
25         right?
```

1. A. Yes, but she will get feedback from there.
2. If you are asking me my thoughts why she
3. didn't do that, I would say I don't think
4. was supposed to, I mean, hold the water in
5. there because my performance is well known
6. everywhere.
7. Q. So she never questioned your performance?
8. A. Never, until later.
9. Q. She didn't here, but she did later?
10. A. Yes.
11. Q. So she didn't want to retaliate against you
12. in this time, but it was okay to retaliate
13. against you later?
14. A. Yes.
15. Q. That's your testimony?
16. A. Yes, my testimony.
17. Q. In fact, Ms. Miles gave you a better
18. appraisal than your earlier appraisals from
19. Ms. Wellington or Mr. Ruggiero, correct?
20. A. True. I'm sorry.
21. Q. That was the best appraisal you ever
22. received in Getronics?
23. A. In some areas, yes. In some areas, no.
24. Q. Do you recall Ms. Miles asking you to return
25. the Getronics laptop computer you were

170

```
 1.              provided?
 2   A.    Very well, so yes.
 3   Q.    And you recall that was in conjunction with
 4        you not -- no longer working from your home,
 5        correct?
 6   A.    That was her story, yes.
 7   Q.    Well, didn't she ask you to return a laptop
 8        at the same time that she told you you
 9        couldn't work from home any longer?
10   A.    It didn't happen this way.
11   Q.    Did she tell you you couldn't work from home
12        any longer?
13   A.    No, she didn't.
14   Q.    She never told you you couldn't work from
15        home any longer?
16   A.    No, she didn't.
17   Q.    Is there any documents that Getronics
18        provided to you stating that you could not
19        work from home?
20   A.    Yes.
21   Q.    And when was that document provided to you?
22   A.    Sometime between May and June, I think --
23   Q.    Okay.
24   A.    -- or maybe later.  I'm not quite sure.
25   Q.    And they also told you that -- Ms. Miles
```

172

1   told you that you should return your laptop
2   as your supervisor, correct?
3   A.  Correct.
4   Q.  And did you accept her authority that you
5       return your laptop?
6   A.  Yes, I did.
7   Q.  You did?
8   A.  Yes.
9   Q.  Did you immediately accept her authority to
10      return the laptop?
11  A.  No, I didn't.
12  Q.  You didn't.  In fact, you only accepted
13      returning the laptop after Mr. Galipeau said
14      to return the laptop?
15  A.  Mr. Galipeau, yes.
16  Q.  But he wasn't your manager, was he?
17  A.  He wasn't.
18  Q.  So you rejected Ms. Miles authority in that
19      instance, correct?
20  A.  Not exactly.
21  Q.  Did you accept her authority?
22  A.  I did not accept her authority.
23  Q.  You didn't accept it and you didn't reject
24      it?
25  A.  I did not reject it, yes.

174

1  Q.  Well, Mr. Galipeau is the one that reported

2      to Ms. Miles what hours you were in the

3      office, correct?

4  A.  Correct.

5  Q.  And you didn't question Mr. Galipeau's

6      reporting of that, did you?

7  A.  I did -- actually, I did not question his

8      reporting.

9  Q.  And in this e-mail, on the first page, 518,

10     from Ruby Miles to you on May 18th at 11:42

11     a.m., she states in the second line, "This

12     discussion is closed for now." And then the

13     next line, "I do not want repetitive cycles

14     of e-mails over this topic." She states at

15     the end, "I will not engage in debates with

16     you over this matter again. Discussion is

17     closed." Did you respond to that e-mail?

18 A.  I did.

19 Q.  And in your response to that e-mail, did you

20     state that, "I am asking whoever is

21     responsible of you and have the authority

22     over your action to stop it as soon as

23     possible or find a way to move me from your

24     department as it is so clear you are out of

25     control and now this conversation is

175

```
1  ·       closed."
2   A.    Yes.
3   Q.    That's an insubordinate e-mail, sir?
4   A.    It was.
5   Q.    Did you apologize for that?
6   A.    No, I did not.
7   Q.    So this is inappropriate conduct?
8   A.    It was.
9   Q.    This is additional inappropriate conduct
10        that you couldn't recall earlier?
11  A.    No. Maybe this one was, yeah.
12  Q.    Maybe this was one you did recall earlier
13        that you didn't tell me about?
14  A.    I -- just now you refreshed my memory and I
15        think --
16  Q.    Okay. You agree with me that it's
17        inappropriate?
18  A.    Yeah. It was, yeah.
19  Q.    Do you think it was inappropriate when you
20        refused to return the laptop even though she
21        asked you to do so?
22  A.    It wasn't.
23        (Exhibit No. 10 marked.)
24  Q.    This is Exhibit 10, an e-mail exchange
25        stamped GETR0874 through 0878. You
```

176

```
 1        apologized to Ms. Miles for your
 2        inappropriate tone and conduct; is that
 3        correct?
 4   A.   I did.
 5   Q.   Did you ever tell Ms. Miles that you did not
 6        trust her?
 7   A.   I did not trust her.  Did I tell her?
 8   Q.   Did you ever communicate that you either did
 9        not trust her or did not trust her judgment?
10   A.   Yes, I did.
11   Q.   Do you think that's insubordinate to say to
12        your supervisor?
13   A.   No, I don't think so.  This was a feeling I
14        had that time.  It was a fact.
15   Q.   Can't a fact or feelings be insubordination?
16   A.   That one, no.
17   Q.   Did Ms. Miles have the right to give you
18        directives?
19   A.   Yes, she does.
20   Q.   If you did not heed to her directives, is
21        that insubordination?
22   A.   If I did not, then it will be
23        insubordination, yes.
24   Q.   Did Mr. Greceffa have the right to give you
25        directives?
```

179

1   A.   I would not consider this insubordination.
2   Q.   Do you recall requesting and being denied
3        tuition reimbursement at some point at
4        Getronics?
5   A.   It happened, yeah.  I don't have a -- not a
6        very good memory of it, but I do remember.
7   Q.   Do you think that denial of tuition
8        reimbursement was a result of discrimination
9        or retaliation?
10  A.   No.
11  Q.   Did you ask for an investigation to be
12       undertaken as a result of your denial of --
13  A.   No, I did not.
14  Q.   Let me finish my question.
15  A.   Okay.
16  Q.   Did you ask for human resources to conduct
17       an investigation with respect to your denial
18       of tuition reimbursement?
19  A.   I did not.
20  Q.   Did you ask human resources to conduct an
21       investigation with respect to Terence
22       Freeman's method of denying you tuition
23       reimbursement?
24  A.   That's correct, I did.
25  Q.   Did you think his method of denying you

AMBASSADOR LEGAL SERVICES (800) 486-9868

1    Q.  Sir, that's not what I'm asking you.

2    A.  What you're asking me now is you are asking

3        me about if I go back to Mr. Freeman's

4        decision?

5    Q.  Yes.

6    A.  It was not.

7    Q.  Was not based on any bias?

8    A.  Any bias, yeah.

9    Q.  But you just thought it was inappropriate

10       the way he handled it?

11   A.  Yes.

12       (Exhibit No. 11 marked.)

13   Q.  Exhibit 11 is an e-mail exchange stamped

14       GETR0932 through 0934.

15       Can you turn to the second to last

16       page, your e-mail to Gayla George on

17       December 18, 2003, and that follows to the

18       last page of the exhibit.  And you say,

19       first line from the top, "But he" -- meaning

20       Mr. Freeman -- "for an unknown reason

21       treated me with unexplained hostility and

22       bias."

23       What is your -- the basis for your

24       allegation in this e-mail, that you were

25       treated by Mr. Freeman with some type of

181

AMBASSADOR LEGAL SERVICES (800) 486-9868

182

1    bias?

2  A.  Okay.  This is what happened.  I -- usually,

3       when you apply for courses, the --

4  Q.  Sir, I'm asking you a very simple question.

5  A.  All right.

6  Q.  What is the basis of your allegation that

7       Mr. Freeman was treating you with bias?

8           MR. COHEN:  You have to let him

9       answer the question.

10          MR. WINTON:  I don't have to let

11      him go on and on.  It's a very

12      simple question.

13          MR. COHEN:  You asked him a why

14      question.

15          MR. WINTON:  He's not.

16          MR. COHEN:  He's giving you why.

17          MR. WINTON:  I want him to answer

18      the question.

19          MR. COHEN:  It's not a yes or no

20      question.

21          MR. WINTON:  I know it's not a yes

22      or no question.  But it also doesn't need to

23      be a diatribe, so --

24  Q.  -- please answer the question, directly,

25      sir.

195

1 · Q.   Okay.  And that is the document that

2       Mr. Greceffa e-mailed to you at

3       approximately 9:45 a.m. on October 26th

4       prior to your call?

5 A.   (Witness reading.)  Oh, yeah.  I think I

6       did.  Yeah, this is it.  October 26, yeah.

7 Q.   And you looked at this prior to the call of

8       Mr. Greceffa?

9 A.   I did.

10 Q.   Now, this document doesn't say that your

11       employment was being terminated that day,

12       does it?

13 A.   No, it does not.

14 Q.   It does state that your job is in jeopardy

15       though, right, on the second page, No. 5?

16 A.   Yes.

17 Q.   And Mr. Greceffa, in his telephone

18       conversation with you, did not tell you that

19       your job was being terminated that day, did

20       he?

21 A.   He didn't.

22 Q.   Right.  But immediately after that call,

23       Mr. Gallipeau did terminate your employment,

24       correct?

25 A.   10 to 15 minutes.

```
 1                true what he said.
 2   Q.   Did you say, that's not true what you said?
 3   A.   No, I kept saying I never received.  I've
 4        never received -- just today I have received
 5        it from Joan Anderson, the HR, she brought
 6        it to my office.  But I have never seen it
 7        before that.
 8   Q.   Are you testifying that you didn't receive
 9        the August 19, 2004 performance expectations
10        document, Exhibit 15, until October 26,
11        2004?
12   A.   That's true.
13   Q.   Didn't you, in fact, receive that document
14        on August 19th after your meeting with
15        Mr. Greceffa?
16             MR. COHEN:  Asked and answered.
17   A.   No, I didn't.
18   Q.   Didn't you receive that document also in an
19        e-mail at the end of September, 2004?
20   A.   E-mail at the end of September?
21   Q.   Yes.
22   A.   At the end of September, did I receive that?
23        No, I didn't.  At the end of September I did
24        not.
25             MR. WINTON:  I need to take a quick
```

197

1    break.
2    THE VIDEOGRAPHER:  The time is 4:31
3    and we're off the record.
4         (A recess was taken from
5         4:31 p.m. to 4:34 p.m.)
6    THE VIDEOGRAPHER:  Back on the
7    record.  The time is 4:34.
8         (Exhibit No. 16 marked.)
9    Q.  Exhibit 16, does that refresh your
10   recollection as to when, sir, as to when you
11   received this e-mail, the August 19th
12   performance expectations document?
13   A.  Yes.  This shows that actually my
14   recollection was not right.  I did not, I --
15   actually, I think I was always on -- did not
16   give it to me on the August the 19th, but,
17   yeah, at one point he sent it to me before
18   Joan Anderson, and I think the date here is
19   correct.
20   Q.  So when I asked you before if you received
21   this at the end of September 2004 --
22   A.  Yes, I did.
23   MR. COHEN:  Let him finish.
24   Q.  When I asked you before if you received this
25   at the end of September 2004, you said no.

199

1   Are you changing your answer to that now?
2   A. Yes, I do.
3   Q. But you are still claiming you didn't
4   receive this on August 19, 2004?
5   A. Correct.
6   Q. On August 19, 2004, you had a meeting in
7   Tewksbury with Mr. Grecella, and Mr. Hoffman
8   attended by phone; is that correct?
9   A. That's correct.
10  Q. And in that meeting, did Mr. Grecella have
11  any documents with him?
12  A. Yes, he did.
13  Q. And was he reading from any of those
14  documents or looking at them while he was
15  talking to you?
16  A. Papers, not documents.  Sheets of
17  paper, but he wasn't reading from anything.
18  Q. So he wasn't looking at any sheets of paper
19  or documents?
20  A. Sheets, but not a document.
21  Q. At the end of the meeting -- at the end of
22  that meeting, he didn't give you a document?
23  A. He gave me -- he gave me a sheet that is a
24  log, like a format of a daily log sheet.
25  And he later sent it by e-mail to us,

200

```
 1.    electronic copy, and that's the only thing
 2     he gave me and he sent it to me in the
 3     e-mail.
 4          I would assume if that document is
 5     part of it, he would have e-mailed it to me
 6     as well that day.
 7   Q.   And this performance expectations document,
 8     you have reviewed this document, correct?
 9   A.   Yes, I did.
10   Q.   All right.  And were the points discussed in
11     this performance expectations document, were
12     they discussed at your meeting on August
13     19th?
14   A.   No, we didn't.
15   Q.   You didn't discuss any of these points?
16   A.   None.  Some of them, yes.  Some of the
17     aspects which is, in general, what Ruby
18     Miles wanted me to do.
19          (Exhibit No. 17 marked.)
20   Q.   You have been shown Exhibit 17, stamped
21     Khilawi0205, a written reprimand dated
22     May 21, 2004.
23   Q.   Do you recall -- do you recognize this
24     document, sir?
25   A.   I do.
```

```
 1   A.   Yes.
 2   Q.   And this is a document following the
 3        February 25, 2004 incident with the e-mail
 4        and Patrick McHenry?
 5   A.   Yes.
 6   Q.   At the end of the document on the first
 7        page, second line from the bottom, it states
 8        "That's when he" -- meaning Mr. Khirawi --
 9        "told her" -- meaning Ms. Miles -- "that she
10        was weak and that he did not trust her.  As
11        she proceeded to tell him to watch his
12        words, he hung up the telephone."
13             Is that the call you were discussing
14        earlier that when you told Ms. Miles she was
15        weak?
16   A.   Yes.  I think that was it, yeah.
17   Q.   Do you agree, that you also told her you did
18        not trust her during that call?
19   A.   I would not trust her judgment in resolving
20        the issue with Patrick.
21   Q.   Did she tell you to watch your words?
22   A.   I don't remember that.  I don't recall she
23        said that.
24   Q.   So you have in front of you Exhibits 19, 18,
25        17, 15, 14, which are all either written
```

Page 205

1               C E R T I F I C A T E
2
3       COMMONWEALTH OF MASSACHUSETTS
4
5       MIDDLESEX, SS.
6               I, Jill Shepherd, Registered
7       Professional Reporter and Notary Public, in
8       and for the Commonwealth of Massachusetts,
9       do hereby certify that:
10              AALAEDIN KHIRAWI, the witness whose
11      deposition is hereinbefore set forth, was
12      satisfactorily identified by means of
13      New Hampshire driver's license, and was duly
14      sworn by me and that the foregoing
15      transcript is a true and accurate record of
16      the testimony given by such witness and such
17      testimony is a true and accurate
18      transcription of my stenotype notes to the
19      best of my knowledge, skill, and ability.
20              I further certify that I am not
21      related to any of the parties in this matter
22      by blood or marriage and that I am in no way
23      interested in the outcome of this matter.
24              IN WITNESS WHEREOF, I have hereunto
25      set my hand and notarial seal this 30th day
        of July, 2006.

                Jill Shepherd, RPR
                Notary Public

        My Commission expires:  May 10, 2007

        THE FOREGOING CERTIFICATION OF THIS
        TRANSCRIPT DOES NOT APPLY TO ANY
        REPRODUCTION OF THE SAME BY ANY MEANS UNLESS
        UNDER THE DIRECT CONTROL AND/OR DIRECTION OF
        THE CERTIFYING REPORTER.

# EXHIBIT B

1

UNITED STATES DISTRICT COURT

ORIGINAL DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11877-WGY

_____

1  
2  
3  
4  
5  AALAELDIN KHIRAWI,                )
6              Plaintiff,            )
7                                    )
8       vs.                          )        DAY II
9                                    )
10 GETRONICS WANG CO., LLC, D/B/A    )
11 GETRONICS,                        )
12              Defendant.           )
13 _____   )
14
15          CONTINUED VIDEOTAPED DEPOSITION of
16 AALAELDIN KHIRAWI, called as a witness by and on
17 behalf of the Defendant, pursuant to the applicable
18 provisions of the Federal Rules of Civil Procedure,
19 before P. Jodi Ohnemus, Notary Public, Certified
20 Shorthand Reporter, Certified Realtime Reporter and
21 Registered Merit Reporter, within and for the
22 Commonwealth of Massachusetts, at the offices of
23 Jackson Lewis, LLP, 75 Park Plaza, Boston,
24 Massachusetts, on Thursday, 28 December, 2006,
25 commencing at 10:36 a.m.

43

1    replying to an email from Mr. Graceffa to you at          11:23:59

2    9:46 a.m. on October 26th, 2004.  Does this refresh        11:24:03

3    your recollection?                                          11:24:09

4        A.    Yes, it does.                                     11:24:09

5        Q.    And do you recall now that Mr. Graceffa           11:24:10

6    actually gave you the written reprimand dated              11:24:11

7    10/26/04 on -- at 9:46 a.m.?                                11:24:15

8        A.    Yes, I do.                                        11:24:18

9        Q.    On October 26?                                    11:24:19

10       A.    Yes, I do.  But -- but my -- my concern is        11:24:20

11   it was an attachment, and I did not have the time,         11:24:23

12   I think -- I don't know -- to print it.  Now, this         11:24:25

13   one, I mean, an attachment you can always -- and if        11:24:29

14   somebody asks you to leave the office in 15                11:24:33

15   minutes, and you didn't print that, there is a good        11:24:35

16   chance there might be changes in there.  So I'm not        11:24:38

17   quite sure if this is the right document or not.           11:24:41

18   It's protection.                                           11:24:46

19       Q.    Well -- what's that?                             11:24:47

20       A.    It's to protect my testimony to you.  I'm        11:24:47

21   saying it's an attachment.  I can go any time and          11:24:50

22   change anything in that attachment if it's not             11:24:53

23   printed out.                                               11:24:55

24       Q.    Well, what do you mean you can change any         11:24:56

25   time an attachment?                                        11:24:58

52

| | |
|---|---|
| 1 | in the -- on the August 19th he gave me two | 11:33:01 |
| 2 | documents. But both of them are not this thing. | 11:33:04 |
| 3 | So they're something else. And they were attached | 11:33:10 |
| 4 | to the email he sent me after the September 19th, | 11:33:13 |
| 5 | otherwise why he didn't attach this to the email to | 11:33:16 |
| 6 | prove himself he was right? | 11:33:19 |
| 7 | Q. When you say -- when he -- withdrawn. | 11:33:20 |
| 8 | When you -- when he said, You keep on fabricating. | 11:33:25 |
| 9 | I already gave you this, and now you are saying you | 11:33:27 |
| 10 | didn't receive it, how did you respond to that? | 11:33:29 |
| 11 | A. I said, "No, sir, you did not." Exactly | 11:33:32 |
| 12 | the same way I'm saying it to you now. | 11:33:35 |
| 13 | Q. All right. So did you agree with what he | 11:33:37 |
| 14 | was saying? | 11:33:39 |
| 15 | A. No. | 11:33:39 |
| 16 | Q. Did you disagree? | 11:33:39 |
| 17 | A. I disagree with him, of course. | 11:33:42 |
| 18 | Q. What did you say exactly, that I disagree? | 11:33:44 |
| 19 | A. I think I was -- no, I was saying, "No, | 11:33:48 |
| 20 | sir. No, sir. You did not. No, sir. You did | 11:33:50 |
| 21 | not." And I -- I just kept saying that, I think. | 11:33:54 |
| 22 | Q. "No, sir. You did not"? | 11:33:57 |
| 23 | A. Yeah. "No, sir. You did not." | 11:33:58 |
| 24 | Q. And when you say, "You did not," meaning, | 11:34:00 |
| 25 | You did not give me that document on August 19th, | 11:34:03 |

53

1    2004?                                                           11:34:06

2        A.    Correct.                                              11:34:06

3        Q.    Did you tell him that what was written in            11:34:12

4    the October 26th, 2004 reprimand, Exhibit 14, was              11:34:13

5    untrue?                                                        11:34:18

6        A.    I said, "They are not facts."                        11:34:21

7        Q.    You said that what was written in that               11:34:26

8    written reprimand was not facts?                               11:34:28

9        A.    Correct.                                             11:34:30

10       Q.    Which is the same thing as saying it's               11:34:37

11   untrue?                                                        11:34:38

12       A.    That's you -- you are asking me the                  11:34:39

13   question?                                                      11:34:41

14       Q.    Yes.                                                 11:34:41

15       A.    Facts are not true, sure.                            11:34:43

16       Q.    Right.  So if you say something is not a             11:34:44

17   fact, that means it's not true.                                11:34:46

18       A.    I'm not -- I'm not very good with words              11:34:49

19   like that, but --                                              11:34:53

20       Q.    Well, when you -- when you say something             11:34:54

21   is not a fact, are you saying that that -- if                  11:34:57

22   someone wrote it down, then it's not true?                     11:35:01

23       A.    That would take me to -- I mean -- a                 11:35:04

24   completely different aspect of talking and                     11:35:06

25   philosophy, I think.                                           11:35:09

56

1    Q.    Did Mr. Graceffa give you any directives     11:37:15

2  during the call?                                     11:37:18

3    A.    No.                                          11:37:20

4    Q.    Was your religion mentioned at all during    11:37:20

5  the call?                                            11:37:25

6    A.    No.                                          11:37:26

7    Q.    Either by you or him?                        11:37:26

8    A.    No.                                          11:37:29

9    Q.    So this was a short telephone conference.    11:37:29

10   A.    Very short.                                  11:37:40

11   Q.    But there was a disagreement during the     11:37:41

12  conference.                                         11:37:43

13   A.    Correct.                                     11:37:43

14   Q.    And Mr. Graceffa was upset during the       11:37:46

15  call?                                               11:37:48

16   A.    Very.                                        11:37:48

17   Q.    And all you recall saying on your side was  11:37:59

18  that you never received that document when he said  11:38:01

19  he gave it to you.                                  11:38:05

20   A.    Correct.                                     11:38:06

21   Q.    And you said that more than once during     11:38:06

22  the call.                                           11:38:08

23   A.    Correct.                                     11:38:09

24   Q.    When you met with -- withdrawn.  You've     11:38:15

25  testified that you had a meeting with Ruby Miles,   11:38:20

64

1  especially, to either make my life there hard to          11:46:10

2  leave, or, as he was actually proved to be, making        11:46:14

3  up stories about giving me documents I've never           11:46:18

4  received, calling -- asking me every time; when I         11:46:21

5  call him that morning, he was yelling at me.  He          11:46:24

6  was calling me a fabricator, and stuff like that.        11:46:26

7  And then he will hear from me, threaten me to hear       11:46:30

8  in 15 minutes, and in 15 minutes he fire me.  If         11:46:34

9  that's not retaliation, I don't know what is.            11:46:37

10     Q.   So your testimony is that everything that        11:46:40

11  Mr. Graceffa did to you was a result of you having       11:46:42

12  brought that discrimination complaint.                   11:46:45

13     A.   Correct.                                         11:46:46

14     Q.   Because you can't imagine any other basis        11:46:50

15  for why he did what he did.                              11:46:54

16     A.   Correct.                                         11:46:56

17     Q.   Anyone else at Getronics other than Ms.         11:47:15

18  Miles and Mr. Graceffa that you believe retaliated       11:47:17

19  against you?                                             11:47:20

20     A.   Can I take a break before I answer that?        11:47:21

21     Q.   No, not before you answer the question.         11:47:24

22          MR. COHEN:  You can answer it.                  11:47:27

23     A.   Okay.                                            11:47:27

24          THE WITNESS:  Can you read the question,        11:47:29

25  again.                                                   11:47:30

65

| | | |
|---|---|---|
| 1 | MR. WINTON: Sure. | 11:47:31 |
| 2 | (Question read back.) | 11:47:31 |
| 3 | A. Directly, no. | 11:47:41 |
| 4 | Q. Would you like to take a break now? | 11:47:42 |
| 5 | A. Yes, please. | 11:47:44 |
| 6 | Q. Sure. | 11:47:45 |
| 7 | VIDEO OPERATOR: Off the record 11:47. | 11:47:46 |
| 8 | (Recess was taken.) | 11:47:46 |
| 9 | VIDEO OPERATOR: On the record, 11:59. | 11:59:48 |
| 10 | Q. Okay. Back on the record. Mr. Khirawi, | 11:59:52 |
| 11 | you understand you're still under oath? | 11:59:54 |
| 12 | A. I do. | 11:59:56 |
| 13 | Q. And you told -- at some point you told | 11:59:57 |
| 14 | Ruby Miles you could not trust her judgment, is | 12:00:02 |
| 15 | that correct? | 12:00:04 |
| 16 | A. That's correct. | 12:00:05 |
| 17 | Q. When you were arrested, that was in | 12:00:10 |
| 18 | Manchester, correct? | 12:00:15 |
| 19 | A. Correct. | 12:00:16 |
| 20 | Q. That was the only time you've ever been | 12:00:16 |
| 21 | arrested? | 12:00:18 |
| 22 | A. Yes. | 12:00:18 |
| 23 | Q. And whose Food Stamps were they or WIC | 12:00:24 |
| 24 | that you went to that store with on that day? | 12:00:27 |
| 25 | A. WIC for my now eight-years-old son. | 12:00:30 |

94

1  Cogliano?                                                      12:33:34

2      A.   Very fairly.                                          12:33:35

3      Q.   Do you believe that during your employment           12:33:37

4  at Getronics they had a right to discipline you?              12:33:39

5      A.   Yes, of course.                                       12:33:42

6      Q.   They had a right to discipline you for                12:33:42

7  insubordination, is that correct?                             12:33:46

8      A.   They have the right to discipline me.                 12:33:48

9      Q.   For --                                                12:33:50

10      A.   If --                                                12:33:51

11      Q.   I'm just asking you a question.  Did they           12:33:51

12  have the right to discipline for insubordination?            12:33:53

13      A.   Yes.                                                 12:33:56

14      Q.   Did they have a right to discipline for             12:33:56

15  inappropriate conduct?                                        12:33:58

16      A.   Yes.                                                 12:33:59

17          MR. COHEN:  This is generally?  Generally            12:34:00

18  speaking?                                                     12:34:00

19          MR. WINTON:  Yes.  That's what I'm asking.           12:34:01

20      Q.   Did Getronics have the right to discipline          12:34:02

21  for insubordination and inappropriate comments?              12:34:04

22      A.   Generally, yes.                                      12:34:06

23      Q.   And they had a right to give you warnings           12:34:07

24  and Performance Improvement Plans?                            12:34:09

25      A.   Generally, yes.                                      12:34:11

95

| | | |
|---|---|---|
| 1 | Q.    And if you were disobeying directives, | 12:34:12 |
| 2 | they had a right to discipline you for that? | 12:34:15 |
| 3 | A.    Generally, yes. | 12:34:16 |
| 4 | Q.    And if you were rude or disrespectful to | 12:34:17 |
| 5 | managers or coworkers, they can discipline you for | 12:34:19 |
| 6 | that as well? | 12:34:22 |
| 7 | A.    Generally, yes. | 12:34:23 |
| 8 | Q.    And they also had a right to terminate | 12:34:27 |
| 9 | your employment for inappropriate conduct, is that | 12:34:29 |
| 10 | correct? | 12:34:31 |
| 11 | A.    Generally, yes. | 12:34:32 |
| 12 | Q.    Do you know how to type? | 12:34:35 |
| 13 | A.    I do. | 12:34:37 |
| 14 | Q.    Did you ever take a course in typing? | 12:34:38 |
| 15 | A.    No. | 12:34:40 |
| 16 | Q.    Do you have to look at the keys when you | 12:34:40 |
| 17 | type? | 12:34:42 |
| 18 | A.    Yes. | 12:34:43 |
| 19 | Q.    How many fingers do you type with? | 12:34:43 |
| 20 | A.    Two. | 12:34:45 |
| 21 | Q.    How fast do you type? | 12:34:45 |
| 22 | A.    Fast enough. | 12:34:48 |
| 23 | Q.    Have you ever used an alias? | 12:34:48 |
| 24 | A.    Explain that. | 12:34:55 |
| 25 | Q.    Have you ever used a name other than | 12:34:56 |

103

1    national origin?                                          12:44:41

2        A.   I -- I was actually more into the bias,          12:44:42

3    and bias, because the way he handled it at that           12:44:47

4    time was not good, was not professional.  And that,       12:44:50

5    I think, my testimony last time.                          12:44:57

6        Q.   So you don't think he treated you any            12:45:02

7    differently because of your race or your religion         12:45:04

8    or national origin, correct?                              12:45:07

9        A.   No.                                              12:45:09

10       Q.   You just think that he handled it in what        12:45:09

11   you thought was an unprofessional manner?                 12:45:11

12       A.   He handled it in not professional manner,        12:45:13

13   and it wasn't the procedure then or now, I think, I       12:45:16

14   guess.                                                    12:45:19

15       Q.   But again, anything he did, you do not           12:45:19

16   believe was related --                                    12:45:21

17       A.   Oh, no.                                          12:45:23

18       Q.   -- to your race, national origin,                12:45:23

19   religion, or any other protected category.                12:45:25

20       A.   No.                                              12:45:27

21       Q.   So you don't think he discriminated              12:45:28

22   against you unlawfully based on some protected            12:45:30

23   category.                                                 12:45:33

24       A.   Correct.                                         12:45:33

25            (GETR 0562-571 marked Exhibit 27.)               12:46:11

Page 122

1   Commonwealth of Massachusetts
2   Middlesex, ss.
3
4
           I, P. Jodi Ohnemus, Notary Public
5   in and for the Commonwealth of Massachusetts,
    do hereby certify that there came before me
6   on the 28th day of December, 2006, the deponent
    herein, who was duly sworn by me; that the ensuing
7   examination upon oath of the said deponent was
    reported stenographically by me and transcribed
8   into typewriting under my direction and control;
    and that the within transcript is a true record of
9   the questions asked and answers given at said
    deposition.

10
11          I FURTHER CERTIFY that I am neither
    attorney nor counsel for, nor related to or
12  employed by any of the parties to the action
    in which this deposition is taken; and, further,
13  that I am not a relative or employee of any
    attorney or financially interested in the outcome
14  of the action.
15
            IN WITNESS WHEREOF I have hereunto set my
16  hand and affixed my seal of office this
    31st day of December, 2006, at Waltham.

17
18  *P. Jodi Ohnemus*

19  _____
20          P. Jodi Ohnemus, RPR, RMR, CRR
            Notary Public,
21          Commonwealth
            of Massachusetts
22          My Commission Expires:
            4/21/2007

23
24
25

# EXHIBIT C



**Getronics**

836 North Street

Tewksbury, MA 01876

www.getronics.com

# MEMO

| | |
|---|---|
| TO: | Aalaeldin Khirawi |
| FROM: | Joan Anderson |
| DATE: | January 15, 2004 |
| SUBJECT: | Allegation of Discrimination |

Thank you for participating in our investigation of your allegations of discrimination based on national origin and religious beliefs. As you know, our internal complaint procedure is designed to ensure that we maintain a productive workplace free of bias.

This memorandum reports on the results of our investigation. Our investigation included interviews with you, your most recent supervisor, your former manager, and your current human resources consultant. Our investigation did not confirm the substance of your claims of discriminatory treatment.

As you know, your most recent request for pre-approval of tuition reimbursement was denied. The denial was based upon the fact that the two courses are not job-related and there are current budget constraints within your department. The denial of tuition reimbursement for these courses is consistent with our tuition reimbursement policy and we uncovered no evidence that this decision was based on your national origin or religious beliefs.

When you demanded that Terence Freeman recall his email on the topic of denial of your request for tuition reimbursement, on which he copied me, and Paul Galipeau, Terence declined to do so. However, we uncovered no evidence that his behavior was related in any way to your national origin or religious beliefs. In fact, Terrence has not met you in person and we do not believe that he has knowledge of your national origin or religious beliefs. Rather, in his email communication, Terence endeavored to be efficient in his communication on the topic of your tuition reimbursement request and copied persons on his message who had been involved in discussion on the topic to date.

You stated in our meeting on December 23, 2003 that your complaint is not against your supervisor, Ruby Miles, but relates to circumstances surrounding your current position. During our investigation we uncovered no evidence of discrimination, but did find evidence of misunderstandings between you and your supervisor.

**GETR0072**

We expect that you and Ruby will move forward in a professional manner. So as to facilitate that process and avoid future misunderstandings, we will convene mediated discussions between you and Ruby to resolve these misunderstandings. I will be available to mediate these discussions and will contact you for such scheduling.

This memo concludes communication of the results of our investigation into your concerns. If you have further evidence that you wish to bring to our attention on the issue of national origin or religious discrimination, we will take appropriate action to investigate and resolve the problems, if any.

Getronics is committed to providing you with an environment free of discrimination and to protect you from any retaliation as a result of your report and our investigation. While we have no reason to believe there will be any problems, please call me if you feel that you are being subjected to retaliation in any form.

Thank you again for your participation.

2

GETR0073

# EXHIBIT D

REDACTED

-----Original Message-----
From: Khirawi, Aalaeldin
Sent: Monday, February 23, 2004 2:42 PM
To: Miles, Ruby; McHenry, Patrick; Anderson-Jones, Tiffiny
Cc: Dining, Dorothy; Galipeau, Paul; Freeman, Terence; Anderson, Joan; George, Gayla; Hoffman, James
Subject: RE: Checklist Feedback Review

Ruby
My tone was professional enough and I did not ask you to apologize for me.
I did, however ask Patrick to apologize for telling me to shut-up.

He also , with very bad temper told me that I was the one who was slowing things down

He does need to apologize for what he has told me , to continue working with him
You , have received an e-mail from me before this one asking about Patrick's role in the project.
   however did receive a response back to this one and not to the first one.
, am really very troubled by your affirmation that he did not " tell me to shut-up, yet Tiffany has told me on a phone
conversation that she did not hear, nor remember him saying it.
She did not confirm not saying it, but you seem to confirm he did not , and you were not there in the meeting!!!!!!!!!!
My tone is very professional and once aging, he is the one who should apologize for his attitude, expressions and
behaviors
I do insist he apologize for what he did
He did admit to Dorothy that he blew up unnecessarily in the meeting as I was told.

Please have him apologize and be professional  so we can proceed with the project at hand

Aalaeldin Khirawi
E-Quality/Training
Tewksbury MA, USA
(978) 858-7761
(978) 858-7232

The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged
material. Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon this
information by persons and/or entities other than the intended recipient is prohibited. If you received this in error, please
inform the sender and/or addressee immediately and delete the material. Thank you.

-----Original Message-----
From: Miles, Ruby
ent: Monday, February 23, 2004 3:26 PM
To: Khirawi, Aalaeldin; McHenry, Patrick; Anderson-Jones, Tiffiny
Cc: Dining, Dorothy; Galipeau, Paul; Freeman, Terence; Anderson, Joan; George, Gayla; Hoffman, James
Subject: RE: Checklist Feedback Review

Al,

First of all, let me apologize on your behalf for sending this out. Your tone within this email is very inappropriate  As I
understand it, Tiffiny did not participate in this and tried to get you not to send it and to speak with me beforehand.  I will
not address every issue, but I will address the main one.  I have spoken to both Patrick and Tiffiny and from both accounts
of the incident, Patrick never told you to "Shut Up".  He did however, request that he'd like to finish what he was saying
before he was interrupted again...since he is project lead, he was trying to take back control of the meeting.   Whether his
comments to you were rude/forceful or disrespectful,  there is a certain demeanor that I expect from my group and that is
not to retaliate.  If you were bothered by Patrick's comments, you should have called/emailed me and we could have
discussed it and then I would have handled the situation with his manager, Dorothy Dining.  Dorothy has designated
Patrick the lead on this project and we (Tiffiny, Al, Ruby - Performance Management) are here to support them and gather
input/information as we have been doing so that when the assessment form is revised, it will accomplish two things: to
make the assessments more technical/usable by MSD and to provide our group with valid trending data.

If you have any further issues within the ESC, please notify me and I will take the appropriate action..

Thanks,

Ruby Miles
QA Manager
Performance Management
Phone: 713-852-5659
Cell: 281-830-9853

The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged
material.  Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon the

information by persons and/or entities other than the intended recipient is prohibited.  If you received this in error, please inform the sender and/or addressee and immediately delete the material.  Thank you.


---Original Message-----
From: Khirawi, Aalaeldin
Sent: Monday, February 23, 2004 12:08 PM
To: McHenry, Patrick; Anderson-Jones, Tiffiny
Cc: Dining, Dorothy; Galipeau, Paul; Miles, Ruby
Subject: RE: Checklist Feedback Review


Patrick
You have demonstrated a very unprofessional behavior on the net-meeting we had this morning over the phone.
Using the expression "Shut up" was demeaning and disrespectful.
Labeling me as the one who slows things down was untruthful and false.
Tiffany was the one who said  that your way and discussions were the one that wasted our time.
You have not demonstrated any understanding or knowledge of the nature of what E-quality does.
And here are the facts:
1) Your complete lack of understanding of what the MSD check list does and how  we use it.
2) Contract specific call flow Vs technical procedures for each problem solving processes.
3) Analyst's role in the different skill set.
4) The role of E-quality within the six sigma project.
5) Inductive Vs Deductive reasoning ( General Vs Specific)
6) Witness system .
All of the above are very essential for any one to facilitate such meetings and for the project underway.

Once again I would like you to apologize for using those angry expressions against me and admit that you are the one who has been wasting our time as Tiffany and my self thought of the way you have conducted yourself.


Professional attitude is the only way for me to deal with and through you in the future


Aalaeldin Khirawi
E-Quality/Training
Tewksbury MA, USA
(978) 858-7761
(978) 858-7232


The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon this information by persons and/or entities other than the intended recipient is prohibited. If you received this in error, please inform the sender and/or addressee immediately and delete the material. Thank you

-----Original Message-----
From: McHenry, Patrick
Sent: Monday, February 23, 2004 12:59 PM
To: Khirawi, Aalaeldin; Anderson-Jones, Tiffiny
Cc: Dining, Dorothy; Galipeau, Paul; Miles, Ruby
Subject: Checklist Feedback Review


Tiffiny and Al,


 will not be able to continue our meeting to review the feedback with both of you later today. Attached are the changes made so far for the checklist and the feedback from Houston. Please review the feedback and make recommendations for changes to the checklist based on the feedback. Please combine your recommendations and send them back to me for review. We can discuss the progress we have made so far in the meeting tomorrow and plan future meetings to continue revising the checklist.

**GETR0910**

Thanks

Patrick McHenry

Team Manager

Enterprised Managed Services

Getronics Infrastructure Solutions

Getronics North America Operations

9009 West Loop South, Suite 500

Houston, TX 77096 USA

Tel: +01 713-852-5919

Fax: +01 713-852-5700

Email: patrick.mchenry@getronics.com

^T Security | Network Integration Services | Network & Desktop Outsourcing | Application Integration & Management

<http://www.getronics.com/> http://www.getronics.com

The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon this information by persons and/or entities other than the intended recipient is prohibited. If you received this in error, please inform the sender and/or addressee immediately and delete the material.

Thank you.

# EXHIBIT E



# WRITTEN REPRIMAND

**Date of Reprimand:** 03/01/04                    **Date of Verbal Warning:**

**Employee Name:** Aalaeldin Khirawi                **Date of Occurrence:** 02/25/04

**Details of Occurrence:**

- On Wednesday morning, 02/25/04, Aalaeldin Khirawi called me (Ruby Miles) on my company cell phone to ask why I had not answered one of his emails from the previous day (02/24/04). This email was concerning a meeting that Ruby Miles, Tiffiny Anderson-Jones and Aalaeldin were supposed to have after Tiffiny, Aalaeldin & Patrick's meeting on 02/23/04. Ruby proceeded to explain to that she was busy and did not get to the email. Aalaeldin became angry and insubordinate. Please see below:

  > In an email dated 02/23/04; 12:08pm Aalaeldn sent an email to Patrick McHenry & Tifiiny Anderson-Jones (cc: Paul Galipeau, Dorothy Dining, Ruby Miles) in response to a meeting that had taken place earlier in the day. In the email among other things, he was requesting an apology from Patrick because he considered Patrick's behavior on the earlier teleconference to be very unprofessional.

  > After receiving the email, I proceeded to gather information from Patrick & Tiffiny and sent an email back to the same distribution list apologizing for Aalaedin's actions. Aalaeldin became even more angry and responded with an email that his tone was professional and that he did not need me to apologize for him.

  > After a couple of emails back & forth, the situation digressed. On Wednesday morning, 02/25/04, Aalaeldin called Ruby on her cell phone to ask about her not responding to his previous day's email. She told him that she had been busy. This was not a good enough reason for him. He proceeded to ask her why she apologized in the email (mentioned above); that he didn't need her to do that. Ruby stated that it was necessary, that we (Performance Management) must work with all groups and just because Aalaedin wasn't aware of "who" Patrick was and how he became designated lead or why we didn't have our meeting that afternoon, was no excuse. Ruby also informed Aalaedin that he must continue to work with Patrick whether he wanted to or not – that she was his manager; and we all have to work together as Team no matter what. Aalaeldin stated that he was not going work with Patrick because he was the one wasting Aalaeldin's & Tiffiny's time; plus he wanted an apology before going forward. Ruby tried to interject that she was his manager and he was to do as she instructed. That's when he told her that she was "weak" and that he did not trust her. As she proceeded to tell him to "watch" his words, he hung up the telephone.

**GETR0016**

**Corrective Action to be Taken:**

- He must continue to work with whomever is designated lead on this project or any other project that this group is involved in the future.
- He must convey a professional demeanor at all times.

You are expected to demonstrate immediate, significant and sustained improvement in your performance improvement plan. Failure to show such improvement may subject you to further disciplinary action (up to and including termination) at any time during the plan period. In addition to meeting the plan objectives, you are expected to perform satisfactorily all other job duties. You must also continue to fulfill the plan requirements after the plan period has ended. Failure to sustain the level of performance required by the plan beyond the plan period may subject you to further disciplinary action (up to and including termination), without additional notice.

**Effective Date of Action:** _03/01/04_     **Subsequent Review Date:** _06/01/04_

_____          _____
Employee Signature                                          Date

_____          _26 Feb 04_____
Manager/Supervisor Signature                        Date

_____          _2/26/04_____
Human Resources Signature                            Date

NOTE: Place in emp. File

GETR0017

# EXHIBIT F

REDACTED

-----Original Message-----
**From:** Khirawi, Aalaeldin
**Sent:** Tuesday, March 09, 2004 8:15 AM
**To:** Miles, Ruby
**Cc:** Freeman, Terence; George, Gayla
**Subject:** RE: Written Reprimand

After careful review of the document "the reprimand", it became very clear to me that you have confirmed my fears all along that you as a manager, do have serious problems with the way you have dealt and still dealing with me, as someone who confronted you with facts and have been working to make the relationship as much as  professional and as twice as productive.
But, you have proven to me time and again that I can not trust your judgment as a manger and here is why:

1) I thought the reprimand is about what you claimed I said, but instead you interjected in it the corrective Action to be taken, the following:
"He must continue to work with whoever is designated lead on this project or any other project that this group is involved in the future."
And you know very well that I have been working with the group, prior to your e-mail and for two weeks now!!!!!!
And you know full well that you have told me that I could withdraw from working with Patrick, but I, and after receiving an e-mail from Jim Hoffman, have decided to continue, and I have communicated that with you and the group over week ago!!!!
So you have twisted the out come of the reprimand to mean something that was not an issue no more
2) You said that you have met and spoke with Tiffiny and Patrick to see what had transpired between us in the meeting that lead to the e-mail under question,  and thus you have decided that I was the one who needed to apologize and therefore you decided to do that for me!!!!!!,

GETR0884

3/18/2004

You Ruby have never spoken to me to hear my side of the story, and that was not the first time.
You also happened to deduct some points from my PMP, as a result of some feed back from a former employee (Erica), that I know 100% she would, could not have reported on me what you have stated during the evaluation meeting. You also failed to call me or e-mail me to discuss her evaluation of me!!!!!!
3) You have ignored an e-mail from me asking about Patrick's role in the project long before I sent my e-mail under question to him.
I did that, and you know very well that you have told me that we own the project, and when I asked about his role you did not answer me in a timely fashion, and to me it looked and still does as a setup from your part.
4) Yes I became angry when you did ignore my e-mails on something very serious and essentials as to know who does what, when and how!!!
5) You also did not say the truth when you said you have sent your e-mail, apologizing for my so called inappropriate language and behavior, and that is not true Ruby.
Just go over these e-mails again and see if I had HR or James Hoffman there!!!!!!!!!!!!!

6) The latest incident of sending me an e-mail with many options to meet with you and MR. Freeman.
One of the options I have was to post pond for future time. I did just that, and my e-mails time line would show that the last interaction between you and me was me asking for Monday, instead. So why would you fax the papers to a public fax machine knowing full well that (I would not be there?!!!!!
Was that a violation of my privacy?
Why did not you send it via the e-mail?!!!!!

You have said once before to me, that I have been subjected to racial discrimination, and you have failed to come up with any thing to prove that allegations, willingly or unwillingly, and now you have been working so hard to discredit me, and that would not be the case, because I have evidences of every thing I say and point to.

Ruby Miles, trust and weakness are both subjective terms in their concept and their meaning, and taking all the points and facts into consideration, I would not rate your performance as strong.
You have created an environment for me, full of hostility, stress, doubts, harassment and bitterness.
I have been trying my best to deal with you professionally , but your continuous effort to retaliate and discredit me has made me wonder, why you are doing this with no thoughts and very clear misstatements of facts and events!!!!!.
I am asking HR kindly to launch an investigation on how and why you have been acting the way you have.
I am really hoping and praying that they do as soon as possible, just because your behavior has affected me deeply in every way.

*Aalaeldin Khirawi*
*E-Quality/Training*
*Tewksbury MA, USA*
*(978) 858-7761*
*(978) 858-7232*

*The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon this information by persons and/or entities other than the intended recipient is prohibited. If you received this in error, please inform the sender and/or addressee immediately and delete the material. Thank you.*

**GETR0885**

3/18/2004

-----Original Message-----
**From:** Miles, Ruby
**Sent:** Thursday, March 04, 2004 4:26 PM
**To:** Khirawi, Aalaeldin
**Cc:** Freeman, Terence; George, Gayla
**Subject:** Written Reprimand

Al,

Enclosed is a copy of the written reprimand.

*Thanks,*

*Ruby Miles*
*QA Manager*
*Performance Management*
Phone: 713-852-5659
Cell: 281-830-9853

The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon the information by persons and/or entities other than the intended recipient is prohibited. If you received this in error, please inform the sender and/or addressee and immediately delete the material. Thank you.

**GETR0886**

# EXHIBIT G

**Getronics**
**Performance Management Process**

# APPRAISAL FORM

## 1. INDIVIDUAL DETAILS

| Employee's Name | Employee Number | Business Unit |
|---|---|---|
| Aalaeldin Khirawi | 69329 | ISS – Performance Management |

| Manager's Name | Date Appraisal Conducted | Date Next Appraisal Due |
|---|---|---|
| Ruby Miles | February 26, 2004 | February, 2005 |

Rating Summary *(complete after the appraisal has been conducted)*
Overall Performance Rating  *(enter 1  2  3  or 4)*                    3

## 2. INSTRUCTIONS

- Follow the prompts to rate the employee's performance against

  - Individual Objectives                                  Section 3(A)
  - Corporate Values and Operating Competencies            Section 3(B)
  - Overall Performance                                    Section 3(C)

- Rate performance using a number from the following rating scale

  1. Less than acceptable or only marginally acceptable and should improve
  2. Meets all requirements and sometimes exceeds them
  3. Usually exceeds the requirements
  4. Always exceeds requirements and enhances Getronics performance

- Rate completely acceptable performance as '2'. When providing a higher or lower rating, make sure that the rating matches its description on the rating scale

- Enter the overall rating in the summary box (above)

*IMPORTANT NOTE*

This document contains guidelines for the successful implementation of effective employee performance management practices which Getronics may tailor or change as necessary. While they are designed to encourage a candid and comprehensive exchange of information, they do not constitute contractual commitments that the exchange will occur or will occur in the precise format described. These materials do not constitute a contract of employment for a specific period of time. Rather, they are offered as guides to help managers and employees review performance, achievement and development on a periodic basis, as appropriate.

GETR0019

## 3. RATING AN EMPLOYEE'S RESULTS AND ACHIEVEMENTS

### A. INDIVIDUAL OBJECTIVES

At the beginning of the appraisal period:

- Agree with the employee on between three to five objectives to be met by the end of the appraisal period
- Write them on this page (or use an attachment if required)
- Sign the bottom of the page

Before conducting the appraisal meeting:

- Compare the employee's results and achievements with their objectives
- Circle a rating for each objective listed on this page
- Provide an overall assessment of achievement of individual objectives

**GETR0020**

| INDIVIDUAL OBJECTIVES (provide as an attachment if preferred) | COMMENTS | RATING (enter 1, 2, 3 or 4) |
|---|---|---|
| 1. Provide feedback to Service Desk Management on ways to increase efficiency of the assessment process and the quality of the assessments. | Aalaeldin always provides feedback to the Service Desk Management on ways improve the work environment. | 3 |
| 2. Escalate to Service Desk Management as well as QA Team whenever there are calls that fail the assessment process and/or handled incorrectly. | Aalaeldin escalates calls and keeps the Service Desk and QA involved as to the status of the calls, but has never calibrated any calls with other assessors. | 3 |
| 3. Uses the eQuality system to grade calls according to predefined specifications (i.e, blue, green, yellow or red) | Aalaeldin uses the eQuality automated system to listen to and grade all calls. | 2 |
| 4. Work within the QA Team to develop and implement processes/procedures to improve and enhance the efficiency of the Service Desk desk analysts. | Aalaeldin has created metrics for the Tewksbury Service Desk Management, but they were placed on hold until just recently (02/01/04). The reports were very informative and will probably be implemented at both sites. | 3 |
| 5. Complete Safety, ITIL courses as designated by the ESC and QA Manager, | Aalaeldin completed the designated courses in the allotted time. | 3 |
| OVERALL ASSESSMENT | | 3 |

### ACKNOWLEDGEMENT OF INDIVIDUAL OBJECTIVES

Manager    Signature _____    Date _March 04_

Employee    Signature _____    Date _3/11/04_

☑   Has the employee's PMP appraisal considered the employee's awareness of and commitment to adhere to the Company's Standards of Ethics and Business Conduct policy?

☑ Has the employee's PMP appraisal considered the employee's commitment to follow all applicable regulations that govern his or her areas of work?

## B. CORPORATE VALUES AND OPERATING COMPETENCIES
Provide a rating against each operating competency, and an overall assessment at the bottom of the page.

| CORPORATE VALUES | OPERATING COMPETENCIES | RATING (enter 1 2 3 or 4) |
|---|---|---|
| Customer Focus - Commitment to deliver an unparalleled experience to the customer (internal and external) | • Takes ownership of customer requirements/issues and recommends appropriate solutions.<br>• Communicates regularly with the customer in a clear and concise manner without inviting confrontation.<br>• Maintains a pro-active, positive, professional relationship with customers. | 4 |
| Trust and Respect | • Seeks input from others, honours commitments, and is open to feedback from others.<br>• Shares information with team members and customers.<br>• Demonstrates high ethical standards and respect for all team members and customers. Includes others in the decision-making process. | 3 |
| Results-oriented | • Assesses his/her success by using appropriate, agreed upon quantitative and/or qualitative measurements.<br>• Makes and keeps realistic promises and pushes him/herself to achieve results.<br>• Does not confuse the value of effort with the value of achieving results and applies a high level of expertise to deliver them. | 3 |
| Authority/ Knowing our brief | • Takes responsibility for actions within the boundaries of his/her role and refers issues to others as appropriate.<br>• Assumes responsibility for decisions and resolves issues.<br>• Demonstrates expertise within his/her own discipline. Stays abreast of changes in field and upgrades skills accordingly. | 3 |
| Teamwork | • Demonstrates commitment to group goals and purpose. Focuses on the success of the business and supports department goals through individual acts.<br>• Helps others to find solutions to problems.<br>• Establishes and maintains effective working relationships. | 3 |
| Open Communication | • Regularly communicates expectations, information, priorities, and goals.<br>• Expresses oneself articulately in written and verbal communications to each particular audience.<br>• Evaluates feedback from audience and replies in a professional manner. | 3 |
| Recognise and Reward | • Acknowledges contributions made by team members.<br>• Provides timely feedback.<br>• Recognises the expected and seeks opportunities to reward the exceptional. | 3 |
| Empowerment and Accountability | • Takes initiative and seeks support to achieve objectives.<br>• Holds him/herself and others to measurable, corporate and customer standards.<br>• Leverages a network of contacts across the, profession and industry. | 3 |

OVERALL ASSESSMENT

3

GETR0021

## C. OVERALL PERFORMANCE RATING

List any other factors that should be taken into account when rating performance (provide as an attachment if preferred), then enter an overall performance rating.

| OVERALL RATING (enter 1 2 3 or 4) | OTHER FACTORS INFLUENCING OVERALL PERFORMANCE RATING |
|---|---|
| 3 | Please see above information. |
| | |
| | |
| | |
| | |
| | |
| | |

## 4. DEVELOPMENT PLANNING

List the job competencies and/or skills to be developed by the end of the next appraisal period and/or any additional strategic initiative, service or solution of which employee must display quantifiably improved knowledge through training or self-study. *(Refer to Manager Guide to Development Planning; provide as an attachment if preferred.)*

| |
|---|
| Aalaeldin will be responsible for taking several GVU and job-related courses which which will enhance your capabilities even further: |
| Designated Six-Sigma & ITIL Training |
| Coaching in a Service-Oriented Culture |
| Establishing Your Team's Desired Performance |
| Building a High Performance Team |
| The Self-Directed Project Team Member |
| Managing Customer-Driven Process Improvement Simualtion |

GETR0022

## 5. SIGNATURES AND COMMENTS

SIGNATURE AND DATE          COMMENTS *(provide as an attachment if preferred)*

**Manager**

_Signature_

_Date_ March 04

**Employee**

_Signature_

_Date_ 3/01/04

I think it is a Fair Appraisal

☐
*Attachments (check and enter number)*

GETR0023

## 6.  ATTACHMENT

*Continued from section* ☐

N/A

*Continued from section* ☐

N/A

*Continued from section* ☐

N/A

| Manager | Signature | *Ruby Mile* | Date | *March 04* |
|---------|-----------|-------------|------|-----------|
| Employee | Signature | | Date | *2/1/04* |

**GETR0024**

# EXHIBIT H

-----Original Message-----
**From:** Miles, Ruby
**Sent:** Thursday, March 18, 2004 1:35 PM
**To:** Khirawi, Aalaeldin
**Subject:** RE: Work Schedule

Al,

Although, as your manager, I don't owe you an explanation; here's the difference:

An accusation would be making the statement:   You have been working from home on Mondays.

However, I am not making an accusation, I'm simply inquiring.  Have you been working from home on Mondays?

*Ruby Miles*
*QA Manager*
*Performance Management*
Office: (713) 852-5659
Cell: (281) 830-9853

The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged material.  Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon the information by persons and/or entities other than the intended recipient is prohibited.  If you received this in error, please inform the sender and/or addressee and immediately delete the material.  Thank you.

-----Original Message-----
**From:** Khirawi, Aalaeldin
**Sent:** Thursday, March 18, 2004 1:20 PM
**To:** Miles, Ruby
**Subject:** RE: Work Schedule

*YES or NO?*

*Ruby*
*Are you accusing me of not coming in Mondays?*
*Yes or no?*

**GETR0216**

*Al*

-----Original Message-----
**From:** Miles, Ruby
**Sent:** Thursday, March 18, 2004 2:05 PM
**To:** Khirawi, Aalaeldin
**Subject:** RE: Work Schedule

Al,

Your work schedule is Monday-Thursday (4-10's in the office) and off on Friday – I need to know have you been working from home on Mondays? Yes or No?

*Ruby Miles*
*QA Manager*
*Performance Management*
Office: (713) 852-5659
Cell: (281) 830-9853

The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon the information by persons and/or entities other than the intended recipient is prohibited. If you received this in error, please inform the sender and/or addressee and immediately delete the material. Thank you.

-----Original Message-----
**From:** Khirawi, Aalaeldin
**Sent:** Thursday, March 18, 2004 12:01 PM
**To:** Miles, Ruby
**Subject:** RE: Work Schedule

Ruby
I really need to know what triggered the questions.?
Just because , if I read the message correctly , it points to something I might have done which was not supposed to be done.
Since working from home was not part of my deal with this company.!!!!!!!!!
I have the right to know what made you asking me those questions?
So please respond to my e-mails .


Al


*First*

*I need to know why you are asking me these questions?*

Al


-----Original Message-----
**From:** Miles, Ruby
**Sent:** Thursday, March 18, 2004 12:08 PM

**To:** Khirawi, Aalaeldin
**Subject:** RE: Work Schedule

Yes, I am asking you - Have you been working from home on Mondays and if yes, who approved this work schedule? Thanks.

*Ruby Miles*
*QA Manager*
*Performance Management*
Office: (713) 852-5659
Cell: (281) 830-9853

The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon the information by persons and/or entities other than the intended recipient is prohibited. If you received this in error, please inform the sender and/or addressee and immediately delete the material. Thank you.

-----Original Message-----
**From:** Khirawi, Aalaeldin
**Sent:** Thursday, March 18, 2004 10:58 AM
**To:** Miles, Ruby
**Subject:** RE: Work Schedule

*Do you mean , have I been working from home on Mondays?*

*Please explain*


*Al*

-----Original Message-----
**From:** Miles, Ruby
**Sent:** Thursday, March 18, 2004 11:36 AM
**To:** Khirawi, Aalaeldin
**Subject:** Work Schedule

Al,

Are you working from home on Mondays?

*Ruby Miles*
*QA Manager*
*Performance Management*
Office: (713) 852-5659
Cell: (281) 830-9853

The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon the information by persons and/or entities other than the intended recipient is prohibited. If you received this in error, please inform the sender and/or addressee and immediately delete the material. Thank you.

GETR0218

# EXHIBIT I

**From:** Khirawi, Aalaeldin
**Sent:** Saturday, March 20, 2004 6:14 PM
**To:** Thomas, Jimmy (HR)
**Cc:** Freeman, Terence; Anderson, Joan; George, Gayla; Miles, Ruby; Hoffman, James; Ogg, Wayne
**Subject:** RE: My response


Mr. Thomas

I have not received any response back from you and accordingly I assume that my assumption was wrong.
I have gone over our company's policy and procedure, and I find nothing that would suggest the lack of an employees'
right to bring up to HR attention any issues or facts of harassment, hostility and retaliation from management.
I do think strongly that you might have not gone over my previous e-mails of allegations and complaints against my
immediate manager Ruby Miles. ( I can always forward them to you if you like)
W      made me come up with such conclusion is the fact that you did not answer my other incidents that made me believe
that Mrs. Miles has been systematically trying to discredit me , and these other incidents are as follows:

1) She did not come up with any evidence to prove or disprove the allegations that my race was the factor behind the
company's decision to deny me what she thought my job and qualifications worth. (She confirmed saying that, but
apologized for saying it in a meeting with Joan Anderson, Gayla George and my self, plus that I have e-mails asking her
about the race allegation and she never disputed that she did make that remarks)).
2) She deducted points from my previous PMP based on false allegations. (I have the e-mails to prove it)
3) My last Reprimand's out come and the proven false accusations she made against me (Is very easy to see that in the
evidences I have presented with the e-mails references)
And even the only point, you have mentioned, which was the faxing of my reprimand to a public place, you have not
correctly stated the circumstances and the out come of that serious violation of my privacy.
Yes she did send me my last PMP to the fax machine, but after I asked her to let me know via the phone on the exact time
to send it (I have the e-mails to prove it). After she had sent to me a meeting invitation with the option to postpone, and I
did just that, asking for the meeting to be on another day (I have the e-mails back and forth to prove it

Mrs. Miles has been trying to discredit me, because she has told me that my race was the factor why I am paid the current
salary. And she said to me when she was here in Tewksbury, that she was a child of the sixties could relate to that.
A and when I took that as serious allegations, to HR, I did expect HR to investigate the issue and to protect my rights if
that was the case.
(Joan Anderson and Gayle George were both there when she did confirm saying it but not meaning it)
Joan Anderson in her last e-mails to me (I have them as records), asked me to report any new evidences or retaliations to
her, and when I did she asked me why did I do it.
(      are saying my frustration of the lack of raise was behind my actions.
That is absolutely not true
I was asked by the company to resume my new position on February 2003, and I did not get the raise till September of
2003.
So that was 7 months of me working in the new job with no compensation.

GETR0219

ly performance for this company is not questionable in all levels, and you can ask all the people I have worked with in ewksbury and for in all accounts .

[y ~ustration started, when my manager used my race and color to express her frustration of her not being able to pay
ie what she promised.
will not under any circumstances shy away from voicing my concerns within my rights and the procedure of the place I
ave worked for since 1999 and do that with professionalism and tender.
did not use any other means to report these violations or to report them to any other department but HR.
did this after the environment has gotten so hostile, and my stress has raisin, and the sense of retaliation has been a fact.
fo one from HR, prior to your first and only e-mail had addressed my allegations of the retaliations.
happened, only when I escalated the issue to Mr. Ogg.
s I said, I am not going to back away from defending my rights and voice my concerns when I see very clearly that I
ave been violated.
: that was mistake, then I do not know what else I could have done

alaeldin Khirawi

----Original Message-----
`rom: Khirawi, Aalaeldin
ent: Fri 3/19/2004 10:32 PM
`o: Khirawi, Aalaeldin; Thomas, Jimmy (HR)
:c: Freeman, Terence; Anderson, Joan; George, Gayla; Miles, Ruby; Hoffman, James; Ogg, Wayne
u  t: RE: Response to your Allegation Sent To Me on 3/18/04

Mr. Thomas
I am really very confused
And I need to know where my position now is?
Do you mean that I should not be raising any issues like this in the future?
Meaning, if I feel and think my manager or any one else with power over me, has created an environment full of
hostility or bitterness and harassment, I should not bring them up and defend my position?
Fearing that HR might think I am abusing the system?
Or when I keep reporting Management abuse, I might be disciplined and intimidated to face more discipline?
I am really very confused and I need help with these questions.
I am raising these questions based on the fact that you have not, yet addressed my other concerns with Ruby Miles
(as the one who referenced to racial agendas behind the company's dealing with me), in the e-mail I addressed not
to you but to Mr. Freeman and Mrs. George
Please address these issues and concerns, just because I need to know my rights, my status as an employee
subjected as I know, to the same equal rights as the rest of us.

Regards

Aalaeldin Khirawi

-----Original Message-----
From: Khirawi, Aalaeldin
Sent: Fri 3/19/2004 4:35 PM

GETR0220

**To:** Khirawi, Aalaeldin; Thomas, Jimmy (HR)
**Cc:** Freeman, Terence; Anderson, Joan; George, Gayla; Miles, Ruby; Hoffman, James; Ogg, Wayne
**Subject:** RE: Response to your Allegation Sent To Me on 3/18/04

Mr. Thomas
This is my second e-mail and I am still waiting for your explanation
Are you asking me to stop defending myself? and to refrain from expressing my self when I feel and think that I have been violated? And my manager has been harassing, and using her power to retaliate against my complaint that she once, told me that my race was the factor that why I was not paid enough?
Please let me know as soon as possible.
Just because the weekend is a long time for me living with the stress of not knowing what you mean.


Regards

Aalaeldin Khirawi
-----Original Message-----
**From:** Khirawi, Aalaeldin
**Sent:** Fri 3/19/2004 12:46 PM
**To:** Khirawi, Aalaeldin; Thomas, Jimmy (HR)
**Cc:** Freeman, Terence; Anderson, Joan; George, Gayla; Miles, Ruby; Hoffman, James; Ogg, Wayne
**Subject:** RE: Response to your Allegation Sent To Me on 3/18/04

My apology
My question reads as follows

Mr. Thomas
Are you ordering  me  refraining from defending  my position, facts and to correct your set of conclusions?

Please advise

Aalaeldin Khirawi

-----Original Message-----
**From:** Khirawi, Aalaeldin
**Sent:** Fri 3/19/2004 12:26 PM
**To:** Thomas, Jimmy (HR)
**Cc:** Freeman, Terence; Anderson, Joan; George, Gayla; Miles, Ruby; Hoffman, James; Ogg, Wayne
**Subject:** RE: Response to your Allegation Sent To Me on 3/18/04

Mr. Thomas
Are you ordering  me from refraining to defend my position, facts and to correct your set of conclusions?

Please advise

Aalaeldin Khirawi

**GETR0221**

-----Original Message-----
**From:** Thomas, Jimmy (HR)
**Sent:** Fri 3/19/2004 10:52 AM
**To:** Khirawi, Aalaeldin
**Cc:** Freeman, Terence; Anderson, Joan; George, Gayla; Miles, Ruby; Hoffman, James; Ogg, Wayne
**Subject:** Response to your Allegation Sent To Me on 3/18/04

Aalaeldin:
I write on behalf of Director of Human Resources Gayla George.

You are directed to cease and desist from your deluge of email to your manager Ruby Miles. You are further directed to provide her with an answer to the simple question posed to you: Are you working from home on Mondays? Copy me on your response to her. Respond to her question immediately.

Your refusal to answer a direct question of your manager constitutes insubordination. Your communication style with your manager is unacceptable. You will be disciplined for your flagrant displays of insubordination. You will communicate in a professional and measured manner with your manager. Such does not include overuse of the exclamation point, bold font or underline. Professional communication does not include repetitive sending of disrespectful email. You will be judged on your future treatment of your manager.

As you know, investigation into your allegations of inappropriate conduct did not yield evidence to support your claims. Perhaps you are frustrated that you have not received a raise in pay. This potential frustration does not give you license to attack your manager at every opportunity. Such frustration does not permit you to decline your manager's request for a meeting with you.

On March 4, 2004, you knew your manager intended to issue a written reprimand to you. In her meeting request, Ruby Miles identified the facsimile number to which she would send the document and asked you to correct the information if she had the wrong number. You declined the meeting request, demonstrating that you obviously received the message. You were directed to attend the meeting requested by your manager. She sent the written reprimand by facsimile to you to the number you acknowledged, by your silence, was correct. Indeed, you received your PMP document via the same facsimile number only days before your written reprimand was delivered to that number.

Your suggestion that your manager sent the written reprimand to an incorrect number or without your authorization out of retaliation for your internal allegations of discrimination is, in a word, untrue. Contrary to your suggestion that we have not investigated your concerns, we have indeed examined what occurred, which is outlined above. This memo will serve as notice that our investigation into the matter is closed and that we have found no evidence of retaliation or retaliatory intent.

That said, we will not permit you to level allegations of retaliation, discrimination or harassment at your manager with abandon. While Getronics is committed to ensuring that its employees have a workplace free from untoward and inappropriate conduct, Getronics also prohibits abuse of its complaint procedures. You are directed not to use the words "retaliation," "discrimination" or "harassment" without the exercise of discretion, care and caution. You are officially cautioned that you may not abuse this Company's complaint procedures.

Do not respond to this email. We will be in contact with you to issue disciplinary steps and to outline our expectations and requirements for your workplace conduct. You will receive a Performance Improvement Plan.

Regards,
Jimmy Thomas on behalf of Gayla George.

*This e-mail message and any attachments are confidential and may be privileged. If you are not the intended recipient, please notify me immediately by replying to this message and please destroy all copies of this message and attachments. Thank you.*

GETR0222

# EXHIBIT J



# PERFORMANCE IMPROVEMENT PLAN

**Date of Reprimand:** March 22, 2004                    **Date of Verbal Warning:**

**Employee Name:** Aalaeldin Khirawi                    **Dates of Occurrence:** March 18-20, 2004

**Details of Performance Deficiencies:**

~~On March 4, 2004, you were issued a written reprimand to address your professional demeanor~~
with your manager and teammates. To date you have failed to show significant improvement in
the aforementioned areas. Please note that your performance is not consistent with our standards
of professionalism and our company values. This letter will serve to advise you of the following
specific points of performance failings, which have all been raised with you in the past.

- Your continued refusal to answer a direct question as posed by your manager.
  Specifically, the question was "Are you working from home on Monday's?"
- On March 19, 2004, you were sent an email from Gayla George (via Jimmy Thomas)
  regarding your professional demeanor and asked not to respond to this e-mail. You did,
  however, respond to this e-mail numerous times and relentlessly demanded a return
  response.
- You continue to use an unacceptable communication style with your manager and others.
  Professional communication, which is required of you, does not include the overuse of the
  exclamation point, bold font or underline. Nor does it include repetitive sending of
  disrespectful emails containing blatant demands and accusations.
- On March 4, 2004 you failed to make yourself available to discuss your written reprimand,
  although you were aware of your manager's intentions and requests to meet with you.
  Furthermore, it was necessary to engage Human Resources to call your attendance to this
  meeting.

In addition, your behavior has violated, at a minimum, the Getronics Rules of Employee Conduct
which in summary reads "Refusing to follow, or interfering with, a manager's or supervisor's
direction, failing to carry out any reasonable order of supervision, or treating a manager or
supervisor in an insubordinate manner of any sort."

**Corrective Action to be Taken:**

Aalaeldin, you must show immediate improvement in the performance failings listed above.

Specifically,

- You will attend all meetings requested by your manager.
- You will respond immediately and politely to all inquiries, requests and directives of your
  manager.
- You must cease and desist from your deluge of email to your manager and others.
- You are directed not to use the words "retaliation," "discrimination" or "harassment"
  without the exercise of discretion, care and caution.

KHIRAWI0210

- You are officially cautioned that you may not abuse the Company's complaint procedures. Please reference the employee handbook, pages 11-13, for dispute resolution procedures. If you disagree with any of the Company's findings, which have been communicated to you, you are directed to use the dispute resolution process.
- You are directed to provide an answer to your manager's simple question posed to you, which is "Are you working from home on Mondays?" As your manager has indicated to you, your working hours are Monday through Thursday for 10 hours each day in the office. Again, you are directed to copy me on your response to the question.
- You will communicate both verbally and in writing in a professional and measured manner with your manager. In your communications with your manager or in communications upon which your manager is copied, you may not accuse your manager of making comments or promises that she has stated she did not make.
- You will focus on the performance of your job duties without anger.

You are expected to demonstrate immediate, significant and sustained improvement in your performance improvement plan. Failure to show such improvement may subject you to further disciplinary action (up to and including termination) at any time during the plan period. In addition to meeting the plan objectives, you are expected to perform satisfactorily all other job duties. You must also continue to fulfill the plan requirements after the plan period has ended. Failure to sustain the level of performance required by the plan beyond the plan period may subject you to further disciplinary action (up to and including termination), without additional notice.

**Effective Date of Action:** _March 23, 2004__  **Subsequent Review Date:** _April 23, 2004__

Employee REFUSED to SIGN     3-25-2004
**Employee Signature**                          Date

                                   3-23-2004
**Manager/Supervisor Signature**                Date

                                   3-23-2004
**Human Resources Signature**                   Date

NOTE: Place in emp. File

KHIRAWI0211

# EXHIBIT K

## Khirawi, Aalaeldin

| | |
|---|---|
| **From:** | Khirawi, Aalaeldin |
| **Sent:** | Friday, March 19, 2004 12:50 PM |
| **To:** | Khirawi, Aalaeldin; Miles, Ruby |
| **Subject:** | RE: Mondays |

The answer is NO

-----Original Message-----
**From:** Miles, Ruby
**Sent:** Thursday, March 18, 2004 11:36 AM
**To:** Khirawi, Aalaeldin
**Subject:** Work Schedule

Al,

Are you working from home on Mondays?

*Ruby Miles*
*QA Manager*
*Performance Management*
Office: (713) 852-5659
Cell: (281) 830-9853

The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon the information by persons and/or entities other than the intended recipient is prohibited. If you received this in error, please inform the sender and/or addressee and immediately delete the material. Thank you.

**KHIRAWI0163**

# EXHIBIT L

-----Original Message-----
**From:**      Khirawi, Aalaeldin
**Sent:**      Tuesday, May 18, 2004 10:49 AM
**To:**        Miles, Ruby
**Cc:**        Freeman, Terence; Hoffman, James
**Subject:**   RE: Co-Worker(s) observation

You have accused me of reporting hours I did not work, and now you are asking me not to know the source.
I will conclude that you do not have any source and this is another episode of harassment , retaliation  a continuous effort from your part to belittle me till I may leave this company, and that is not honest nor acceptable by all laws, and morality
And I am asking who ever is responsible of you and have the authority over your action to stop it and as soon as possible or find a way to move me from your department as it is so clear that you are out of control
And now this conversation is closed

AL

-----Original Message-----
**From:**      Miles, Ruby
**Sent:**      Tuesday, May 18, 2004 11:42 AM
**To:**        Khirawi, Aalaeldin
**Cc:**        Freeman, Terence; Hoffman, James
**Subject:**   RE: Co-Worker(s) observation

## REDACTED

Al,

I am your manager and I consult sources that I deem appropriate since I am managing you from a remote location. This discussion is closed for now.  We will discuss the matter of how best to monitor your comings and goings this Friday.  I do not want repetitive cycles of emails over this topic.  Recall the number of times you required me to pose the simple question to you of whether or not you were working from home on Mondays.  I will not engage in debates with you over this matter.  Again, discussion is closed

*Ruby Miles*
*QA Manager*
*Performance Management Group*

**Getronics North America Operations**
**9009 West Loop South, Suite 500**
**Houston, TX 77096 USA**
**Tel: +01 713-852-5659**
**Cell: +01 281-830-9853**
**Email: ruby.miles@getronics.com**

ICT Security | Network Integration Services | Network & Desktop Outsourcing | Application Integration & Management

www.getronics.com

*The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon this information by persons and/or entities other than the intended recipient is prohibited. If you received this in error, please inform the sender and/or addressee immediately and delete the material.*

*Thank you.*

-----Original Message-----

**From:**   Khirawi, Aalaeldin
**Sent:**   Tuesday, May 18, 2004 7:36 AM
**To:**     Miles, Ruby
**Cc:**      Freeman, Terence; Hoffman, James
**Subject:** RE: Co-Worker(s) observation

Ruby
I need to know who from my co-workers in Tewksbury reported that I was not here when I said I was, so as to see which story was the correct one.
I do need the information before Friday so as I could bring the results with me for the meeting on that day with Mr. Hoffman

Al Khirawi

-----Original Message-----
**From:**   Miles, Ruby
**Sent:**   Monday, May 17, 2004 11:58 AM
**To:**     Khirawi, Aalaeldin
**Subject:** RE: Timesheet Due

By co-worker observation, you have not been in the office the hours that you reported.  Have you been working from home? If you were working from home, can you please tell me what processes you were working on? Keep in mind, however, you're not approved to work from home at this time.

Also, I found another mistake - please change 5 hours on May 13th to STD (006000, 987) instead of your regular time 589909.

Thanks.

***Ruby Miles***
***QA Manager***
***Performance Management Group***

**Getronics North America Operations**
**9009 West Loop South, Suite 500**
**Houston, TX 77096 USA**
**Tel: +01 713-852-5659**
**Cell: +01 281-830-9853**
**Email: ruby.miles@getronics.com**

ICT Security | Network Integration Services | Network & Desktop Outsourcing | Application Integration & Management

www.getronics.com

*The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon this information by persons and/or entities other than the intended recipient is prohibited. If you received this in error, please inform the sender and/or addressee immediately and delete the material.*

*Thank you.*

-----Original Message-----
**From:**       Khirawi, Aalaeldin
**Sent:**       Monday, May 17, 2004 10:38 AM
**To:**  Miles, Ruby
**Subject:**    RE: Timesheet Due

*Regarding the first issue the answer is yes.*
*But let me know why you will approve 74 instead of 80*

*Al*

-----Original Message-----

**GETR0519**

**From:**     Miles, Ruby
**Sent:**     Monday, May 17, 2004 11:31 AM
**To:**  Khirawi, Aalaeldin
**Subject:**      RE: Timesheet Due

Al,

It is my understanding that today, May 17th is your first day of working 10 hour days.  Please verify?

On another note, as I proceeded to approve your timesheet, I am only approving the following hours: instead of 80 hours, I will approve 74 hours.

Thanks.

*Ruby Miles*
*QA Manager*
*Performance Management Group*

**Getronics North America Operations**
**9009 West Loop South, Suite 500**
**Houston, TX 77096 USA**
**Tel: +01 713-852-5659**
**Cell: +01 281-830-9853**
**Email: ruby.miles@getronics.com**

ICT Security | Network Integration Services | Network & Desktop Outsourcing | Application Integration & Management

www.getronics.com

*The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon this information by persons and/or entities other than the intended recipient is prohibited. If you received this in error, please inform the sender and/or addressee immediately and delete the material.*

*Thank you.*

-----Original Message-----
**From:**      Khirawi, Aalaeldin
**Sent:**      Monday, May 17, 2004 8:26 AM
**To:**      Miles, Ruby
**Subject:**      RE: Timesheet Due

*Ruby*
*I am not sure what codes to use, since 5 days are worked every day for the last 3 weeks.*
*Can you help me?*

*Al*

-----Original Message-----
**From:**      Miles, Ruby
**Sent:**      Friday, May 14, 2004 7:48 AM
**To:**      Anderson-Jones, Tiffiny; Bentley, Leland; Khirawi, Aalaeldin
**Subject:**      Timesheet Due

All,

Please complete your timesheet for me so that I can approve.  Thanks.

*Ruby Miles*
*QA Manager*
*Performance Management Group*

**GETR0520**

**Getronics North America Operations**
**9009 West Loop South, Suite 500**
**Houston, TX 77096 USA**
**Tel: +01 713-852-5659**
**Cell: +01 281-830-9853**
**Email: ruby.miles@getronics.com**

ICT Security | Network Integration Services | Network & Desktop Outsourcing | Application Integration & Management

www.getronics.com

*The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon this information by persons and/or entities other than the intended recipient is prohibited. If you received this in error, please inform the sender and/or addressee immediately and delete the material.*

*Thank you.*

# EXHIBIT M

-----Original Message-----
From:      Ogg, Wayne
Sent:      Monday, May 24, 2004 9:38 AM
To:        Khirawi, Aalaeldin
Subject:   Request to Investigate



Mr. Khirawi:

I have again inquired into your situation. This Company flatly denies your allegations of inappropriate conduct of any kind. You have and continue to be treated fairly.

It is my understanding that your performance, including but not limited to your reporting of hours worked, is under scrutiny. This is unrelated to any of the reasons you suggest below. Indeed, you are on a Performance Improvement Plan.

I have no comment related to your private interactions with your personal doctor, as you are responsible for seeking appropriate care for yourself.

Please understand that as your employer, we are entitled to require performance, productivity and courteousness from you. If you wish to remain with us, I encourage you to focus on your performance, productivity and professionalism toward your colleagues and management. Getronics, not its employees, determines who shall report to whom.

Thank you.

Wayne Ogg

-----Original Message-----
**From:** Khirawi, Aalaeldin
**Sent:** Tuesday, May 18, 2004 2:16 PM
**To:** Ogg, Wayne
**Subject:** Request to investigate

Hello Mr. Ogg

I did send you a request to intervene in my case , which has taken other serious turns in the last week.

1

**GETR0503**

I have been working in this company since 1999.

I am a black Muslim, originally from Africa.

I have had so many events in this company, that I have served that makes me conclude that is a systematic effort to make it hard for me to stay.

My performance has never been the issue, and thus I would conclude that my ethnicity , back ground and religion have.

I was out for over 6 weeks on STD leave.

And I have asked my Dr to get me back half days against his own will, as he wanted me to stay out longer.

My manager Ruby Miles has refused to pay me the hours that Getronics should be paying me, basing her decision on a source from Tewksbury who told her that I did not report to work the dates and hours I said I have.

I am really feeling cornered by my manager and pressured to make a decision to leave this company which I love and respect.

I have asked Mr Hoffman James to mover me under different management or different post or task.

I do really need help, just because my environment has been full of doubts, harassment and retaliation

My best of regards

Aalaeldin Khirawi

GETR0504

# EXHIBIT N



# WRITTEN REPRIMAND

**Date of Reprimand:** May 21, 2004          **Date of Verbal Warning:**

**Employee Name:** Aalaeldin Khirawi          **Date of Occurrence:** 5/18/04

---

**Details of Performance Deficiencies:**

On March 4, 2004, you were issued a written reprimand to address your professional demeanor with your manager and teammates. On March 22, 2004 you were issued a performance improvement plan that addressed your professional demeanor and insubordination with your manager. On May 18, 2004 you were again insubordinate and disrespectful toward your manager. You were sent an email by Ruby Miles regarding the monitoring of your time and asked not to respond to this e-mail and that the issue was closed. You did, however, respond to this e-mail and with an unacceptable, disrespectful tone.

Aalaeldin, your behavior continues to violate, at a minimum, the Getronics Rules of Employee Conduct, which in summary reads "Refusing to follow, or interfering with, a manager's or supervisor's direction, failing to carry out any reasonable order of supervision, or treating a manager or supervisor in an insubordinate manner of any sort."

**Corrective Action to be Taken:**

Aalaeldin, you must show immediate improvement in adhering to the direction set by your manager. Also, you must communicate both verbally and in writing in a professional and measured manner with your manager.

You are expected to demonstrate immediate, significant and sustained improvement in your performance improvement plan. Failure to show such improvement may subject you to further disciplinary action (up to and including termination) at any time during the plan period. In addition to meeting the plan objectives, you are expected to perform satisfactorily all other job duties. You must also continue to fulfill the plan requirements after the plan period has ended. Failure to sustain the level of performance required by the plan beyond the plan period may subject you to further disciplinary action (up to and including termination), without additional notice.

**Effective Date of Action:** 5/21/04          **Subsequent Review Date:** _____

_employee refused to sign_

**Employee Signature** _____          **Date** 5/21/04

**Manager/Supervisor Signature** _____          **Date** 5/24/04

**Human Resources Signature** _____          **Date**

NOTE: Place in emp. File

# EXHIBIT O

**Khirawi, Aalaeldin**

| | |
|---|---|
| **From:** | Khirawi, Aalaeldin |
| **ent:** | Wednesday, May 26, 2004 12:55 PM |
| **ı o:** | Khirawi, Aalaeldin; Miles, Ruby |
| **Cc:** | Galipeau, Paul; Hoffman, James; Freeman, Terence |
| **Subject:** | RE: RE: CRM8 Ticket # 3919833; Retrieval of Getronics-owned laptop |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

After I spoke with Paul Galipeau again, I am convinced now I should be returning the lap top ( Dell) back.
It will be given by me to Dave Ayotte as it is OK with Mr Galipeau, on May the 27th 2004 @ 9.30 am eastern standard time ( Thursday ) , which is within the dead line of Mrs. Miles

Al Khirawi

-----Original Message-----

| | |
|---|---|
| **From:** | Khirawi, Aalaeldin |
| **Sent:** | Wednesday, May 26, 2004 12:44 PM |
| **To:** | Miles, Ruby |
| **Cc:** | Galipeau, Paul; Hoffman, James; Freeman, Terence |
| **Subject:** | RE: RE: CRM8 Ticket # 3919833; Retrieval of Getronics-owned laptop |

I apologize for the mistake, I meant using it for the GUV classes like the 6 sigma, MSCP, MSCPA, MSCE, and also to use it for running some reports ( Witness and other software) as part of the assignments I have as a QA rep using software like MS excel and other software that I have them installed in it.
It is a very good tool and resource some one like me with this kind of job descriptions and duties should have.
And actually I was planning to convince Tiffiny to acquire one for the same purpose from Getronics ( if she does not have one already) .
Any way , if you insist and Paul wants back then I have no other way but to spend $1500 to buy one just to use it to better my self and to get it to help me do my job better in this great company we all love and respect

Al Khirawi

I have talked to Paul Galipuea, who gave me the Lap top before even I started working with your team.
I understand that the Lap top is his and was given to me by him on November of last year , as I mentioned to all of you, and I do not remember asking you to give me the Lap top.
I spoke with Paul yesterday as he was my previous manager and told him if he needed the lap top back and he said no.
And now I am asking him again, if he needs his Lap Top back then I will give it back to him.
And in case he does need it back, I will just buy a newer one from an out side vendor , since I use it to access the JUV from home, my E-mails and also to access so many good resources for business and personal use

Once again , it was given to me on a personal request from Paul and I am waiting for him to ask for it back

ı Khirawi

1

KHIRAWI0189

-----Original Message-----
| | |
|---|---|
| **From:** | Miles, Ruby |
| **Sent:** | Wednesday, May 26, 2004 11:35 AM |
| **To:** | Khirawi, Aalaeldin |
| **Cc:** | Galipeau, Paul; Hoffman, James; Freeman, Terence |
| **Subject:** | RE: RE: CRM8 Ticket # 3919833; Retrieval of Getronics-owned laptop |
| **Importance:** | High |

Al,

As outlined in our telephone communication this past Friday, May 21st, you were directed by me to return the Getronics-owned laptop on Monday, May 24th. As your manager, I am instructing you to return the Getronics-owned laptop by close of business tomorrow, Thursday, May 27 to the Tewksbury desktop technician, Dave Ayotte. If you do not adhere to this directive, it will result in another written reprimand.

*Ruby Miles*
*QA Manager*
*Performance Management Group*

**Getronics North America Operations**
**9009 West Loop South, Suite 500**
**Houston, TX 77096 USA**
**Tel: +01 713-852-5659**
**Cell: +01 281-830-9853**
**Email: ruby.miles@getronics.com**

ICT Security | Network Integration Services | Network & Desktop Outsourcing | Application Integration & Management

www.getronics.com

*The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon this information by persons and/or entities other than the intended recipient is prohibited. If you received this in error, please inform the sender and/or addressee immediately and delete the material.*

*Thank you.*

-----Original Message-----
| | |
|---|---|
| **From:** | Ayotte, Dave |
| **Sent:** | Tuesday, May 25, 2004 4:21 PM |
| **To:** | Crawford, Gail |
| **Cc:** | Miles, Ruby; Galipeau, Paul |
| **Subject:** | RE: CRM8 Ticket # 3919833; Retrieval of Getronics-owned laptop |

Gail,
 As requested, I attempted to retrieve the Getronics-owned laptop from Aalaeldin Khirawi. He stated that this was a mistake on Ruby's part, as the laptop was given to him by Paul Galipeau, and not Ruby. He then went on to state that he would get Paul involved & resolve the matter himself.

As such, I was not able to retrieve the Laptop. I will leave the CRM ticket in "Open – Pending Customer" status for the time being, until given further instructions.

Thank you,

**Dave Ayotte**
Technical Support Specialist

Getronics Infrastructure Solutions
836 North St.
Tewksbury, MA.
01876
Tel: 978-858-8219

**KHIRAWI0190**

Fax: 978-858-6616
dave.ayotte@getronics.com
www.getronics.com/us

KHIRAWI0191

# EXHIBIT P

EEOC FORM 131 (5/01)
# U. S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| **Chief Executive Officer**<br>**GETRONICS**<br>**836 North Street**<br>**Tewksbury, MA 01876** | **Aaladldin  Khirawi** |
| | THIS PERSON *(check one or both)*<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>**161-2004-00285** |

## NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act          [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act          [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [X] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by      **16-JUL-04**      a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below.  Your response will be placed in the file and considered as we investigate the charge.  A prompt response to  this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by                          to the enclosed request for information and send your response to the EEOC Representative listed below.  Your response will be placed in the file and considered as we investigate the charge.  A prompt response to this request will make it easier to conclude our investigation.

5. [X] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources.  If you would like to participate, please say so on the enclosed form and respond by      **02-JUL-04**
to  **Liz Marcus, ADR Coordinator, at (617) 565-3200**
If you <u>DO NOT</u> wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above.  Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

**Rance A. O'Quinn,**
**Enforcement Supervisor**

*EEOC Representative*

Telephone:  **(617) 565-3192**

**Boston Area Office**
**John F. Kennedy Fed Bldg**
**Government Ctr, Room 475**
**Boston, MA 02203**

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION
[X] RACE    [ ] COLOR    [ ] SEX    [ ] RELIGION    [X] NATIONAL ORIGIN    [ ] AGE    [ ] DISABILITY    [X] RETALIATION    [ ] OTHER

## See enclosed copy of charge of discrimination.

**GETR0139**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| **Jun 15, 2004** | **Robert L. Sanders,**<br>**Director** | |





**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Boston Area Office**

John F. Kennedy Federal Building
Government Center
Room 475
Boston, MA 02203-0506
(617) 565-3200
TTY (617) 565-3204
FAX (617) 565-3196

---

**Massachusetts Jurat Attachment to**
**EEOC Form 5 Charge of Discrimination**

---

Charge Number: 161 - 2004 - 00285

Commonwealth of Massachusetts
County of Suffolk

On this the ___8th___ Day of ___June, 2004___, before me,
    Day      Month   Year

___JAMES VAN RYEN___, the undersigned Notary Public, personally appeared
  Name of Notary Public

___AALAELDIN M KHIRAWI___, proved to me through satisfactory evidence of identity,
  Name of Charging Party

___N.H Driv. Lic___, to be the person whose name was signed on the attached
  Description of Identity

document in my presence, and who swore or affirmed to me that the contents of the document
are truthful and accurate to the best of their knowledge and belief.

_____
Signature of Notary Public

JAMES J. VAN RYEN, Notary Public
My Commission Expires July 5, 2008

_____
Printed Name of Notary

My Commission Expires _____

JAMES J. VAN RYEN, Notary Public
My Commission Expires July 5, 2008

_____
Place notary seal and/or stamp above



RECEIVED
14 2004
E.E.O.C.
BOSTON AREA OFFICE

**GETR0142**

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | **161-2004-00285** |

| **Massachusetts Commission Against Discrimination** | | and EEOC |
|---|---|---|
| *State or local Agency, if any* | | |

| Name *(Indicate Mr., Ms., Mrs.)*<br>**Mr. Aaladldin Khirawi** | Home Phone No. *(Incl Area Code)*<br>**(603) 669-7886** | Date of Birth<br>**08-29-1963** |
|---|---|---|
| Street Address                    City, State and ZIP Code<br>**14 Auclair Avenue, Manchester, NH 03102** | | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name<br>**GETRONICS** | No. Employees, Members<br>**500 or More** | Phone No. *(Include Area Code)* |
|---|---|---|
| Street Address<br>**836 North Street, Tewksbury, MA 01876** | City, State and ZIP Code | |
| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
| Street Address | City, State and ZIP Code | |

*(stamp: JUN 1 4 2004  E.E.O.C. BOSTON AREA OFFICE)*

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☒ NATIONAL ORIGIN<br>☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ OTHER *(Specify below.)* | Earliest    Latest<br>**02-03-2003**    **06-01-2004**<br>☒ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

1. I began working for the Respondent in 1999 as a temporary employee but was hired in September of 2000 as a full-time, permanent employee i.e., Customer Service Representative. In October of 2002, I applied for the vacant position of a Quality Assurance Representative and was told, by the Respondent (Ruby Miles) that I will be selected for the position because of my education and experience. Ms. Miles further told me that my salary would be around $38,000.00 to $40,000.00 with stock options and other compensation bonuses. From February 2003 to September 2003, Respondent had me working as a Quality Assurance Representative without changing my pay or benefits. When I asked Ms. Miles why Respondent has not offered me the position yet, her response was, "Because it is all racial Alladin, its because you are black...welcome to the club of suffering." . In August of 2003, Respondent, Paul Galipieau, offered me the Quality Assurance Representative position but told me that my salary will be $36,000.00 and the compensation package also changed. Initially, I told Mr. Galipieau that I would not sign the offer but did sign it later on him promise that I will get a salary increase in September of 2003 and January of 2003, and that he will also find compensation for me for the months I had worked as a Quality Assurance Representative from February 2003 to September 2003. I never received the salary increase and compensations as promised. In January or February of 2004, I filed a complaint against Ruby Miles with the Respondent and have been subjected to retaliation ever since.. Ms. Miles has threatened me with a warning for my attendance and gave me bad performance evaluations.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| Date **6/10/04**    *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* **6.10.04**    JAMES J. VAN RYEN, Notary Public<br>My Commission Expires July 5, 2008 |

GETR0140

EOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 161-2004-00285 |

**Massachusetts Commission Against Discrimination** and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE *(Continued from previous page):*

**II. Respondent did not give me a valid reason why it subjected me to employment discrimination.**

**III. I believe Respondent retaliated against me, showed bad faith on a promise made to me in August of 2003, and gave me a different salary/compensation package when it hired me as a Quality Assurance Representative all because of my Religion (Islam) and race (Muslim from Africa) in violation of Title VII of the Civil Rights Act of 1964, as amended, and all applicable**

GETR0141

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

6/10/04 — *Charging Party Signature*  
*Date*

NOTARY – *When necessary for State and Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)*  
6·10·04

JAMES J. VAN RYEN, Notary Public  
My Commission Expires July 5, 2008

# EXHIBIT Q

**From:** Khirawi, Aalaeldin
**Sent:** Thursday, August 05, 2004 12:26 PM
**To:** Miles, Ruby
**Subject:** RE: Suggestions

*Ruby*
~~*Of course this is all not true, and specially with Tiffiny ( I have all the e-mails to prove this)*~~
*My only question will be to you at this time, why are you doing this?*
*Why are you still after me and making up this untrue stuff, and wants me to leave the company.*
*I am just asking this once and for all, what exactly do you want from me?*

*Please send me and in details what exactly do you want me to do and ASAP?*


*Al*
-----Original Message-----
**From:** Miles, Ruby
**Sent:** Thursday, August 05, 2004 12:40 PM
**To:** Khirawi, Aalaeldin
**Subject:** RE: Suggestions

Al,

I have received your email.  Right now, I want you to focus on my pending requests, which you have ignored repeatedly.  Your conduct has been unacceptable, as you know.

Please complete your assigned tasks.  Please send me an email when you arrive to work and when you depart. Additionally, when you are away from your desk for more than a few minutes, advise me, as well, via email.  Outside of such times, I will expect you to answer your telephone when I and any of your other colleagues attempt to contact you.

This message will also confirm that your offer to "help" Tiffiny complete the EOM (trending portion) reports has been belated and misguided.  Tiffiny has tried to contact you previously, as you well know, and you have not responded.  Please contact Tiffiny by telephone to consult on the trending section of the reports as the rest of the report has been previously discussed and agreed upon. Please do so immediately since the trending of the reports is very important. The total report is due tomorrow, therefore urgency is of utmost importance.  Thank you.

I will be in touch with further directives in the near future.  Please do not respond to this email.  That is a directive.  I will not tolerate back and forth discussion on these or any other directives.  Thank you.

Ruby


**Ruby Miles**
**QA Manager**
**Performance Management Group**

**Getronics North America Operations**
**9009 West Loop South, Suite 500**
**Houston, TX 77096 USA**
**Tel: +01 713-852-5659**
**Cell: +01 281-830-9853**
**Email: ruby.miles@getronics.com**
ICT Security | Network Integration Services | Network & Desktop Outsourcing | Application Integration & Management

**GETR0452**

www.getronics.com
*The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon this information by persons and/or entities other than the intended recipient is prohibited. If you received this in error, please inform the sender and/or addressee immediately and delete the material.*

*Thank you.*

---

**From:** Khirawi, Aalaeldin
**Sent:** Thursday, August 05, 2004 9:10 AM
**To:** Miles, Ruby
**Subject:** Suggestions

Mrs. Miles.
I have this suggestion too, and to more better our performance and interaction with management , we can schedule a meeting to discuss the out come of the monthly report and trending data ( Starting next month).
I mean, after every report ( on the 5th, 6th or 7th)
It can be one hour or less meeting and all attend, and like that we give let us say 5 minutes to each to give us feed back, and like that we we be building a network between Huston and Tewksbury.


Please advise

**GETR0453**

# EXHIBIT R.

**From:** Khirawi, Aalaeldin
**Sent:** Friday, August 06, 2004 7:59 AM
**To:** Miles, Ruby
**Subject:** RE: Suggestions-Notes

Mrs. Miles

Please also, send me your feed back on the suggestions I have raised to you, because I would like to communicate them to my managers here for feed back as well.


Al


*Mrs. Miles*
*I do not understand that you keep giving me directive after directive*
*This kind of communication can not be acceptable in such an environment and nature of business.*
*We are in a performance management team, and we are involved in developing some kind of plans, projects and most importantly network of data analysis.*
*I do believe the 6 sigma project would appreciate such kind of discussion*
*We need to work and find a way to communicate better than this.*
*I have just finished talking to Tiffiny, and we agree on most of the things I have raised before and she will actually send an e-mail out as she promised me that our interaction and work together is good and producing a lot of results.*
*I do not know your problems with me using the e-mail to communicate*
*It is cheap, convenient and productive, and most importantly it will record all communication and interaction between people that uses lots of data , graphs and discussion.*
*I will prefer to communicate via the e-mails, and Tiffiny just said she has no problem with that*


*Al Khirawi*
-----Original Message-----
**From:** Miles, Ruby
**Sent:** Friday, August 06, 2004 8:35 AM
**To:** Khirawi, Aalaeldin
**Subject:** RE: Suggestions

Al,

This is non-negotiable. The point is that you and Tiffiny need to speak on the telephone which is what I have written to you in the past. This should be done twice a week at whatever scheduled intervals that you and Tiffiny work out. If you find after communicating with her, that the conversations will be 30-60min., you may use my conference bridge number. I will furnish that to you/Tiffiny as deemed necessary; otherwise, please use the regular phone service to call her directly. Please contact her by 9am EDT today. This is a directive and not up for discussion. Thanks.


**Ruby Miles**
**QA Manager**
**Performance Management Group**

**Getronics North America Operations**
**9009 West Loop South, Suite 500**
**Houston, TX 77096 USA**

GETR0446

**Tel: +01 713-852-5659**
**Cell: +01 281-830-9853**
**Email: ruby.miles@getronics.com**
ICT Security | Network Integration Services | Network & Desktop Outsourcing | Application Integration & Management
www.getronics.com

*The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon this information by persons and/or entities other than the intended recipient is prohibited. If you received this in error, please inform the sender and/or addressee immediately and delete the material.*

*Thank you.*

---

**From:** Khirawi, Aalaeldin
**Sent:** Thursday, August 05, 2004 3:28 PM
**To:** Miles, Ruby
**Subject:** RE: Suggestions

*Mrs. Miles*

*I did send more than one e-mail to Tiffiny , including  one today today, but no response as of yet.*
*Is she out?*
*I prefer e-mails , they are convenient , effective and cheaper than calling.*
*I am not sure.*


*Al Khirawi*
-----Original Message-----
**From:** Miles, Ruby
**Sent:** Thursday, August 05, 2004 12:40 PM
**To:** Khirawi, Aalaeldin
**Subject:** RE: Suggestions

Al,

I have received your email.  Right now, I want you to focus on my pending requests, which you have ignored repeatedly.  Your conduct has been unacceptable, as you know.

Please complete your assigned tasks.  Please send me an email when you arrive to work and when you depart.  Additionally, when you are away from your desk for more than a few minutes, advise me, as well, via email.  Outside of such times, I will expect you to answer your telephone when I and any of your other colleagues attempt to contact you.

This message will also confirm that your offer to "help" Tiffiny complete the EOM (trending portion) reports has been belated and misguided.  Tiffiny has tried to contact you previously, as you well know, and you have not responded.  Please contact Tiffiny by telephone to consult on the trending section of the reports as the rest of the report has been previously discussed and agreed upon. Please do so immediately since the trending of the reports is very important. The total report is due tomorrow, therefore urgency is of utmost importance.  Thank you.

I will be in touch with further directives in the near future.  Please do not respond to this email.  That is a directive.  I will not tolerate back and forth discussion on these or any other directives.  Thank you.

Ruby


***Ruby Miles***

**GETR0447**

'6/2004

**QA Manager**
**Performance Management Group**

**Getronics North America Operations**
**9009 West Loop South, Suite 500**
**Houston, TX 77096 USA**
**Tel: +01 713-852-5659**
**Cell: +01 281-830-9853**
**Email: ruby.miles@getronics.com**
**ICT Security | Network Integration Services | Network & Desktop Outsourcing | Application Integration & Management**
www.getronics.com
*The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon this information by persons and/or entities other than the intended recipient is prohibited. If you received this in error, please inform the sender and/or addressee immediately and delete the material.*

*Thank you.*

---

**From:** Khirawi, Aalaeldin
**Sent:** Thursday, August 05, 2004 9:10 AM
**To:** Miles, Ruby
**Subject:** Suggestions

Mrs. Miles.
I have this suggestion too, and to more better our performance and interaction with management , we can schedule a meeting to discuss the out come of the monthly report and trending data ( Starting next month).
I mean, after every report ( on the 5th, 6th or 7th)
It can be one hour or less meeting and all attend, and like that we give let us say 5 minutes to each to give us feed back, and like that we we be building a network between Huston and Tewksbury.

Please advise

**GETR0448**

# EXHIBIT S

Message

REDACTED

**From:** Miles, Ruby
**Sent:** Friday, August 06, 2004 10:39 AM
**To:** Getronics Helpdesk Americas
**Subject:** FW: Voice mails and calls from number 713-852-5531
**Importance:** High

Dear Getronics Helpdesk Americas,

**GETR0444**

:/6/2004

Please do not open this ticket. Al Khirawi works for me and we will not pursue this issue at this time. I will let you know when/if to open a ticket. Thanks!

**Ruby Miles**
QA Manager
**Performance Management Group**

**Getronics North America Operations**
**9009 West Loop South, Suite 500**
**Houston, TX 77096 USA**
**Tel: +01 713-852-5659**
**Cell: +01 281-830-9853**
**Email: ruby.miles@getronics.com**
ICT Security | Network Integration Services | Network & Desktop Outsourcing | Application Integration & Management
www.getronics.com
*The information transmitted is intended only for use by the addressee and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of it, or the taking of any action in reliance upon this information by persons and/or entities other than the intended recipient is prohibited. If you received this in error, please inform the sender and/or addressee immediately and delete the material.*

*Thank you.*

---

**From:** Anderson-Jones, Tiffiny
**Sent:** Friday, August 06, 2004 10:26 AM
**To:** Miles, Ruby
**Subject:** FW: Voice mails and calls from number 713-852-5531
**Importance:** High

-----Original Message-----
**From:** Khirawi, Aalaeldin
**Sent:** Friday, August 06, 2004 10:23 AM
**To:** Getronics Helpdesk Americas
**Cc:** Anderson-Jones, Tiffiny
**Subject:** Voice mails and calls from number 713-852-5531

*I have counter part Anderson-Jones, Tiffiny phone number 713-852-5531, Huston, calling and leaving messages in my phone numbers in Tewksbury 978-858-7761 and 978-858-7232, messages that I never found.*

*Please can you run a report between May to August 2004 on all messages from 713-852-5531 to phone numbers 978-858-7761 and 978-858-7761 and 978-858-7232 if possible*

*This is very important*

*Al Khirawi*

*Regards*

GETR0445

# EXHIBIT T



## PERFORMANCE EXPECTATIONS

**Date of Issuance:**    August 19, 2004

**Employee Name:**    Aalaeldin Khirawi

**Details of Past Performance:**

You have raised several internal complaints of unfair treatment and alleged discrimination, all of which have been duly and fully investigated. Getronics has found no evidence of unfair treatment or discrimination. You have inappropriately displayed frustration with and rejection of these results. Getronics requires that you comport yourself with professionalism and respect.

Your workplace behavior to date has violated, at a minimum, the Getronics Rules of Employee Conduct policy. Specifically, "[r]efusing to follow, or interfering with, a manager's or supervisor's direction, failing to carry out any reasonable order of supervision, or treating a manager or supervisor in an insubordinate manner of any sort" constitutes unacceptable conduct. Your supervisor has endeavored to work with you by providing direction, requests for information and requests for specific performance items.

You have embarked on a path of disobedience notwithstanding the facts that on March 4, 2004, March 22, 2004 and May 21, 2004, you were issued a written reprimand, a performance improvement plan and a written reprimand, respectively, to address your unprofessional, insubordinate and disrespectful demeanor toward your supervisor and others within Getronics.

Far too frequently, you have resisted your supervisor's authority and argued back through exhaustive and wasteful email cycles. This conduct will not be tolerated with your supervisor or any other member of the Getronics organization. Additionally, an essential function of your job is reporting to work timely and consistently. Your attendance pattern has been unacceptable. In the past twelve (12) months, you have taken over thirteen (13) sick days. Getronics considers the use of more than eight (8) days of sick leave in a rolling twelve-month period to be excessive. You have likewise failed to abide the simple request that you notify your supervisor, who is located in Houston, of your arrival and departure times so that she can best monitor your daily performance and workload.

Your unavailability and lack of accountability will no longer be accepted.

Getronics hereby issues this document to outline expectations for your performance. Your supervisor is Ruby Miles. All of your workplace direction and support shall be received from Ms. Miles. You are being assigned a new human resources representative, Jamie Graceffa. All of your human resources direction and support shall be received from Mr. Graceffa.

GETR0005

**Performance Expectations:**

## A. Workplace Behavior

1. You must use a professional communication style with your supervisor and any other Getronics employee with whom you interact. Professional communication does not include overuse of the exclamation point, bold font or underline. Nor does it include repetitive sending of disrespectful email. You will cease and desist from your deluge of email to your supervisor or any other Getronics employee. When you are advised that an issue is closed, abide the directive.

2. You are directed not to use the words "retaliation," "discrimination" or "harassment" without the exercise of discretion, care and caution. Although you may disagree with the Company's findings with respect to your internal allegations of unfair treatment, Getronics stands by its decisions and determinations. You are officially cautioned not to abuse the Company's complaint procedures.

3. You will abide all directives and attend all meetings requested by your supervisor. You may not attempt to end-run your supervisor's authority. You will not consult any supervisor other than your own for direction and control.

4. You shall abide by all requirements completely. For example, you are to communicate in the medium specified by your manager. If your manager states that you are to place a telephone call to a colleague, this is precisely what you are to do.

## B. Performance Requirements:

In addition to abiding any other request or directive,

1. **Attendance:** Upon arrival and initiation of work for the day, and upon departure and cessation of work for the evening, you are to send an email to Jamie Graceffa. If you are to be out of contact and unavailable for a significant period of time, you are to send an email before and after such unavailability to Jamie Graceffa. Additionally, on Fridays, you are to send an email before and after your mid-day break to Jamie Graceffa.

2. **Weekly Status Report:** You will submit a weekly status report outlining your accomplishment of the following job requirements. Please send your weekly status report to Jamie Graceffa each Tuesday by noon, EST.

   a. Conduct call assessments at a rate of no less than ten (10) per week. Please ensure that at least ten (10) calls are assessed on any client account that has not had any calls assessed within that week. You are to analyze the database to determine which accounts are in need of assessment. (In your weekly status report, please summarize the calls you have assessed.)

GETR0006

    b.  Ensure that the overall quality standards are being met on a consistent basis by monitoring the Service Desk processes/procedures (i.e., Call Flows and/or other KEWA documentation used assessing a call). (In your weekly status report, please summarize weekly progress on this task.)

    c.  Coordinate call calibrations between Houston and Tewksbury with Tiffiny to ensure consistency and congruency of call assessments. Continue with Six Sigma project. Tiffiny will be the contact for all verbal & written communication on this project until further notice. (In your weekly status report, please summarize your efforts with respect to the foregoing.)

    d.  Consult with Tiffiny at least twice a week by telephone for updates and coordination of tasks. (In your weekly status report, identify the date and time of these conference calls and summarize the topics discussed.)

    e.  Continue with status updates on new call assessment form. (In your weekly status report, please summarize your efforts toward and knowledge of analysts' use of the new form.)

    f.  Continue work with Team Managers or Team Leads on special projects. (In your weekly status report, please summarize any special project in which you are engaged.)

3.  **Daily Log**: You are required to complete a log of your daily work activity on an hourly basis. You are to submit your weekly hours reporting log to Jamie Graceffa by noon EST on Tuesday of each week. Please use the attached format for your daily log reporting.

You are expected to demonstrate immediate, significant and sustained improvement in your performance. Failure to show such improvement may subject you to further disciplinary action (up to and including termination) at any time. In addition to meeting the performance expectations, you are expected to perform satisfactorily all other job duties. Failure to sustain the level of performance required by this document or any other Getronics workplace rule may subject you to further disciplinary action (up to and including termination), without additional notice.

Employee Aalaeldin Khirawi               Date 8/19/04

Supervisor Ruby Miles                   Date 8/24/04

HR Representative Jamie Graceffa            Date 8/19/04

cc: Personnel File

GETR0007

# EXHIBIT U

## DISMISSAL AND NOTICE OF RIGHTS

To: Aaladldin Khirawi
    14 Auclair Avenue
    Manchester, NH 03102

From: Boston Area Office
      John F. Kennedy Fed Bldg
      Government Ctr, Room 475
      Boston, MA 02203

[ ] On behalf of person(s) aggrieved whose identity is
    CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 161-2004-00285 | Rance A. O'Quinn, Enforcement Supervisor | (617) 565-3192 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[ ] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ] While reasonable efforts were made to locate you, we were not able to do so.

[ ] You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this Notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Robert L. Sanders,
Area Office Director

0 8 OCT 2004

(Date Mailed)

Enclosure(s)

cc: GETRONICS
    c/o Marthe C. Stanek, Esq.
    290 Concord Road
    Billerica, MA. 01821-4130

# EXHIBIT V


*F 1*

### The Commonwealth of Massachusetts
### Commission Against Discrimination
### One Ashburton Place , Boston, MA 02108
### Phone: (617) 994-6000 Fax: (617) 994-6024

---

### NOTICE OF FINAL DISPOSITION

---

10/26/2004

Aaladldin Khirawi
14 Auclair Ave.
Manchester, NH 03102

**Re:  Complainant(s)**  Aaladldin Khirawi

**Vs.**

**Respondent(s)**  Getronics
MCAD Docket Number: 04BEM01982
EEOC Charge Number: 161A400285

**LACK OF PROBABLE CAUSE FINDING**

Dear Sir or Madam:

Please be advised that the Equal Employment Opportunity Commission has informed this Commission of a Final Determination in the above-referenced case dated 10/12/04.

We are in agreement with their decision and have granted substantial weight to the EEOC's determination to close your case for Lack of Probable Cause.  Therefore, your complaint has been dismissed.

**APPEAL PROVISION AND PROCEDURE**

If you wish to appeal the dismissal of your complaint, and believe that the finding of Lack of Probable Cause was incorrect, you may appeal to this Commission within ten (10) days after receipt by you of this notice.  Your appeal of the dismissal must be made in writing by you or your attorney to the Appeals Clerk of this Commission (Attention: Nancy To).

Sincerely,

Walter J. Sullivan Jr.
Investigating Commissioner            Ym  10-27-04

Cc:

Getronics
Attn:  Director of Human Resources
836 North Street
Tewksbury, MA 01876

MCAD Docket Number 04BEM01982, EEOC Notice of Final Disposition - LOPC            **GETR0239**

# EXHIBIT W

**From:** Graceffa, Jamie
**Sent:** Tuesday, September 28, 2004 5:01 PM
**To:** Khirawi, Aalaeldin
**Cc:** Miles, Ruby; Hoffman, James
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00

Dear Al:

I am mystified by your response. I convened the meeting with you and Jim Hoffman for the express purpose of presenting the Performance Expectations document to you. And, notwithstanding your refusal to sign it, after I explained its terms to you, I insisted that you take and carry away a copy with you. This is precisely what happened. You took the document with you. For you to now claim you have never seen it is preposterous.

Moreover, my involvement with the management of your performance and the Company's expectation and demands with respect to your performance are totally separate from your E.E.O.C. matter. Although you have allegations pending, Getronics will require that you comport yourself appropriately from interpersonal and technical standpoints. The two are not related. Your performance is under scrutiny due to the Company's long-standing and continuing dissatisfaction with your conduct.

For the last time I write to you: this discussion is closed. Do not respond to this email. That is a directive. Thank you, in advance, for your cooperation.

Regards,

Jamie

---

**From:** Khirawi, Aalaeldin
**Sent:** Tuesday, September 28, 2004 1:45 PM
**To:** Graceffa, Jamie
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00

Dear Jamie
I just received the document from Joan Anderson (HR)
I have not seen this document before today at 13.30.
This document starts with details of past performance and responses to my now current civil rights issues with this company.
And in it you or the company  to be exact is responding to my allegations which are now in front off the Equal Employment Opportunity Commission (EEOC).
I would not be comfortable to discuss this matter with you or with any person without my Lawyer, and the investigator from The EEOC.
I do not know why you have made such an allegations that you have given me this document and you have farther discussed the items in it with me in details as your previous e-mails suggested.
This could not have been since the case, since I was directed by my lawyer not to do that.
The second,  and third pages are the same items and performance plan that was initiated by Mrs.. Miles Ruby against me .
They are, however the same thing except of creating a new daily log sheet and the weekly reports being e-mailed to you.
This document proves that the meeting I had with you is the same like the previous meetings  with at least Mr. Hoffman, who told me before the meeting and in e-mail that it would be different from the previous meetings.
I will go over this document again and I will definitely follow its guidelines fully just like I  did with the other performance plans.

Regards

GETR0281

4/26/2005

heraw

-----Original Message-----
**From:** Graceffa, Jamie
**Sent:** Tuesday, September 28, 2004 1:29 PM
**To:** Khirawi, Aalaeldin
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00

Dear Al:

Just to be clear, the document you will receive today is a copy of the document I presented to you during our meeting and you took it with you. You refused to sign it, however. Again, I will be providing you with another copy shortly. Email correspondence on this matter is closed. Thank you.

Regards,

Jamie

---

**From:** Khirawi, Aalaeldin
**Sent:** Monday, September 27, 2004 5:16 PM
**To:** Graceffa, Jamie
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00

*Thank you so much. That would help me great deal then.*
*Once again*
*    not see or read any document.*

*Regards*

*Al Khirawi*

-----Original Message-----
**From:** Graceffa, Jamie
**Sent:** Monday, September 27, 2004 5:14 PM
**To:** Khirawi, Aalaeldin
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00

Al,

Tomorrow I will send you a copy of the version signed by Jim Hoffman and myself. I would like to remind that I did present the document to you during our meeting.

Thank you,
Jamie

---

**From:** Khirawi, Aalaeldin
**Sent:** Monday, September 27, 2004 5:05 PM
**To:** Graceffa, Jamie
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00

*Mr. Graceffa'*
*I agree, that I should not respond to this e-mail.( I already did)*
*But please e-mail the document you have been referring to, since I have not seen it*

4/26/2005

GETR0282

*Regards*

*Al Khirawi*

-----Original Message-----
**From:** Graceffa, Jamie
**Sent:** Monday, September 27, 2004 4:59 PM
**To:** Khirawi, Aalaeldin
**Cc:** Hoffman, James; Miles, Ruby
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00

Al,

As you know, the Performance Expectations document is clear and the Company's position is that you must abide its terms on an on-going basis.  For a considerable period of time prior to its issuance, the Company endeavored to promote acceptable performance from you, to no avail.

To be clear, although it has long been a requirement of your employment, you were not consistently emailing Ruby Miles at the point of your start and end times each day.  Accordingly, this performance expectation is an element of the Performance Expectations document.  And, you have continued to ignore or refuse to comply with this basic requirement.

I will not debate your points below and stand by all of my prior communications on this topic.  Please do not respond to this email with other than actual compliance with the terms of your Performance Expectations ument.  This matter is closed.  Thank you.

---

**From:** Khirawi, Aalaeldin
**Sent:** Monday, September 27, 2004 10:36 AM
**To:** Graceffa, Jamie; Hoffman, James
**Subject:** Performance requirements addresses on Thursday, August the 19th @ 15.00

Hello all

As a result of the e-mail sent to me on Friday August the 24th at 15.00 PM, I would like to clarify the following issues:

The meeting took place in Tewksbury (Second floor).
Mr. Graceffa and my self attended together in the room, while Mr. Hoffman dialed from Huston.
My expectation from the meeting that it would be the monthly report on the previous performance paln(s), and was indicated to me by Mrs Miles, Mr Hoffman and Mr Freeman, or a new performance plan.
I asked Mr. Hoffman to kindly inform me , if it was another performance plan to let me know what had triggered it, and if it was the monthly review of the pervious plan(s), then it was over due.
Mr. Hoffman told me (( via e-mail)) , that it was different from both.
The meeting was opened by Mr Hoffman, and then Mr Graceffa took over.
Mr Graceffa told me directly that, he could see me getting off the performance plan , if I to stick to the new expectations from him personally.
Up, to that moment I did not know what had happened to my supervisor Mile, Ruby ( since I had not received any ng form her informing me on her absence).
.ur Graceffa , then told me that I would be expected to do the following:

1) Report my ins and out time to him directly and via e-mail.
I raised the issues of login time "previous" system with Mrs.. Miles, and he said that would be fine, but added to it my Friday prayers time, and any time away from desk that exceeds the 40 minute time frame , except for lunch.

2) Mr. Graceffa , also told me to take in control of the both weekly meetings with Tiffiny Jones and to write the minutes for them and include them in my weekly report ( with the interference of Mr Hoffman, it was reduced to only one meeting to be my responsibility in calling it in and write its minutes).

3) Mr Graceffa also wanted me to be responsible of managing the training scheduling for all analysts in Tewksbury. ( But, then, dropped under the clarification of Mr Hoffman, that it would be out side my control and decision).

4) Mr Graceffa, then told me that I would be directing all my time off request to him till Miles comes back, and I did just that for two times ( The remainder of Thursday the 19th and all Friday the 20th). But then directed again and via e-mail by him to direct those requests to Mr Hoffman.

5) Mr Graceffa , introduced the daily log -on activity sheet and handled me some documents regarding the new procedure.
He later, told me that he would e-mail me the documents to start using for my new reporting to him.
I have not received the document on time, and I had to create the same sheet by my self, and started reporting to Mr. Graceffa the sheets, along with the weekly reports on Monday the 23rd of August 2004 and up until today this morning.

6) Mr. Graceffa told me that , the plan would stay open ended and no future date would be set for evaluation.

My understanding that, Mr Graceffa has been forwarding my weekly reports and log sheets to Mr Hoffman.
I asked , and after the first report on Tuesday the 24th of August 2004 Mr Graceffa if that was exactly what he wanted from me.
Mr Graceffa , then forwarded my question ( I guess), to Mr Hoffman who send me the following response on Wednesday August the 25th

" , I looked over the report and daily task log. You're capturing of the work being performed is appropriate as it's been requested at this time. Thanks."

Please let me confirm that this explanation is the understanding I got from the meeting and the events.
I based all my reporting to Mr. Graceffa on this understanding.


Regards
Aalaeldin Khirawi


GETR0284

4/26/2005

# EXHIBIT X

REDACTED

**From:** Khirawi, Aalaeldin
**Sent:** Wednesday, September 29, 2004 8:20 AM
**To:** Graceffa, Jamie
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00

**GETR0396**

Good morning Jamie

I have read the document given to me by Joan Anderson on Tuesday Sep the 28th @ 13.30 , and I have many questions about it.
Do I ask these questions for clarification or the directive you have issued yesterday should prevent me from doing so?

Please advise

My regards

Al Khirawi

-----Original Message-----
**From:** Khirawi, Aalaeldin
**Sent:** Tuesday, September 28, 2004 5:09 PM
**To:** Graceffa, Jamie
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00

*Dear Jamie*
*Your statement is not true  and you know that very well, however,*

*I will respect your directive to close this discussion that you have started by your e-mail dated Friday the 24th at 14.59 PM.*

*Regards*

*Al Khirawi.*


-----Original Message-----
**From:** Graceffa, Jamie
**Sent:** Tuesday, September 28, 2004 5:01 PM
**To:** Khirawi, Aalaeldin
**Cc:** Miles, Ruby; Hoffman, James
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00

Dear Al:

I am mystified by your response.  I convened the meeting with you and Jim Hoffman for the express purpose of presenting the Performance Expectations document to you.  And, notwithstanding your refusal to sign it, after I explained its terms to you, I insisted that you take and carry away a copy with you.  This is precisely what happened.  You took the document with you.  For you to now claim you have never seen it is preposterous.

Moreover, my involvement with the management of your performance and the Company's expectation and demands with respect to your performance are totally separate from your E.E.O.C. matter.  Although you have allegations pending, Getronics will require that you comport yourself appropriately from interpersonal and technical standpoints.  The two are not related.  Your performance is under scrutiny due to the Company's long-standing and continuing dissatisfaction with your conduct.

For the last time I write to you:  this discussion is closed.  Do not respond to this email.  That is a directive. Thank you, in advance, for your cooperation.

Regards,

Jamie

**From:** Khirawi, Aalaeldin
**Sent:** Tuesday, September 28, 2004 1:45 PM

GETR0397

9/29/2004

**To:** Graceffa, Jamie
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00

Dear Jamie
I just received the document from Joan Anderson (HR)
I have not seen this document before today at 13.30.
This document starts with details of past performance and responses to my now current civil rights issues with this company.
And in it you or the company to be exact is responding to my allegations which are now in front off the Equal Employment Opportunity Commission (EEOC).
I would not be comfortable to discuss this matter with you or with any person without my Lawyer, and the investigator from The EEOC.
I do not know why you have made such an allegations that you have given me this document and you have farther discussed the items in it with me in details as your previous e-mails suggested.
This could not have been since the case, since I was directed by my lawyer not to do that.
The second, and third pages are the same items and performance plan that was initiated by Mrs. Miles Ruby against me .
They are, however the same thing except of creating a new daily log sheet and the weekly reports being e-mailed to you.
This document proves that the meeting I had with you is the same like the previous meetings with at least Mr. Hoffman, who told me before the meeting and in e-mail that it would be different from the previous meetings.
I will go over this document again and I will definitely follow its guidelines fully just like I did with the other performance plans.

Regards

Al Cheraw
-----Original Message-----
**From:** Graceffa, Jamie
**Sent:** Tuesday, September 28, 2004 1:29 PM
**To:** Khirawi, Aalaeldin
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00

Dear Al:

Just to be clear, the document you will receive today is a copy of the document I presented to you during our meeting and you took it with you. You refused to sign it, however. Again, I will be providing you with another copy shortly. Email correspondence on this matter is closed. Thank you.

Regards,

Jamie

**From:** Khirawi, Aalaeldin
**Sent:** Monday, September 27, 2004 5:16 PM
**To:** Graceffa, Jamie
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00

*Thank you so much. That would help me great deal then.*
*Once again*
*I did not see or read any document.*

*Regards*

*Al Khirawi*

GETR0398

-----Original Message-----
**From:** Graceffa, Jamie
**Sent:** Monday, September 27, 2004 5:14 PM
**To:** Khirawi, Aalaeldin
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00

Al,

Tomorrow I will send you a copy of the version signed by Jim Hoffman and myself.  I would like to remind that I did present the document to you during our meeting.

Thank you,
Jamie

---

**From:** Khirawi, Aalaeldin
**Sent:** Monday, September 27, 2004 5:05 PM
**To:** Graceffa, Jamie
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00

*Mr. Graceffa'*
*I agree, that I should not respond to this e-mail.( I already did)*
*But please e-mail the document you have been referring to, since I have not seen it*


*Regards*

*Al Khirawi*

-----Original Message-----
**From:** Graceffa, Jamie
**Sent:** Monday, September 27, 2004 4:59 PM
**To:** Khirawi, Aalaeldin
**Cc:** Hoffman, James; Miles, Ruby
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00

Al,

As you know, the Performance Expectations document is clear and the Company's position is that you must abide its terms on an on-going basis.  For a considerable period of time prior to its issuance, the Company endeavored to promote acceptable performance from you, to no avail.

To be clear, although it has long been a requirement of your employment, you were not consistently emailing Ruby Miles at the point of your start and end times each day.  Accordingly, this performance expectation is an element of the Performance Expectations document.  And, you have continued to ignore or refuse to comply with this basic requirement.

I will not debate your points below and stand by all of my prior communications on this topic.  Please do not respond to this email with other than actual compliance with the terms of your Performance Expectations document.  This matter is closed.  Thank you.

---

**From:** Khirawi, Aalaeldin
**Sent:** Monday, September 27, 2004 10:36 AM

GETR0399

/29/2004

**To:** Graceffa, Jamie; Hoffman, James
**Subject:** Performance requirements addresses on Thursday, August the 19th @ 15.00

Hello all

As a result of the e-mail sent to me on Friday August the 24th at 15.00 PM, I would like to clarify the following issues:

The meeting took place in Tewksbury (Second floor).
Mr. Graceffa and my self attended together in the room, while Mr. Hoffman dialed from Huston.
My expectation from the meeting that it would be the monthly report on the previous performance paln(s), and was indicated to me by Mrs Miles, Mr Hoffman and Mr Freeman, or a new performance plan.
I asked Mr. Hoffman to kindly inform me , if it was another performance plan to let me know what had triggered it, and if it was the monthly review of the pervious plan(s), then it was over due.
Mr. Hoffman told me (( via e-mail)) , that it was different from both.
The meeting was opened by Mr Hoffman, and then Mr Graceffa took over.
Mr Graceffa told me directly that, he could see me getting off the performance plan , if I to stick to the new expectations from him personally.
Up, to that moment I did not know what had happened to my supervisor Mile, Ruby ( since I had not received any thing form her informing me on her absence).
Mr Graceffa , then told me that I would be expected to do the following:

1) Report my ins and out time to him directly and via e-mail.
I raised the issues of login time "previous" system with Mrs.. Miles, and he said that would be fine, but added to it my Friday prayers time, and any time away from desk that exceeds the 40 minute time frame , except for lunch.

2) Mr. Graceffa , also told  me to take in control  of the both weekly meetings with Tiffiny Jones and to write the minutes for them and include them in my weekly report ( with the interference of Mr Hoffman, it was reduced to only one meeting to be my responsibility in calling it in and write its minutes).

3) Mr Graceffa also wanted me to be responsible of managing the training scheduling for all analysts in Tewksbury. ( But, then, dropped under the clarification of Mr Hoffman, that it would be out side my control and decision).

4) Mr Graceffa, then told me that I would be directing all my time off  request to him till Miles comes back, and I did just that for two times ( The remainder of Thursday the 19th and all Friday the 20th),  But then directed again and via e-mail by him to direct those requests to Mr Hoffman.

5) Mr Graceffa , introduced the daily log -on activity sheet and handled me some documents regarding the new procedure.
He later, told me that he would e-mail me the documents to start using for my new reporting to him.
I have not received the document on time, and I had to create the same sheet by my self, and started reporting to Mr. Graceffa the sheets, along with the weekly reports on Monday the 23rd of August 2004 and up until today this morning.

6) Mr. Graceffa told me that , the plan would stay open ended and no future date would be set for evaluation.

My understanding that, Mr Graceffa has been forwarding my weekly reports and log sheets to Mr Hoffman.
I asked , and after the first report on Tuesday the 24th of August 2004 Mr Graceffa if that was exactly what he wanted from me.
Mr Graceffa , then forwarded my question ( I guess), to Mr Hoffman who send me the following response on Wednesday August the 25th

"Al, I looked over the report and daily task log. You're capturing of the work being performed is appropriate as it's been requested at this time. Thanks."

Please let me confirm that this explanation is the understanding I got from the meeting and the events. I based all my reporting to Mr. Graceffa on this understanding.

---

Regards
Aalaeldin Khirawi

---

GETR0401

# EXHIBIT Y

# REDACTED

**From:** Khirawi, Aalaeldin
**Sent:** Thursday, September 30, 2004 2:55 PM
**To:** Graceffa, Jamie
**Cc:** Miles, Ruby
**Subject:** RE: RE: Performance Expectations Document -recieved on Tuesday Sept the 28th @ 13.30

One more thing Mr. Graceffa
I did not and will not discuss any legal pending issue with any one.
You were the one who wanted me to , when you addressed the company's position in the document received on Tuesday the 28th.
Thanx


Dear Jamie.
Once again, you are not helping me understand what you want from me.
٦    did not answer any of my questions which I see very important for me to continue providing you with the information you ne..d from me on daily basis.
This is not an argument.
You have sent me en e-mail dated Friday the 24th ( Unprovoked) stating the following : ( Please see below in blue).
In it you seemed to be evaluating my performance in reporting to and off work.
So , I think I deserve to get more information , on the days and times I have missed reporting to you, because I have all e-mails saved and they all say that I have just done that ( Unless I am off, you are off or I had to leave with permissions)
Secondly, you can issue warnings and more than that, but that would not change the fact that, you have not been correct when you said the document was presented to me in the meeting on Thursday the 19th .
You also have quoted Ruby Miles as saying that my performance has not improved, and all the e-mails from Mrs. Mile has not indicate such allegations.
I will continue to clarify my position, all the time, unless you want me to accept false and untrue statements.


Regards


Dear Al,

I write to advise that you are not performing satisfactorily at least one of the stated requirements issued to you in the Performance Expectations document. In pertinent part, the document requires the following of you:

> "1. Upon arrival and initiation of work for the day, and upon departure and cessation of work for the evening, you are to send an email to Jamie Graceffa. If you are to be out of contact and unavailable for a significant period of time, you are to send an email before and after such unavailability to Jamie Graceffa. Additionally, on Fridays, you are to send an email before and after your mid-day break to Jamie Graceffa."

en the document was presented to you, you indicated that you understood its terms. However, you have not abided the clear requirement as you are not consistently emailing me *when* you arrive and *at the point* that you leave, as prescribed in the above language. Please understand that you are to email me immediately upon log-on, which is the technical start of your day. In other words, the time stamp of your email is considered your start time. Further, you must advise me, via email, at the precise point you log-off for the day. Finally, you are to email

GETR0379

me before and after you leave and return to the office for your Friday mid-day break. If you need to write yourself reminders to send these emails, please do so.

It is my understanding that your supervisor, Ruby Miles, will confer with you separately on the substantive reporting and performance of your daily tasks.

Thank you for your attention to this matter.

Jamie.

-----Original Message-----
**From:** Graceffa, Jamie
**Sent:** Thursday, September 30, 2004 2:26 PM
**To:** Khirawi, Aalaeldin
**Cc:** Miles, Ruby
**Subject:** RE: Performance Expectations Document

Dear Al,

First, I have deleted from the above subject line your attempt to continue to argue the timing of your receipt of the Performance Expectations Document. You continue to press this point with me notwithstanding my clear directive that you cease. You will receive a written warning on this matter. This is an example of unprofessional and inappropriate conduct. Please be advised that your immediate and sustained improvement is a requirement of continued employment with Getronics.

Second, your below message is not concise.

Third, I will not engage in a briefing battle with you over your performance. You have been coached, counseled, disciplined and warned exhaustively. Please review your own records, which you claim to have, for evidence of behavior this Company views as unacceptable. The Company's attempts to manage you are long-standing and pre-date the allegations you have brought before the E.E.O.C.

Fourth, please do not discuss your allegations, which the Company disputes, during work hours. You will not be permitted to attempt to argue your case with this Company's resources, which includes my time and that of your managers.

Fifth, as I stated to you, on September 29, 2004 at 10:49 a.m., I will provide clarification to you only on what this Company requires of you. Amazingly, none of your below questions seeks such clarification and several are stated on utterly false pretenses. All of them constitute argument with the information contained in the Performance Expectations document. The document is not up for debate. The document describes what you must do. The document is clear.

Nonetheless, by way of final clarification to you: You are to email me at the point when you log on for the day and at the point when you leave for the day. You are also to send me an email before and after your mid-day break on Friday. If you are away from your desk for any sustained amount of time, which is 40 minutes or more, you are to email me at the point that you leave and when you return. The time stamp on the email, not the text of your email, is the operative time and date.

This matter is closed. Please do not reply to this email. That is a directive. Thank you, in advance, for your anticipated cooperation.

   'ards,
Jamie

**From:** Khirawi, Aalaeldin
**Sent:** Thursday, September 30, 2004 11:03 AM

GETR0380

9/30/2004

**To:** Graceffa, Jamie
**C** Miles, Ruby
**S** **Ject:** RE: Performance Expectations Document -recieved on Tuesday Sept the 28th @ 13.30

( I copied Mrs. Miles, as you have requested me to do)

Dear Mr. Grceffa
Here are my questions, I hope they are short and concise
Page # 1
1) Do you still want me to address the details of my legal complaint against Getronics ?
2) Do you still think that my performance regarding the job is unsatisfactory?, and if yes please let me know what areas do
think my performance has not been improving?
3) Do you still think that I do not comport myself with professionalism and respect?, and if yes, would you please give me
details or incidents in which I have been involved ?
4) Can you please elaborate on the incidents you have outlined in the second paragraph, that suggested my behavior had
violated , at minimum, the Getronics Rules of Employee?
5) The third paragraph, stated that on March 4, 2004 I was issued a written reprimand .
On that reprimand there was an indication and an item, that there would be monthly evaluation of the progress , Do you have
that evaluation?, and if yes, can I have a copy of it?
6) The 4th paragraph indicated that my attendance pattern has been unacceptable, can you please give me a report on the days,
or hours I have missed?
7) Can I have the report that indicates that I have had more than 13 days sick time?
8) Can I get the report on my failure in letting Mrs Miles know of my arrival and departure time?
What days have I failed to do that, in what time period are you talking about?
9) he document also stated that "Your unavailability and lack of accountability will no longer be accepted", can you please
e.  ain what does that mean?
10) Have you discussed these issues, that are addressed on this first page with me on the meeting ?


Page # 2

In regard to section A
Item number (1)
Can I get some examples of my communications failure with my co-workers since the first reprimand was issued ( May 4th
2004)?, If yes , would you please send me examples?
Item # (2)
Have I ever used the term "Retaliation", "Discrimination" or Harassment" after May 21st?, and if yes, would you please send me
copies of the incidents?
Item # (3)
Have I ever failed to attend any meeting requested by my supervisor?
Please give me details ( Date, Time)?
Item # (4)
Have I ever failed to communicate in the medium specified by my supervisor?
Please give me examples? ( Date, and time)

In regard to section (B)
1) Attendance:
You have mentioned in one of the e-mails that I failed to e-mail you and Mrs. Miles on my time in and out, would you please
cify those days ( Day and month)?
2  Weekly report:
Would you please tell me what is missing from my weekly report, and if it meets the requirement set by this document?
Also, tell me if I have been meeting all my quality standards?
3) Daily log:

**GETR0381**

/30/2004

How do see my daily log so far?, are they meeting the requirements of this document?


General issues:
1) You have mentioned in the meeting that I should not be reporting on absence less than 40 minutes?
Is that a true statement?
2) You have mentioned to me in one of your e-mails that you have told me that , the meeting would be about my previous performance , would you please tell me when  did that take place and through which medium?
3) Mr. Hoffman James, had sent me an e-mail telling me that the meeting I had with both of you, would be different in its issues than previous meetings I had with him?
Was the meeting different from any other meetings? and if that was so, please explain?

I hope these questions are short and concise

My best of regards

Al Khirawi




F **n:** Khirawi, Aalaeldin
S**..t:** Wednesday, September 29, 2004 8:20 AM
**To:** Graceffa, Jamie
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00


Please disregard my question regarding the format and contents of my questions to you.
I will write them first and you tell me if they are short and concise

Regards,

Al Khirawi


It is not fabrication Mr. Graceffa, and you very well know that. And no amount of accusations and threats from your part would change this fact.
I have a lot of points to raise in regard to this document that I received on Tuesday the 28th at 13.30 from Joan Anderson.
I will definitely write them in my lunch hour, so it doesn't interfere with my work load, as nothing ever does.

Thank you

Al Khirawi
-----Original Message-----
**From:** Graceffa, Jamie
**S**~**nt:** Wednesday, September 29, 2004 10:49 AM
    Khirawi, Aalaeldin
**Cc:** Miles, Ruby
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00

Al,

GETR0382

)/30/2004

Y·· have had the document since I first presented it to you. I will repeat for the last time: this issue is closed.
Ϝ ϳou should understand, my directive to you yesterday was for you to relent on your insistence that you never saw the document previously. That is a fabrication. You continue to argue the point. If you respond to the point of when you first received the document one more time, you will receive a written warning.

You are responsible for completing all of today's work assignments and job requirements. If you have time to do so during work hours, you may send me a short and concise email on your questions pertaining to the Performance Expectations document. Please copy your supervisor on it.

I will not debate the points contained within the Performance Expectations document. I will provide clarification only on what this Company requires of you. Further, I am unavailable this afternoon and anticipate that I will not be able to respond to your brief questions until tomorrow.

Thank you.

Regards,
Jamie

---

**From:** Khirawi, Aalaeldin
**Sent:** Wednesday, September 29, 2004 8:20 AM
**To:** Graceffa, Jamie
**Subject:** RE: Performance requirements addresses on Thursday, August the 19th @ 15.00

Good morning Jamie

ᴌ ϳe read the document given to me by Joan Anderson on Tuesday Sep the 28th @ 13.30 , and I have many questions about it. Do I ask these questions for clarification or the directive you have issued yesterday should prevent me from doing so?

Please advise

My regards

Al Khirawi

**GETR0383**

# EXHIBIT Z

| | |
|---|---|
| **From:** | Khirawi, Aalaeldin |
| **Sent:** | Tuesday, October 12, 2004 2:06 PM |
| **To:** | Graceffa, Jamie |
| **Subject:** | RE: Updated: HR meeting |

Jamie,

1What do you mean by updating my calendar? ( It is updated by default  and entries as my experience and knowledge are telling me)

2_ The only way to do this is , when you send me a meeting notice that meets my availability.

3_ If the meeting request is on a time that I am not available then , how can you expect me to attend?

4_ My tone with you is professional and excellent, to the best of my knowledge , and please stop the threatening, because it will not work well with me

You are welcome

-----Original Message-----

| | |
|---|---|
| **From:** | Graceffa, Jamie |
| **Sent:** | Tuesday, October 12, 2004 1:56 PM |
| **To:** | Khirawi, Aalaeldin |
| **Subject:** | RE: Updated: HR meeting |

Al,

as stated below,

1.  Please update your calendar so that I can determine your availability.
2.  I will then send a new meeting request.

and,

3.  I will expect you to accept the meeting request.
4.  Watch your tone with me.

Thank you.

| | |
|---|---|
| **From:** | Khirawi, Aalaeldin |
| **Sent:** | Tuesday, October 12, 2004 1:34 PM |
| **To:** | Graceffa, Jamie |
| **Subject:** | RE: Updated: HR meeting |

*Jamie*
*Does that mean , you will reschedule.?*
*Please try to be simple in responding*

*Al*

-----Original Message-----

1

| From: | Graceffa, Jamie |
| Sent: | Tuesday, October 12, 2004 12:32 PM |
| To: | Khirawi, Aalaeldin |
| Subject: | RE: Updated: HR meeting |

Al,

Please be sure to update your outlook calendar no later than close of business today.  I will then send another meeting notice.

Thank you,
Jamie

| From: | Khirawi, Aalaeldin |
| Sent: | Tuesday, October 12, 2004 8:40 AM |
| To: | Graceffa, Jamie |
| Subject: | Declined: Updated: HR meeting |
| When: | Thursday, October 14, 2004 2:30 PM-3:30 PM (GMT-05:00) Eastern Time (US & Canada). |
| Where: | Maine Conf. Room - Tewksbury |

Mr. Graceffa.
I would not be able to attend the meeting at the set day and time .
Please reschedule

Regards

Al Khirawi

2

**GETR0371**

# EXHIBIT AA

**From:** Khirawi, Aalaeldin
**Sent:** Tuesday, October 19, 2004 3:11 PM
**To:** Graceffa, Jamie
**Subject:** RE: Meeting

*Once again, you are twisting and changing the facts.*
*That is all what I will say at this time*

*Al*

-----Original Message-----
**From:** Graceffa, Jamie
**Sent:** Tuesday, October 19, 2004 3:01 PM
**To:** Khirawi, Aalaeldin
**Subject:** Meeting

Al,

I have received your message indicating that the date and time selected are not convenient for you. You did not make me aware that your work hours have changed.

This meeting is now rescheduled for Wednesday, October 20, at 2:00. Please call me at the appointed time and hour. As for the location, as you are no doubt aware, there are conference rooms available in Tewksbury for private conversations. You need to reserve one for our appointed time. Please do so immediately.

As you well know, I have attempted to set appointments with you to discuss information that you claim you need to discuss. You have declined quite clearly, and I suggest you review your own email history for confirmation of this basic fact. Once again, you are misstating history and misconstruing fact. Yet again, I must tell you to cease your argument with me on this point.

You are reminded that you are an employee of Getronics and that you are directed to treat its managers and all other employees with the appropriate level of respect and courtesy. Your manner toward me will not be tolerated. You may not lash out and argue with me or any other manager or supervisor as you have in the past. This discussion is closed. If you write back to me or argue in any other forum on this point, you will be disciplined.

Jamie.

GETR0367

# EXHIBIT BB



## WRITTEN REPRIMAND

**Date of Reprimand:** October 26, 2004     **Date of Verbal Warning:** _____

**Employee Name:** Aalaeldin Khirawi     **Date of Occurrence:** September 24-30, 2004

**Details of Occurrence and Corrective Action to be Taken:**

1. The Performance Expectations document was presented to you on August 19, 2004, during a meeting with Jamie Graceffa and Jim Hoffman, which was expressly convened for the purpose of presenting this document. As Jamie Graceffa has communicated to you repeatedly (to no avail), there will be no further debate on this issue. This subject is closed. **You will cease to argue this fact.**

2. You are unwilling or unable to absorb the point that you are incorrect on a fact. Even if your version is correct (which it is not), you must immediately improve upon your unprofessional failure to acknowledge a differing viewpoint. The bottom line is that your manager and employer have a view and you must respect it, even if you disagree. **You will respect the views of others.**

3. You are unwilling or unable to cease an argument when you are specifically directed to do so. Your inability to stop your relentless cycles of email, when you are explicitly directed to do so, is unacceptable. Your continued argument against the tide is unacceptable. **You will abide future directives to cease discussion.**

4. Your approach is too draining and highly unprofessional. Your arguing about your past performance and pretending not to understand plain English will not be tolerated further. Your email seeking "clarification" was not short and concise. Your attempts to argue each point contained in the Performance Expectations document (which is a very clear document) will not be entertained further. **You will improve your argumentative, rude and disrespectful communication style.** In particular, your arrival and departure emails will no longer contain the argumentative subject line ("In-out New system (Based on the document 09/28/2004 and clarification made by Mr. Graceffa on Sep. 30[th]"). **You will behave professionally in the workplace.**

GETR0003



5. None of the above conduct is acceptable. You must improve on each of these points immediately. Your job is in jeopardy.

You are expected to demonstrate immediate, significant and sustained improvement in your performance improvement plan. Failure to show such improvement may subject you to further disciplinary action (up to and including termination) at any time during the plan period. In addition to meeting the plan objectives, you are expected to perform satisfactorily all other job duties. You must also continue to fulfill the plan requirements after the plan period has ended. Failure to sustain the level of performance required by the plan beyond the plan period may subject you to further disciplinary action (up to and including termination), without additional notice.

**Effective Date of Action:** <u>October 26, 2004</u>

*[handwritten: EMPLOYEE REFUSED TO SIGN]* *J Graefe 10/26/04*
_____    _____
Employee Aalaeldin Khirawi                                    Date
                                                                    *10/26/04*
_____    _____
Supervisor Ruby Miles                                          Date
                                                                    *10/26/04*
_____    _____
HR Representative Jamie Gracefia                          Date

cc:  Personnel File

GETR0004

# EXHIBIT CC

| | |
|---|---|
| From: | Khirawi, Aalaeldin |
| Sent: | Tuesday, October 26, 2004 10:01 AM |
| To: | Graceffa, Jamie |
| Subject: | RE: Document |

*Jamie*

*I have read it and I am really troubled by your continuous effort to change the facts and the events that took place between us. Here is my response in writing and to protect my record .*

*1) I did not receive any papers or documents that you mentioned in item number (1).*
*You know that  and there is no amount of affirmations from your side would change this fact.*
*2) All my facts are correct 100% and to the best of my knowledge.*
*3) All my contacts with you were highly professional and will be any future contact.*
*4) I have not been rude with you.*
*You have called my statement of the facts " Fabrications", and I have defended my integrity, and I will always do so.*
*5) I have done every thing  to keep my job, but if you see it as in jeopardy, then that would mean you have been always after me to either leave the company or take other steps to make me lose it*


*Regards*


*Al Khirawi*

-----Original Message-----

| | |
|---|---|
| From: | Graceffa, Jamie |
| Sent: | Tuesday, October 26, 2004 9:46 AM |
| To: | Khirawi, Aalaeldin |
| Subject: | Document |


Al,

Attached with this email is a copy of the written warning which will be issued to you today. Please print it out and bring it with you to the conference room you reserved for our 10:00 a.m. meeting.  Please call me from the conference room at 10:00 a.m.  My number is 978-625-7212, or X 57212.


Thank you,

Jamie


<< File: written reprimand 10 26 04.pdf >>

1

GETR0362

# EXHIBIT DD



**Getronics**

290 Concord Road

Billerica, MA 01821

Telephone: 978-625-7112

Fax: 978-625-5087

E-mail: wayne.ogg@getronics.com

www.getronics.com

Wayne Ogg
Vice President
Human Resources

**VIA EXPRESS MAIL**

October 26, 2004

Aalaeldin Khirawi
14 Auclair Avenue
Manchester, NH 03102

Dear Mr. Khirawi:

Please be advised that your employment with Getronics has been terminated effective October 27, 2004. You have been terminated due to your continued and flagrant inappropriate conduct in the workplace.

Enclosed please find your final pay and your termination packet. For your convenience, I have enclosed a postage-paid envelope for you to return the documents that require signature.

Please be advised that Getronics will take an accounting of the funds paid to you during your employment with Getronics. If Getronics determines that you owe the Company money, please note that we will be in contact with you.

Thank you.

Sincerely,

Wayne Ogg
Vice President, Human Resources

Enclosures

GETR0082

# EXHIBIT EE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05-11877-REK

| | |
|---|---|
| AALAELDIN KHIRAWI | ) |
| Plaintiff | ) |
| v. | ) |
| GETRONICS WANG CO., LLC D/B/A GETRONICS | ) |
| Defendants | ) |

## ANSWERS OF THE PLAINTIFF, AALAELDIN KHIRAWI, TO INTERROGATORIES PROPOUNDED BY THE DEFENDANT

INTERROGATORY NO. 1

Please state Plaintiffs name, address, date of birth, place of birth, marital status, (including spouse's or former spouse's name and dates of marriage if applicable), name(s) and date(s) of birth of any child(ren) (if applicable), and social security number.

ANSWER NO. 1

- Aalaeldin Khirawi.
  207 Agnes Street # 110
  Manchester, NH 03102.
- 08/29/1963, (Khartoum, Sudan, Africa)
- Married to Manal Adam.
- Married on January 27 1992.
- Children: Sarah, 11/25/1992
- Ahmed 08/08/1998
- Akram 03/25/2005

INTERROGATORY NO. 2

Please list all residences, if any, other than the one listed in response to the preceding

interrogatory, which Plaintiff has had during the past ten (10) years, giving the complete address

and dates of residence at each such address, and the names of individuals who lived with

Plaintiff at each such address.

ANSWER NO. 2

- 207 Agnes street #110, Manchester NH 03102 ( June 2005 to current) ( Manal Adam, Sarah Khirawi, Ahmed Khirawi and Akram Khirawi )

- 16 Chase Ave # 2, Manchester, NH 03103 ( March 2005 to June 2005) ( Manal Adam, Sarah Khirawi, Ahmed Khirawi and Akram Khirawi)

- 14 AuclairAve Manchester , NH 03102 ( August 2002 to March 2005) ( Manal Adam, Sarah Khirawi, Ahmed Khirawi )

- 184 Garden Drive # 2, Manchester, NH 03102 ( August 1998 to August 2002) ( Manal Adam, Sarah Khirawi, Ahmed Khirawi)

- 135 Log Street # 2A, Manchester, NH 03102 ( January 1994 to August 1998) ( Manal Adam, Sarah Khirawi, )

INTERROGATORY NO. 3

Identify each and every educational institution Plaintiff has attended beginning with high school,

and state the dates of attendance, whether Plaintiff received a degree or certificate therefrom, and

the nature and the date of the degree or certificate, if applicable.

ANSWER NO. 3

- Khartoum High, Sudan 1983 (General, Received High School Diploma).
- University of Khartoum, Sudan ( Economics 1987, Bs.c in Economics)
- University of Southern New Hampshire ( Economics, 1999, Ms.c in Economic Development).
- University of Southern New Hampshire ( Computer Information Systems, 1999, Graduate Certificate in CIS).
- Xintra, Lowell , MA ( Microsoft Systems and Networking ( A+, and Network+)

INTERROGATORY NO. 4

Identify each and every employer by whom Plaintiff has been employed, had a business

relationship with or training (including self-employment), other than Getronics, including each

employer's last known address and telephone number. For each such employer state:

(a)    the date(s) of commencement and termination of each such employment, business

relationship or training (including self-employment);

(b)    the duties performed by Plaintiff for each employer, person or institution;

(c)    the name and present or last known address of Plaintiffs immediate supervisor;

(d)    Plaintiffs rate(s) of pay during each of the above positions, including identification of any

raise(s) in pay in connection with any of the positions, with the dates thereof;

(e)    a summary description of any employee benefits Plaintiff received in connection with

each employment, business relationship or training;

(f)    any other compensation or remuneration received by Plaintiff in connection with each

employment, business relationship or training; and

(g)    the reason for the termination or conclusion of each employment, business relationship or

training, including but not limited to a statement of whether the severance of such employment

was voluntary or involuntary.

ANSWER NO. 4.

- **Sullivan Cogliano.**
  230 Second Avenue Waltham MA 02451
  781.890.7890 (Andrew MacLennan Resource Manager)
  Started in 2005, and still current "CONTRACT" Pays $20.00 per hour. Duties include
  providing assistance to TD BankNorth in the implementation of Harland Financial Solution's
  Teller and Platform Systems (Windows NT and XP), throughout the bank's retail branch
  network. Performed site surveys and preparation and equipment installation. Removed

outdated computers, associated peripheral equipment, and packing materials at designated locations).

- **Khirawi PC Repairs**
Start up business (self-employment), started January 2005 to December 2005, ended due to lack of business calls.
Maintained personal computers and networking connections to people from my own community. Worked 72 Hours and made under $5000 total.

- **Daniel Webster** College Nashua, NH From 2001 to 2003
Neil Parmenter  Assistant Professor of Business and Management (Phone: 603.577.6650).
Adjunct Faculty in Managerial Economics (part-time)
Instructed undergraduates in Managerial Economics in a Global Setting.
Taught  Macro and Micro Economics.
( Worked 20 hours per term and get paid $ 1500.00).
Program ended .

- **KeyBank** Bedford, NH  From 1996 to 1997
**Customer Service Associate**
Planned successful marketing and advertising strategies targeting and developing new accounts. Expanded customer base through a variety of effective sales techniques.  Delivered convincing oral sales presentations to upper management of major companies.  Performed staff orientation and training, assisted with scheduling. Develop and implement new sales and marketing strategies to increase business and market share.
Bank closed down, and has no operation in NH.
Paid $23000 per year.

INTERROGATORY NO. 5

State whether Plaintiff has ever applied for unemployment compensation benefits, workers' compensation benefits, disability benefits, social security, supplemental security income, or benefits under any policy of insurance during or following his employment with Getronics. If the answer is in the affirmative, identify the agency(ies) or company(ies) to whom such application was made; state the date of the application; the disposition of the application; the amount of the benefit paid, if any; and identify each and every document related to any such application and the disposition thereof.

ANSWER NO. 5

- I had applied for short term disability when I was employed by Getronics in May 2004. I do not have any related documents.
- I also applied and received unemployment benefits from Getronics after termination from Getronics.

INTERROGATORY NO. 6

Identify each and every person whom Plaintiff may call as a witness at trial of this matter and the nature of the testimony to be elicited from each witness.

ANSWER NO. 6.

Please refer to the plaintiff's automatic disclosures. The plaintiff has not yet finally decided who he will call as a witness in this case and will supplement this answer within a reasonable time before trial. In addition to the plaintiff and his wife, the following is a preliminary list:

The plaintiff does not have addresses for the following individuals, but states that they are current or former employees of the defendants:

1. Ruby Miles
2. Paul Galipeau
3. Terence Freeman
4. Gayla George
5. Joan Anderson
6. Wayne Ogg
7. Patrick McHenry
8. Tiffiny Anderson-Jones
9. Jimmy Thomas
10. James Hoffman
11. Jamie Graceffa
12. Katrina Brown
13. Aimee Wellington
14. Brian Thornton
15. Michelle Bonnano
16. Robert Mallon
17. Emmet Millet
18. Individuals named in the defendants' automatic disclosures.

INTERROGATORY NO. 7

Identify each expert witness whom Plaintiff intends to call at a trial of this matter and, for each such expert witness, please provide the following information: his or her name, residential

address and business address, the subject matter on which the expert is expected to testify, the

substance of the facts and opinions to which the expert is expected to testify, and a summary of

the grounds for each such opinion.

ANSWER NO. 7

The plaintiff has not yet identified who he will call as an expert witness at trial.  Upon doing so,
the plaintiff will supplement this answer.

INTERROGATORY NO. 8

Identify each and every individual with knowledge of any facts pertaining to the allegations in

Plaintiffs Complaint, and give a detailed description of the material facts possessed by each such

person.

ANSWER NO. 8

See answer number 6. These are co-workers, managers and human resources representatives of
the defendants who may have knowledge relative to the treatment of the plaintiff, the claims and
defenses in this case.

INTERROGATORY NO. 9

Describe in detail each item of damage, including amounts, for which Plaintiff intends to seek

recover at trial, the manner in which such amount has been calculated, and the specific basis and

support for said amount.

ANSWER NO. 9

The plaintiff seeks to recover all lost earnings and earning capacity, the value of fringe benefits,
for emotional distress, for legal fees and costs, and also will seek that the jury award a punitive
damage verdict against the defendant.  The plaintiff does not know how much the jury might
award for emotional distress and punitive damages, or how much the Court might order the
defendant to pay for the plaintiff's legal costs. As to earnings, the plaintiff estimates that he has
lost approximately $75,000 gross (without calculating any offset) in earnings and fringe benefits
alone to date.  The plaintiff intends to supplement this number as his job search and this litigation
progresses.

INTERROGATORY NO. 10

State whether Plaintiff made any efforts to seek new employment, including self-employment, or

any work as an independent contractor or consultant, following the cessation of his employment

from Getronics. If so, state:

(a)    the name and address of each potential employer, entity or person to whom Plaintiff

made application, the date of each such application and the position for which application was

made;

(b)    the name and address of any employment agency, career counselor or other employment

recruiter with whom Plaintiff had contact, including the date and the nature of contact; and

(c)    identify each and every document reflecting or relating to Plaintiff's efforts to seek new

employment, including self-employment and any independent contractor or consulting work.

ANSWER NO. 9

Please see the plaintiff's document production, which include documents indicating and related
to his job search efforts since his termination from Getronics.

INTERROGATORY NO. 11

State whether Plaintiff engaged in any business or enterprise on his own behalf following the

cessation of his employment with Getronics, including any self-employment, and any

independent contractor or consulting work, other than post-Getronics employment identified in

response to Interrogatory No. 4. If so, state:

(a)    the name and address of the business or enterprise;

(b)    the nature of the business or enterprise;

(c)    the names and addresses of owners of the business or enterprise;

(d)    the date the business or enterprise began;

(e)     the gross and net revenues of the business for the years during which Plaintiff had some

affiliation or involvement with it and any income or remuneration received by Plaintiff; and

(f)     the nature of Plaintiff's duties and responsibilities in such business or enterprise.

ANSWER NO. 11

See answer number 4.

INTERROGATORY NO. 12

State whether Plaintiff has previously made a claim, or instituted litigation or administrative

charges against any individual, company or organization (other than Getronics). If the answer is

in the affirmative, state the date each claim, suit or administrative action was commenced; the

name and address of the agency or other forum in which it was commenced; the substance of

each such claim or complaint; the outcome or present status of each matter; and identify each and

every document upon which Plaintiff relied in answering or which in any way pertains to the

information requested in this interrogatory.

ANSWER NO. 12

No.

INTERROGATORY NO. 13

Identify each and every physician, psychiatrist, psychologist, social worker, clergy member or

other health care provider or facility that Plaintiff has visited, consulted or received treatment

from relative to any physical or emotional condition Plaintiff alleges Defendant caused. For each

individual or other health care provider identified, state his or her address, occupation, area of

specialization, if any; any medical institutions with which the person is presently associated or

affiliated; any medical institutions with which the person was associated or affiliated while

treating Plaintiff; the date Plaintiff first consulted that person or entity; the condition for which

treatment was sought; the diagnosis that was rendered; the nature of the treatment rendered; the

cost of treatment and whether Plaintiff is presently receiving treatment or consultation from such

person or entity.

ANSWER NO. 13

None.

INTERROGATORY NO. 14

Identify each and every physician, psychiatrist, psychologist, social worker, clergy member or

other health care provider or facility that Plaintiff has visited, consulted or received treatment

from in the past ten (10) years. For each individual or other health care provider identified, state

his or her address, occupation, area of specialization, if any; any medical institutions with which

the person is presently associated or affiliated; any medical institutions with which the person

was associated or affiliated while treating Plaintiff; the date Plaintiff first consulted that person

or entity; the condition for which treatment was sought; the diagnosis that was rendered; the

nature of the treatment rendered; and whether Plaintiff is presently receiving treatment or

consultation from such person or entity.

ANSWER NO. 14

Objection.  This interrogatory seeks information that is not relevant and is not likely to lead to
admissible evidence as to any claims or defenses in this action, is outside the scope of discovery
pursuant to Rule 26, and is designed to embarrass, annoy or oppress the plaintiff.

INTERROGATORY NO. 15

Identify any and all sources of income received by Plaintiff during the period from January 1,

1996 to the present. For each such source of income, state the amount of income received and the

frequency with which each such payment is or was received.

ANSWER NO. 15

~~Objection. This interrogatory seeks information that is not relevant and is not likely to lead to~~ admissible evidence as to any claims or defenses in this action, is outside the scope of discovery pursuant to Rule 26, and is designed to embarrass, annoy or oppress the plaintiff. Without ~~waiving this objection, the plaintiff refers the defendant to answer #4.~~

INTERROGATORY NO. 16

For each position Plaintiff held while employed by Getronics, state the job titles and dates of

each job; the salaries or compensation plans for each job; the hours and responsibilities for each

job; the name of Plaintiffs supervisor or immediate superior in each position; and identify each

and every document upon which Plaintiff relied in answering, or which relates in any way to the

information requested in this interrogatory.

ANSWER NO. 16

In addition to my positions at Getronics,

- **Daniel Webster** College Nashua, NH From 2001 to 2003

**Neil Parmenter**  Assistant Professor of Business and Management (Phone:  603.577.6650).

 **Adjunct Faculty in Managerial Economics (part-time)**
Instructed undergraduates in Managerial Economics in a Global Setting.
Taught  Macro and Micro Economics.
( Worked 20 hours per term and get paid $ 1500.00).
Program ended .

Signed and subscribed under the pains and penalties of perjury this _15_ day of June, 2006.

_Aali k_

Aalaledin Khirawi

As to objections

For the plaintiff,

_[signature]_

Sol J. Cohen
BBO # 630776
COHEN & SALES
43 Thorndike Street
Cambridge, MA 02141
(617) 621-1151

## CERTIFICATE OF SERVICE

I, Sol J. Cohen, attorney for the plaintiff, Aalaeldin Khirawi hereby certify that on this _1st_ day of _July_, 2006, I served a copy of the above document on the defendants in this action, by mailing the same, postage pre-paid to the defendants' attorney at the following address:

Eric J. Winton, Esq.
Jackson Lewis LLP
75 Park Plaza
Boston, MA 02116

by Fedex to.
Eric Winton, Esq.,   c/o Camp Yavneh
18 Lucas Pond Rd.
Northwood, NH 03261

_[signature]_

Sol J. Cohen

# EXHIBIT FF

**Getronics**

# Employment Application

290 Concord Road, Billerica, MA 01821-4130

Getronics is an Affirmative Action/Equal Opportunity Employer.

me: Aalaeldin M Khirawi

FIRST    MIDDLE    LAST

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

SOCIAL SECURITY NUMBER

Address: 184 Garden Dr # 2 ## NH 03102

STREET    CITY    STATE    ZIP

TELEPHONE NUMBER

Are you able to demonstrate that you are a United States citizen or authorized to legally work in the United States?

Yes ____   No ____   **If the answer is no, please do not fill out this application for employment. If you are hired, you will be asked to provide documents evidencing your identity and authorization to work in the United States. If you cannot produce acceptable documents, you will be required by federal law to leave the Company's employment.**

Position(s) Desired:  1. _____  2. _____   $ _____

SALARY REQUIREMENTS

☐ Full-time   ☐ Part-time   Shift Desired: _____   Location Desired: _____

Referred by? _____   When will you be available to start work? _____

## Education (provide the following information for schools/degrees you have completed)

Khartoum High          Khartoum #3      Khartoum Sudan

HIGH SCHOOL                ADDRESS

University of Khartoum

COLLEGE                    ADDRESS

3/1983 — 11/1988    B6.C    Economics

FROM (MM/YY) – TO (MM/YY)    DEGREE    MAJOR

New Hampshire College    Manchester NH

COLLEGE                    ADDRESS

1/1994 – 1999    Ms.C    Economics & CIS.

FROM (MM/YY) – TO (MM/YY)    DEGREE    MAJOR

## Employment History (list most recent first)

*Important:* You may include any verified work performed on a volunteer basis in the Employment History section.

Granite Day Connection    Concord    NH

COMPANY NAME                ADDRESS    Starting:    Ending:

Day — Program Speci

POSITION                    SALARY

Kasai Mumbini            May we contact your current employer? ☑ Yes ☐ No

SUPERVISOR                TELEPHONE

Particpating in designing    eductional Programs for individul

DUTIES AND RESPONSIBILITIES

Joining Wang    From (MM/YY): 3/98-4/1990 (MM/YY):

REASON FOR LEAVING    DATES OF EMPLOYMENT

New hope org. (Sudanese association of NH).

COMPANY NAME                ADDRESS    Starting: None Prof    Ending: Organization

Member of the executive

POSITION                    SALARY

Comittee    (603)669-27    May we contact your current employer? ☐ Yes ☐ No

SUPERVISOR                TELEPHONE

Samera Karrar /    Help Sudanes Refuges With

DUTIES AND RESPONSIBILITIES    From (MM/YY):    To (MM/YY): all concern

Current.    DATES OF EMPLOYMENT

REASON FOR LEAVING

Key Bank (Bedford NH).

COMPANY NAME                ADDRESS    Starting: 25,000    Ending:

Sales Associate

POSITION                    SALARY

Imran Khan    May we contact your current employer? ☑ Yes ☐ No

SUPERVISOR                TELEPHONE

Sell and Cross- sell    Bank Financial Prode

DUTIES AND RESPONSIBILITIES    From (MM/YY):    To (MM/YY):

Joining NH College    DATES OF EMPLOYMENT

REASON FOR LEAVING

Have you previously been employed by Getronics or any of its predecessors and affiliates?   ☐ Yes ☐ No

Have you previously applied for employment with Getronics or any of its affiliates?   ☐ Yes ☐ No

Page 1 of 3

01/00

**KHIRAWI0263**

# Employment Application

**Getronics**

Getronics is an Affirmative Action/Equal Opportunity Employer.

290 Concord Road, Billerica, MA 01821-4130

## Military

| BRANCH | POSITION | FROM (MM/YY) – TO (MM/YY) | DUTIES |
|---|---|---|---|
| | | | |
| BRANCH | POSITION | FROM (MM/YY) – TO (MM/YY) | DUTIES |
| | | | |

## References (List supervisors and others familiar with your work or school achievements whom we may contact.)

Imran Khan — Assit Mgr. — Key Bank Bedford N,

| NAME | POSITION TITLE | COMPANY/SCHOOL |
|---|---|---|
| ADDRESS | TELEPHONE | RELATIONSHIP |

Wouland let — Acadmic Supervisor — NH College

| NAME | POSITION TITLE | COMPANY/SCHOOL |
|---|---|---|
| ADDRESS | TELEPHONE | RELATIONSHIP |

Kasi Miumbini — Granite Day Connection s. (Mgr)

| NAME | POSITION TITLE | COMPANY/SCHOOL |
|---|---|---|
| ADDRESS | TELEPHONE | RELATIONSHIP |

## Additional Information

1. Have you been employed by the Department of Defense, in any capacity, within the last two (2) years? ☐ Yes ☐ No
   If yes, did you serve at a civilian pay rate equal to or greater than the minimum rate payable for grade GS-13, Step 1, or on active military duty at a pay grade of 0-4 or higher? ☐ Yes ☐ No

2. Have you ever been previously granted or denied a security clearance by the Dept. of the Army, Navy or Air Force, by the Nuclear Regulatory Commission or any other government agency? ☐ Granted ☐ Denied ☐ Never Applied
   If granted, indicate when granted, where, by whom, and level of clearance. Please give particulars:

3. Have you ever been convicted of a felony? ☐ Yes ☒ No
   If yes, give date and place, charge and disposition:

You may answer "no record" for any convictions where there is a sealed record on file with the Commissioner of Probation, or in any case of adjudications involving delinquency or as a child in need of services, which did not result in a complaint transferred to the Superior Court for criminal prosecution.

Conviction of a crime is not an automatic bar to your employment. All circumstances will be considered.

It is unlawful in Massachusetts and several other states to require or administer a lie detector test as a condition of employment or continued employment. An employer who violates this law shall be subject to criminal penalties and civil liability.

I hereby affirm that I have supplied complete and correct information to the above questions to the best of my knowledge and belief. I understand that any misrepresentation of this information may result in refusal of or separation from employment. I understand that any offer of employment is subject to my successful completion of Getronics' hiring process, including any background checks. So that the Company may be fully informed as to my qualifications, I consent to and authorize the investigation of my education, employment and related background.

In exchange for my employment, I agree to follow the rules and regulations of Getronics. I understand and agree that my employment and compensation can be ended, with or without cause, and with or without notice, at any time, by either the Company or me. I understand that no representative of Getronics, other than the President of the Company, has any authority to enter into any compensation or employment agreement for any specified period of time or to make any agreement contrary to the information contained in this paragraph.

**APPLICANT'S SIGNATURE**    9 / 8 / 2000    **DATE**

01/00

**KHIRAWI0264**

# EXHIBIT GG

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11877-WGY

```
                          )
AALAEDIN KHIRAWI          )
                          )
     Plaintiff            )
                          )
V                         )
                          )
GETRONICS WANG CO., LLC   )
D/B/A GETRONICS           )
                          )
     Defendant            )
                          )
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

RUBY Y. MILES

AUGUST 2ND, 2006

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL OF DEPOSITION RUBY Y. MILES,

produced as a witness at the instance of Plaintiff,

and duly sworn, was taken in the above-styled and

numbered cause on August 2nd, 2006, from

9:30 a.m. until 4:10 p.m., at the Offices of

Getronics, 9009 West Loop South, Houston, Texas,

before Bobbie Showers, CSR in and for the State of

Texas, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the

record or attached hereto.

Khirawi Vs. Getronics RUBY Y. MILES                    8/2/06

Page 11

1    Q.    And before yesterday, did you review any
2    documents to help you prepare for today?

3    A.    No.

4    Q.    Okay.  And other than what we have
5    discussed so far, did you do anything to help you
6    prepare for today's deposition?

7    A.    No.

8    Q.    And other than speaking to Mr. Winton
9    and Ms. Stanek, did you discuss today's deposition
10   with anybody?

11   A.    Absolutely not.

12   Q.    And within the last 30 days, have you
13   discussed this lawsuit or Mr. Khirawi's claims
14   against Getronics with anybody?

15   A.    No.

16   Q.    How about within the last six months?
17   Have you discussed the lawsuit with anybody?

18   A.    No.

19   Q.    Are you currently employed at
20   Getronics?

21   A.    Yes.

22   Q.    What is your position with Getronics?

23   A.    I am their Quality Manager in the
24   Customer Support Group.

25   Q.    How long have you held that position?

Khirawi Vs. Getronics RUBY Y. MILES                        8/2/06

Page 29

1    the monthly reports.  They also calibrate the call

2    assessments with the Team Management out on MSD.

3                They also train assessors to be

4    able to assess calls, because everybody doesn't

5    know how.  They may listen to calls themselves.

6        Q.    Now, if I said to you that he began as a

7    QA Representative at 36,000 a year in August of

8    2003, does that sound correct?

9        A.    Yes.

10       Q.    Had he been doing any of the duties of a

11   QA Representative before he began with the salary

12   of 36,000?

13       A.    Yes.

14       Q.    Now, can you describe for me why he was

15   doing some of the QA Representative duties before

16   he actually held the position?

17                MR. WINTON:  Objection as to form.

18   You can answer.

19       A.    Okay.  Rephrase it for me, please.

20       Q.    (BY MR. COHEN)  Sure.  I'm trying to

21   find out why he was performing some of the duties

22   of the QA Representative before he held the title

23   and the salary of the QA Representative.

24       A.    Because it took awhile for him to get

25   his raise and he wanted a job.  He was doing it all

Khirawi Vs. Getronics RUBY Y. MILES                    8/2/06

Page 51

1    Q.    And who in Human Resources did you speak

2    to about the status of the promotion?

3    A.    Terrence Freeman.

4    Q.    Anybody else in Human Resources?

5    A.    Terrence Freeman.  He is my contact.

6    Q.    And what did Mr. Freeman tell you when

7    you inquired about the status of Mr. Khirawi's

8    promotion?

9    A.    "It takes time."

10   Q.    Was he able to give you any more

11   specific information as to why it takes time or why

12   it took time in this particular instance?

13   A.    We had a management change, senior level

14   management change in the whole ESC, so when that

15   came about, it just stopped.  Raises -- it just

16   froze them for awhile I'll say.

17   Q.    When did the management change take

18   place?

19   A.    I don't remember the dates.

20   Q.    Was it before your interview of

21   Mr. Khirawi?

22   A.    No.

23   Q.    Is it your testimony that the management

24   change took place sometime in between the time that

25   you interviewed Mr. Khirawi and the time that he

Khirawi Vs. Getronics RUBY Y. MILES                    8/2/06

Page 52

1  was granted the promotion to begin reporting to you

2  in September 2003?

3      A.    Yes.

4      Q.    Did you relay that, that the management

5  change may have an effect -- may have the effect of

6  delaying a promotion or raise to Mr. Khirawi?

7      A.    Yes.

8      Q.    And it is your testimony that as far as

9  you understand, all raises were frozen in that time

10 frame?

11             MR. WINTON:  Objection as to form.

12 You can answer the question.

13     A.    Yes.

14     Q.    (BY MR. COHEN)  Okay.  So Mr. Freeman

15 told you that it takes time and your understanding

16 was in part the management change resulted in the

17 delay in the actual promotion of Mr. Khirawi.

18             Was there anything else that

19 Mr. Freeman told you that was resulting in the

20 delay?

21             MR. WINTON:  Objection as to form.

22 You can answer.  Every time I say that, you just

23 answer.

24     A.    Because the raise was 33 percent.

25 That's a large --

Khirawi Vs. Getronics RUBY Y. MILES                8/2/06

Page 63

1    before that which is the next email in time.  Right

2    at the bottom, do you see your reply email to

3    Mr. Khirawi, dated Wednesday, March 19th, 2003, at

4    10:43 a.m.?

5        A.    Yes.

6        Q.    And it references that Dick Boynton a VP

7    may have some decision-making authority to make the

8    promotion.  Is that correct?

9        A.    Right.

10       Q.    And does that remind you now who the VP

11   was who might have effected Mr. Khirawi's

12   promotion?

13       A.    Yes.

14       Q.    And where was Dick Boynton located?

15       A.    He was here in Houston.

16             But I also said it may go higher.

17       Q.    And did you ever have any communication

18   with Mr. Boynton about the promotion?

19       A.    No.

20       Q.    Now, Mrs. Miles, Mr. Khirawi has

21   testified that at the time of that training seminar

22   in Tewksbury, when he inquired about the status of

23   his promotion, your reply was something along the

24   lines of:

25             "It is racial.  It's because your

Khirawi Vs. Getronics RUBY Y. MILES                    8/2/06

Page 64

1          name is Aalaeldin and you're black.

2          Welcome to the club of suffering."

3               Did you say anything like that?

4     A.    No.

5     Q.    You didn't say anything remotely close

6   to that?

7     A.    No.

8     Q.    And does that refresh your recollection

9   as to anything else that was said during that

10  conversation when you say he intimidated you?

11    A.    Other than what I told you before, he

12  wanted to know about his raise and he wanted to

13  know why he wasn't getting it and he felt

14  discriminated against.

15    Q.    Did Mr. Khirawi ever ask you in an email

16  to confirm that you made a comment along those

17  lines, that the delay in the promotion was racial

18  and he should feel welcome to the club of

19  suffering?

20    A.    I don't remember that.

21    Q.    You don't remember any emails asking you

22  to confirm that?

23    A.    No.

24    Q.    Other than that conversation, which I

25  think your testimony was that you told him that

1    this together in one conversation?

2        A.    No.

3                    MR. WINTON:    Objection.

4        Q.    (BY MR. COHEN)    Okay.    Who spoke to you

5    first?

6        A.    I don't recall.

7        Q.    Did you ask Mr. Khirawi for his version

8    of what happened?

9        A.    No.

10       Q.    Why not?

11       A.    I know Patrick and I know Tiffany.    I

12   have been in meetings with both of them before and

13   I trusted what they told me.

14       Q.    Is there any other reason why you didn't

15   ask Mr. Khirawi for his explanation or his version

16   of what happened?

17       A.    No.

18       Q.    When Mr. Khirawi says that Mr. McHenry

19   told him to shut-up during that telephone

20   conference, did you learn that from Mr. Khirawi at

21   any time?

22       A.    Yes.

23       Q.    And did you ask Mr. McHenry whether he

24   told Mr. McHenry to shut-up?

25       A.    Yes.

1    Q.    Did Mr. McHenry confirm that he did tell

2  him to shut-up?

3    A.    He confirmed that he didn't tell him to

4  shut-up.

5                    (Exhibit No. 8 was marked for

6  identification.)

7    Q.    (BY MR. COHEN)   If you can take a look

8  at that document that we marked Exhibit No. 8 and

9  just tell me if you recognize it first.

10    A.    Yes.

11    Q.    And that is the email string, dated

12  February 23rd, 2004, related to this incident

13  involving Mr. Khirawi, Ms. Jones, and Mr. McHenry,

14  correct?

15    A.    Correct.

16    Q.    And on the second page of the document,

17  which is marked on the bottom GETR028, there is an

18  email from you dated, Monday, February 23, 2004,

19  at 3:26 p.m., where you apologize on Mr. Khirawi's

20  behalf for an email he sent previous to that to

21  Mr. McHenry and a few other people.

22                    Before you sent that email -- first

23  of all, can you confirm that you sent this email on

24  February 23rd, 2004?

25    A.    Yes.

Page 94

1      A.      Rephrase the question.

2      Q.      Well, did you -- did you review any

3   documents -- let's start with that -- before you

4   prepared this, to help you prepare it?

5      A.      I reviewed Al's work performance with

6   his peers in Tewksbury to do this document.  He did

7   excellent work with his peers in Tewksbury, so this

8   document came strictly from his work performance

9   for the job that he did in Tewksbury.

10     Q.      Okay.  But his job also included

11  interaction with members of the Team in Houston,

12  correct?

13     A.      Yes.

14     Q.      Why didn't you include -- if you are

15  evaluating his performance in the QA Representative

16  job, why didn't you include any issues you might

17  have had with direction that he had with Houston

18  Team Members?

19     A.      My management style is to review on the

20  job.  On the job performance.  He was doing a great

21  job for the people in Tewksbury.

22              The other side of that coin,

23  personnel issues within the Team, that's for

24  written warnings, that's for PIPS.  I can separate

25  that, because you can have difficult employees who

Khirawi Vs. Getronics RUBY Y. MILES                    8/2/06

Page 150

1    Q.    Were there issues with his inappropriate

2    conduct?

3    A.    Yes.

4    Q.    And were those addressed in documents

5    other than the appraisal?

6    A.    Yes.

7    Q.    Mr. Cohen asked you about ways to find

8    out if Mr. Khirawi was in the building

9    electronically.  Do you recall those questions?

10   A.    Yes.

11   Q.    And you said something about swiping

12   pass key cards.  Do you recall that?

13   A.    Yes.

14   Q.    And is it possible for an employee to

15   swipe a pass key card and let more than one

16   employee into the room while doing so?

17   A.    Yes.

18   Q.    So that's not really a scientific way --

19   let me --

20            That's not really a scientific way

21   to have of determining whether someone is in the

22   building or in the room at that time, is that

23   correct?

24   A.    Correct.

25   Q.    Mr. Cohen asked you about Mr. Galipeau

Page 157

1   showed that Mr. Khirawi did not respond to specific

2   messages by Ms. Jones.  Do you recall that?

3       A.    Yes.

4       Q.    And why is it that it wasn't important

5   whether -- what the computer system would detail as

6   to that issue?

7       A.    Because he had already been

8   insubordinate, and it is very expensive to get that

9   kind of information.

10      Q.    And had Tiffany Jones actually told you

11  that she tried to get ahold of Al, left a message

12  for him, and he didn't respond?

13      A.    Yes.

14      Q.    And that would have been enough for

15  you?

16      A.    That would have been enough for me.

17      Q.    And you had testified that opening such

18  a Ticket is in and of itself insubordination,

19  correct?

20      A.    Yes.

21      Q.    Why is that?  Is it something about the

22  expense?

23      A.    Yes, it is very expensive, and he just

24  can't open that Ticket.  It would probably take

25  somebody like I said definitely above me, maybe

Page 158

1  even HR.  That is not something that just a regular

2  employee can do.

3      Q.    And is a regular -- withdrawn.

4            Are employees of Getronics

5  permitted to use company time and money for their

6  own personal reasons?

7      A.    Absolutely not.

8      Q.    Mr. Cohen asked you if the documents and

9  testimony today covered all the reasons that

10  Mr. Khirawi was terminated.  Do you recall that?

11      A.    Yes.

12      Q.    Do you know every single reason why

13  Mr. Khirawi was terminated?

14      A.    I do not.

15      Q.    You had nothing to do with Mr. Khirawi's

16  last phone call with Mr. Graceffa?

17      A.    I did not.

18      Q.    Or with the warning given to Mr. Khirawi

19  in October of 2004?

20      A.    I did not.

21      Q.    You testified that you had discussion

22  with Paul Galipeau about returning the laptop.  Do

23  you recall that?

24      A.    Yes.

25      Q.    Do you know if Mr. Galipeau knew about

Khirawi Vs. Getronics RUBY Y. MILES                    8/2/06

Page 169

1    that?

2         A.    Yes.

3         Q.    Isn't a large factor what -- if they are

4    internal -- what they are making at the time?

5         A.    Yes, yes.

6         Q.    And the fact that Getronics does not

7    give easily raises in the 20 or 30 percent range?

8         A.    Absolutely not.

9         Q.    In your experience of 14 years at

10   Getronics, have you ever known of a 33 percent

11   raise, other than Mr. Khirawi's?

12        A.    Not since I've been here that I know of,

13   no.

14        Q.    Not anything 33 percent or higher?

15        A.    No.

16        Q.    As we sit here today on August 2nd,

17   2006, this is three or four years after many of the

18   instances that we talked about occurred.  Is that

19   correct?

20        A.    Yes.

21        Q.    And is your recollection of dates

22   perfect?

23        A.    No.

24        Q.    All right.  You are not exactly sure as

25   you sit here today when Mr. Khirawi's

Page 176

1    every day as Mr. Khirawi was?

2        A.    Not who worked for me, no.

3              MR. COHEN:  That's all I have.

4              FURTHER EXAMINATION

5    BY MR. WINTON:

6        Q.    Is Mr. Khirawi the only person you have

7    ever managed remotely?

8        A.    Yes.

9              MR. WINTON:  I don't have any

10   further questions.

11             MR. COHEN:  That's all I have.

12             (At 4:10 p.m. the testimony was

13   concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

Khirawi Vs. Getronics RUBY Y. MILES                    8/2/06

Page 180

```
 1   FOR THE PLAINTIFF:
     Cohen & Sales
 2   By:  Sol J. Cohen
          Attorney-at-Law
 3   47 Thorndike Street
     Cambridge, Massachusetts 02141
 4   (617) 621-1131
     soljcohen@cohenandsales.com
 5
 6   FOR THE DEFENDANT:
     Jackson Lewis LLP
 7   By:  Erik J. Winton
          Attorney-at-Law
 8   75 Park Plaza
     Boston, Massachusetts 02116
 9   (617) 367-0025
     wintone@jacksonlewis.com
10
              I further certify that I am neither
11   counsel for, related to, nor employed by any of the
     parties or attorneys to the action in which this
12   testimony was taken, and further that I am not
     financially or otherwise interested in the outcome
13   of this action.
14            Certified by me this 10th day of
     August 2006.
15
16   __Bobbie Showers_____
17   BOBBIE SHOWERS
     Registered Professional Reporter
     Texas CSR 5404
18   Expiration Date:  12/31/2006
19
20
21
22
23
24
25
```

# EXHIBIT HH

COPY

Page 1

VOLUME:     I
PAGES:      1-106
EXHIBITS:   1-30

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \*
                                    \*
AALAELDIN KHIRAWI,                  \*
          Plaintiff,                \*
                                    \*
vs.                                 \*
                                    \*
GETRONICS WANG CO., LLC             \*
D/B/A GETRONICS,                    \*
          Defendant.                \*
                                    \*
\* \* \* \* \* \* \* \* \* \* \*

          DEPOSITION OF JAMESON GRACEFFA, taken
on behalf of the Plaintiff, pursuant to the
Massachusetts Rules of Civil Procedure, before
Melinda M. Piccirilli, Certified Shorthand
Reporter and Notary Public within and for the
Commonwealth of Massachusetts, at the law
offices of Cohen & Sales, 43 Thorndike Street,
Cambridge, Massachusetts, on Friday, August 11,
2006, commencing at 10:10 a.m.

Page 33

1   Q. Who did you speak with?

2   A. I don't recall exactly but my boss Karen

3      Regan.

4   Q. Where was Karen Regan's office?

5   A. In Billerica, Mass.

6   Q. Was that a conversation in person that you

7      had with her?

8   A. Yes.

9   Q. Approximately when was that?

10  A. I don't recall.  I'm not positive.

11  Q. Do you think it was sometime approximately

12     in August of 2004?

13  A. I don't recall.

14  Q. Do you recall when the first time you became

15     aware any human resources issues relative to

16     Mr. Khirawi existed?

17  A. I don't recall.

18  Q. What did Ms. Regan tell you when you first

19     spoke to her about Mr. Khirawi?

20  A. I don't recall her exact words.  She thought

21     I could help an employee situation.

22  Q. How did she think you could help?

23  A. I have a background in mediation, conflict

24     resolution, and I was local.

Page 72

1    A. Mr. Hoffman went through the document.  He

2       -- to the best of my recollection, I soft

3       copied it to Jim, he went through it at the

4       time of the meeting.  That's the best of my

5       recollection, that nuts and bolts of it.

6    Q. Is there anything else that you can recall

7       about what occurred during that meeting?

8    A. Specifics I can't recall right now.

9    Q. I see on Page 2 of this under B, Performance

10      Requirements, 2, Weekly Status Report, is my

11      understanding correct that Mr. Khirawi was

12      to submit to you a status report every week

13      regarding the job requirements listed

14      underneath that A through F over to the next

15      page?

16   A. Yes.

17   Q. Did he do that?

18   A. I recall receiving status reports.

19   Q. You did receive them?

20   A. I did receive some.  I don't recall if I got

21      them regularly.

22   Q. Is it your testimony that you can't recall

23      whether Mr. Khirawi complied with that

24      requirement of this performance expectation

Page 75

1    submit his weekly reports properly?

2          MR. WINTON:   Objection as to form.

3    A. I was asking if it was acceptable to her

4    what he was getting to me.

5    Q. I'll put No. 18 in front of you.  Can you

6    take a look at that and let me know if you

7    recognize it.

8    A. Yes, I recognize this.

9    Q. What is this?

10   A. This refers to Mr. Khirawi letting me know

11   when he's coming and of his goings.

12   Q. Is it your testimony that Mr. Khirawi failed

13   to send you e-mails upon his arrival and

14   departure?

15   A. To the best of my recollection, yes.

16   Q. How many times did that happen?

17   A. I don't recall exactly.

18   Q. Was it more than once?

19   A. I don't recall.

20   Q. Do you remember the specifics of the

21   instance that precipitated this e-mail from

22   you to Mr. Khirawi?

23   A. I don't recall the specifics.

24   Q. Looking at what we marked No. 19, tell me

Page 89

1   calling me a liar several times.  I said,

2   Al, please let me finish and then you may

3   respond.  He said, Okay.

4       I started to go through the document

5   again and he interrupted me and said, I will

6   not listen to your lies, or something to

7   that effect, called me a liar several times.

8   He told me something to the effect that I

9   would have to live with myself, these lies,

10  something to the effect that he is Muslim

11  and he will not hear these lies.

12      He repeated that I was a liar over

13  and over again.  I was pretty surprised.

14  I've never -- I don't recall encountering

15  anything like that in my career, so I was a

16  little surprised.  I again reminded him,

17  Please let me finish.  You can respond.  I

18  just couldn't speak.  He would not allow me

19  to speak.

20  Q. Is there anything else that you can recall

21     that was said during that telephone meeting?

22  A. The other thing I said was -- because I

23     couldn't finish the document -- is that I

24     would end the call now and respond to him in

Page 90

1  writing.  And then he hung up on me before I

2  was -- ended the call.  And that's what I

3  recall from that conversation right now.

4  Q. Did he raise his voice?

5  A. To the best of my recollection, he did.

6  Q. You have no idea who was around him, so you

7     wouldn't know whether anyone heard him,

8     correct?

9  A. Correct.

10 Q. When we talked earlier about what you did to

11    prepare for today, you mentioned that you

12    reviewed some documents and perhaps a

13    position statement.

14        Did you review any documents that

15    related specifically to this telephone

16    meeting with Mr. Khirawi?

17 A. In preparation for this deposition?

18 Q. Yes.

19 A. I don't recall so.

20 Q. In the last six months have you reviewed any

21    documents that related to this telephone

22    meeting with Mr. Khirawi?

23 A. Other than the bit that may have been from a

24    position statement, no, I don't recall so.

Page 94

1      Khirawi about the termination?

2   A. I don't recall so.

3   Q. After the telephone meeting with Mr. Khirawi

4      but before he was terminated, did you speak

5      with Ms. Stanek?

6   A. Yes.

7   Q. Did you report the substance of what was

8      said in the meeting between you and Mr.

9      Khirawi to anybody before he was terminated,

10     not including Ms. Stanek or any other

11     attorneys for Getronics?

12          MR. WINTON:  You're asking if he

13     spoke with anyone other than counsel?

14          MR. COHEN:  That's correct.

15  A. I don't recall so.

16          (Letter dated 11/29/04 marked as

17          Exhibit No. 28)

18  Q. Take a look at this document that we marked

19     Exhibit 28.  Just let me know whether you've

20     seen it before today.

21  A. I don't recall seeing this document.

22  Q. Do you know what TALX is?

23  A. I've seen it before but I don't know exactly

24     what they do.

Page 101

1   document; it just means that as you sit here

2   today you can't recall having seen it; is

3   that correct?

4         MR. COHEN:  Objection.

5   Q. Is that correct?

6   A. That's correct.

7   Q. At the start of your October 26, 2004,

8      telephone meeting with Mr. Khirawi, did he

9      ask you to be brief in your presentation?

10  A. Yes.  I left that out.  I didn't recall it

11     at that time.  He started the phone call by

12     saying something to the effect of, Mr.

13     Graceffa, please be brief.  I have things to

14     do, something like that.

15  Q. What was Mr. Khirawi's tone like during that

16     telephone meeting on October 26, 2004?

17  A. Very disrespectful, almost menacing.  It was

18     almost like he was chanting when he called

19     me a liar over and over again, and I was

20     very uncomfortable with the situation.

21         In fact, I walked out with people for

22     the rest of the week to my car when I had

23     left.  It just made me very uncomfortable,

24     that whole conversation.

Page 104

1                     C E R T I F I C A T E

2

3    COMMONWEALTH OF MASSACHUSETTS

4    MIDDLESEX, SS.

5

6              I, Melinda M. Piccirilli, a

7    Certified Shorthand Reporter and Notary Public

8    in and for the Commonwealth of Massachusetts,

9    do hereby certify that JAMESON GRACEFFA, the

10   witness whose deposition is hereinbefore set

11   forth, was duly sworn by me and that such

12   deposition is a true and accurate record, to

13   the best of my knowledge, skills, and ability,

14   of the testimony given by such witness.

15              IN WITNESS WHEREOF, I have hereunto

16   set my hand and affixed my seal of office this

17   28th Day of August, 2006.

18

19

20              Melinda M. Piccirilli, CSR

21              Notary Public

22

23   My commission expires:

24   December 5, 2008