UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05-11877-WGY

_____
                                                          )
AALAELDIN KHIRAWI                      )
                                                          )
          Plaintiff                                  )
                                                          )
v.                                                        )
                                                          )
GETRONICS WANG CO., LLC             )
D/B/A GETRONICS                             )
                                                          )
          Defendants                             )
_____)

## PLAINTIFF, AALAELDIN KHIRAWI'S SUPPLEMENT TO HIS OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

NOW COMES the plaintiff, Aalaeldin Khirawi, and respectfully supplements his opposition to the defendant 's Motion for Summary Judgment, by attaching Exhibits 42-48.  The plaintiff filed his Opposition to the Defendant's Motion for Summary Judgment and related documents on April 5, 2007.  The plaintiff states that Exhibit 42 could not previously be filed electronically as an exhibit attachment to his original Opposition due to its size.  The plaintiff has since reformatted Exhibit 42 to allow for its electronic filing.

WHEREFORE, the plaintiff seeks that the Court include the attached exhibits as further support for his opposition to the defendant's motion for summary judgment.

Respectfully submitted,
For the plaintiff,


/s/       Sol J. Cohen
Sol J. Cohen
BBO # 630776
COHEN & SALES
43 Thorndike Street
Cambridge, MA 02141
(617) 621-1151

**CERTIFICATE OF SERVICE**

    I, Sol J. Cohen, attorney for the plaintiff, Aalaeldin Khirawi hereby certify that on this 6th day of April, 2007, I filed this document through the Court's ECF system, and will be sent electronically to the registered participants who are counsel of record on this matter.

                       /s/      Sol J. Cohen        
                       Sol J. Cohen

                        8-2-06 - ruby y, miles
0001
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2
                        CIVIL ACTION NO. 05-11877-WGY
 3
   _____
 4                                 )
   AALAEDIN KHIRAWI                )
 5                                 )
        Plaintiff                  )
 6                                 )
   V                               )
 7                                 )
   GETRONICS WANG CO., LLC         )
 8 D/B/A GETRONICS                 )
                                   )
 9      Defendant                  )
   _____)
10
11 ****************************************************
12              ORAL DEPOSITION OF
13               RUBY Y. MILES
14              AUGUST 2ND, 2006
15 ****************************************************
16              ORAL OF DEPOSITION RUBY Y. MILES,
17 produced as a witness at the instance of Plaintiff,
18 and duly sworn, was taken in the above-styled and
19 numbered cause on August 2nd, 2006, from
20 9:30 a.m. until 4:10 p.m., at the Offices of
21 Getronics, 9009 West Loop South, Houston, Texas,
22 before Bobbie Showers, CSR in and for the State of
23 Texas, pursuant to the Federal Rules of Civil
24 Procedure and the provisions stated on the
25 record or attached hereto.
0002
 1
                   A P P E A R A N C E S:
 2
 3 FOR THE PLAINTIFF:
 4 Cohen & Sales
   By:  Sol J. Cohen
 5       Attorney-at-Law
   47 Thorndike Street
 6 Cambridge, Massachusetts 02141
   (617) 621-1131
 7 soljcohen@cohenandsales.com
 8
 9 FOR THE DEFENDANT:
10 Jackson Lewis LLP
   By:  Erik J. Winton
11       Attorney-at-Law

                        Page 1

8-2-06 - ruby y, miles

```
     75 Park Plaza
12   Boston, Massachusetts 02116
     (617) 367-0025
13   wintone@jacksonlewis.com
14   -and-
15   Getronics
     By:  Marthe C. Stanek
16        Associate General Counsel
     290 Concord Road
17   Bellerica, Massachusetts 01821-4130
     (978) 625-5230
18   marthe.stanek@getronics.com
19
20
21
22
23
24
25
0003
 1
                     I N D E X
 2
                                          PAGE
 3
 4   Appearances                            3
 5   Stipulations                           6
 6   WITNESS:  RUBY Y. MILES
 7   Examination by Mr. Cohen        6, 160, 172
 8   Examination by Mr. Winton     138, 168, 176
 9
                  E X H I B I T S
10
11   NO.   DESCRIPTION                     PAGE
12    1    Appraisal Form, GETR0040 - GETR0046   36
13    2    String of email, top one 4-1-03,
14         Ruby Miles to Aalaeldin Khirawi,
15         GETR0609 - GETR0632             41
16    3    Position/Employee Requisition,
17         GETR00225 - GETR0028            41
18    4    Justification for Aalaeldin Khirawi
19         Promotion to Quality Representative,
20         GETR0032                        42
21    5    Memo, 8-27-03, Brian Benoit to
22         Aalaeldin M. Khirawi, GETR0029  47
23    6    Memo, 1-13-04, Joan Anderson to
24         Aalaeldin Khirawi, GETR0072 -
25         GETR0073                        76
0004
 1
              E X H I B I T S - Continued
 2
```

Page 2

8-2-06 - ruby y, miles

3   NO.   DESCRIPTION                                    PAGE
4    7    String of email, top one 1-28-04,
5         Ruby Miles to James Hoffman,
6         GETR0331 - GETR0033                              79
7    8    String of email, top one 2-23-04,
8         Aalaeldin Khirawi to Ruby Miles,
9         et al., GETR0207 - GETR210                       91
10   9    Appraisal Form, 2-26-04, GETR0019 -
11        GETR0024                                         93
12  10    Written Reprimand, 2-25-04,
13        GETR0016                                         97
14  11    String of email, top one 3-9-04,
15        Ruby Miles to Terrence Freeman,
16        GETR0360 - GETR0361                              98
17  12    String of email, top one 3-18-04,
18        Ruby Miles to Aalaeldin Khirawi,
19        GETR0216 - GETR0218                              99
20  13    String of email, top one 3-20-04,
21        Aalaeldin Khirawi to Jimmy Thomas,
22        GETR0219 - GETR0222                             104
23  14    Performance Improvement Plan,
24        3-18-20-04, GETR0012 - GETR0013                 105
25
0005
1

              E X H I B I T S - Continued
2
3   NO.   DESCRIPTION                                    PAGE
4   15    String of email, top one 5-17-04,
5         Aalaeldin Khirawi to Ruby Miles,
6         GETR0301 - GETR0303                             112
7   16    Written Reprimand, 5-18-04,
8         GETR0231                                        114
9   17    String of email, top one 5-18-04,
10        Aalaeldin Khirawi to Ruby Miles,
11        GETR0226 - GETR0230                             113
12  18    String of email, top one 5-26-04,
13        Aalaeldin Khirawi to Ruby Miles,
14        GETR0496 - GETR0500                             115
15  19    EEOC Charge No. 161-2004-00285,
16        GETR0139 - GETR0142                             119
17  20    String of email, top one 8-6-04,
18        Aalaeldin Khirawi to Robert Mallon,
19        GETR0433 - GETR0438                             123
20  21    Performance Expectations, 8-19-04,
21        GETR0005 - GETR0007                             126
22  22    Written Reprimand, 9-24-30-04,
23        GETR0003 - GETR0004                             130
24
25
0006
1                    RUBY Y. MILES,
                       Page 3

                          8-2-06 - ruby y, miles
2    having been first duly sworn, was examined and
3    testified as follows:
4                         EXAMINATION
5    BY MR. COHEN:
6         Q.    Good morning.  Would you state your
7    name, please.
8         A.    My name is Ruby Miles.
9                    MR. COHEN:  Okay.  And before we
10   begin, Counsel, can we put the stipulations on the
11   record?
12                   MR. WINTON:  Yes.
13                   MR. COHEN:  Can we agree that we
14   will waive objections, except objections as to the
15   form, and we will also agree to waive motions to
16   strike until the time of trial?
17                   MR. WINTON:  Yes.
18                   MR. COHEN:  And we will have the
19   witness read and sign within 30 days of receipt,
20   waive the notary, sign under the pains and
21   penalties of perjury?
22                   MR. WINTON:  Yes.
23        Q.    (BY MR. COHEN)  Mrs. Miles, my name is
24   Sol Cohen.  I'm an attorney from Cambridge,
25   Massachusetts, and I represent Aalaeldin Khirawi in
0007
1    a lawsuit which is based on a retaliation complaint
2    brought against Getronics, which is pending at the
3    United States District Court for the District of
4    Massachusetts.
5                    I'm going to ask you a series of
6    questions today.  If you don't understand the
7    question, let me know that, so I can rephrase the
8    question or ask a different question.
9                    If you don't hear a particular
10   question, let me know that, so that I can repeat
11   it.  Do you understand those rules so far?
12        A.    Yes.
13        Q.    And just like you did just now, you have
14   to answer verbally, so that our stenographer can
15   take everything down.  Allow me to finish asking my
16   question and I will do my best to allow you to
17   finish answering the question before I begin the
18   next question.
19        A.    Okay.
20        Q.    If at any time you want to go to the
21   ladies' room, grab a drink, or anything like that,
22   just let us know.
23        A.    Okay.
24        Q.    Where do you live, Mrs. Miles?
25        A.    I live in Richmond, Texas.
0008
1         Q.    And what is your address?
                          Page 4

```
                        8-2-06 - ruby y, miles
2       A.      2403 Cannons Hall Court.
3       Q.      How long have you lived there?
4       A.      It will be 19 years in October.
5       Q.      And are you married?
6       A.      No.  I'm divorced.
7       Q.      I'm sorry, have you been married?
8       A.      Yes.
9       Q.      And do you have any kids?
10      A.      I have two children.
11      Q.      And how old are they?
12      A.      Almost 39 and 40.
13      Q.      And where are you from originally?
14      A.      Originally from Houston, Texas.
15      Q.      Have you ever had your deposition taken
16  before?
17      A.      Never.
18      Q.      Have you ever given testimony under oath
19  in a court proceeding?
20      A.      Never.
21      Q.      Did you meet with anybody to help you
22  prepare for today's deposition?
23      A.      Yes.  (Indicates)
24      Q.      And with whom did you meet?
25      A.      My attorney, Erik Winton and Marthe
0009
1   Stanek.
2       Q.      And how many times did you meet with
3   Mr. Winton and Ms. Stanek?
4       A.      Yesterday.
5       Q.      And for how long did you meet?
6       A.      Most of the day.
7       Q.      And where did you meet?
8       A.      Here.
9       Q.      And was anybody else present, other than
10  the three of you?
11      A.      No.
12      Q.      Okay.  And other than Mr. Winton and
13  Ms. Stanek, did you speak with anybody to help you
14  prepare for today's deposition?
15      A.      No.
16      Q.      And did you review any documents to help
17  you prepare for today's deposition?
18      A.      Yes.
19      Q.      Can you tell me what documents you
20  reviewed?
21      A.      There were several.  I don't recall them
22  just off the top of my head.
23      Q.      You don't recall any of the documents --
24      A.      No.
25      Q.      -- that you reviewed yesterday?
0010
1                       MR. WINTON:  Wait for him to finish
                        Page 5
```

                    8-2-06 - ruby y, miles
2  his question.
3                    THE WITNESS:  Okay.
4                    MR. WINTON:  Do you want him to ask
5  it again?
6                    THE WITNESS:  Yes.
7      Q.    (BY MR. COHEN)  Do you recall any of the
8  documents that you reviewed yesterday?
9      A.    I looked at salary requisitions.  I
10 looked at some PIP forms that I filled out for Al.
11     Q.    What is a PIP form?
12     A.    Performance Improvement.  And written --
13 written -- when you -- well, the same, Performance
14 Improvement.  That will work.
15     Q.    Was there anything else, any other
16 documents that you looked at?
17     A.    I looked at a few, a couple of emails
18 that Al had written.
19     Q.    Approximately how many emails did you
20 look at yesterday?
21     A.    Approximately 20 or so, maybe thereof.
22     Q.    Okay.  Are there any other documents
23 that you can remember that you reviewed to help you
24 prepare for today's deposition?
25     A.    No, I don't recall.
0011
1      Q.    And before yesterday, did you review any
2  documents to help you prepare for today?
3      A.    No.
4      Q.    Okay.  And other than what we have
5  discussed so far, did you do anything to help you
6  prepare for today's deposition?
7      A.    No.
8      Q.    And other than speaking to Mr. Winton
9  and Ms. Stanek, did you discuss today's deposition
10 with anybody?
11     A.    Absolutely not.
12     Q.    And within the last 30 days, have you
13 discussed this lawsuit or Mr. Khirawi's claims
14 against Getronics with anybody?
15     A.    No.
16     Q.    How about within the last six months?
17 Have you discussed the lawsuit with anybody?
18     A.    No.
19     Q.    Are you currently employed at
20 Getronics?
21     A.    Yes.
22     Q.    What is your position with Getronics?
23     A.    I am their Quality Manager in the
24 Customer Support Group.
25     Q.    How long have you held that position?
0012
1      A.    This is 2006 -- approximately five
                    Page 6

8-2-06 - ruby y, miles
2   years.
3       Q.    And can you summarize what your duties
4   are as the Quality Manager for the Customer Support
5   Group?
6       A.    Okay.  That's not very easy, but here
7   goes.  My group does support for the Managed
8   Service Desk, so what they do is we do what we call
9   checks and balances.  And by that I mean, the
10  Service Desk has a call-monitoring system, right,
11  that they use to listen to calls, first line, first
12  resolve, help desk resolvable calls.
13                  And so they have people who listen
14  to the calls, and so what my group does is that we
15  make sure that it's the best quality given to the
16  client.
17                  Besides that, we are responsible
18  for monthly reports.
19                  Besides that, we also QA
20  problem-tracking tickets and Internet
21  documentation, so we do a little bit of everything,
22  as far as QA.
23      Q.    When you say "QA," you are talking about
24  Quality Assurance?
25      A.    Quality Assurance, yes.
0013
1       Q.    And you say you assure the best quality
2   to the clients.  Can you give me some examples of
3   clients of Getronics?
4                  MR. WINTON:  Wait a second.  Do you
5   want to keep this confidential?
6                  MS. STANEK:  Yes.
7                  MR. WINTON:  We will mark this
8   confidential.
9                  You can still answer.
10                 THE WITNESS:  Okay.
11      A.    We have Novartis Pharmaceuticals.  A
12  company by the name of Nalco Chemicals, N-a-l-c-o.
13  They are out of Sugar Land.
14                 Khovnanian Homes.  Beazer Homes.
15  Booz Allen Hamilton, whatever they may do.
16  Deutsche Bank.  Let me go -- AXA.  There are
17  about --
18                 And now we are moving into Mexico.
19  We have GE Capital.  We have Solvay Chemicals in
20  Mexico.  We have our own Internal Service Desk in
21  Mexico.
22                 So all together there are about 25
23  or so accounts, which I didn't name them all.  Some
24  of them are small.  State of Georgia.  I can't name
25  them all off the top hove my head right now.
0014
1       Q.    (BY MR. COHEN)  Okay.  That is
                        Page 7

                          8-2-06 - ruby y, miles
2    sufficient.  Just trying to get an idea of the type
3    of client that Getronics has.
4                      So you are saying that the Help
5    Desk listens to calls from these clients or from
6    representatives of --
7         A.   Yes, we have a --
8                      MR. WINTON:  Let him finish the
9    question.  Okay?  Take it slow.
10        Q.   (BY MR. COHEN)  So you are saying that
11   the Help Desk monitors calls from representatives
12   from these clients.  Is that correct?
13        A.   Yes.
14        Q.   And can you describe for me what you
15   meant by QA -- you said QA problem-tracking
16   tickets?
17        A.    Yes.  We have a group that -- when a
18   call comes in, you have to open a problem-tracking
19   ticket.  So we have a system called Vantive and we
20   have something, People Software called SQ -- just
21   put it is Peoples Soft.  Peoples Soft is the
22   vendor.
23                     And what one of the people who
24   works for me does is that he goes in and he makes
25   sure that what the analysts or the agents put in
0015
1    the ticket is accurate, the spelling is correct,
2    you know, the ticket makes sense, because what
3    happens a lot of times with the tickets is that
4    when the spelling is poor and the client sees that,
5    that's -- that's not good for Getronics, so that is
6    one of the things that we do.
7         Q.   Can you tell me how many subordinates
8    you have currently?
9         A.   Two.
10        Q.   Two?
11        A.   Two.
12        Q.   And as of now, can you describe what
13   your authority is, and specifically do you have the
14   authority to terminate one of your subordinates?
15                     MR. WINTON:  Objection as to form.
16   You can answer.
17        A.    That's not an easy task.  That's my
18   answer.  So do I have authority?
19                     MR. WINTON:  It is a simple
20   question, Ruby.
21                     THE WITNESS:  Yes or No?
22                     MR. WINTON:  Yes.
23        A.   Yes.
24        Q.   (BY MR. COHEN)  And was that the case
25   back in 2004 as well?
0016
1         A.   No.
                              Page 8

8-2-06 - ruby_y, miles
2       Q.    So your authority level within the
3    management of Getronics has changed since 2004?
4       A.    Yes.
5       Q.    But your position and your title has not
6    changed.  Is that right?
7       A.    Correct.
8       Q.    Currently, I assume, and correct me if
9    I'm wrong, but I assume you have the authority to
10   issue discipline, written reprimands --
11      A.    Absolutely.
12      Q.    -- to your subordinates, is that
13   correct?
14      A.    Yes.
15      Q.    And that was the case back in 2004?
16      A.    Yes.
17      Q.    How long have you been with Getronics
18   total?
19      A.    It was 14 years June 1st.
20      Q.    Okay.  And before your current position,
21   what position did you hold?
22      A.    I was their ISO Representative, which
23   meant that I don't know -- ISO 9,000.  It's a
24   quality standard so they audit and the auditors
25   would come and I would be the person that they
0017
1    would meet and I would be the person who would
2    bring them around.
3       Q.    Was that a management position?
4       A.    Yes.
5             But I didn't manage anyone, but it
6    is a management position.
7       Q.    But you had no subordinates?
8       A.    No.
9       Q.    How long did you hold that ISO Rep
10   position?
11      A.    Probably two years.
12      Q.    How about before that?  Can you tell me
13   what position you held with Getronics?
14      A.    I was out on the Service Desk as a
15   Service Desk Manager.
16      Q.    And how long did you do that?
17      A.    Oh, easily two to three years.
18      Q.    And how many subordinates did you have
19   in that management position?
20      A.    Oh, 20, 30, depending on the size of the
21   desk and depending on how we managed the desk.
22      Q.    Okay.  And can you go one more?  What
23   position did you hold before the Service Desk
24   Manager?
25      A.    I traveled for the company.  I did
0018
1    bringing in accounts.  So whenever they wanted to
                         Page 9

8-2-06 - ruby y, miles
```
 2  bring in a new account, I would go out on the Team
 3  and be a part of the Team to do due diligence for
 4  those accounts and make sure that we got all the
 5  information and information-gathering, so that was
 6  what I did when I first started working here for a
 7  couple of years.
 8      Q.    And that was a management position?
 9      A.    I've always been a manager here, but
10  not --
11              MR. WINTON:  Just yes, that was a
12  management position.
13      A.    Yes.
14              MR. WINTON:  Listen to the
15  question.
16      Q.    (BY MR. COHEN)  Okay.  And how many
17  subordinates did you have working in that
18  position?
19      A.    Sometimes one, sometimes two.
20      Q.    And did you have a title that you can
21  tell me with that position?
22      A.    I don't recall it at this time.
23      Q.    And how long did you do that?
24      A.    Probably two years to 2-1/2 years.
25      Q.    Okay.  Have you held a management
0019
 1  position for all your 14 years with Getronics?
 2      A.    Yes.
 3      Q.    And did all -- have all of your
 4  positions included management of subordinates?
 5      A.    No.
 6      Q.    When was the first time you had a
 7  management position that included managing
 8  subordinates?
 9              MR. WINTON:  At Getronics or
10  anywhere?
11      Q.    (BY MR. COHEN)  At Getronics.
12      A.    When I managed the Service Desk.
13      Q.    Now, shifting gears a little bit, during
14  your employment at Getronics, have you had any
15  training relative to company policies or law
16  involving discrimination in the workplace?
17      A.    Yes.
18      Q.    Okay.  Can you tell me the last time you
19  had any such training?
20      A.    Probably a couple of years ago.
21      Q.    Was that 2004?
22      A.    Yes, probably.
23      Q.    And do you remember what month it was in
24  2004?
25      A.    I don't recall.
0020
 1      Q.    You are familiar with Mr. Khirawi?
```

8-2-06 - ruby y, miles
2      A.    Yes.
3      Q.    And he was a subordinate of yours from
4  approximately when to when?
5      A.    I don't recall the exact year.  I don't
6  recall the exact year.
7      Q.    Okay.  Do you recall his termination
8  date?
9      A.    No.
10     Q.    Okay.  October 27th, 2004.  Does that
11 sound accurate?
12     A.    Probably.
13     Q.    And do you recall whether the training
14 you had relative to discrimination occurred after
15 Mr. Khirawi was terminated?
16     A.    I don't recall.
17     Q.    Is there any -- are there any documents
18 that you can think of that can tell us when you had
19 that training?
20     A.    We get yearly documents from the
21 company.
22           MR. WINTON:  He asked you one
23 question:  Are there any documents that could help
24 you remember when you received the training?
25     A.    No, I don't recall.
0021
1      Q.    (BY MR. COHEN)  Did you get regular
2  documents on -- relative to training regarding
3  discrimination?
4      A.    Yes.
5      Q.    Okay.  And when was the last time you
6  received any documents like that?
7      A.    This past week.
8      Q.    And can you describe what that document
9  that you received this past week contains?
10           MR. WINTON:  Mark this confidential
11 as well?
12           MS. STANEK:  Yes.
13           MR. WINTON:  Okay.  We are going to
14 mark this confidential as we are going to mark all
15 policy documents.
16           MR. COHEN:  When you said all --
17           MR. WINTON:  All policy documents
18 for the company.
19     A.    It speaks of discrimination against
20 race, religion, sexual origin.  It also talks about
21 the company code, you know, what is good for
22 Getronics.  It also has policies in there about
23 Internet usage, so there are several documents
24     Q.    (BY MR. COHEN)  Okay.  Now, the training
25 that you had in 2004, was that a similar thing
0022
1  where you just received some documents from the
                        Page 11

                    8-2-06 - ruby y, miles
2    company?
3        A.    Yes, yes.
4        Q.    Did you also attend any sort of training
5    seminar or any sort of presentation?
6        A.    No -- a short class.  I'll put it like
7    that, yes.
8        Q.    And that was in 2004?
9        A.    There about.  I don't recall exactly.
10       Q.    Did you have a class, a short class this
11   year as well?
12       A.    No.
13       Q.    Where was the short class held in 2004?
14             MR. WINTON:  I'm just going to --
15   to the extent you keep saying in 2004, that is when
16   she thinks it was.  She hasn't confirmed that it
17   was actually 2004.  So as long as every time you
18   say 2004, we are talking about what she thinks, I'm
19   not going to object at this time.
20             MR. COHEN:  All right.
21   Understood.
22       A.    One of the training rooms.
23       Q.    (BY MR. COHEN)  Here in this building?
24       A.    Yes.
25       Q.    Getronics in Houston?
0023
1        A.    Yes.
2        Q.    And how many people attended the class?
3        A.    Approximately 10 to 15.
4        Q.    And who did the presentation?
5        A.    I don't recall -- I don't recall
6    exactly.
7        Q.    Can you recall how long the class was?
8        A.    An hour to an hour-and-a-half.
9        Q.    Can you recall anything about what was
10   presented or what was said during the
11   presentation?
12       A.    Basically, just to go over the
13   discrimination laws, the policies of the company to
14   make sure we understood.
15       Q.    Is there anything else that you can
16   remember from that class?
17       A.    No.
18       Q.    And were you given any documents during
19   the class?
20       A.    No.
21       Q.    Were there any videos shown?
22       A.    No.
23       Q.    Okay.  And since that short class, have
24   you had any similar classes at Getronics?
25       A.    No.
0024
1        Q.    Okay.  How about before then, did you
                        Page 12

                          8-2-06 - ruby y, miles
2    have any sort of classes on discrimination at
3    Getronics?
4         A.    Periodically.
5         Q.    Can you remember how long before the
6    class in what we think might be 2004 occurred?  Let
7    me rephrase that.
8                    How much time went by between or
9    before the classes you had around 2004 since the
10   time before that?
11        A.    One-and-a-half to two years.
12        Q.    And so was it a similar class as you had
13   the time before the 2004, approximately 2004
14   class?
15        A.    Yes.
16        Q.    And the class or the documents that you
17   received in approximately 2004, did that include
18   any training on how to respond to an Employee's
19   Complaint Of discrimination?
20        A.    Not that I recall.
21        Q.    And did that class in approximately 2004
22   include any training specifically with respect to
23   company policy or laws relative to retaliation for
24   an employee's report of discrimination?
25        A.    Not that I recall.
0025
1         Q.    In any capacity other than with your
2    employment at Getronics, have you had any training
3    relative to company policies or laws regarding
4    discrimination in the workplace?
5                    MR. WINTON:  Can you read one that
6    back?
7                    (The proceedings were read by the
8    Court Reporter as follows:
9                    "QUESTION:  In any capacity other
10                   than with your employment at Getronics,
11                   have you had any training relative to
12                   company policies or laws regarding
13                   discrimination in the workplace?"
14                   MR. WINTON:  Do you mean companies
15   other than Getronics?
16                   MR. COHEN:  Right.
17                   MR. WINTON:  Okay.
18        Q.    (BY MR. COHEN)  Necessarily any
19   company's policy other than Getronics?
20        A.    Yes.
21        Q.    Okay.  And when is the last time you had
22   any training like that?
23        A.    When I worked for BP.
24        Q.    BP?
25        A.    BP.
0026
1         Q.    British Petroleum?
                          Page 13

8-2-06 - ruby y, miles
```
 2        A.    Yes.
 3        Q.    Okay.  So I take it that was over 14
 4    years ago?
 5        A.    Yes.
 6        Q.    And can you remember anything about the
 7    training that you had?
 8        A.    Just wanted to make sure, because I was
 9    the Help Desk Manager for most of those years, that
10    all employees were treated fairly.  It's always
11    been according to race, creed, religion, sexual
12    preference, et cetera, et cetera.
13                    So it may have been a little bit
14    more in-depth and they may have done it a little
15    more, but a little bit more sensitive training.
16    I'll say that.  Sensitivity training, I would call
17    it.
18        Q.    The training at BP involved more
19    in-depth --
20        A.    Yes.
21        Q.    -- sensitivity training, rather than the
22    training at Getronics?
23        A.    Yes, maybe.  I would say that, yes.
24        Q.    When did you first meet Mr. Khirawi?
25        A.    I don't recall the year, but I flew to
0027
 1    Tewksbury to meet him and to interview him in
 2    probably early 2003.  That's a guess.
 3                    MR. WINTON:  We don't want you to
 4    guess, Ruby.  If you don't know --
 5                    THE WITNESS:  I don't know.
 6                    MR. WINTON:  -- tell him that.
 7        A.    I don't know.
 8        Q.    (BY MR. COHEN)  Did you fly to Tewksbury
 9    specifically to interview Mr. Khirawi?
10        A.    No.
11        Q.    Okay.  Was the purpose of your flight to
12    Tewksbury other than to interview Mr. Khirawi?
13        A.    I also went there to install and to help
14    train for our problem-tracking system that we
15    installed in Tewksbury.
16        Q.    How did you learn of Mr. Khirawi as a
17    possible candidate for your Team?
18                    Is it accurate to call your group
19    or the group that you manage a Team?
20        A.    Yes.  There used to be, yes.
21                    Through Paul Galipeau.
22        Q.    And who is Paul Galipeau?
23        A.    He is the MSD Director for Tewksbury.
24        Q.    And were you looking for somebody for a
25    specific position on your Team?
0028
 1        A.    Yes.
```
Page 14

                    8-2-06 - ruby y, miles
2        Q.    And I take it you made that known to
3    Mr. Galipeau?
4        A.    Yes.
5        Q.    And he recommended Mr. Khirawi?
6        A.    Yes.
7        Q.    Okay.  And how long after your interview
8    did Mr. Khirawi become a member of your Team or a
9    subordinate employee for you?
10       A.    It took several months.
11       Q.    It took several months from the date of
12   the interview?
13       A.    Yes.
14       Q.    Can you tell me approximately when he
15   began working for you?
16       A.    I don't know exactly.
17       Q.    What position did he begin when he began
18   working for you?
19       A.    He was a QA Representative.
20       Q.    Do you remember what his salary was when
21   he began working for you?
22       A.    36,000 probably, thereof.
23       Q.    So can you describe the duties of a QA
24   Representative?
25       A.    QA Representatives create -- they create
0029
1    the monthly reports.  They also calibrate the call
2    assessments with the Team Management out on MSD.
3                 They also train assessors to be
4    able to assess calls, because everybody doesn't
5    know how.  They may listen to calls themselves.
6        Q.    Now, if I said to you that he began as a
7    QA Representative at 36,000 a year in August of
8    2003, does that sound correct?
9        A.    Yes.
10       Q.    Had he been doing any of the duties of a
11   QA Representative before he began with the salary
12   of 36,000?
13       A.    Yes.
14       Q.    Now, can you describe for me why he was
15   doing some of the QA Representative duties before
16   he actually held the position?
17                 MR. WINTON:  Objection as to form.
18   You can answer.
19       A.    Okay.  Rephrase it for me, please.
20       Q.    (BY MR. COHEN)  Sure.  I'm trying to
21   find out why he was performing some of the duties
22   of the QA Representative before he held the title
23   and the salary of the QA Representative.
24       A.    Because it took awhile for him to get
25   his raise and he wanted a job.  He was doing it all
0030
1    along and he wanted to continue to do it.
                    Page 15

8-2-06 - ruby y, miles

2      Q.    And have you seen that happen before,
3   where an employee at Getronics performs the duties
4   of a particular position before they actually hold
5   the title and receive the salary commensurate with
6   the position?
7      A.    I don't know it personally.
8      Q.    And approximately how long did he do
9   those duties before the time that he began and
10  actually held the title in approximately August of
11  2003?
12     A.    I don't recall.
13     Q.    Was it more than three months?
14     A.    I would say probably.
15     Q.    Wasn't it -- didn't he actually begin
16  those duties in the fall of 2002?
17     A.    When Al began those duties, he was not
18  reporting to me.  He was performing those duties
19  for Paul, so I can't tell you exactly.
20     Q.    Okay.  So did he -- when did he actually
21  begin to report to you?
22     A.    I don't recall the exact month.
23     Q.    Well, did he begin -- are you saying
24  that he didn't begin reporting to you until he
25  actually held the formal position of QA
0031
1   Representative with the 36,000 salary?
2      A.    Right.
3      Q.    Other than speaking to Mr. Galipeau, did
4   you do any background research into Mr. Khirawi
5   before you decided to offer him the position?
6      A.    No.
7      Q.    Okay.  And when did you offer him the
8   position?
9      A.    While I was in Tewksbury.
10     Q.    The same trip where you interviewed
11  him?
12     A.    Yes.
13     Q.    And did you discuss salary at the time?
14     A.    Yes.
15     Q.    Okay.  Tell me what you said.
16     A.    I never give out amounts of money, but I
17  did discuss him getting a raise because he would be
18  going from an hourly employee to a salary
19  employee.
20     Q.    So is it your testimony that you did not
21  talk to any specific numbers at all with
22  Mr. Khirawi at the time?
23     A.    At that specific time, no.
24     Q.    Okay.  Was there some point in time
25  after that meeting with him in Tewksbury that you
0032
1   discussed salary?

Page 16

8-2-06 - ruby_y, miles

2      A.    Right.  I spoke to Paul Galipeau.
3      Q.    Was that soon after the meeting with
4  Mr. Khirawi?
5      A.    Right.
6      Q.    What did you discuss with Paul
7  Galipeau?
8      A.    How much we could pay Al.
9      Q.    Okay.  And what were the numbers
10  discussed with Mr. Galipeau?
11      A.    Because of his education and his
12  knowledge, we were hoping for $40,000 a year.
13      Q.    Okay.  And is that consistent with your
14  understanding of the salaries at Getronics for a QA
15  Representative with Mr. Khirawi's education,
16  background, and credentials?
17              MR. WINTON:  Objection as to form.
18  You can answer.
19      A.    We have reference points of salaries, so
20  it doesn't say min, it doesn't say max, so
21  reference that you anywhere.
22      Q.    (BY MR. COHEN)  What do you mean when
23  you say "reference"?  Are you saying that there are
24  salary ranges for positions?
25      A.    Yes.
0033
1      Q.    Okay.  Back then in 2002 or 2003, what
2  were the salary ranges for a QA Representative?
3      A.    I don't recall honestly.
4      Q.    What are they today?
5      A.    46 to -- I don't know.
6      Q.    46,000 you think is the low range?
7      A.    The reference point now, yes.
8      Q.    The low reference point today?
9      A.    Yes.
10      Q.    And where you fall in on the range as a
11  Quality Representative, would it be dependent on
12  what your education, background, and experience
13  were?
14              MR. WINTON:  Objection as to form.
15  You are talking about two different things.  She is
16  saying "reference point."  You are saying "range."
17  I think we need to be clear.
18              MR. COHEN:  Let me rephrase.
19      Q.    (BY MR. COHEN)  Where you fall in on the
20  reference points on the salary for a QA
21  Representative, would that depend on the
22  individual's experience, education, and
23  credentials?
24      A.    No.
25      Q.    Okay.  What would it depend on?
0034
1              In other words, what factors are
                          Page 17

8-2-06 - ruby y, miles
2  considered in where a QA Representative falls
3  within the reference points?
4      A.    Their present salary.  Whether they are
5  an internal or external candidate.  That along with
6  experience, knowledge, and the company.
7               We have a policy here at this
8  company that over 9 percent has to go up to the VP,
9  so that's a very difficult thing to get.  So
10 because of the environment of this company, that
11 may not be the case.
12     Q.    Okay.  Now, you testified that you spoke
13 to Paul Galipeau and that you were both hoping for
14 a $40,000 a year offer to Mr. Khirawi, correct?
15     A.    Right
16     Q.    And did you relay that hope to
17 Mr. Khirawi?
18     A.    Yes.
19     Q.    And when was that?
20     A.    I don't recall exactly.
21     Q.    Can you tell me approximately how much
22 time went by between the conversation with
23 Mr. Galipeau and the time that you relayed that
24 hope to get Mr. Khirawi $40,000 a year to
25 Mr. Khirawi?
0035
1      A.    It wasn't long, but I don't remember.
2      Q.    A matter of weeks do you think?
3      A.    Days, weeks, yes.
4      Q.    Before you offered him the position, did
5  you ask anyone other than Mr. Galipeau for any
6  comments about Mr. Khirawi's past work
7  performance?
8      A.    Yes.
9      Q.    Who did you ask?
10     A.    I spoke to some of the people in
11 Tewksbury on the Help Desk that he had been working
12 for.
13     Q.    Do you remember specifically who?
14     A.    Amy Callon and Sev Puglisi,
15 P-u-g-l-i-s-i.
16     Q.    And that's Sev, S-e-v?
17     A.    Uh-huh.
18     Q.    And what did they tell you?
19     A.    That liked his work.  They knew his work
20 and they thought he would be a good employee.
21     Q.    And did you review any documents
22 relative to Mr. Khirawi's past performance before
23 you offered him the position of Quality Assurance
24 Representative?
25     A.    Yes.  I looked at his Monthly Reports.
0036
1      Q.    Okay.  When we are talking about Monthly
                    Page 18

8-2-06 - ruby y, miles
2  Reports, these are Monthly Reports of tickets or
3  can you tell me what they are?
4       A.     Monthly Reports of Aalaeldin's
5  performance.
6       Q.     And what was your conclusion when you
7  reviewed his Monthly Reports?
8       A.     Liked them a lot.  Very good.
9       Q.     And is there anything else that you did
10 to inquire or find out about Mr. Khirawi's past
11 work performance before you offered him the QA
12 Representative job?
13      A.     No.
14                  (Exhibit No. 1 was marked for
15 identification.)
16      Q.     (BY MR. COHEN)  If you can take a look
17 at a document that has been put in front of you
18 marked Exhibit No. 1, and once you are through
19 looking at it, if you can just tell me if you
20 recognize it.
21      A.     It's an Appraisal Form.
22      Q.     And have you seen this before today?
23      A.     Not this particular one.
24      Q.     And this is an Appraisal Form that
25 appears to be an Appraisal conducted by a manager
0037
1  named Amy Wellington?
2       A.     Right.
3       Q.     And you mentioned that you had spoken to
4  an Amy Callon.  Is this the same person?
5       A.     No.  It might have been Wellington.  I
6  talked to Amy Callon and Amy Wellington.
7       Q.     But they are definitely two different
8  people?
9       A.     Two different people.
10      Q.     And how many employees were in your
11 Team, who were subordinate to you, at Getronics
12 that you offered Mr. Khirawi the position of QA
13 Representative?
14      A.     He made -- it was eight of us all
15 together.
16      Q.     And were you aware of any prior Human
17 Resources issues that Mr. Khirawi had before coming
18 to work on your Team?
19      A.     No.
20                  MR. WINTON:  Objection as to form.
21 You can answer.
22      A.     No.
23      Q.     (BY MR. COHEN)  Were you aware that he
24 had made a Complaint of Discrimination and a
25 request for religious accommodation back in 2000?
0038
1       A.     No.

Page 19

8-2-06 - ruby y, miles
 2      Q.    Were you aware that at least Mr. Khirawi
 3   claims that he was instructed to take a leave soon
 4   after the attacks of September 11, 2001?
 5      A.    No.
 6      Q.    Had you ever heard that?
 7      A.    No.
 8      Q.    And are you familiar with the project
 9   named AERO?
10      A.    No.
11      Q.    Were you aware at the time that you
12   offered Mr. Khirawi the position and interviewed
13   him that at least he claims that he was removed
14   from the project named AERO soon after the
15   September 11, 2001 attacks?
16      A.    Absolutely not.
17      Q.    What position did Mr. Khirawi hold
18   before he came to work on your Team?
19      A.    I don't recall.
20      Q.    Now, you were, at the time, as you are
21   now, I take it, located in Houston, correct?
22      A.    Yes.
23      Q.    And so the idea when he came aboard your
24   Team was that you were going to manage him from
25   Houston and he was going to be located in
0039
 1   Tewksbury, Mass.  Correct?
 2      A.    Yes.
 3      Q.    And had you done that with any other
 4   subordinates in the past?
 5      A.    No.
 6      Q.    And can you tell me, if you know, who
 7   the Plaintiff's previous supervisors were before
 8   you became a supervisor in 2003?
 9      A.    I don't recall.
10      Q.    Well, we know that Mr. Galipeau was a
11   supervisor at some point, correct?
12      A.    Overall, yes.  Director, yes.
13   Immediate, I don't know.
14      Q.    We know Ms. Wellington was his
15   supervisor.  Is that correct?
16      A.    By viewing this.
17      Q.    By viewing Exhibit No. 1?
18      A.    Yes.
19      Q.    And so you can't recall or you don't
20   have any knowledge as you sit here who else may
21   have supervised Mr. Khirawi before you?
22      A.    No, I don't recall.
23      Q.    Now, after meeting with Mr. Khirawi when
24   you interviewed him in Tewksbury, and after
25   speaking to other individuals about his past
0040
 1   performance, did you come to a conclusion that
                        Page 20

                        8-2-06 - ruby y, miles
2    Mr. Khirawi was a great listener?
3                      MR. WINTON:  Objection as to form.
4                      THE WITNESS:  Excuse me?
5                      MR. WINTON:  You can answer.  I
6    just objected to the form of the question.
7                      THE WITNESS:  Okay.
8                      MR. WINTON:  You can have it read
9    back if you want.
10                     THE WITNESS:  Please.  Please read
11   it back.
12                     (The proceedings were read by the
13   Court REPORTER as follows:
14                     "QUESTION:  Now, after meeting with
15           Mr. Khirawi when you interviewed him in
16           Tewksbury, and after speaking to other
17           individuals about his past performance,
18           did you come to a conclusion that
19           Mr. Khirawi was a great listener?")
20        A.    No decision one way or another about him
21   being a listener.
22        Q.    (BY MR. COHEN)  Okay.
23        A.    I looked at the work that Al could do.
24   He got great reviews.
25        Q.    Okay.  And did you come to any
0041
1    conclusion at that time, back when you were
2    interviewing him and you offered him the position
3    after speaking to other individuals about his past
4    performance that Mr. Khirawi had excellent
5    communication skills?
6                      MR. WINTON:  Objection as to form.
7    You can answer.
8         A.    He had great communication skills.
9                      (Exhibit Nos. 2 and 3 were marked
10   for identification.)
11        Q.    (BY MR. COHEN)  You can take a look at
12   what has been marked as Exhibit No. 3 and let me
13   know if you recognize it?
14        A.    Yes.
15        Q.    And what is that document?
16        A.    This is a Requisition Form for a
17   position.
18        Q.    And that is your signature on the bottom
19   of the first page on the left?
20        A.    Yes.
21        Q.    And had you read this before you signed
22   it?
23        A.    Yes.
24        Q.    Okay.  And everything was true and
25   accurate as far as you know at the time that you
0042
1    signed it, correct?
                        Page 21

8-2-06 - ruby y, miles
```
 2      A.    Yes.
 3                  (Exhibit No. 4 was marked for
 4    identification.)
 5      Q.    (BY MR. COHEN)  If you can take a look
 6    at the document that we have marked Exhibit No. 4
 7    and tell me if you have seen that before?
 8      A.    Yes.
 9      Q.    And what is this?
10      A.    A Justification for Al's position,
11    promotion.
12      Q.    Had you seen this before today?
13      A.    Yes.
14      Q.    Did you see this around the time that he
15    was actually formally awarded the QA Representative
16    position with the $36,000 salary?
17      A.    Yes.
18      Q.    And who drafted this?
19      A.    Paul Galipeau drafted this.
20      Q.    At the time that you offered Mr. Khirawi
21    the position of QA Representative, was there a time
22    frame as to -- discussed as to when the promotion
23    might actually occur?
24      A.    No.
25      Q.    Were you assuming at the time that the
0043
 1    promotion would actually occur within a matter of
 2    weeks?
 3      A.    Yes.
 4      Q.    And is it your testimony that you can't
 5    recall whether you relayed that assumption to
 6    Mr. Khirawi?
 7      A.    I don't recall.
 8      Q.    Did you discuss with Mr. Khirawi the
 9    process for approval of such a promotion?
10      A.    Yes.
11      Q.    And what did you tell him?
12      A.    Sometimes it takes time.
13      Q.    You told him at the time that you
14    interviewed him in Tewksbury?
15      A.    Once the position was offered to him,
16    just knowing the environment of the company,
17    sometimes it takes time to get it through.
18      Q.    You met with Mr. Khirawi during the
19    interview.  Was it a conference room in Tewksbury?
20      A.    Yes.
21      Q.    And was anybody else present other than
22    yourself and Mr. Khirawi?
23      A.    No.
24      Q.    This was a meeting in person, I take
25    it?
0044
 1      A.    Yes.
```
Page 22

8-2-06 - ruby y, miles

```
 2     Q.    And before discussing -- strike that.
 3                 Before interviewing Mr. Khirawi,
 4  did you discuss with any Upper Management the
 5  possibility of promoting Mr. Khirawi to a QA
 6  Representative position?
 7     A.    Repeat that.
 8     Q.    Sure.  Before interviewing Mr. Khirawi
 9  and offering him the QA Representative position,
10  had you discussed the possibility of promoting him
11  to that position with either anyone in Upper
12  Management or Human Resources?
13     A.    Paul Galipeau was my contact for Al.
14     Q.    Other than Paul Galipeau, did you speak
15  with anyone either to gain the authority --
16     A.    I had the --
17     Q.    -- or for any other reason?
18                 MR. WINTON:  Wait for him to finish
19  his question.  Okay?
20                 THE WITNESS:  Okay.
21                 MR. WINTON:  Now, listen to the
22  question.
23     Q.    (BY MR. COHEN)  Other than speaking to
24  Mr. Galipeau before coming to interview
25  Mr. Khirawi, did you speak to anybody else in Upper
0045
 1  Management or Human Resources, either to gain the
 2  authority or to offer him the position or for any
 3  other reason?
 4                 MR. WINTON:  We are still talking
 5  about prior to interviewing him?
 6                 MR. COHEN:  Right.
 7     A.    My immediate manager.
 8     Q.    (BY MR. COHEN)  Who was that at the
 9  time?
10     A.    Steve Wylie.
11     Q.    And what was Mr. Wylie's response when
12  you -- strike that.
13                 Tell me what you talked about with
14  Mr. Wylie before you came to Tewksbury.
15     A.    We knew we needed a person in Tewksbury,
16  and he came highly recommended, and he allowed me
17  to fly there to interview him.
18     Q.    Okay.  So did you feel that you had the
19  authority to offer Mr. Khirawi the position when
20  you flew to Tewksbury?
21     A.    Yes.
22     Q.    And what was Steve Wylie's position at
23  the time?
24     A.    Titles have changed.  I don't know.  I
25  don't recall.
0046
 1     Q.    Is he with the company still?
```

8-2-06 - ruby y, miles

```
 2      A.    Yes.
 3      Q.    Is he still -- do you report to him
 4   still?
 5      A.    Oh, no.
 6      Q.    Do you know what his position is today?
 7      A.    Something new.  No, I don't recall.
 8      Q.    Other than speaking to Mr. Galipeau and
 9   Mr. Wylie before coming to Tewksbury to interview
10   Mr. Khirawi, did you discuss the possibility of
11   promoting Mr. Khirawi to the QA Representative
12   position with anybody else?
13      A.    No.
14      Q.    Are you able to narrow down
15   approximately when that interview took place for
16   me?
17      A.    I don't recall.
18      Q.    Do you remember what season it was in
19   Tewksbury when you came to Massachusetts?
20            MR. WINTON:  For the interview?
21            MR. COHEN:  Right.
22      Q.    (BY MR. COHEN)  For the interview.
23      A.    No, I don't.
24      Q.    Do you remember whether it was cold?
25      A.    I came twice.
0047
 1      Q.    You came twice?
 2      A.    I don't remember.  I don't recall.
 3      Q.    Do you remember having to wear a jacket
 4   or a coat at the time that you came to
 5   Massachusetts to -- in part to interview
 6   Mr. Khirawi?
 7      A.    I just don't recall.
 8      Q.    Do you have any calendars from the years
 9   2002 or 2003 that might tell us when that trip
10   was?
11      A.    No.
12      Q.    Are there any documents that might tell
13   us when that trip was?
14      A.    No, I don't have any.
15            (Exhibit No. 5 was marked for
16   identification.)
17            (After a brief recess, the
18   proceedings continued as follows:)
19      Q.    (BY MR. COHEN)  And would you take a
20   look at the document we have marked Exhibit No. 5
21   and tell me whether you recognize it?
22      A.    Yes.
23      Q.    And had you seen this document before
24   today?
25      A.    Of course, yes.
0048
 1      Q.    And this is the offer letter to
```

8-2-06 - ruby y, miles
2  Mr. Khirawi offering him the QA Representative
3  position, correct?
4       A.    Yes.
5       Q.    And does that refresh your memory at
6  least as to confirm when he began reporting to
7  you?
8       A.    Yes.
9       Q.    Okay.  And that was August 27th, 2003,
10  correct?
11      A.    It says September 1st, 2003.
12      Q.    I'm sorry.  He began reporting, right.
13  So his position began September 1st, 2003?
14      A.    Yes.
15      Q.    And is it fair to say that the $36,000
16  salary contained within this offer letter is not
17  the salary that you relayed to Mr. Khirawi that you
18  had hoped he would receive with a QA Representative
19  position when you spoke to him back in -- back at
20  the time that you interviewed him?
21      A.    Yes.
22      Q.    Now, between the time that you
23  interviewed him in Tewksbury and this time when he
24  began reporting to you in September of 2003, had
25  you been in regular contact with Mr. Khirawi?
0049
1       A.    Yes.
2       Q.    And was all the contact that you had
3  with him, was it related specifically to his job
4  duties?
5       A.    I don't recall that at all.
6       Q.    Were there communications in that time
7  frame, between when you interviewed him in
8  Tewksbury and September 2003 when you discussed the
9  status of his promotion and raise?
10      A.    Yes.
11      Q.    And what form did those communications
12  take?
13      A.    Emails probably.
14      Q.    I take it that Mr. Khirawi on a somewhat
15  regular basis inquired of you what the status of
16  the promotion was?
17      A.    Yes.
18      Q.    And how would you respond to him?
19      A.    As much as I knew at that time.
20      Q.    Do you know in that time between the
21  time you interviewed him in Tewksbury and September
22  1st, 2003, did you make any inquiry with anybody
23  within Upper Management as to the status of the
24  promotion of Mr. Khirawi to QA Representative?
25      A.    Yes.
0050
1       Q.    Who did you speak to?
                        Page 25

8-2-06 - ruby y, miles
2      A.    I always went to HR, the HR
3    Representative.
4      Q.    Who had the authority to grant the
5    promotion in that circumstance?
6      A.    The way Getronics works --
7              MR. WINTON:  Who has the authority
8    to grant a promotion?  Do you know?  Is it a
9    position?
10              THE WITNESS:  Yes.
11              MR. WINTON:  Is it a department?
12    Tell him who has the authority, if you know.
13      A.    A VP.
14      Q.    (BY MR. COHEN)  How many VP's were there
15    back in 2002 and 2003?
16      A.    I don't know.
17      Q.    How many VP's were you aware of here in
18    Houston?
19              MR. WINTON:  At that time?
20              MR. COHEN:  Yes.
21      Q.    (BY MR. COHEN)  In that time frame, 2002
22    and 2003?
23      A.    None.
24      Q.    I'm sorry?  One?
25      A.    None.
0051
1      Q.    And who in Human Resources did you speak
2    to about the status of the promotion?
3      A.    Terrence Freeman.
4      Q.    Anybody else in Human Resources?
5      A.    Terrence Freeman.  He is my contact.
6      Q.    And what did Mr. Freeman tell you when
7    you inquired about the status of Mr. Khirawi's
8    promotion?
9      A.    "It takes time."
10      Q.    Was he able to give you any more
11    specific information as to why it takes time or why
12    it took time in this particular instance?
13      A.    We had a management change, senior level
14    management change in the whole ESC, so when that
15    came about, it just stopped.  Raises -- it just
16    froze them for awhile I'll say.
17      Q.    When did the management change take
18    place?
19      A.    I don't remember the dates.
20      Q.    Was it before your interview of
21    Mr. Khirawi?
22      A.    No.
23      Q.    Is it your testimony that the management
24    change took place sometime in between the time that
25    you interviewed Mr. Khirawi and the time that he
0052
1    was granted the promotion to begin reporting to you
                              Page 26

                         8-2-06 - ruby y, miles
2   in September 2003?
3        A.    Yes.
4        Q.    Did you relay that, that the management
5   change may have an effect -- may have the effect of
6   delaying a promotion or raise to Mr. Khirawi?
7        A.    Yes.
8        Q.    And it is your testimony that as far as
9   you understand, all raises were frozen in that time
10  frame?
11               MR. WINTON:  Objection as to form.
12  You can answer the question.
13       A.    Yes.
14       Q.    (BY MR. COHEN)  Okay.  So Mr. Freeman
15  told you that it takes time and your understanding
16  was in part the management change resulted in the
17  delay in the actual promotion of Mr. Khirawi.
18               Was there anything else that
19  Mr. Freeman told you that was resulting in the
20  delay?
21               MR. WINTON:  Objection as to form.
22  You can answer.  Every time I say that, you just
23  answer.
24       A.    Because the raise was 33 percent.
25  That's a large --
0053
1                MR. WINTON:  That's fine.
2        A.    A large amount of money.
3        Q.    (BY MR. COHEN)  And I think you
4   testified that anything beyond nine percent under
5   company policy would need VP approval?
6        A.    Right.
7        Q.    And who was the VP that ultimately
8   approved the 33 percent raise and the promotion?
9        A.    I don't know.
10       Q.    Did you have any direct contact with the
11  VP about the status of Mr. Khirawi's promotion?
12       A.    No.
13       Q.    So all your contact was with
14  Mr. Freeman?
15               MR. WINTON:  Objection as to form.
16       A.    Yes.
17       Q.    (BY MR. COHEN)  Was there anything else
18  that you can remember that Mr. Freeman told you was
19  having an effect in any way on the promotion of
20  Mr. Khirawi?
21       A.    No.
22       Q.    Mr. Khirawi began working for you
23  September 1, 2003.  Is that correct?
24       A.    Yes.
25       Q.    And he was terminated August 27th,
0054
1   2004.  Does that sound right?
                         Page 27

                    8-2-06 - ruby y, miles
2                        MR. WINTON:  Objection as to
3    form.  That's not the dates that we have.
4         Q.    (BY MR. COHEN)  Was he terminated --
5    what was the date of his termination?
6         A.    I don't know.
7         Q.    October 27th?  Does that sound correct?
8                    October 27th, 2004.  Does that
9    sound correct?
10        A.    I don't know.
11        Q.    What is your best estimate as to what
12   his termination date was?
13        A.    I don't recall.
14        Q.    Why was Mr. Khirawi terminated?
15        A.    Al was terminated because of blatant
16   insubordination.
17        Q.    Is that your answer?
18        A.    Yes.
19        Q.    And over the course of what period of
20   time was Mr. Khirawi insubordinate?
21        A.    Months.
22        Q.    Okay.  If I'm correct that his
23   termination occurred October 27th, 2004, when would
24   you say was the approximate time that the
25   insubordination began?
0055
1         A.    Late 2003.
2         Q.    Would you say December 2003?
3         A.    That sounds correct.
4         Q.    Okay.  From the point in time he
5    began -- let's say from the point in time when he
6    began any duties of the Quality Assurance
7    Representative position, whether or not it was
8    before he formally received the promotion and began
9    reporting to you on September 1st, 2003 or before
10   that, up to the point when he first began to become
11   insubordinate in the latter part of 2003, what was
12   his work performance?
13                    MR. WINTON:  Objection as to form.
14   You can answer.
15        A.    He did his work.
16        Q.    (BY MR. COHEN)  Did he do his work
17   well?
18        A.    He did his work to my satisfaction.
19        Q.    Would you call that an average work
20   performance?
21        A.    He was good.
22        Q.    And were there any specific performance
23   problems up to that point in time when he began to
24   become insubordinate in December 2003?
25        A.    No.
0056
1         Q.    Did he have any attendance problems up
                        Page 28

8-2-06 - ruby y, miles
2   to December 2003?
3       A.    I don't recall.
4       Q.    Okay.  And there were no incidents of
5   insubordination before December 2003, correct?
6                   MR. WINTON:  Objection as to form.
7       A.    No.
8       Q.    (BY MR. COHEN)  Up to that point in time
9   in December of 2003 when he began to become
10  insubordinate, did you get along well with
11  Mr. Khirawi?
12      A.    Yes.
13      Q.    Up to that point in December 2003, were
14  there any incidents of Mr. Khirawi not getting
15  along with other co-workers?
16      A.    No.
17      Q.    We have already marked this as No. 2.
18  If you can take a look at that email again.
19                  MR. COHEN:  Erik, I'm sorry, I
20  don't have a copy.
21                  MR. WINTON:  Do you want her to
22  read the whole thing?
23                  MR. COHEN:  Well, I just would like
24  to know if she recognizes those as being an email
25  string between her and Mr. Khirawi from April
0057
1   2003.
2       A.    Okay.
3       Q.    (BY MR. COHEN)  Okay.  Have you had a
4   chance to review Exhibit No. 2?
5       A.    Yes.
6       Q.    And is that, is Exhibit No. 2 an email
7   string between yourself and Mr. Khirawi, beginning
8   January 24th, 2003 and ending April 1st, 2003?
9       A.    Yes.
10      Q.    And is it fair to characterize the topic
11  of this email string, the status of Mr. Khirawi's
12  promotion?
13      A.    Yes.
14      Q.    If you can turn to the page that -- if
15  you look at the marked numbers on the bottom right,
16  I'm looking at GETR0616, and if you look at that
17  page, I'm looking specifically at an email from
18  yourself to Mr. Khirawi, dated Wednesday, March
19  19th, 2003, at 11:10 a.m.
20      A.    Yes.
21      Q.    Do you remember when you wrote that
22  email to Mr. Khirawi?
23      A.    Reading it, yes.
24      Q.    And you seem to be referring -- and
25  correct me if I'm wrong -- but you seem to be
0058
1   making a reference to past discrimination that you
                        Page 29

8-2-06 - ruby y, miles
2  have experienced yourself.  Is that correct?
3       A.    Absolutely.
4       Q.    And why were you bringing up past
5  discrimination that you have experienced to
6  Mr. Khirawi in this context of the topic of the
7  delay in his promotion?
8       A.    Because Al had brought that up as a
9  reason to why he wasn't getting his raise, so I was
10  intimating to him not to feel alone.
11       Q.    What did Al say when he related that he
12  felt that discrimination was a factor in the delay
13  in his promotion?
14       A.    Because of him being Muslim and mainly
15  mostly religion, yeah.
16       Q.    And was that -- when he relayed that he
17  felt the reason for the delay was discriminatory,
18  was that in a conversation or within an email?
19       A.    It was a conversation.
20       Q.    And was that a conversation in
21  Tewksbury?
22       A.    It may have been also -- I don't
23  recall.
24       Q.    You know, you said you came to Tewksbury
25  at the time that you interviewed him.  Did you also
0059
1  come back to Tewksbury some months later at least
2  in part to attend some type of a seminar?
3       A.    I came to do some training.
4       Q.    Okay.  And when you came to do some
5  training, do you remember when that was?
6       A.    Don't recall the dates.
7       Q.    Well, when you came to do some training,
8  was Mr. Khirawi an attendee of the training?
9       A.    He was supposed to be.
10       Q.    He didn't attend?
11       A.    One of three sessions.
12       Q.    And did you speak to Mr. Khirawi
13  during -- at some point during that trip about the
14  status of his promotion?
15       A.    Yes.
16       Q.    And can you recall where you were when
17  you spoke to him?
18       A.    Not exactly.
19       Q.    Was anybody else a party to that
20  conversation with Mr. Khirawi, other than the two
21  of you?
22       A.    No.
23       Q.    Can you tell me exactly what was said
24  during that conversation?
25       A.    He wanted to know the status of his
0060
1  raise.  He was very, very upset.  And he got down
                          Page 30

```
                    8-2-06 - ruby y, miles
2    close to me.  I mean, like hands on desk
3    (indicating).
4         Q.    You were sitting?
5         A.    I was sitting.
6         Q.    And he was standing?
7         A.    He was standing.
8                      I recall it was the training room.
9    It was the training room.  And he was standing and
10   he came and he wanted to know why had he not gotten
11   his raise and he was liking (hitting table).
12                     And I backed up, because that was
13   frightful to me, and I tried to calm him down.
14                     And because we were the only two in
15   the room -- the person who was teaching the
16   training, that I came there with, was about to
17   come in, and so she could tell that there was
18   something going on, but she just backed up and
19   backed out.
20                     And he just stormed out the door
21   and didn't come to another training class.
22        Q.    Did you feel physically intimidated?
23        A.    Absolutely.
24        Q.    Did you report this to anybody?
25        A.    I told Paul Galipeau.
0061
1         Q.    Did you document it in any way?
2         A.    No, I did not.
3         Q.    What was Paul Galipeau's response?
4         A.    That he was just, you know, upset and
5    wanted to know about his raise.  And I took that,
6    because Al did come back and apologize to me, so I
7    let it go.
8         Q.    Other than telling Paul Galipeau about
9    that incident, did you tell anyone else?
10        A.    No.
11        Q.    And how long after did Al come back and
12   apologize?
13        A.    Couple of hours.
14        Q.    And can you tell me exactly what he said
15   and what you said back to him during that
16   exchange?
17        A.    I can't recall every word, no.
18        Q.    Was that when he told you he felt that
19   discrimination was a factor in the delay in the
20   promotion?
21        A.    Yes.
22        Q.    And how did you respond to that?
23        A.    I told him, Al, people do get
24   discriminated against.  Yes, they do.  But I do not
25   believe that that is the case here at Getronics.
0062
1         Q.    You told him specifically that you
                    Page 31
```

8-2-06 - ruby y, miles
2   didn't believe that discrimination was a factor in
3   this specific instance at Getronics?
4        A.    Right.
5        Q.    Is there anything else that you can
6   remember that was said during that exchange?
7        A.    Other than to try to reassure him that
8   it takes time, because of the amount of raise that
9   he was getting, and that I was keeping in contact
10  with the people that I needed to, meaning Terrence,
11  and we were doing all that we could do, and pretty
12  much that was it.
13       Q.    If you can stay with Exhibit No. 2, if
14  you can turn to the page marked GETR0618.
15       A.    All right.
16       Q.    Right in the middle of that page there
17  is an email from Al to you, dated March 19th, 2003,
18  9:16 a.m.  Do you see that?
19       A.    Yes.
20       Q.    And it reads:
21                   "who should and would make the
22             decision?  Is it Mr. Steve?"
23                   Did I read that correctly?
24       A.    Yes.
25       Q.    And if you would, turn to the page
0063
1   before that which is the next email in time.  Right
2   at the bottom, do you see your reply email to
3   Mr. Khirawi, dated Wednesday, March 19th, 2003, at
4   10:43 a.m.?
5        A.    Yes.
6        Q.    And it references that Dick Boynton a VP
7   may have some decision-making authority to make the
8   promotion.  Is that correct?
9        A.    Right.
10       Q.    And does that remind you now who the VP
11  was who might have effected Mr. Khirawi's
12  promotion?
13       A.    Yes.
14       Q.    And where was Dick Boynton located?
15       A.    He was here in Houston.
16                   But I also said it may go higher.
17       Q.    And did you ever have any communication
18  with Mr. Boynton about the promotion?
19       A.    No.
20       Q.    Now, Mrs. Miles, Mr. Khirawi has
21  testified that at the time of that training seminar
22  in Tewksbury, when he inquired about the status of
23  his promotion, your reply was something along the
24  lines of:
25                   "It is racial.  It's because your
0064
1             name is Aalaeldin and you're black.
                         Page 32

8-2-06 - ruby y, miles
2          Welcome to the club of suffering."
3                 Did you say anything like that?
4       A.    No.
5       Q.    You didn't say anything remotely close
6    to that?
7       A.    No.
8       Q.    And does that refresh your recollection
9    as to anything else that was said during that
10   conversation when you say he intimidated you?
11      A.    Other than what I told you before, he
12   wanted to know about his raise and he wanted to
13   know why he wasn't getting it and he felt
14   discriminated against.
15      Q.    Did Mr. Khirawi ever ask you in an email
16   to confirm that you made a comment along those
17   lines, that the delay in the promotion was racial
18   and he should feel welcome to the club of
19   suffering?
20      A.    I don't remember that.
21      Q.    You don't remember any emails asking you
22   to confirm that?
23      A.    No.
24      Q.    Other than that conversation, which I
25   think your testimony was that you told him that
0065
1    people do discriminate, but that you don't believe
2    discrimination was a factor in the delay of his
3    promotion, did you ever allude to race being a
4    factor in the workplace to Mr. Khirawi?
5                 MR. WINTON:  Objection as to form.
6       A.    No.
7       Q.    (BY MR. COHEN)  Did you ever mention to
8    Mr. Khirawi any past experience with discrimination
9    that you have had in the context of discussing his
10   promotion?
11      A.    Repeat?
12      Q.    Sure.  Did you ever mention to
13   Mr. Khirawi any past experience you have had with
14   discrimination in the context of discussing his
15   promotion?
16      A.    I've mentioned my past experiences with
17   discrimination, but I never mentioned any problems
18   with Getronics.
19      Q.    Can you tell me what you told him about
20   past -- your past experience with discrimination in
21   the context of discussing his promotion?
22                MR. WINTON:  Objection as to form.
23      A.    I just told him about the many series of
24   things happening to me throughout my life, you
25   know, way back 35 years ago when I know I was
0066
1    discriminated against.  But and in my young life
                        Page 33

8-2-06 - ruby y, miles
2    and in my college life.
3                    We talked -- me and Al talked about
4    a lot of things, about being discriminated against,
5    but I never said Getronics discriminated against
6    him.
7         Q.    Did you believe that the delay in
8    Mr. Khirawi's promotion was race-related in any
9    way?
10        A.    No.  Absolutely not.
11        Q.    Did you ever say to him, either in
12   telephone or in person communication or an email,
13   that the delay was unusual in your experience with
14   Getronics?
15        A.    I don't recall that because --
16                    MR. WINTON:  That's fine.
17        A.    I don't recall.
18        Q.    (BY MR. COHEN)  Have you had any
19   experiences in which there was a delay of the
20   length of the delay in Mr. Khirawi's promotion
21   while at Getronics?
22        A.    Not me personally.
23        Q.    Are you aware of anybody else at
24   Getronics that has ever been the subject of a delay
25   between the time of an offer of a position and the
0067
1    actual promotion?
2         A.    No.
3         Q.    Did you think it was unusual?
4         A.    No.
5         Q.    Have you ever told anybody at Getronics
6    anything to the effect that race could be a factor
7    in promotions or employment decisions at
8    Getronics?
9         A.    No.
10        Q.    Now, at some point in late 2003, did
11   Mr. Khirawi make an Internal Report of
12   Discrimination to Human Resources, related to
13   the -- either the delay in his promotion or a
14   request for tuition reimbursement?
15        A.    Tuition reimbursement.
16        Q.    Okay.  When was that?
17        A.    In 2003, I believe.
18        Q.    Now, are you aware as to whether Human
19   Resources investigated that complaint?
20        A.    Yes.
21        Q.    Your understanding is that they did
22   investigate it?
23        A.    Yes.
24        Q.    And in the context or during that
25   investigation, did Mr. Khirawi include that he felt
0068
1    the delay in his promotion was also
                        Page 34

8-2-06 - ruby y, miles
2    discriminatory?
3        A.    (No response)
4                    MR. WINTON:  If you know.
5        A.    I don't remember.
6        Q.    (BY MR. COHEN)  Did you participate in
7    any way in the investigation of Mr. Khirawi's late
8    2003 Complaint of Discrimination?
9        A.    Yes.
10       Q.    In what way did you participate?
11       A.    A meeting between me, Al, I guess
12   Joan -- I can't think of her last name -- in
13   Tewksbury.
14       Q.    Joan Anderson?
15       A.    Yes.
16                   And probably Gayla George.
17       Q.    And who is Gayla George?
18       A.    She was the Human Resources Director at
19   that time.
20       Q.    Do you know if she is still with the
21   company?
22       A.    No, she is not.
23       Q.    Was she located in Tewksbury?
24       A.    No.
25       Q.    Houston?
0069
1        A.    Yes.
2        Q.    And that meeting, was that, did that
3    meeting take place in January 2004?
4        A.    I don't know the date.
5        Q.    Does that time frame sound about right?
6        A.    Yes.
7        Q.    And how did you attend?  Did you attend
8    by telephone?
9        A.    Yes.
10       Q.    Were you in the room with Ms. George?
11       A.    Yes.
12       Q.    Was anyone else in the room?
13       A.    No.
14       Q.    And Ms. Anderson was in Tewksbury?
15       A.    Yes.
16       Q.    Did anybody else participate in that
17   meeting?
18       A.    Not that I recall.
19       Q.    Can you tell me everything that was said
20   during that meeting?
21       A.    No, I can't recall everything that was
22   said.
23       Q.    Can you recall anything that was said?
24       A.    I believe this is the meeting when Joan
25   checked out Al's claim to find out why he thought
0070
1    he was being discriminated against, and she found
Page 35

                    8-2-06 - ruby y, miles
2   nothing, and we were trying to hash out the
3   differences that we had.  If I recall, that was
4   that meeting.
5        Q.    All right.  Is that the total of your
6   memory at this point --
7        A.    Yes.
8        Q.    -- as to what was said during that
9   meeting?
10       A.    Yes.
11       Q.    At some point, either during that
12  meeting or before the meeting, do you know whether
13  Mr. Khirawi reported to Human Resources a comment
14  that he attributed to you to the effect of the
15  promotion -- the lack of the promotion is
16  race-related and that he should feel welcome to the
17  club of suffering?
18       A.    I remember that, yes.
19       Q.    And was that discussed at the meeting?
20       A.    It was discussed, but I never said
21  that.
22       Q.    I understand, but his claim that you
23  said that was discussed?
24       A.    Yes.
25       Q.    And did you deny that you said anything
0071
1   like that during the meeting?
2        A.    Absolutely -- part of that -- I told,
3   like I never said, "Welcome to the club."  Never.
4   I never said those words.
5                  I told Al that I understand his
6   feelings.  People do get discriminated against.  I
7   never added the rest of that.
8                  And intimated that I have said time
9   and time again, I wish I wouldn't have said it, but
10  I did.  But that's all I said.  And I didn't ever
11  intimate that I felt that Getronics ever was
12  discriminating against him because of race.
13  Never.
14       Q.    And did you make that clear during this
15  meeting in approximately January 2004?
16       A.    Yes.
17       Q.    Is there anything else that you can
18  remember now as to what was said during that
19  meeting?
20       A.    No.
21       Q.    Were you also interviewed separately by
22  Ms. Anderson relative to Mr. Khirawi's Complaint of
23  Discrimination at that time in late December 2003?
24       A.    I don't remember.
25       Q.    Mrs. Miles, did you ever discuss the
0072
1   topic of the amount that Mr. Khirawi was going to
                       Page 36

                         8-2-06 - ruby y, miles
2    be offered as far as salary for the QA
3    Representative position with Steve Wylie?
4        A.    Yes.
5        Q.    Approximately when was that?
6        A.    I don't recall.
7        Q.    Can you remember what it was you talked
8    about with Mr. Wylie?
9        A.    I spoke with Steve and I told him that
10   Al came with high recommendations and I had met
11   with him and I thought he would be a good employee
12   and that I'd like to offer him -- because of his
13   education and his background and the work that I
14   had seen, I'd like to offer him a certain amount of
15   money, $40,000.
16                   And Steve, being my immediate
17   manager, looked at me and said, "No way.  This is
18   as far as we are going."
19       Q.    "This" being 36,000?
20       A.    Well, he told me, "It was a 33 percent
21   raise and it is unheard of at Getronics."  Those
22   were his words.  That's it, yes.
23       Q.    And did that conversation with Mr. Wylie
24   take place after your interview with Mr. Khirawi in
25   Tewksbury?
0073
1        A.    Yes.
2        Q.    Is it fair to say that that conversation
3    took place around the time he was offered the
4    36,000?
5        A.    Yes.
6        Q.    Did Mr. Wylie express any reservation
7    about offering 36,000 to Mr. Khirawi?
8        A.    No.
9        Q.    Now, going back to this claim by
10   Mr. Khirawi that you made a comment along the lines
11   of, Welcome to the club of suffering, did you say
12   anything like, You would be surprised what I went
13   through.  Welcome to the club?
14       A.    I never said, "Welcome to the club."
15                   MR. WINTON:  That's not what he is
16   asking you.  Listen to his question.
17                   THE WITNESS:  Okay.
18       A.    I'm done.
19       Q.    (BY MR. COHEN)  You never said, "Welcome
20   to the club"?
21       A.    Never.
22       Q.    You are certain of that?
23       A.    I'm certain of that.
24       Q.    Did you ever tell anyone that you said
25   that?
0074
1        A.    No.

8-2-06 - ruby y, miles

2      Q.    You are certain you never told Joan
3   Anderson you said that?
4      A.    I don't recall saying that, no.
5      Q.    Is Joan Anderson still with the
6   company?
7      A.    I don't know.
8      Q.    When did you first become aware of
9   Mr. Khirawi's claim that you made a comment like to
10  the effect that race was a factor in the delay in
11  his promotion and that welcome to the club of
12  suffering?
13     A.    When did I become --
14     Q.    When did you first become aware of that
15  contention by Mr. Khirawi?
16     A.    I really never said -- our meeting, when
17  we met.
18     Q.    You are talking about the meeting with
19  Joan Anderson and Gayla George and Mr. Khirawi?
20     A.    Right.
21     Q.    And how did you feel when you heard
22  that?
23     A.    Very hurt.
24     Q.    Were you upset?
25     A.    Yes.
0075
1      Q.    Were you angry?
2      A.    More hurt.
3      Q.    Did you become emotional during that
4   meeting?
5              MR. WINTON:  Are you talking about
6   the January '04 meeting?
7              MR. COHEN:  Yes.
8      Q.    (BY MR. COHEN)  With Joan Anderson and
9   Ms. George and Mr. Khirawi.
10     A.    I don't recall.
11     Q.    You don't recall being angry that
12  Mr. Khirawi reported that you had said -- you had
13  made a comment along the lines that race might be a
14  factor and welcome to the club of suffering?
15     A.    I was angry, but I was again more hurt.
16  It goes to my integrity and who I am as a person.
17     Q.    Did you tell Ms. Anderson that you were
18  very angry about the fact that Mr. Khirawi
19  attributed that comment to you?
20     A.    I probably did.
21     Q.    After the meeting, when you first
22  learned at the meeting with Ms. Anderson and
23  Ms. George and Mr. Khirawi, when you first learned
24  that Mr. Khirawi attributed that comment about race
25  being a factor and welcome to the club of suffering
0076
1   to you, did you confront Mr. Khirawi or discuss his

Page 38

                    8-2-06 - ruby y, miles
2    contention that you said that with him?
3         A.    No.  I never --
4         Q.    You never discussed that with
5    Mr. Khirawi?
6         A.    No.
7                    (Exhibit No. 6 was marked for
8    identification.)
9         Q.    (BY MR. COHEN)  Can you take a look at
10   what we have marked Exhibit No. 6 and let me know
11   whether you recognize it.
12        A.    Yes.
13        Q.    And these are the written conclusions by
14   Joan Anderson relative to Mr. Khirawi's late 2003
15   Complaint of Discrimination, correct?
16        A.    Yes.
17        Q.    And if you could look at -- I'm looking
18   at the bottom paragraph on the first page,
19   beginning, "You stated in our meeting on December
20   23, 2003."  Do you see that paragraph?
21        A.    Yes.
22        Q.    And then Ms. Anderson seems to indicate
23   that she found evidence of misunderstandings
24   between Mr. Khirawi and yourself.  Are you aware of
25   to what she is referring?
0077
1         A.    No.
2         Q.    And, Mrs. Miles, were you the subject of
3    any disciplinary action as a result of
4    Mr. Khirawi's reporting that you had made a comment
5    along the lines that the delay in his promotion was
6    racially related and welcome to the club of
7    suffering?
8         A.    Repeat that?
9         Q.    Were you the subject of disciplinary
10   action by Getronics as a result of Mr. Khirawi's
11   reporting to Human Resources the comment that he
12   attributed to you along the lines that his
13   promotion was delayed because of race and welcome
14   to the club of suffering?
15        A.    No.
16        Q.    And were you counseled in any way by any
17   management as a result of Mr. Khirawi's report to
18   that effect?
19        A.    No.
20        Q.    And at that time, we are talking January
21   2004, to whom were you reporting?
22        A.    I changed managers, so I'm not sure.
23        Q.    You changed managers around that time
24   frame?
25        A.    Somewhere in 2004, yes.
0078
1         Q.    Okay.  Can you tell me from whom to whom
                    Page 39

8-2-06 - ruby y, miles
2   you changed?
3       A.    I went from Steve Wylie to Dwight Myers,
4   M-y-e-r-s.
5                   MR. WINTON:  Do you need to
6   correct?
7                   THE WITNESS:  Yes, I do.
8       Q.    (BY MR. COHEN)  Please feel free to make
9   corrective.
10                  MR. WINTON:  Go ahead.
11      A.    I had a lot of managers.
12                  MR. WINTON:  He is asking you if
13  you know who your manager was at the time.  You
14  either know or you don't know.
15      A.    I don't know.
16      Q.    (BY MR. COHEN)  Is there anything as far
17  as you know in your personnel file related in any
18  way to Mr. Khirawi's report that you -- that he
19  attributed that comment regarding the reasons for
20  his -- for the delay in his promotion to you?
21      A.    No.
22      Q.    So from the point in time September 1st,
23  2003 when Mr. Khirawi began reporting to you to the
24  point in time -- strike that.
25                  Let's go off the record for a
0079
1   moment.
2                   (After a discussion off the record,
3   the proceedings resumed as follows:)
4       Q.    (BY MR. COHEN)  So just so I'm clear,
5   Mrs. Miles, from the point in time September 1st,
6   2003, when Mr. Khirawi began reporting to you,
7   until late 2003, there were no incidents of
8   insubordination.  Is that correct?
9       A.    Not that I recall.
10                  (Exhibit No. 7 was marked for
11  identification.)
12      Q.    (BY MR. COHEN)  If you can take a look
13  at this that we have marked Exhibit No. 7, and just
14  let me know whether you recognize that email at the
15  top of page 1 or the first page of the document?
16      A.    Yes.
17      Q.    And that is an email from yourself to
18  James Hoffman?
19      A.    Yes.
20      Q.    And James Hoffman, what was his
21  position?
22      A.    My manager.
23      Q.    Okay.  And going now from the time
24  September 1st, 2003 -- from September 1st, 2003 to
25  let's say the beginning of March 2004, during that
0080
1   period, Mr. Khirawi was reporting directly to you,
                        Page 40

                        8-2-06 - ruby y, miles
2    correct?
3        A.    Right.
4        Q.    And was Mr. Khirawi particularly good at
5    seeking input from other people during that period
6    of time?
7        A.    I don't understand the question.
8        Q.    How would you rate his willingness to
9    seek input or information or feedback from other
10   co-workers, in that time frame, September 1st,
11   2003, to the beginning of March 2004?
12       A.    Not good.
13       Q.    And, again, we are talking during that
14   period September 1st, 2003 to the beginning of
15   March 2004, how would you rate Mr. Khirawi's
16   willingness to be open to feedback from others --
17   sorry, I take that back.  I asked you that.
18                    How would you rate during that
19   period his demonstration for respect for other Team
20   Members?
21       A.    The same.  Not good.
22       Q.    And how was he during that time frame as
23   far as including other people in the
24   decision-making possess?
25       A.    I need more -- I don't understand the
0081
1    question.
2        Q.    Do you have any opinion as to whether
3    Mr. Khirawi, during that period of time, was
4    particularly strong at resolving any disputes or
5    differences of opinions between Team Members?
6        A.    Al had two sets of Team Members.  He had
7    Team Members in Tewksbury and he had Team Members
8    in Houston.  His relationship with his Team Members
9    in Houston was not good.  His relationship with his
10   Team Members in Tewksbury was good.  They love his
11   work.
12                    So that's how I could separate it.
13   So Houston, not good.  Tewksbury, with his
14   performance, with the work that he did for them,
15   was great.
16       Q.    Would you say overall that he
17   established good and effective working
18   relationships with others between September 1st,
19   2003 and March 2004?
20       A.    Again, in Houston one way; in Tewksbury
21   another way.
22       Q.    And are you of the same opinion, if
23   I ask you whether during this time frame,
24   September 1st, 2003 to March 2004 that Mr. Khirawi
25   demonstrated a strong commitment to Team goals?
0082
1        A.    I'll say the same thing.  In Tewksbury,
                        Page 41

8-2-06 - ruby y, miles
2  because those were the people that he did the
3  reports for, those are the people that loved his
4  work, those were the people that he was around all
5  the time.  Here in Houston, trying to establish a
6  relationship with this Team, wasn't an easy task.
7  But I could separate those two.
8       Q.    And the vast majority of his work -- I
9  mean, he is physically located in Tewksbury all the
10 time, right?
11      A.    Right.
12      Q.    So with whom did he have regular
13 interaction in Houston?
14              MR. WINTON:  At what time?
15      Q.    (BY MR. COHEN)  During this time frame,
16 September 1st, 2003 to March 2004.
17      A.    He was -- he and Tiffany Anderson-Jones
18 were both QA Representatives.  So she was the QA
19 Representative here in Houston and he was the QA
20 Representative in Tewksbury, so they should have
21 spoken at least once a week, but sometimes they
22 probably could have spoken daily, because they did
23 the same job.
24              And then he also would probably
25 speak with the call assessors, because at that time
0083
1  I did have call assessors.  Now, I don't, but I did
2  then.  And the call assessors would calibrate calls
3  with the QA Reps and they would talk with each
4  other.
5              MR. WINTON:  The question is:  Who
6  did he speak with?  You said Tiffany
7  Anderson-Jones --
8       A.    Tiffany Anderson-Jones and the call
9  assessors.
10      Q.    (BY MR. COHEN)  And we are talking about
11 people, obviously, Tiffany being his counterpart
12 here, he would interact with on a regular basis.
13 Correct?
14      A.    He should, yes.
15      Q.    And would he interact on a regular basis
16 with the call assessors in Houston?
17      A.    Not necessarily, no.
18      Q.    Is there anybody else in Houston that he
19 would interact with on a regular basis, and again
20 we are talking about the time period September 2003
21 to March 2004?
22      A.    No.
23      Q.    What was your understanding of the
24 quality of Mr. Khirawi's work relationship with
25 Tiffany Anderson-Jones?
0084
1       A.    In a word, strained.
                              Page 42

```
                      8-2-06 - ruby y, miles
 2      Q.    Did that come from -- who did that come
 3   from or how did you learn that?
 4      A.     From Tiffany.
 5      Q.    And was that the case before March of
 6   2003 -- I'm sorry -- before March of 2004?
 7      A.    It took a long time for them to --
 8                   MR. WINTON:  There is a question:
 9   Do you know?
10                   Why don't you read back the
11   question so you can hear it again?
12                   (The proceedings were read by the
13   Court Reporter as follows:
14                   "QUESTION:  And was that the case
15             before March of 2004?"
16      A.    I don't recall.  I heard it.
17      Q.    (BY MR. COHEN)  Okay.  Why don't you
18   tell me when the first time you remember was that
19   you learned that the working relationship between
20   Tiffany and Mr. Khirawi was strained?
21      A.    I don't remember the date.
22      Q.    And you can't recall whether you learned
23   that before March of 2004?
24      A.    No.
25      Q.    And what was it that Mr. -- that
0085
 1   Ms. Jones, Tiffany, told you that led you to that
 2   conclusion, that her working relationship with
 3   Mr. Khirawi was strained?
 4      A.    She was trying to reach Al so they could
 5   coordinate their work process, since they both did
 6   the same thing, and it was becoming increasingly
 7   difficult to reach him.
 8      Q.    And do you remember -- is it your
 9   testimony you can't remember when she told you
10   that?
11      A.    No, not the dates.  No, I can't.
12      Q.    Other than telling you that she had a
13   difficult time reaching Mr. Khirawi, was there
14   anything else that Ms. Jones, Tiffany, said to you
15   that led you to the conclusion that her
16   relationship with Mr. Khirawi was strained?
17      A.    Once she did reach him, the
18   communication was difficult.
19      Q.    In what way?  Did she say?
20      A.    Just didn't want to participate, if I
21   remember her words.
22      Q.    Is there anything else that she told you
23   that led you to the conclusion that the
24   relationship was strained?
25      A.    No, no.
0086
 1                   MR. WINTON:  Sol, I've got noon.
                      Page 43
```

8-2-06 - ruby y, miles
2                MR. COHEN:  Why don't we go off the
3    record.
4                (After a discussion off the record,
5    the proceedings resumed as follows:)
6        Q.    (BY MR. COHEN)  Mrs. Miles, did
7    Mr. Khirawi before March of 2004 express himself
8    articulately, verbally and in writing?
9        A.    In my opinion, Al's writing is good.
10       Q.    And did he articulate well verbally,
11   again, before March of 2004?
12       A.    Yes.
13       Q.    I understand that you had concluded that
14   Tiffany had a strained working relationship with
15   Mr. Khirawi, although you are not certain when that
16   began, right?
17       A.    Right.
18       Q.    Before March 2004, are you aware of
19   anyone else that he had a strained working
20   relationship or any type of working relationship,
21   other than a good and effective relationship?
22                MR. WINTON:  Objection as to form.
23       A.    I don't remember the dates, no.
24                MR. COHEN:  We can take a break.
25                (After a lunch break, the
0087
1    proceedings continued as follows:)
2        Q.    (BY MR. COHEN)  Okay.  Mrs. Miles,
3    Tiffany Anderson-Jones we said was Mr. Khirawi's
4    counterpart here in Houston, correct?
5        A.    Yes.
6        Q.    And she held the position of Quality
7    Assurance Representative as well?
8        A.    Yes.
9        Q.    Is Ms. Jones still with the company?
10       A.    No.
11       Q.    Do you know when she left the company?
12       A.    Her last day was last Thursday.
13       Q.    Was there an incident involving
14   Mr. Khirawi and Tiffany and a man named Patrick
15   McHenry in 2004?
16       A.    Yes.
17       Q.    Do you remember when that occurred?
18       A.    No, not exactly.
19       Q.    And do you remember what project it was
20   related to?
21       A.    Not exactly.
22       Q.    Had you discussed the project in advance
23   with Mr. Khirawi before the incident took place?
24       A.    I don't recall.
25       Q.    Do you recall whether you informed
0088
1    Mr. Khirawi what his role would be and what Patrick
                         Page 44

                    8-2-06 - ruby y, miles
2    McHenry's role would be in a meeting that took
3    place over the telephone?
4        A.    I don't recall.
5        Q.    Did you discuss who was to take the lead
6    on that project or in that meeting?
7        A.    I don't recall.
8        Q.    Do you remember what happened?
9               MR. WINTON:  Objection as to form.
10   Do you mean with respect to McHenry?
11              MR. COHEN:  Yes.
12       Q.    (BY MR. COHEN)  Do you remember what
13   happened in that incident during the meeting
14   between Mr. Khirawi, Tiffany, and Mr. McHenry?
15       A.    Since I wasn't present, I got from
16   Tiffany and Patrick.
17       Q.    And what did they tell you happened?
18       A.    That Al got very upset with Patrick and
19   wanted to know who he was and how he got on this
20   project.
21              And Patrick was upset with Al.  He
22   spoke to me, because Patrick is a manager on the
23   desk.  And I didn't know, but Dorothy Dining, who
24   is the MDS Director, had put him in charge of the
25   project.
0089
1        Q.    When did you first find out that
2    Mr. McHenry was in charge of the project?
3        A.    After the incident.
4        Q.    So is it fair to say at least as far as
5    you know that Mr. Khirawi did not know that
6    Mr. McHenry was in charge of the project at the
7    time of the incident?
8        A.    As far as I know.
9        Q.    Is there anything you can recall
10   specifically about what -- other than what you have
11   told me already -- about what Tiffany or Patrick
12   told you happened during that telephone
13   conference?
14       A.    Not specifics at this time.
15       Q.    How did you first learn that there was a
16   clash -- for lack of a better way to say it --
17   during that telephone conference with Mr. Khirawi,
18   Mr. McHenry, and Ms. Jones?
19       A.    As I stated before, Tiffany told me and
20   Patrick told me.
21       Q.    They both approached you about it?
22       A.    Yes.
23       Q.    Was that in person?
24       A.    I don't recall, either person or phone.
25       Q.    But they were both -- they both relayed
0090
1    this together in one conversation?
                    Page 45

8-2-06 - ruby y, miles
```
 2      A.    No.
 3                  MR. WINTON:  Objection.
 4      Q.    (BY MR. COHEN)  Okay.  Who spoke to you
 5  first?
 6      A.    I don't recall.
 7      Q.    Did you ask Mr. Khirawi for his version
 8  of what happened?
 9      A.    No.
10      Q.    Why not?
11      A.    I know Patrick and I know Tiffany.  I
12  have been in meetings with both of them before and
13  I trusted what they told me.
14      Q.    Is there any other reason why you didn't
15  ask Mr. Khirawi for his explanation or his version
16  of what happened?
17      A.    No.
18      Q.    When Mr. Khirawi says that Mr. McHenry
19  told him to shut-up during that telephone
20  conference, did you learn that from Mr. Khirawi at
21  any time?
22      A.    Yes.
23      Q.    And did you ask Mr. McHenry whether he
24  told Mr. McHenry to shut-up?
25      A.    Yes.
0091
 1      Q.    Did Mr. McHenry confirm that he did tell
 2  him to shut-up?
 3      A.    He confirmed that he didn't tell him to
 4  shut-up.
 5                  (Exhibit No. 8 was marked for
 6  identification.)
 7      Q.    (BY MR. COHEN)  If you can take a look
 8  at that document that we marked Exhibit No. 8 and
 9  just tell me if you recognize it first.
10      A.    Yes.
11      Q.    And that is the email string, dated
12  February 23rd, 2004, related to this incident
13  involving Mr. Khirawi, Ms. Jones, and Mr. McHenry,
14  correct?
15      A.    Correct.
16      Q.    And on the second page of the document,
17  which is marked on the bottom GETR028, there is an
18  email from you dated, Monday, February 23, 2004,
19  at 3:26 p.m., where you apologize on Mr. Khirawi's
20  behalf for an email he sent previous to that to
21  Mr. McHenry and a few other people.
22                  Before you sent that email -- first
23  of all, can you confirm that you sent this email on
24  February 23rd, 2004?
25      A.    Yes.
0092
 1      Q.    And before you sent that email on
```
                        Page 46

8-2-06 - ruby y, miles
2   February 23rd, 2004, did you speak with Mr. Khirawi
3   to get his version or to learn his side of the
4   facts?
5        A.    No.
6        Q.    I notice that on your email, dated
7   February 23rd, 2004, at 3:26 p.m., you copied Gayla
8   George, Joan Anderson, and James Hoffman, as well
9   as Terrence Freeman, in addition to Mr. McHenry,
10  and Ms. Jones, Dorothy Dining, and Paul Galipeau.
11                 Can you tell me why you copied
12  Gayla George and Joan Anderson?
13       A.    Because at this time we had had problems
14  with Al as far as I was concerned, HR problems with
15  Al, and I felt like that is what I needed to do.
16  That was my best justice.
17       Q.    Well, Joan Anderson was the HR Rep who
18  investigated Mr. Khirawi's discrimination
19  complaint, correct?
20       A.    Correct.
21       Q.    Did you think this had anything to do
22  with his Complaint of Discrimination?
23            MR. WINTON:   Objection as to form.
24  You can answer.
25       A.    Again, the reason I copied is because of
0093
1   HR issues period.  His tone of emails, him getting
2   angry, that was the reason.
3        Q.    (BY MR. COHEN)  When you say "HR
4   issues," I know we have talked about the Complaint
5   of Discrimination, the internal complaint that Joan
6   Anderson investigated.
7                 What other HR issues had you had
8   with Mr. Khirawi to this point in time?
9        A.    That's what I mean, HR issues.
10            (Exhibit No. 9 was marked for
11  identification.)
12       Q.    (BY MR. COHEN)  If you could take a look
13  at Exhibit 9 and just let me know if you recognize
14  that?
15       A.    Yes.
16       Q.    And this is your Performance Evaluation
17  dated March 1st, 2004 on the second page.  Is that
18  correct?
19       A.    Yes.
20       Q.    Was that one of the documents that you
21  reviewed to help you prepare for today's
22  deposition?
23       A.    Yes.
24       Q.    What did you do to prepare this
25  evaluation?
0094
1        A.    Rephrase the question.
                        Page 47

8-2-06 - ruby y, miles
```
 2      Q.    Well, did you -- did you review any
 3 documents -- let's start with that -- before you
 4 prepared this, to help you prepare it?
 5      A.    I reviewed Al's work performance with
 6 his peers in Tewksbury to do this document.  He did
 7 excellent work with his peers in Tewksbury, so this
 8 document came strictly from his work performance
 9 for the job that he did in Tewksbury.
10      Q.    Okay.  But his job also included
11 interaction with members of the Team in Houston,
12 correct?
13      A.    Yes.
14      Q.    Why didn't you include -- if you are
15 evaluating his performance in the QA Representative
16 job, why didn't you include any issues you might
17 have had with direction that he had with Houston
18 Team Members?
19      A.    My management style is to review on the
20 job.  On the job performance.  He was doing a great
21 job for the people in Tewksbury.
22                 The other side of that coin,
23 personnel issues within the Team, that's for
24 written warnings, that's for PIPS.  I can separate
25 that, because you can have difficult employees who
0095
 1 do a great job.  So I viewed him strictly on his
 2 job performance there in Tewksbury.
 3      Q.    Is there anywhere in this Appraisal Form
 4 that mentions or -- does it say anywhere in here
 5 that this is a review only of his performance in
 6 Tewksbury?
 7      A.    No.
 8      Q.    Did you do a separate -- did you
 9 complete a separate Appraisal Form for his
10 performance or interaction with Team Members in
11 Houston?
12      A.    No.  Because, again, like I said, this
13 is a performance review.  The other is interaction
14 with his Team Members.  That's the way I manage.  I
15 still manage that way today.
16      Q.    So is it your testimony that there had
17 been negative interaction with Team Members, but
18 that wasn't part of this Appraisal Form.  Is that a
19 fair characterization of your testimony?
20      A.    That's a fair characterization.
21      Q.    Do you stand by everything that is
22 contained within this Appraisal Form today, and I
23 mean as of the time that this was completed?
24      A.    Yes.
25      Q.    When was the first time that you
0096
 1 remember Mr. Khirawi being insubordinate?
```
Page 48

                        8-2-06 - ruby y, miles
2              MR. WINTON:  Objection.  Asked and
3    answered.  You can answer.
4         A.    I don't exactly recall.
5         Q.    (BY MR. COHEN)  I think your prior
6    testimony was that you thought it was late 2003.
7    Do I remember that correctly?
8         A.    Okay.
9         Q.    Yes or No?
10        A.    Yes.
11        Q.    And do you remember specifically as we
12   sit here what the incident was, the first incident
13   of insubordination?
14        A.    Al turned in an expense for classes and
15   I denied it.  But before I can actually say that it
16   was denied, I had to take it to Terrence Freeman.
17   Because the only classes that the company pays for
18   are job-related courses.
19                So he got upset because he said
20   these were job-related courses.  So once it got
21   past me, it could have been overridden by
22   Personnel.  But it goes to the manager and then it
23   goes to the HR Rep.
24        Q.    And how was he insubordinate?
25        A.    Via emails.  He was upset.  Very upset.
0097
1         Q.    Is there anything else that you can
2    remember as to how he was insubordinate during that
3    incident?
4         A.    Not that I could recall.
5         Q.    Going back to the Appraisal Form, March
6    1st, 2004, you said, I think you mentioned that you
7    had discussed his performance with Team Members in
8    Tewksbury?
9         A.    Right.
10        Q.    Who did you talk to?
11        A.    Some of the Team Managers.
12        Q.    Was Paul -- I'm sorry?
13        A.    Paul Galipeau.
14        Q.    Was he one of the Team Members that you
15   spoke to?
16              MR. WINTON:  In preparing the
17   interview?
18              MR. COHEN:  Yes.
19        A.    I don't recall Paul.
20        Q.    (BY MR. COHEN)  Okay.  Can you recall
21   who you spoke with in preparing the Appraisal
22   Form?
23        A.    Not at this time.
24              (Exhibit No. 10 was marked for
25   identification.)
0098
1         Q.    (BY MR. COHEN)  We have put a form
                        Page 49

8-2-06 - ruby y, miles
2  marked Exhibit No. 10 in front of you.  If you can
3  take a look at that and let me know if you
4  recognize it.
5       A.    Yes.
6       Q.    And this is a Written Reprimand, dated
7  March 1st, 2004.  Did you draft this document?
8       A.    Not alone.
9       Q.    Okay.  With whom did you draft this?
10      A.    Help from my counsel.
11      Q.    Okay.
12      A.    And Terrence Freeman, Personnel.
13      Q.    When you are talking about counsel, you
14 are talking about Ms. Stanek?
15      A.    Yes.
16      Q.    And this is a Written Reprimand related
17 to the incident that we just talked about involving
18 Mr. Khirawi, Ms. Jones, and Mr. McHenry and its
19 aftermath, correct?
20      A.    Correct.
21                 (Exhibit No. 11 was marked for
22 identification.)
23      Q.    (BY MR. COHEN)  If you could take a look
24 at this document we have marked Exhibit No. 11 and
25 let me know if you recognize this.
0099
1       A.    Yes.
2       Q.    And this is an email string between
3  yourself and James Hoffman, correct?
4       A.    Yes.
5       Q.    And James Hoffman is an HR Manager?
6       A.    No.  James Hoffman is and was my
7  immediate management.
8       Q.    And then Terrence Freeman, is he an HR
9  Manager?
10      A.    He was my HR contact.
11                 (Exhibit No. 12 was marked for
12 identification.)
13      Q.    (BY MR. COHEN)  At some point did you
14 discover that Mr. Khirawi was working from home on
15 Mondays?
16      A.    At some point, yes, I was trying to
17 discover.  That is what the email was about.
18 Because we couldn't find him and --
19                 MR. WINTON:  Listen to the
20 question.  Can you read back the question, please?
21                 (The proceedings were read by the
22 Court Reporter as follows:
23                 "QUESTION:  At some point did
24            you discover that Mr. Khirawi was
25            working from home on mondays?")
0100
1       A.    That is what I was inquiring about.
                    Page 50

8-2-06 - ruby y, miles

```
 2      Q.    (BY MR. COHEN)  Okay.  So at some point
 3   did you suspect that he might be working from home
 4   on Mondays?
 5      A.    Yes.
 6      Q.    And do you remember when that was?
 7      A.    When I sent the email, March 18th.
 8      Q.    March 18th, 2004?
 9      A.    Yes.
10      Q.    What made you suspect that he might be
11   working from home on Mondays?
12      A.    Al was a remote employee and people
13   there were trying to find him.
14      Q.    People where?
15      A.    In Tewksbury.  So they asked, "Where is
16   Al?"
17      Q.    And who were the people that were trying
18   to find him?
19      A.    Team Managers.
20      Q.    Who specifically?
21      A.    No specific name.
22      Q.    Is that because you can't remember?
23      A.    I can't remember.
24      Q.    Are there any documents or anything that
25   you can think of that might refresh your memory as
0101
 1   to who brought to your attention that they couldn't
 2   find Mr. Khirawi in Tewksbury?
 3      A.    No.
 4      Q.    Was he authorized to work from home on
 5   Mondays?
 6      A.    No.
 7      Q.    Did you ultimately find out whether he
 8   was working from home on Mondays?
 9      A.    Ultimately, Jimmy Thomas from Personnel,
10   from HR took this over, and he asked Al was he
11   working from home.  Answer Yes or No.  And his
12   answer was No.
13      Q.    Okay.  Did you ever discover anything to
14   lead you to a contrary conclusion?
15      A.    Al would be missing from his desk at
16   sporadic periodic times, for long periods of times,
17   so, no, I never found out for sure.
18      Q.    Was he getting his work done --
19            MR. WINTON:  Objection as to form.
20      Q.    (BY MR. COHEN)  -- in this time frame of
21   March 2004?
22      A.    It became increasingly difficult for Al
23   to do his work.  He did less and less.
24      Q.    What was making it difficult for him to
25   do his work?
0102
 1      A.    I can't answer for Al's state of mind.
```

Page 51

8-2-06 - ruby y, miles
```
 2      Q.    Is your answer:  I don't know?
 3      A.    I don't know.
 4      Q.    So was it your opinion that around the
 5 time frame March of 2004 that his productivity had
 6 dropped?
 7      A.    Yes.
 8      Q.    And did you document that drop in
 9 productivity in any way?
10      A.    I don't recall.
11      Q.    Did you ask anybody in Tewksbury to keep
12 an eye on Mr. Khirawi and when he was coming in and
13 what days he was working?
14      A.    Yes.
15      Q.    Who did you ask?
16      A.    I contacted Paul Galipeau.
17      Q.    Did you ask anybody else to do the same
18 thing?
19      A.    I contacted Paul and he may have asked
20 other people, but my contact was Paul.
21      Q.    And when was that?
22      A.    I don't recall the time, the date.
23      Q.    Did Mr. Galipeau get back to you with
24 some sort of an answer or any feedback as to what
25 he found or what the individual to whom he
0103
 1 delegated that task found as far as when
 2 Mr. Khirawi was coming in and what days he was
 3 working?
 4            MR. WINTON:  Objection as to form.
 5 You can answer.
 6      A.    Yes.
 7      Q.    (BY MR. COHEN)  What did he tell you?
 8      A.    It was sporadic at best.
 9      Q.    What was sporadic?
10      A.    When he would be at his desk, whether he
11 would spend eight hours there, 10 hours, because he
12 was working 40-hour weeks.  We couldn't place Al at
13 his desk doing his work all the time.
14      Q.    Is there any way electronically to find
15 out whether he was in the building?  Let's start
16 with that.
17            Whatever time you wanted to find
18 out whether he was in the building?
19      A.    Yes.
20      Q.    How could you have done that?
21      A.    There is a way, but I don't have the
22 power to do that.
23      Q.    Is it a security camera system?
24      A.    I don't recall, but there is a way.
25      Q.    Do you know whether there were security
0104
 1 cameras in Tewksbury?
```
Page 52

8-2-06 - ruby y, miles
2        A.    Pass key cards.  I remember that.
3        Q.    Okay.  So to get into the building, you
4   swipe your card?
5        A.    To get into the Help Desk area where he
6   works, you swipe your card.
7        Q.    And that, to your understanding,
8   electronically records when he entered the Help
9   Desk area?
10       A.    To my understanding.
11       Q.    Did you ever inquire as to whether you
12  could find out from those electronic records as to
13  when Mr. Khirawi was in the Help Desk area?
14       A.    We did examine them, and you could tell
15  in some areas that he was there and then the others
16  were inconclusive.
17       Q.    When you say "we," who else?  Who helped
18  you examine those records?
19       A.    Paul.
20       Q.    Okay.  And can you tell me roughly what
21  time frame that was?
22       A.     I don't recall that.
23                    (Exhibit No. 13 was marked for
24  identification.)
25       Q.    (BY MR. COHEN)  Mrs. Miles, if you can
0105
1   take a look at that and just let me know if you
2   recognize this.
3        A.    Yes.
4        Q.    And is this Exhibit No. 13, is this a
5   copy of an email string beginning on the second to
6   last page with an email from Jimmy Thomas, dated
7   Friday, 3-19-21, at 10:52, and ending on the first
8   page with an email from Mr. Khirawi, dated
9   Saturday, March 20th, 2004 at 6:14 p.m.?
10       A.    Yes.
11       Q.    Now, the first email, which is
12  Mr. Thomas' email to Mr. Khirawi, with a number of
13  cc's, did you participate in the drafting of that,
14  the memo that is contained within that email?
15       A.    No, I did not draft this.
16       Q.    Had you gone to Human Resources to seek
17  assistance --
18       A.    Yes.
19       Q.    -- with the topic that is discussed in
20  this email string?
21       A.    Yes.
22       Q.    And who did you go to in HR?
23       A.    Terrence Freeman.
24                    (Exhibit No. 14 was marked for
25  identification.)
0106
1        Q.    (BY MR. COHEN)  All right.  We have put
                        Page 53

                         8-2-06 - ruby y, miles
2    Exhibit No. 14 in front of you.  If you could take
3    a look at that and let me know if you recognize
4    it.
5        A.    Yes.
6        Q.    And this is a PIP, a Performance
7    Improvement Plan?
8        A.    Yes.
9        Q.    Is this the first Pip that you are aware
10   of to which Mr. Khirawi was subjected?
11       A.    I'm not aware.
12       Q.    This was the first PIP issued to
13   Mr. Khirawi during the time that you were his
14   Direct Supervisor, correct?
15       A.    I don't recall.
16       Q.    And did you participate in the creation
17   of this PIP, dated March 22nd, 2004?
18       A.    Along with Marthe and HR.
19       Q.    Did you draft this?
20       A.    No, I did not.
21       Q.    Do you know who drafted it?
22       A.    No, I do not.
23       Q.    Now, this PIP is again related to
24   Mr. Khirawi's refusal to give you an answer to your
25   question as to whether he was working at home on
0107
1    Mondays, correct?
2                    MR. WINTON:  Objection as to form.
3                    You are asking -- I'm sorry,
4    you can go ahead and answer.
5        A.    Yes.
6        Q.    (BY MR. COHEN)  Okay.  If you go back
7    and take a look at Exhibit No. 13, the last email
8    was from Mr. Khirawi on the first page, dated
9    March 20th, 2004.
10                   Are you aware of any incidents of
11   insubordination or anything else that might have
12   occurred between the date of this email, which is
13   March 20th, and the date of this PIP, which is
14   March 22nd?
15       A.    Al had been blatantly, blatantly
16   disrespectful for many months.
17                   MR. WINTON:  Listen to the question
18   that he is specifically asking.  Read it back,
19   please.
20                   (The proceedings were read by the
21   Court Reporter as follows:
22                   "QUESTION:  Are you aware of
23           any incidents of insubordination or
24           anything else that might have occurred
25           between the date of this email, which is
0108
1           March 20th, and the date of this PIP,
                         Page 54

                        8-2-06 - ruby y, miles
 2          which is March 22nd?")
 3                  MR. WINTON:  He is asking between
 4   the period of time March 20th to March 22nd, if you
 5   are aware?
 6       A.   No.
 7       Q.   (BY MR. COHEN)  Okay.  You had said that
 8   Al had been blatantly disrespectful from that time
 9   March 22nd, is that correct?
10       A.   Yes.
11       Q.   We talked about this incident in mid to
12   late March where he refused to give you an answer
13   to your question as to whether he was working from
14   home, correct?
15       A.   Correct.
16       Q.   And you talked about the incident
17   involving Mr. McHenry and Tiffany Anderson-Jones,
18   correct?
19       A.   Yes.
20       Q.   And I think we talked about the late
21   2003 incident of insubordination, where he had
22   requested tuition reimbursements, correct?
23       A.   Correct.
24       Q.   Other than those three, up to this point
25   in time, up to this time March 2003, when else was
0109
 1   he blatantly disrespectful?
 2       A.   It's the number of emails back and
 3   forth.
 4                  MR. WINTON:  Listen to the
 5   question.
 6                  THE WITNESS:  Yeah.
 7                  MR. WINTON:  When else was he
 8   disrespectful, if you know?
 9       A.   I don't know.
10       Q.   (BY MR. COHEN)  After this incident
11   on -- I'm sorry -- after this PIP on March 22nd,
12   2004, when was the next time that you can remember
13   that Mr. Khirawi was insubordinate?
14       A.   I don't recall.
15       Q.   Can you tell me again who Sevarino
16   Puglisi is?
17       A.   Sev was a Team Manager or is a Team
18   Manager.
19       Q.   And he was located in Tewksbury?
20       A.   Yes.
21       Q.   And did you ever ask him to help you
22   keep an eye on Mr. Khirawi in his -- when he came
23   in to work and when he left?
24                  MR. WINTON:  Objection as to form.
25   You can answer.
0110
 1       A.   Yes.
                        Page 55

8-2-06 - ruby y, miles
```
 2      Q.    (BY MR. COHEN)  And why did you do
 3 that?
 4      A.    That's who Paul led me to.
 5      Q.    Okay.  So as far as you understand it,
 6 Mr. Galipeau --
 7      A.    Galipeau.
 8      Q.    -- delegated the responsibility for
 9 keeping an eye on Mr. Khirawi's hours to Sev
10 Puglisi?
11                MR. WINTON:  Objection as to form.
12      A.    Yes.
13                MR. WINTON:  You can answer it.
14      A.    Yes.
15      Q.    (BY MR. COHEN)  Did you ever come to any
16 concrete conclusion as to whether Mr. Khirawi was
17 working the number of hours that he said he was
18 working or that he was supposed to be working?
19      A.    No.
20      Q.    In the 14 years that you have worked at
21 Getronics, have you ever requested that a
22 particular subordinate of yours -- let me rephrase
23 that.
24                During the time that you have been
25 with Getronics, have you had occasion to keep an
0111
 1 eye on a particular employee, whom you suspected of
 2 not working the hours that they said they were
 3 working?
 4                MR. WINTON:  Objection as to form.
 5      A.    No.
 6      Q.    (BY MR. COHEN)  So this was the first
 7 occasion with Mr. Khirawi?
 8      A.    Yes.
 9      Q.    Did Mr. Khirawi work overtime on
10 Saturdays as far as you knew?
11                MR. WINTON:  What time frame?
12      Q.    (BY MR. COHEN)  Well, let's start with
13 the time frame that he was reporting directly to
14 you, from September 1st, 2003, until the time that
15 he was terminated.
16      A.    I don't recall.
17      Q.    Do you recall if there was ever an issue
18 with his working overtime on Saturdays?
19      A.    I don't recall.
20      Q.    This issue with the number of hours that
21 he was working, I think your testimony was that
22 that was brought to your attention by employees or
23 managers at the Tewksbury location.  Correct?
24      A.    Right.
25      Q.    Was there anything else that led you to
0112
 1 suspect that Mr. Khirawi may not have been working
```
Page 56

8-2-06 - ruby y, miles
2   the number of hours that he was supposed to be?
3       A.    No.
4                   (Exhibit No. 15 was marked for
5   identification.)
6       Q.    (BY MR. COHEN)  I'll put a document
7   marked 15 in front of you.  If you would take a
8   look at that and let me know if you recognize it.
9                   MR. WINTON:  Is there a question?
10                  MR. COHEN:  Yes.
11      Q.    (BY MR. COHEN)  Just first, if you
12  recognize that?
13      A.    Yes.
14      Q.    And this is an email string beginning
15  May 17th, 2004 from Mr. Khirawi or at least a
16  portion of the email from Mr. Khirawi on May 17th,
17  2004, at 8:26 a.m., and then ending on the first
18  page with an email from Mr. Khirawi, dated Monday,
19  May 17th 2004, at 12:15 p.m., correct?
20      A.    Correct.
21      Q.    And right in the middle of the first
22  page there is an email from you, dated Monday,
23  May 17th, 2004, at 11:58 a.m.?
24      A.    Right.
25      Q.    And it begins:
0113
1                   "By co-worker observation, you have
2               not been in the office the hours that
3               you reported."
4                   Does this in any way help you
5   remember who it was that observed Mr. Khirawi not
6   being in the office the hours that he had
7   reported?
8       A.    I don't recall.
9                   (Exhibit No. 16 was marked for
10  identification.)
11      Q.    (BY MR. COHEN)  We have put a document
12  marked Exhibit No. 16 in front of you.
13      A.    Yes.
14      Q.    If you can just take a look at it and
15  first let me know if you recognize it?
16      A.    Yes.
17      Q.    Okay.  And this is a Written Reprimand,
18  dated May 21st, 2004 to Mr. Khirawi, correct?
19      A.    Yes.
20      Q.    And did you participate in the creation
21  of this document?
22      A.    Yes.
23      Q.    Did you draft it?
24      A.    No.
25      Q.    Who drafted it?
0114
1       A.    Counsel.
                                Page 57

8-2-06 - ruby y, miles
2    Q.    Ms. Stanek?
3    A.    Along with Personnel, HR.
4              (Exhibit No. 17 was marked for
5    identification.)
6    Q.    (BY MR. COHEN)  Mrs. Miles, we have put
7    another document that we have marked Exhibit No. 17
8    in front of you, and that is a five-page email
9    string, beginning on the last page with an email
10   from you dated Friday, May 14th, 2004, at
11   7:48 a.m., and ending with an email from
12   Mr. Khirawi, dated Tuesday, May 18th, 2004, at
13   1:16 p.m.
14              This was -- the topic of this email
15   string is the co-worker observation.  Mr. Khirawi
16   was not working the hours that he reported.
17   Correct?
18   A.    Yes.
19   Q.    And if you look back to the May 21st,
20   2004, Written Reprimand, which is Exhibit No. 16,
21   the top paragraph --
22   A.    Yes.
23   Q.    -- makes a reference to or in the middle
24   there is a sentence beginning:
25              "On May 18th, 2004, you were again
0115
1              insubordinate and disrespectful toward
2              your manager."
3              Did I read that correctly?
4    A.    Yes.
5    Q.    Okay.  And as far as you know, is that a
6    reference to emails contained within this email
7    string that we have marked Exhibit No. 17?
8    A.    Yes.
9    Q.    Is there anything else, either any
10   emails or verbal communication, that that may be a
11   reference to, that insubordination on May 18th
12   described in the Written Reprimand?
13   A.    I can't recall at this time.
14              (Exhibit No. 18 was marked for
15   identification.)
16   Q.    (BY MR. COHEN)  Mrs. Miles, we have put
17   another document in front of you that we have
18   marked 18, and that is an email string beginning
19   with one from Dave Ayotte, dated Tuesday, May 25th,
20   2004, at 4:21 p.m., and ending with an email from
21   Mr. Khirawi on Wednesday, May 26th, 2004, at
22   10:56 a.m., and this talks about an issue regarding
23   a laptop computer, correct?
24   A.    Correct.
25   Q.    Can you tell me what this was about, how
0116
1    this issue came up?

Page 58

8-2-06 - ruby y, miles
2        A.    Having a laptop computer is a privilege,
3    and because we were trying to control Al's
4    environment, he lost his privilege to keep the
5    laptop.
6        Q.    This wasn't related -- your request that
7    he turn in the laptop, was it related to any need
8    on Getronics' part for return of the use of the
9    laptop?
10       A.    No.
11       Q.    Okay.  So was this a response to
12   insubordination or other performance problems that
13   Mr. Khirawi had up to this point?
14       A.    Yes.
15       Q.    Whose idea was it to retrieve
16   Mr. Khirawi's laptop or the laptop that he was
17   using?
18                MR. WINTON:  To the extent you are
19   asking about conversation between counsel and
20   witness, I'm going to instruct you not to answer;
21   but if you can answer the question without relaying
22   communications with counsel, then you may answer.
23       A.    I won't answer.
24       Q.    (BY MR. COHEN)  Okay.  So is it your
25   testimony that, without relaying communications
0117
1    between yourself and an attorney or attorneys for
2    Getronics, that you cannot answer that question?
3        A.    Yes.
4        Q.    Is it fair to say it wasn't your idea?
5                MR. WINTON:  Objection as to form.
6    You can answer as to whether it's your idea or
7    not.
8        A.    It was a collaborative effort.
9        Q.    (BY MR. COHEN)  Were you in agreement
10   with the decision to retrieve the laptop from
11   Mr. Khirawi?
12       A.    Absolutely.
13       Q.    And had you spoken to any other managers
14   about the idea to retrieve Mr. Khirawi's laptop or
15   the laptop he was using?
16       A.    Paul Galipeau.
17       Q.    Did Mr. Galipeau concur in the idea to
18   retrieve the laptop?
19       A.    Absolutely.
20       Q.    If you can take a look at the top page
21   of Exhibit No. 18, the email from Mr. Khirawi on
22   Wednesday, May 26th, 2004, at 10:56 a.m., and it's
23   an email to you and then there is a cc to Paul
24   Galipeau, James Hoffman, and Terrence Freeman.
25                And in the middle of the email,
0118
1    Mr. Khirawi says:
                        Page 59

                    8-2-06 - ruby y, miles
2                   "I spoke with Paul yesterday, as he
3            was my previous manager, and told him if
4            he needed the laptop back and he said
5            No."
6                   Did you speak to Mr. Galipeau after
7    receiving this email and ask him, Did you tell
8    Mr. -- did you ask him, Why did you tell Al that
9    you didn't need the laptop back?
10                  What I'm getting at is why didn't
11   you ask Mr. Galipeau why he told Al that he didn't
12   need the laptop back, after he had concurred in the
13   opinion or in the idea to retrieve the laptop?
14                  MR. WINTON:  Objection as to form.
15   If you can answer it --
16                  THE WITNESS:  Read it back.
17                  MR. WINTON:  You can.  It's a hard
18   question.
19       A.   Repeat, please.
20       Q.   (BY MR. COHEN)  Let me start again.  Let
21   me re-ask.  Let me rephrase the question and try to
22   make this easier.
23                  Were you surprised when you read
24   this email at all?
25       A.   Yes.
0119
1        Q.   Okay.  And why were you surprised when
2    you read this email?
3        A.   Because Paul and I had discussed this.
4        Q.   You had discussed this in advance and
5    before this email by Mr. Khirawi, correct?
6        A.   Yes.
7        Q.   And did you then go to Mr. Galipeau and
8    ask him or express your surprise?
9        A.   I don't recall.
10                  MR. COHEN:  Let's take a break.
11                  (After a brief recess, the
12   proceedings continued as follows:)
13       Q.   (BY MR. COHEN)  Other than what we have
14   discussed to this point, can you recall any
15   incidents of insubordination by Mr. Khirawi up to
16   June 1st, 2004?
17       A.   I don't recall.
18       Q.   Now, Mr. Khirawi filed an EEOC Complaint
19   of Discrimination in June of 2004, correct?
20                  MR. WINTON:  If you know.
21       A.   I don't know.
22                  (Exhibit No. 19 was marked for
23   identification.)
24       Q.   (BY MR. COHEN)  If you can take a look
25   at this document that we have marked No. 19.  This
0120
 1   is his EEOC Complaint, dated June 15th, 2004, in
                        Page 60

8-2-06 - ruby y, miles
2    the bottom left of the first page.  Have you seen
3    this before today?  You can flip through it just to
4    make sure you can tell.
5         A.    I don't recall seeing this document
6    before today.
7         Q.    Is it your testimony that until today,
8    you were not aware that Mr. Khirawi had filed a
9    Charge of Discrimination with the EEOC in June of
10    2004?
11         A.    I was aware that he filed, but I haven't
12    seen this document.  That's my testimony.
13         Q.    And when did you first become aware that
14    he had filed an EEOC charge?
15         A.    Through counsel.
16         Q.    And was that sometime in June or early
17    July of 2004?  Does that sound about right?
18         A.    I don't remember.  I don't recall.
19         Q.    Were you, did you participate in any
20    internal investigation relating specifically to
21    this EEOC charge?
22         A.    No.
23         Q.    Were you out on any sort of a medical
24    leave at any time in 2004?
25         A.    Yes.
0121
1         Q.    And do you remember approximately from
2    when to when that was?
3         A.    No.
4         Q.    And are you able to tell me
5    approximately what length of time you were out?
6         A.    Six to eight weeks probably.
7         Q.    Do you know who was responsible for
8    supervising Mr. Khirawi during the time you were
9    out in 2004?
10         A.    I don't recall.
11         Q.    Do you recall whether there were any
12    incidents of insubordination during the period that
13    you were out?
14         A.    I don't know.
15         Q.    Are you aware of any incidents of
16    insubordination in the month of June 2004?
17         A.    I don't recall.
18         Q.    Are you aware of any incidents of
19    insubordination by Mr. Khirawi in the month of July
20    of 2004?
21         A.    I don't recall.
22         Q.    Do you know whether as a part of the
23    EEOC case that was pending in the summer of 2004 as
24    a result of Mr. Khirawi's complaint that you have
25    in front of you, there was a mediation or an effort
0122
1    to try to resolve the case between Getronics and
                        Page 61

                        8-2-06 - ruby y, miles
2  Mr. Khirawi?
3       A.    I don't know.
4       Q.    So you were never made aware that there
5  was a conciliation or a mediation to try to settle
6  the case?
7       A.    No, I don't recall.
8       Q.    So it's fair to say you didn't
9  participate in that conciliation or remediation?
10      A.    Yes.
11      Q.    Did anybody from Getronics tell you
12 something along the lines that, We tried to resolve
13 the case, but we couldn't, with Mr. Khirawi?
14              MR. WINTON:  Before you answer, you
15 understand that if an answer requires you to relay
16 any communications between counsel, I instruct you
17 not to answer.  Do you need the question read
18 back?
19      A.    No answer.
20      Q.    (BY MR. COHEN)  Okay.  So you can't
21 answer the question without relating communications
22 between yourself and attorneys for Getronics?
23      A.    Correct.
24      Q.    You know, I think we talked briefly
25 about a point in time when Tiffany Anderson-Jones
0123
1  reported that she was having difficulty reaching
2  Mr. Khirawi by telephone.  Is that correct?
3       A.    Correct.
4       Q.    And I think that your testimony was you
5  couldn't recall when that occurred.  Is that
6  correct?
7       A.    Correct.
8       Q.    Is that still the case, you can't
9  recall?
10      A.    That's still the case.
11              (Exhibit No. 20 was marked for
12 identification.)
13              MR. COHEN:  This is 433 through
14 438.  No 20.
15      Q.    (BY MR. COHEN)  When you learned from
16 Tiffany that she had difficulty reaching
17 Mr. Khirawi, did you relay that or somehow confront
18 Mr. Khirawi with that?
19              This isn't necessarily in the
20 document.  You're free to look at it if you want.
21      A.    Repeat the question.
22              MR. COHEN:  Would you read it back,
23 please.
24              (The proceedings were read by the
25 Court Reporter as follows:
0124
1                      "QUESTION:  When you learned
                        Page 62

                              8-2-06 - ruby y, miles
2            from Tiffany that she had difficulty
3            reaching Mr. Khirawi, did you relay that
4            or somehow confront Mr. Khirawi with
5            that?")
6      A.    I don't recall.
7      Q.    Do you remember him telling you that he
8   never received a voicemail message from Tiffany
9   that he didn't respond to?
10     A.    I don't recall.
11     Q.    Did Mr. Khirawi ask for an inspection of
12  the phone system to determine if there was a
13  problem with the phone system and with his receipt
14  of Tiffany's voicemail messages?
15     A.    Yes.
16     Q.    And what became of that request?
17     A.    I sent an email.  I closed it.  I
18  requested it be closed.
19     Q.    Why did you request that it be closed?
20     A.    He has no right to do that.  That's
21  company confidential information.
22     Q.    Okay.  Who did have the authority to
23  request -- let me take that back.
24            Is it called a Ticket when you
25  request an investigation like that?
0125
1      A.    He opened it via our Proprietary Ticket
2   System, but he has no right to ask for that.
3      Q.    Who does have the authority to ask for
4   that?
5      A.    Probably Jim Hoffman and above.
6      Q.    Did you think it would have been
7   important to find out whether he did, in fact,
8   received messages from Ms. Jones,
9   Ms. Anderson-Jones that he didn't return?
10     A.    No.
11     Q.    And is it fair so assume that you didn't
12  ask Mr. Hoffman to open a case to find out whether
13  or not the phone system was defective or whether he
14  had actually received voicemail messages from
15  Tiffany which he didn't return?
16     A.    Yes.
17     Q.    You did ask that?
18     A.    No, that's fair to assume that I
19  didn't.
20     Q.    Okay.  Is the policy relative to who has
21  the authority to ask for such an investigation or
22  opening a Ticket into the phone system, is that
23  documented anywhere in the written policy?
24     A.    I can't answer that.
25     Q.    Is that because you don't know?
0126
1      A.    Yes.
                              Page 63

8-2-06 - ruby y, miles
2        Q.    Did you consider this incident with
3    Mr. Khirawi opening the Ticket to be an incident of
4    insubordination?
5        A.    Yes.
6        Q.    Did he press the issue after you asked
7    that the Ticket be closed?
8        A.    Yes.
9        Q.    After this incident, were there any
10   other incidents of insubordination or performance
11   problems by Mr. Khirawi in August of 2004?
12       A.    I don't recall.
13       Q.    Okay.  And were there any other
14   incidents of insubordination or performance
15   problems by Mr. Khirawi in September of 2004?
16       A.    I don't recall.
17       Q.    Up to October 2004, and with the
18   exception of the Internal Complaint of
19   Discrimination Mr. Khirawi made in January of 2004
20   or actually I think it began in December 2003, did
21   Mr. Khirawi make any other report or complaint of
22   discrimination or retaliation internally?
23                  MR. WINTON:  Objection as to form.
24       A.    I don't recall.
25                  (Exhibit No. 21 was marked for
0127
1    identification.)
2        Q.    (BY MR. COHEN)  We have put a document
3    marked Exhibit 21 in front of you.  Would you take
4    a look at that and tell me whether you recognize
5    that?
6        A.    I recognize it.
7        Q.    And is this another PIP issued to
8    Mr. Khirawi on August 19th, 2004?
9        A.    Yes.
10                  MR. WINTON:  Objection as to form.
11       Q.    (BY MR. COHEN)  And did you participate
12   in the creation of this document?
13       A.    No.
14       Q.    Do you know who did?  Or let me take
15   that back.
16                  Do you know who created it?
17       A.    No.
18       Q.    When was the first time that you saw
19   this?
20       A.    I don't recall.
21       Q.    Do you recall a meeting with Mr. Khirawi
22   on August 19th, 2004?
23       A.    I don't recall.
24       Q.    Do you recall learning that there was a
25   meeting with Mr. Khirawi -- including Mr. Khirawi,
0128
1    Jamie Graceffa, and Jim Hoffman on August 19th,
                        Page 64

                    8-2-06 - ruby y, miles
2    2004?
3        A.    Jim mentioned the meeting to me.
4        Q.    And you didn't attend this meeting?
5        A.    No, I didn't.
6        Q.    Why didn't you attend?
7        A.    At that time, I was reporting to Jamie
8    and Jim.
9        Q.    Okay.  So at this time he had no longer
10   been reporting to you?
11       A.    No, not directly.
12       Q.    Okay.  I mean, was he reporting to you
13   with respect to the actual work of Getronics?
14                 I'm separating the actual work of
15   Getronics and the duties with respect to his QA
16   Representative position and these performance
17   issues that had been ongoing at that point in
18   time.
19       A.    Performance issues, no.  Doing his work
20   responsibilities, yes.
21       Q.    Okay.  So the follow-up for these
22   performance -- these PIPS, for that purpose
23   Mr. Khirawi was reporting to Mr. Graceffa?
24       A.    Yes.
25       Q.    And do you know as of when that was?
0129
1        A.    I don't recall.
2        Q.    And who was Mr. Graceffa?
3        A.    HR Rep.
4        Q.    And what did Mr. Hoffman tell you about
5    the meeting with Mr. Khirawi?
6                 MR. WINTON:  The August 19th
7    meeting?  Right?
8                 MR. COHEN:  Yes.
9        Q.    (BY MR. COHEN)  We are talking about the
10   August 19th, 2004 meeting.
11       A.    I don't recall.
12       Q.    Do you recall whether Mr. Hoffman spoke
13   to you about the August 19th meeting after the
14   meeting?  Let me rephrase that.
15                 Do you recall whether Mr. Hoffman
16   spoke to you about the August 19th meeting before
17   or after the meeting?
18       A.    I don't recall the time.
19       Q.    The incident that we talked about where
20   Mr. Khirawi asked for the investigation into the
21   phone system, which seemed to have occurred in the
22   early part of August 2004, if we take that point in
23   time until August 19th, 2004, were there any
24   incidents of insubordination between the time of
25   that incident, which was the beginning of August,
0130
1    to August 19th, 2004?
                    Page 65

8-2-06 - ruby y, miles
2        A.    I don't recall.
3        Q.    Do you have any knowledge as to whether
4   Mr. Khirawi was given this document, the August
5   19th PIP?
6        A.    I have no idea.
7        Q.    Do you remember the first time that
8   you -- I may have asked you this already.
9                  But do you remember when it was
10  that you first saw this document yourself?
11       A.    I don't recall the exact date.
12       Q.    And I may have asked you this already,
13  but do you recall any incidents of insubordination
14  or performance problems on the part of Mr. Khirawi
15  during the month of September 2004?
16       A.    I don't recall.
17       Q.    Do you remember any incidents of
18  insubordination or performance problems during the
19  month of October 2004?
20       A.    I don't recall.
21                  (Exhibit No. 22 was marked for
22  identification.)
23       Q.    (BY MR. COHEN)  Okay.  We have put No.
24  22 in front of you.  If you could take a look at
25  that and let me know if you have recognized that?
0131
1        A.    Yes.
2        Q.    This is a Written Reprimand, issued to
3   Mr. Khirawi, dated October 26th, 2004, correct?
4        A.    Right.
5        Q.    And did you participate in the creation
6   of this document?
7        A.    No, I did not.
8        Q.    Do you know who drafted it?
9        A.    Counsel and HR.
10       Q.    Counsel meaning Ms. Stanek?
11       A.    Yes.
12       Q.    And did you speak to anybody about this
13  Written Reprimand?
14                  MR. WINTON:  Objection as to form.
15  To the extent he is asking for communication with
16  counsel, instruct you not to answer.
17       Q.    (BY MR. COHEN)  Can you answer the
18  question without revealing communication between
19  yourself and counsel?
20       A.    No.
21       Q.    Do you know who decided to terminate
22  Mr. Khirawi?
23                  MR. WINTON:  I'm going to ask you
24  not to answer to the extent that you have to reveal
25  communications between you and counsel.
0132
1        Q.    (BY MR. COHEN)  Can you answer without

8-2-06 - ruby y, miles
2   revealing communications between yourself and
3   counsel?
4       A.    No.
5       Q.    Is it fair to say that it wasn't your
6   decision to terminate Mr. Khirawi?
7                 MR. WINTON:  If you can answer that
8   question without revealing communications between
9   you and counsel, you should answer.
10      A.    I can't answer that.
11      Q.    (BY MR. COHEN)  Okay.  You can't answer
12  that without revealing attorney-client
13  communication?
14      A.    Absolutely.
15      Q.    Did you agree with the decision to
16  terminate him?
17      A.    Absolutely.
18      Q.    Did Mr. Khirawi ever ask to be
19  transferred to a different department so that he
20  was no longer working on your Team?
21      A.    I remember him making that request.
22      Q.    And do you remember to whom he made that
23  request?
24      A.    No, I don't.
25      Q.    Do you remember if anybody looked into
0133
1   the possibility of transferring him?
2       A.    No, I don't.
3       Q.    Have we now to this point discussed all
4   the incidents of insubordination that in your mind
5   led to Mr. Khirawi's termination?
6                 MR. WINTON:  Objection as to form.
7       A.    Repeat?
8       Q.    (BY MR. COHEN)  Sure.  Have we now
9   discussed all the incidents of insubordination that
10  in your mind led to the termination of
11  Mr. Khirawi?
12      A.    Yes.
13      Q.    And have we now discussed all the
14  reasons that Mr. Khirawi was terminated?
15                MR. WINTON:  If you know.
16      A.    Besides being blatantly disrespectful
17  and insubordinate and emails capitalizing words and
18  underlining words and many, many emails in one day,
19  in two days, in three days, then we have covered
20  it.
21      Q.    (BY MR. COHEN)  And we have gone through
22  and marked a number of exhibits that include
23  emails, which to my understanding includes some
24  emails from Mr. Khirawi that you felt were
25  insubordinate.  Is that correct?
0134
1       A.    Yes.

                        Page 67

8-2-06 - ruby y, miles

```
 2        Q.    Are there any emails that you can think
 3   of that contain disrespect or underlining words or
 4   a multitude of emails you felt was insubordinate
 5   that we haven't gone over here today?
 6        A.    I don't believe I've seen them all,
 7   because there were so many.
 8        Q.    Okay.  But all I can really ask you is
 9   as you sit here today --
10        A.    Right.
11        Q.    -- can you think of any other emails
12   that we haven't talked today or haven't marked?
13             MR. WINTON:  Asked and answered.
14   She said she hasn't seen them all, there were so
15   many.
16        Q.    (BY MR. COHEN)  So your answer is No?
17        A.    My answer is I haven't seen them all,
18   because there are so many.
19        Q.    So, again, as you sit here today, my
20   question is:  Can you think of any emails in
21   addition to what we have gone over today and marked
22   as exhibits?
23             MR. WINTON:  Are you asking if she
24   can think of any specific email that she recalls or
25   if there are any others?
0135
 1             MR. COHEN:  Let's start with:  Are
 2   there any others?
 3             MR. WINTON:  I think she has
 4   already testified.
 5        A.    There are others, but I can't give you
 6   dates, times, specifics.
 7        Q.    (BY MR. COHEN)  So there are others in
 8   addition to what we have marked here today, but is
 9   it fair to say that you can't recall specifically
10   which ones?
11        A.    I can't recall specific times and
12   dates.
13        Q.    Okay.  Can you recall specific topics?
14   Yes or No?
15        A.    No.
16        Q.    So there is nothing, no specific topics
17   or dates of emails that you felt were disrespectful
18   or insubordinate that stand out in your mind here
19   other than what we have talked about today?
20             MR. WINTON:  Objection as to form.
21        A.    The extra emails -- that's all I can
22   say.
23             MR. COHEN:  Let's read back the
24   question.
25             (The proceedings were read by the
0136
 1   Court Reporter as follows:
```

Page 68

                        8-2-06 - ruby y, miles
2                       "QUESTION:  So there is
3               nothing, no specific topics or dates of
4               emails that you felt were disrespectful
5               or insubordinate that stand out in your
6               mind here other than what we have talked
7               about today?")
8       A.      No.
9       Q.      (BY MR. COHEN)  Who replaced Mr. Khirawi
10      after he was terminated?
11      A.      No one.
12      Q.      So nobody -- after Mr. Khirawi, no one
13      has held the position of QA Representative in
14      Tewksbury?
15      A.      No.
16      Q.      Is there any reason why he wasn't
17      replaced?
18      A.      The company decided not to replace that
19      position, and Tiffany Anderson-Jones did it
20      remotely.
21      Q.      So did Tiffany Anderson-Jones take over
22      Mr. Khirawi's responsibilities with respect to
23      Tewksbury?
24      A.      Yes.
25      Q.      Is it true that nobody -- I just want to
0137
1       be clear here.  Nobody has taken over that QA
2       Representative position in Tewksbury?
3       A.      Not sitting in Tewksbury.
4       Q.      I've got it.  Okay.
5                       Have you been involved in any
6       Complaint of Discrimination in any capacity
7       involving Getronics, other than this one?
8       A.      No.
9       Q.      May I have that Exhibit No. 22?
10                      Now, if you can take a look at this
11      Exhibit No. 22 again, was there a meeting on
12      October 26th, 2004 between Mr. Khirawi and Mr.
13      Graceffa as far as you know?
14      A.      As far as I know.
15      Q.      As far as you know there was?
16      A.      As far as I know.
17      Q.      And you didn't attend that meeting,
18      correct?
19      A.      No, I didn't.
20      Q.      Do you have any knowledge as to what
21      occurred during that meeting?
22      A.      No, I do not.
23      Q.      I see at the top of this reprimand the
24      date of the reprimand is October 26th, 2004, then
25      it says date of occurrence, September 24th to 30th,
0138
1       2004.

                            8-2-06 - ruby y, miles
 2                    Can you think of anything that
 3     occurred performance-wise or insubordination-wise
 4     in that time frame, September 24th to 30th, 2004?
 5          A.    I don't recall.
 6                    MR. COHEN:  Off the record for a
 7     minute.
 8                    (After a brief recess, the
 9     proceedings continued as follows:)
10                    MR. COHEN:  That concludes my
11     questioning.
12                    MR. WINTON:  Oh, off the record.
13     Need a couple of minutes.
14                    (After a brief recess, the
15     proceedings continued as follows:)
16                       EXAMINATION
17     BY MR. WINTON:
18          Q.    Mrs. Miles, I just have a few questions
19     regarding some of the questions and answers,
20     questions asked by Attorney Cohen and answers you
21     gave, just to clarify a couple of issues.
22                    You had mentioned earlier today
23     that you believe your authority level changed and
24     that you now have the ability or the authority to
25     terminate your subordinates.  Do you recall that
0139
 1     testimony?
 2          A.    Yes.
 3          Q.    But you don't have the final authority
 4     to do that, do you?
 5          A.    No, I don't.
 6          Q.    When you say your authority has changed,
 7     are you talking about authority with respect to who
 8     you need to communicate with?
 9          A.    Yes.
10          Q.    And explain to me that difference in
11     authority.
12          A.    The communication can now skip my
13     immediate manager and go directly to HR.
14          Q.    So before you would have had to speak to
15     your managers about terminating subordinates, but
16     now you can go directly to HR about that?
17          A.    Yes.
18          Q.    But you still don't have final authority
19     to terminate?
20          A.    No.
21          Q.    And you never did have final authority
22     on terminating subordinates during your employment
23     with Getronics.  Correct?
24          A.    No.
25          Q.    A different topic.  You testified about
0140
 1     the differences in training for discrimination
                          Page 70

                        8-2-06 - ruby y, miles
2  issues that you received at Getronics as opposed to
3  BP.  Do you recall that testimony?
4      A.    Yes.
5      Q.    And you said something about BP giving
6  you sensitivity training.  Is that correct?
7      A.    Yes.
8      Q.    Was that what the training was called?
9  Was it called Sensitivity Training?
10     A.    Yes, it was sensitivity role play.
11     Q.    So it was a different type of training?
12     A.    Right.
13     Q.    But both trainings were based on
14 discrimination issues?
15     A.    Yes.
16     Q.    And both trainings did help you
17 understand these issues?
18     A.    Yes.
19     Q.    You testified with respect to other
20 individuals at Getronics who may have started
21 engaging in duties or responsibilities of another
22 position before they actually received either the
23 title or salary for that position.  Do you recall
24 that testimony?
25     A.    Yes.
0141
1      Q.    Okay.  Are you testifying that no one
2  else at Getronics has ever done that?
3      A.    I'm sure it happens.
4      Q.    You don't have any specific knowledge as
5  you sit here today, but you wouldn't be surprised
6  if that happened?
7      A.    I would not be surprised.
8      Q.    You testified with respect to the
9  reference points for salaries.  Do you recall that
10 testimony?
11     A.    Yes.
12     Q.    Now, are reference points the same as
13 salary ranges?
14     A.    No.
15     Q.    Can you explain what reference points
16 are?
17     A.    Salary ranges to me are set in stone.
18 That is what I call them.  If it says min max, it's
19 min max.  Reference points you can start anywhere.
20     Q.    So is it in your experience at Getronics
21 that people are paid outside of the reference
22 points?
23     A.    All the time.
24     Q.    And that has something to do with what
25 salary they may have been at before?
0142
1      A.    It has to do with that.  It also has to
                        Page 71

8-2-06 - ruby y, miles
2  do with internal versus external.
3      Q.    Mr. Cohen asked you if you were aware of
4  any incidents of insubordination by Mr. Khirawi
5  prior to December of 2003.  Do you recall that
6  question?
7      A.    Yes.
8      Q.    Okay.  As you sit here today, are you
9  aware of specific incidents prior to December
10  2003?
11     A.    Nothing specific, but I know they
12  exist.
13     Q.    And with respect to incidents with
14  co-workers, he also asked you if you were aware of
15  any incidents with co-worker, prior to December
16  2003.
17                Do you recall any specifics at this
18  time?
19     A.    No specifics.
20     Q.    But does that mean, hey, there weren't
21  any necessarily?
22     A.    Yes.
23     Q.    There could have been?
24     A.    There could have been.
25     Q.    You are just not sure as you sit here
0143
1  today?
2      A.    Right.
3      Q.    When you spoke -- when you answered
4  questions from Mr. Cohen regarding a conversation
5  you had with Mr. Khirawi in mid-2003 in the
6  training room at Tewksbury, you testified something
7  to the effect that you wished you wouldn't have
8  said that.  Do you recall that testimony?
9      A.    Yes.
10     Q.    And you are saying that -- you are
11  saying that, as you sit here today you wished you
12  wouldn't have said that?
13     A.    Yes.
14     Q.    And when you say you wished you wouldn't
15  have said that, why are you saying that?
16     A.    After the fact, I wish I hadn't said
17  it.
18                At the time that I said it, meaning
19  that people do get discriminated against, I meant
20  that, but knowing what happened since then, I
21  wouldn't have ever said that.
22     Q.    Why wouldn't you have ever said that?
23     A.    Because all of the emails and all the
24  blatant disrespect and the problems that arose from
25  me saying that.
0144
1      Q.    The problems that arose from your saying
                          Page 72

8-2-06 - ruby y, miles
2  that -- what specifically about Mr. Khirawi's
3  reaction to that statement makes you say that you
4  wish you wouldn't have said it?
5       A.    Because he said that I discriminated
6  against him and I retaliated against him, and that
7  is not the case.
8       Q.    But you say you wish you wouldn't have
9  said it.  Are you talking about -- withdrawn.
10                 Did Mr. Khirawi report to Getronics
11  exactly what you said to him?
12      A.    No.
13      Q.    Did he report something different than
14  what you said to him?
15      A.    Yes.
16      Q.    Is that one of the reasons why you wish
17  you wouldn't have said it?
18      A.    Absolutely.
19      Q.    Did Mr. Khirawi misinterpret anything
20  you said to him?
21      A.    He twisted my words in short.
22      Q.    But you specifically told him during
23  that meeting that in this case Getronics was not
24  discriminating against him based on race?
25      A.    Yes, I did.
0145
1       Q.    Or discriminating against him in any
2  manner?
3       A.    Yes, I did.
4       Q.    Mr. Cohen asked you questions about
5  whether you may have said to Mr. Khirawi, "Welcome
6  to the club of suffering."  Do you recall those
7  questions?
8       A.    Yes.
9       Q.    And you were certain that you never said
10  that phrase to Mr. Khirawi, "Welcome to the club of
11  suffering"?
12      A.    Correct.
13      Q.    Could you have possibly said the phrase,
14  "Welcome to the club" in relation to having to wait
15  for raises?
16                 MR. COHEN:  Objection, form.
17      Q.    (BY MR. WINTON)  You can answer.
18      A.    Yes.
19      Q.    You don't have a specific recollection
20  of saying that?
21      A.    No.
22      Q.    But you wouldn't be surprised if you did
23  say that with respect to waiting for raises?
24                 MR. COHEN:  Objection.
25      A.    Yeah.
0146
1       Q.    (BY MR. WINTON)  And your point in
                         Page 73

8-2-06 - ruby y, miles
2   saying something to that effect would be what?
3                   MR. COHEN:  Objection.
4        A.    The point in saying that is because I've
5   been there.  I've been here for 14 years.  I've
6   done three raises.  Back when I was talking to
7   Aalaeldin, I'd been here for 10 years.  I had
8   two -- the same three raises.
9                   So I was just trying to make him
10  feel like I felt, that it is not personal.  It's
11  not because Getronics doesn't like him.  It's not
12  because they are discriminating against him because
13  he is black or because he is Muslim or whatever.
14  It's life.  And in corporate America today is what
15  I think personally.
16       Q.    (BY MR. WINTON)  And sometimes there are
17  delays in getting raises and promotions, correct?
18       A.    Still exists here.
19       Q.    With respect to the incident relating to
20  Mr. Khirawi's email to Mr. McHenry in February
21  2004, do you recall questions and answers relating
22  to that?
23       A.    Yes.
24       Q.    Mr. Cohen asked you why you didn't ask
25  Mr. Khirawi for his version of what happened.  Do
0147
1   you recall that?
2        A.    Yes.
3        Q.    And I believe your testimony was that
4   you said you know Patrick and you know Tiffany and
5   you had been to meetings with them both before and
6   you trusted what they told you.  Do you remember
7   that testimony?
8        A.    Yes.
9        Q.    Mr. Cohen asked you if there was any
10  reason why you didn't ask for an -- withdrawn.
11                  Mr. Cohen asked you if there were
12  any other reason why you didn't ask for an
13  explanation from Mr. Khirawi.  Do you recall that?
14       A.    Yes.
15       Q.    As you sit here now, can you think of
16  any other reason why?
17       A.    Because Al sent out this email copying
18  everybody, getting upset.  It was after the point.
19  I had to double-back and I wanted to make it
20  better, because I have to have a relationship.  I
21  have to have a working relationship with the
22  people.  I have to.  I have to keep that.
23       Q.    So the fact that Mr. Khirawi may have a
24  different version of what happened didn't matter at
25  that point because of the email he had already
0148
1   sent?
                       Page 74

                    8-2-06 - ruby y, miles
2        A.    It did not matter.
3        Q.    Mr. Cohen asked you questions about the
4   email you sent apologizing on behalf of Mr. Khirawi
5   for the McHenry incident in February 2004.  Do you
6   recall those questions?
7        A.    Yes.
8        Q.    And Mr. Cohen asked you why you cc'd
9   Human Resources on that email.  Do you remember
10  those questions?
11       A.    Yes.
12       Q.    And you said that there were HR issues
13  was the reason why -- that Mr. Khirawi had HR
14  issues.  Do you recall that?
15       A.    Yes.
16       Q.    And when you say "HR issues," are you
17  talking about the insubordination?
18       A.    Yes.  And also because he cc'd so I had
19  to make sure that I covered my bases.
20       Q.    Well, if you look at the emails, I'm not
21  sure he cc'd HR on those emails, but if the emails
22  show that you were the first one who brought HR
23  into this, was that as a result of the
24  insubordination that he showed?
25       A.    Yes.
0149
1        Q.    And is that something when you bring HR
2   in is for insubordination issues?
3        A.    I think so, absolutely.
4        Q.    With respect to the performance
5   appraisal you provided Mr. Khirawi at the end of
6   February 2004 or early March 2004, you testified
7   that you did not address his inappropriate conduct
8   in that appraisal.  Is that correct?
9        A.    Correct.
10       Q.    And Mr. Cohen asked you about any
11  potential negative interaction that he might have
12  had with other employees.  Do you recall those
13  questions?
14       A.    Yes.
15       Q.    To your knowledge, at the time you
16  drafted that appraisal, had Mr. Khriawi had any
17  negative interaction with other employees based on
18  his technical performance?
19       A.    No.
20       Q.    Were there major issues with his
21  technical performance at that time?
22       A.    No.
23       Q.    Either with respect to Tewksbury or
24  Houston?
25       A.    No.
0150
1        Q.    Were there issues with his inappropriate
                      Page 75

8-2-06 - ruby y, miles
```
 2   conduct?
 3       A.    Yes.
 4       Q.    And were those addressed in documents
 5   other than the appraisal?
 6       A.    Yes.
 7       Q.    Mr. Cohen asked you about ways to find
 8   out if Mr. Khirawi was in the building
 9   electronically.  Do you recall those questions?
10       A.    Yes.
11       Q.    And you said something about swiping
12   pass key cards.  Do you recall that?
13       A.    Yes.
14       Q.    And is it possible for an employee to
15   swipe a pass key card and let more than one
16   employee into the room while doing so?
17       A.    Yes.
18       Q.    So that's not really a scientific way --
19   let me --
20                 That's not really a scientific way
21   to have of determining whether someone is in the
22   building or in the room at that time, is that
23   correct?
24       A.    Correct.
25       Q.    Mr. Cohen asked you about Mr. Galipeau
0151
 1   delegating responsibility to Sev Puglisi.  Do you
 2   recall that question?
 3       A.    Yes.
 4       Q.    And you had said that Mr. Galipeau had
 5   delegated some of his responsibility of overseeing
 6   Mr. Khirawi to Mr. Puglisi.  Is that right?
 7       A.    Yes.
 8       Q.    Is it your testimony that Mr. Galipeau
 9   delegated all of that responsibility to
10   Mr. Puglisi?
11       A.    No.  He also monitored Al also.
12       Q.    So Mr. Galipeau monitored Mr. Khirawi
13   himself as well?
14       A.    Yes.
15       Q.    So he did not completely delegate that
16   responsibility to Mr. Puglisi?
17       A.    No, he did not.
18       Q.    Mr. Cohen asked you about the
19   communications you had with Mr. Khirawi with
20   respect to the number of hours he claimed to work
21   and how many you would give -- oh, withdrawn.
22                 Mr. Cohen asked you questions about
23   the number of hours Mr. Khirawi claimed to have
24   worked.  Do you recall those questions?
25       A.    Yes.
0152
 1       Q.    And there were disagreements about
```
Page 76

8-2-06 - ruby y, miles
2    that.  Do you recall that?
3         A.    Yes.
4         Q.    Disagreement with Mr. Khirawi.  Do you
5    recall that?
6         A.    Yes.
7         Q.    And Mr. Cohen had asked you if anything
8    led you to believe that Mr. Khirawi was not working
9    the hours he was supposed to and you mentioned
10   something about being brought to your attention by
11   people in Tewksbury.  Do you recall that?
12        A.    Yes.
13        Q.    Were there any other reasons why you
14   believe that Mr. Khirawi was not working the hours
15   that he was reporting?
16        A.    Looking at his time sheets and STD that
17   was mentioned and I had to keep with that, being
18   his manager.
19        Q.    And were there any -- other than
20   Tewksbury, were there any other Getronics employees
21   that were having a hard time getting ahold of
22   Mr. Khirawi?
23        A.    Yes.
24        Q.    Who would that have been?
25        A.    People in Houston trying to reach him.
0153
1    Tiffany or whoever he might have needed to work
2    with at that time.
3         Q.    And you as well?
4         A.    And me as well.  I called him.  He
5    wouldn't pick up.
6         Q.    Mr. Cohen asked you about a number of
7    documents such as Written Reprimands or PIPS or
8    Performance Expectation Documents provided by
9    Getronics to Mr. Khirawi.  Do you recall those
10   documents?
11        A.    Yes.
12        Q.    He asked you if you drafted some of
13   those documents.  Do you recall those questions?
14        A.    Yes.
15        Q.    If you didn't draft the document, do you
16   know necessarily who drafted it?
17        A.    No.
18        Q.    So when you would say an answer like,
19   "Counsel drafted it with HR," that is your
20   assumption?
21        A.    That's my assumption.
22        Q.    You have no direct knowledge of that?
23        A.    I have no direct knowledge of that.
24        Q.    Mr. Cohen asked you about the request by
25   Getronics of Mr. Khirawi to return his laptop
0154
1    computer.  Do you recall those questions?
                    Page 77

8-2-06 - ruby y, miles
```
 2        A.    Yes.
 3        Q.    And Mr. Cohen asked you about the
 4   reasons why Getronics was asking for the return of
 5   that laptop.  Do you recall those questions?
 6        A.    Yes.
 7        Q.    Okay.  Was Mr. Khirawi authorized to
 8   work from his home at that time?
 9        A.    No.
10        Q.    Are any employees of Getronics given
11   laptops, if they are not authorized to work from
12   home that you know of?
13        A.    No.
14        Q.    Wasn't that an additional reason why the
15   laptop was taken back?
16        A.    Yes.
17        Q.    Mr. Cohen asked you about your
18   recollection of any other incidents of
19   insubordination other than those discussed during
20   your testimony in response to his questions or
21   shown in emails that were made exhibits during this
22   deposition.  Do you recall those questions?
23        A.    Yes.
24        Q.    Are there other documents or emails or
25   incidents of insubordination by Mr. Khirawi that
0155
 1   have not been discussed or reviewed today?
 2        A.    Yes.
 3        Q.    And you are certain of that?
 4        A.    I'm certain of that.
 5        Q.    And you don't have a specific
 6   recollection of each individual act of
 7   insubordination, whether it be over a telephone
 8   call or email.  Is that correct?
 9        A.    Correct.
10        Q.    But you are sure that you have not
11   covered them all today?
12        A.    I'm sure.
13        Q.    And is there some better way of
14   determining the extent of insubordination than
15   asking your recollection?
16        A.    I'm sure with the EEOC proceedings and
17   all of the documentation that the company had to go
18   through and I know it because I received them and I
19   sent them.  I mean, I know it.
20        Q.    So the documents which have been
21   provided to the EEOC and the Massachusetts
22   Commission Against Discrimination and those
23   documents provided to Mr. Khirawi's attorney, those
24   would have a better record than your
25   recollection --
0156
 1        A.    Than my recollection?
```
                          Page 78

8-2-06 - ruby y, miles
```
 2       Q.     -- about Mr. Khirawi's insubordination?
 3       A.     Yes.
 4       Q.     You were asked if you participated in
 5  any internal investigation related to Mr. Khirawi's
 6  charge of discrimination.  Do you recall that
 7  testimony?
 8       A.     Yes.
 9       Q.     Were you interviewed or did anyone
10  discuss with you the response to Mr. Khirawi's
11  charge of discrimination?
12       A.     Yes.
13       Q.     You just didn't lead that investigation,
14  correct?
15       A.     No.
16       Q.     You were asked by Mr. Cohen about
17  Mr. Khirawi opening a Ticket to determine
18  voicemails that may have been left for him by
19  Tiffany Jones.  Do you recall that?
20       A.     Yes.
21       Q.     And you testified that it was not
22  important to know if Mr. Khirawi specifically
23  received messages -- withdrawn.
24                   You testified that it was not
25  important to know whether the computer system
0157
 1  showed that Mr. Khirawi did not respond to specific
 2  messages by Ms. Jones.  Do you recall that?
 3       A.     Yes.
 4       Q.     And why is it that it wasn't important
 5  whether -- what the computer system would detail as
 6  to that issue?
 7       A.     Because he had already been
 8  insubordinate, and it is very expensive to get that
 9  kind of information.
10       Q.     And had Tiffany Jones actually told you
11  that she tried to get ahold of Al, left a message
12  for him, and he didn't respond?
13       A.     Yes.
14       Q.     And that would have been enough for
15  you?
16       A.     That would have been enough for me.
17       Q.     And you had testified that opening such
18  a Ticket is in and of itself insubordination,
19  correct?
20       A.     Yes.
21       Q.     Why is that?  Is it something about the
22  expense?
23       A.     Yes, it is very expensive, and he just
24  can't open that Ticket.  It would probably take
25  somebody like I said definitely above me, maybe
0158
 1  even HR.  That is not something that just a regular
```
Page 79

8-2-06 - ruby y, miles
2  employee can do.
3      Q.    And is a regular -- withdrawn.
4                  Are employees of Getronics
5  permitted to use company time and money for their
6  own personal reasons?
7      A.    Absolutely not.
8      Q.    Mr. Cohen asked you if the documents and
9  testimony today covered all the reasons that
10 Mr. Khirawi was terminated.  Do you recall that?
11     A.    Yes.
12     Q.    Do you know every single reason why
13 Mr. Khirawi was terminated?
14     A.    I do not.
15     Q.    You had nothing to do with Mr. Khirawi's
16 last phone call with Mr. Graceffa?
17     A.    I did not.
18     Q.    Or with the warning given to Mr. Khirawi
19 in October of 2004?
20     A.    I did not.
21     Q.    You testified that you had discussion
22 with Paul Galipeau about returning the laptop.  Do
23 you recall that?
24     A.    Yes.
25     Q.    Do you know if Mr. Galipeau knew about
0159
1  the request that Mr. Khirawi return the laptop
2  prior to Mr. Khirawi asking him?
3      A.    No.
4      Q.    You don't know or he didn't?
5      A.    I don't know.
6      Q.    You don't know either way?
7      A.    No.
8      Q.    And do you have any knowledge -- do you
9  recall being shown an exhibit and warning, dated
10 August 19th, 2004?
11     A.    Yes.
12     Q.    That's Exhibit 21.
13     A.    Yes.
14     Q.    Have you seen that document before?
15     A.    Yes.
16     Q.    And this document required Mr. Khirawi
17 to be on a Strict Performance Expectations Plan.
18 Is that correct?
19     A.    Yes.
20     Q.    And he needed to specifically report to
21 Mr. Graceffa with respect to his attendance and his
22 Weekly Status Report.  Do you recall that?
23     A.    Yes.
24     Q.    And Mr. Khirawi was told as part of that
25 Performance Expectations Plan, at the bottom of
0160
1  page 1, that all his workplace direction and
                        Page 80

8-2-06 - ruby y, miles
2    support shall be received from you.  Is that
3    correct?
4         A.    Yes.
5                   MR. WINTON:  I don't have any other
6    questions at this time.
7                   FURTHER EXAMINATION
8    BY MR. COHEN:
9         Q.    Can you give me a better description of
10   what the reference point means when it comes to
11   salary, if it doesn't refer to any specific
12   numbers?
13        A.    I would call it a place to start,
14   depending on the applicant.  That's a good
15   description.
16        Q.    But is there a number placed to start,
17   depending on the applicant?
18        A.    No.  I mean, it's the reference point.
19        Q.    What is its use in your mind?  What
20   utility does it have?
21        A.    I can't answer that.  I know how it is
22   used.  I can't answer for why they state it like
23   that.  I have no idea.
24        Q.    Do you know whether there are any
25   documents that talk about the reference points for
0161
1    each particular position?
2                   MR. WINTON:  Objection as to form.
3         A.    I don't know.
4         Q.    (BY MR. COHEN)  So when we talk about
5    the QA Representative position back in 2003, there
6    is no specific number that goes along with the term
7    reference points?
8         A.    Reference points.  No min max.
9         Q.    No minimum, maximum?
10        A.    I don't recall what they are, without
11   looking at the paper.
12        Q.    So were there minimum and maximum
13   numbers then?
14        A.    For the reference points?
15        Q.    Right.
16        A.    That were on -- yeah, they was on the
17   requisition.
18        Q.    Okay.  So if you look at Exhibit 3,
19   which you have a copy of in front of you, you see
20   the reference pay entry is 40,400.  Is that right?
21        A.    Yes.
22        Q.    And reference in the upper is 49,900?
23        A.    Yes.
24        Q.    But you are saying that doesn't
25   necessarily require that the applicant or the
0162
1    person who is being placed in that QA
                   Page 81

8-2-06 - ruby y, miles
2  Representative position be paid a minimum of
3  40,400?
4      A.    No, it does not.
5      Q.    It would depend on education, I take
6  it?
7      A.    Not only education.
8      Q.    But I'm saying that education is one
9  factor?
10     A.    Yes.
11     Q.    Experience is one factor?
12     A.    Yes.
13     Q.    If it's an internal versus external
14 promotion?
15     A.    Yes.
16     Q.    Okay.  And describe what you mean by it
17 depends on whether it's an internal or external.
18 Is it more favorable to be an internal placement?
19              MR. WINTON:  Objection as to form.
20 Go ahead.
21     A.    I have a saying, Last in, best dressed.
22              It's generally when we change jobs,
23 right, a lot of people will change jobs and go to
24 another company to get a big raise.  Internally,
25 there is all kinds of salaries.
0163
1              And it generally doesn't behoove an
2  applicant -- a lot of times it behooves them to
3  move, because he gets experience at that job.  He
4  may get a raise at that job.
5              But will he get the reference pay?
6  Not necessarily, because it depends where he is.
7              If you take a person who is taking
8  $25,000, and I'm speaking at this company because I
9  know that, they probably are not going to give him
10 $40,000.  It won't happen.
11     Q.    (BY MR. COHEN)  Is there anything else
12 that you can think of that helps determine whether
13 the candidate is placed within those minimum or
14 maximum reference points?
15     A.    No.  It has to go through so many
16 iterations of approval.
17     Q.    Okay.  And you just testified, I think,
18 that with respect to instances of insubordination
19 prior to December of 2003, that you know there were
20 such incidents, correct?
21     A.    Yes.
22     Q.    But you can't think of any such
23 incidents specifically as you sit here, right?
24     A.    No.
25     Q.    And can you think of any documents
0164
1  specifically that might help you remember what
                    Page 82

8-2-06 - ruby y, miles
2  those incidents of insubordination prior to
3  December 2003 were?
4       A.    Something to think about.  I don't
5  know.  But I know they exist.
6       Q.    And we are talking about incidents that
7  involved you, correct?
8       A.    Correct.
9       Q.    Okay.  And I was a little unclear,
10  earlier you just testified that with respect to
11  that incident with Mr. Khirawi, Ms. Anderson-Jones,
12  and Mr. McHenry, that the reason you didn't ask
13  Mr. Khirawi for his version of events was that he
14  had already sent this email or sent the email,
15  correct?
16       A.    That's my recollection.
17       Q.    And but isn't it true that Mr. Khirawi,
18  even after that, asked you to be able to give you
19  his version of the facts?
20       A.    He was being insubordinate.  That's an
21  insubordinate act to me.
22       Q.    So to ask to give his version --
23       A.    Just because of the whole situation, the
24  way it happened.  That was personal to me, so
25  that's all I know to say.  It was personal.  I
0165
1  didn't feel it at the time, so I took the action
2  that I saw was the correct one.
3       Q.    Okay.  And you testified a little bit
4  just now about the fact that not only Mr. Puglisi
5  helped you to observe Mr. Khirawi's comings and
6  goings and the hours that he was at his desk, but
7  Mr. Galipeau --
8       A.    Galipeau.
9       Q.    -- also monitored Mr. Khirawi as well.
10  Correct?
11       A.    Yes.
12       Q.    Did Mr. Galipeau tell you what his own
13  personal observations were?
14       A.    We discussed that, yes.
15       Q.    And what did he tell you?
16       A.    That when he would check on him, he
17  couldn't find him all the time either.
18       Q.    Is it typical that a QA Representative
19  would be at his desk the entire eight hours or
20  whatever his workday is?
21       A.    Of course not, no.
22       Q.    But in any case, I think you testified
23  that you really didn't come to any concrete
24  conclusions as to whether Mr. Khirawi was reporting
25  hours that he didn't work?
0166
1       A.    By people observing and that was
                        Page 83

8-2-06 - ruby y, miles
2   concrete enough for me, because those are the
3   people that he was working with, you know.
4              So I couldn't keep up with every
5   hour, but because they didn't see him and it would
6   be more than the length of time.  Basically, you
7   have what, an hour for lunch, you have got two
8   15-minute breaks.
9              I don't even work that way.  I
10  don't get that deep into it.  But away from the
11  desk for hours at a time, he wasn't doing what he
12  was supposed to be doing.  He wasn't at his desk
13  when he should have been.
14      Q.    Okay.  And you are saying that the
15  information that you had and the conclusions that
16  you came to was that Mr. Khirawi was away from his
17  desk for hours at a time?
18      A.    Yes.
19      Q.    And was that the subject of any Written
20  Reprimand or any formal disciplinary action?
21              MR. WINTON:  If you know.
22              THE WITNESS:  I beg your pardon?
23              MR. WINTON:  If you know.
24      A.    I don't remember.
25      Q.    (BY MR. COHEN)  Wouldn't that have been
0167
1   a pretty serious infraction, an employee basically
2   off for hours of time from work?
3       A.    Of course.  It had been so many things
4   by that time.
5       Q.    But normally that would have warranted
6   some sort of disciplinary action, I take it?
7       A.    Yes.
8       Q.    Okay.  And I think you testified just
9   now that someone did discuss with you the company's
10  response to Mr. Khirawi's EEOC charge.  Did I get
11  that correct?
12      A.    Yes.
13      Q.    And who was it that discussed that with
14  you?
15              MR. WINTON:  I'm going to instruct
16  her not to answer to the extent you are talking
17  about communications with counsel.
18      Q.    (BY MR. COHEN)  Can you answer without
19  revealing communications with counsel?
20      A.    No.
21      Q.    Okay.  Then you also testified as far as
22  the opening of the Ticket, which itself I think you
23  said was insubordinate, correct?
24      A.    Yes.
25      Q.    And I'm curious to know, seeing as how
0168
1   he was able to open the Ticket, are there any
                    Page 84

8-2-06 - ruby y, miles
 2  controls in place or were there at the time any
 3  controls in place to prevent someone who is
 4  unauthorized to open a Ticket and cause a company
 5  expense?
 6      A.    Yes.
 7      Q.    Okay.  Can you describe what those
 8  controls are?
 9      A.    The department that that Ticket would
10  have gone to was going to come back to me anyway to
11  find out why that Ticket was open and then I was
12  going to have to go through the process of taking
13  it to HR.  So it would have -- it would have made
14  its way back to me.
15              MR. COHEN:  That's all I have.
16              FURTHER EXAMINATION
17  BY MR. WINTON:
18      Q.    Mr. Cohen asked you on redirect about
19  the different issues which determine whether a
20  person is going to get the salary within the
21  reference point range or outside of that range.  Do
22  you recall those questions?
23      A.    Yes.
24      Q.    And you said, depending on experience,
25  education, internal versus external.  Do you recall
0169
 1  that?
 2      A.    Yes.
 3      Q.    Isn't a large factor what -- if they are
 4  internal -- what they are making at the time?
 5      A.    Yes, yes.
 6      Q.    And the fact that Getronics does not
 7  give easily raises in the 20 or 30 percent range?
 8      A.    Absolutely not.
 9      Q.    In your experience of 14 years at
10  Getronics, have you ever known of a 33 percent
11  raise, other than Mr. Khirawi's?
12      A.    Not since I've been here that I know of,
13  no.
14      Q.    Not anything 33 percent or higher?
15      A.    No.
16      Q.    As we sit here today on August 2nd,
17  2006, this is three or four years after many of the
18  instances that we talked about occurred.  Is that
19  correct?
20      A.    Yes.
21      Q.    And is your recollection of dates
22  perfect?
23      A.    No.
24      Q.    All right.  You are not exactly sure as
25  you sit here today when Mr. Khirawi's
0170
 1  insubordination began, are you?
                    Page 85

8-2-06 - ruby y, miles
```
 2      A.    No.
 3      Q.    All you know is it was so many instances
 4 over so long a period of time?
 5      A.    That's all I know.
 6      Q.    But you can't point to a certain date
 7 when it started?
 8      A.    No.
 9      Q.    So it could have started before December
10 2003, but you are not sure exactly when it
11 started?
12      A.    No.
13      Q.    And the only way for you to specifically
14 know is for you to review every single email in the
15 thousand pages provided?
16      A.    Right.
17      Q.    Mr. Cohen asked you about issues
18 relating to discrepancy with respect to
19 Mr. Khirawi's reporting hours and witnesses'
20 observations of his hours worked.  Do you recall
21 that?
22      A.    Yes.
23      Q.    And he asked you if he was disciplined
24 at all for what you believed was him being away
25 from his desk for hours at a time.  Do you recall
0171
 1 that?
 2      A.    Yes.
 3      Q.    Wasn't part of his written reprimands or
 4 per -- withdrawn.
 5            Weren't part of his Performance
 6 Expectations Plan require that he monitor his times
 7 that he would tell when he would check-in and
 8 check-out every day?
 9      A.    Yes.
10      Q.    Now, wasn't that a requirement that he
11 do that every day?
12      A.    I recall that, yes.
13      Q.    And doesn't that address whether or not
14 he is working?
15      A.    Yes.
16      Q.    With respect to the Ticket for the
17 review of the voicemail, in essence, although he
18 thought he opened a Ticket, he really wasn't able
19 to, correct?
20      A.    In essence.
21      Q.    He said that the email asked him for a
22 Ticket, but it would not have been authorized?
23      A.    It would not have been authorized.
24      Q.    So a Ticket really never was opened?
25      A.    It was open.  It had a Ticket number.
0172
 1 But that Ticket was going to be closed.  It was
```
Page 86

8-2-06 - ruby y, miles
2   going to come back to me.
3        Q.    So no investigation had started, is that
4   right?
5        A.    No.   That is why it came back to me.
6                    MR. WINTON:  I don't have any
7   further questions.
8                    FURTHER EXAMINATION
9   BY MR. COHEN:
10       Q.    Okay.  You just testified about the fact
11  that in your 14 years you had never seen somebody
12  have a 33 percent salary increase, correct?
13       A.    Correct.
14       Q.    And in your 14 -- based on your 14 years
15  of experience at Getronics, was Mr. Khirawi's
16  salary at the time that he was increased to 36,000
17  low in light of his experience and his education
18  and the job that he was doing and specifically the
19  duties related to the QA Rep position?
20                   MR. WINTON:  Objection as to form.
21  He wasn't a QA Rep.
22       Q.    (BY MR. COHEN)  Well, let me rephrase
23  that.
24                   At the time that he actually
25  received the promotion in September '03, he was
0173
1   doing the duties of a QA Rep in Tewksbury.
2   Correct?
3        A.    Yes.
4        Q.    So given that he had been doing the
5   duties of a QA Rep, which has a starting reference
6   point of 40,900, and he was making
7   27,000-something, I believe, given that he had a
8   master's degree and given his other education, and
9   given his experience with the company since 1999,
10  was his $27,000 salary low in light of your 14
11  years' experience with Getronics?
12                   MR. WINTON:  Objection as to form.
13  You can answer.
14       A.    The point of that is I have no control
15  over it.
16       Q.    (BY MR. COHEN)  I'm not asking you
17  whether you have control over it.  I'm just asking
18  you whether it was low or not in light of your
19  experience with Getronics?
20       A.    Al took the job at $27,000
21       Q.    No doubt about that.  I'm only asking
22  you your opinion as to whether the $27,000 was low
23  in light of your experience with Getronics, and
24  given all the factors that I have just described?
25       A.    I do not have enough experience to know
0174
1   that.
                              Page 87

8-2-06 - ruby y, miles
```
 2      Q.    Okay.
 3      A.    Meaning I don't know that.
 4      Q.    For sure?
 5      A.    Right.
 6      Q.    Why is that?  Is that because you don't
 7 know what other people's salary is?
 8      A.    Absolutely, not.  It is not discussed.
 9      Q.    That's fine.  Is it fair to say then
10 that you don't know what people's increases have
11 been?
12      A.    I do know that anything above nine
13 percent has to go up to the top.
14      Q.    Okay.  How do you know that?
15      A.    Sorry.
16      Q.    Go ahead.
17      A.    Because I have to know that, being a
18 manager, and when I give increases I have to know
19 that.
20      Q.    Okay.  But the fact that it has to go up
21 to the top when it is over nine percent doesn't
22 necessarily mean that you know whether or not
23 someone in the company, Getronics, has received
24 salary increases over 33 percent?
25      A.    I'll just say it is unheard of as far as
0175
 1 I'm concerned.  I'll leave it at that.  As far as I
 2 know.
 3      Q.    Okay.  Now, you said a few minutes ago
 4 that in your -- it's been three or four years and
 5 your recollection of dates isn't perfect, correct?
 6      A.    Right.
 7      Q.    And there may be many instances of
 8 insubordination that you can't recall as you sit
 9 here, correct?
10      A.    Correct.
11      Q.    And tell me, you spent the whole day
12 yesterday with Counsel, didn't you?
13      A.    Yes.
14      Q.    And you spent the day with Counsel
15 reviewing documents, didn't you?
16      A.    Yes.
17      Q.    And those documents included emails,
18 didn't they?
19      A.    Yes.
20      Q.    Other than Mr. Khirawi, was anyone to
21 your knowledge in your Team required to check-in
22 every day and check-out every day?
23      A.    No.
24      Q.    And in your 14 years with Getronics, has
25 anybody been required to check-in and check-out
0176
 1 every day as Mr. Khirawi was?
```
                        Page 88

                         8-2-06 - ruby y, miles
2        A.     Not who worked for me, no.
3                     MR. COHEN:  That's all I have.
4                     FURTHER EXAMINATION
5     BY MR. WINTON:
6        Q.     Is Mr. Khirawi the only person you have
7     ever managed remotely?
8        A.     Yes.
9                     MR. WINTON:  I don't have any
10    further questions.
11                    MR. COHEN:  That's all I have.
12                    (At 4:10 p.m. the testimony was
13    concluded.)
14
15
16
17
18
19
20
21
22
23
24
25
0177
1                     CHANGES AND SIGNATURE
2        PAGE   LINE  CHANGE      REASON
3     _____
4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
25    _____
0178
1

8-2-06 - ruby y, miles

```
2  STATE OF TEXAS
3  COUNTY OF _____
4
5         I, the undersigned RUBY Y. MILES, declare
6  under penalty of perjury that I have read the
7  foregoing transcript, and I have made any
8  additions, additions or deletions that I was
9  desirous of making; that the foregoing is a true
10 and correct transcript of my testimony contained
11 therein.
12
          EXECUTED this _____ day of August
13
   2006, at _____, Texas.
14                    (City)
15
16
17         _____
18              RUBY Y. MILES
19
20
21
22
23
24
25
0179
1            UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
2
             CIVIL ACTION NO. 05-11877-WGY
3
   _____
4                              )
   AALAEDIN KHIRAWI            )
5                              )
         Plaintiff             )
6                              )
   V                           )
7                              )
   GETRONICS WANG CO., LLC     )
8  D/B/A GETRONICS             )
                               )
9        Defendant             )
   _____)
10
11 ***************************************************
12          REPORTER'S CERTIFICATION
13        DEPOSITION OF RUBY Y. MILES
14             AUGUST 2ND, 2006
15 ***************************************************
16        I, Bobbie Showers, Certified Shorthand
```

Page 90

8-2-06 - ruby y, miles

Reporter in and for the State of Texas, hereby
17  certify to the following:
18          That the witness, RUBY Y. MILES, was
    duly sworn by the officer and that the transcript
19  of the oral deposition is a true record of the
    testimony given by the witness;
20

            That the deposition transcript was
21  submitted on _____ to the witness or
    the attorney for the witness for examination,
22  signature, and returned to me by
    _____,
23

            That pursuant to information given to
24  the deposition officer at the time said testimony
    was taken, the following includes counsel for all
25  parties of record:
0180
 1  FOR THE PLAINTIFF:
    Cohen & Sales
 2  By:  Sol J. Cohen
         Attorney-at-Law
 3  47 Thorndike Street
    Cambridge, Massachusetts 02141
 4  (617) 621-1131
    soljcohen@cohenandsales.com
 5
 6  FOR THE DEFENDANT:
    Jackson Lewis LLP
 7  By:  Erik J. Winton
         Attorney-at-Law
 8  75 Park Plaza
    Boston, Massachusetts 02116
 9  (617) 367-0025
    wintone@jacksonlewis.com
10
            I further certify that I am neither
11  counsel for, related to, nor employed by any of the
    parties or attorneys to the action in which this
12  testimony was taken, and further that I am not
    financially or otherwise interested in the outcome
13  of this action.
14          Certified by me this 10th day of
    August 2006.
15
16                  --------------------------------
                    BOBBIE SHOWERS
17                  Registered Professional Reporter
                    Texas CSR 5404
18                  Expiration Date:  12/31/2006
19
20
                        Page 91

8-2-06 - ruby y, miles

21
22
23
24
25

# EXHIBIT 43

Page 1

VOLUME:     I
PAGES:      1-106
EXHIBITS:   1-30

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \*
                            \*
AALAELDIN KHIRAWI,          \*
            Plaintiff,      \*
                            \*
vs.                         \*
                            \*
GETRONICS WANG CO., LLC     \*
D/B/A GETRONICS,            \*
            Defendant.      \*
                            \*
\* \* \* \* \* \* \* \* \* \*

DEPOSITION OF JAMESON GRACEFFA, taken

on behalf of the Plaintiff, pursuant to the

Massachusetts Rules of Civil Procedure, before

Melinda M. Piccirilli, Certified Shorthand

Reporter and Notary Public within and for the

Commonwealth of Massachusetts, at the law

offices of Cohen & Sales, 43 Thorndike Street,

Cambridge, Massachusetts, on Friday, August 11,

2006, commencing at 10:10 a.m.

## Page 2

```
 1
 2   Sol J. Cohen, Esquire
     Cohen & Sales
 3   43 Thorndike Street
     Cambridge, MA  02141
 4   For the Plaintiff
 5
     Erik J. Winton, Esquire
 6   Jackson Lewis, LLP
     75 Park Plaza
 7   Boston, MA  02116
     For the Defendant
 8
 9   Marthe C. Stanek, Esquire
     Associate General Counsel, Employment
10   Getronics
     290 Concord Road
11   Billerica, MA  01821
12
     Also present:  Sarah Mitrou, paralegal
13
14
15
16
17
18
19
20
21
22
23
24
```

APPEARANCES

## Page 4

| 1 | 16 | E-mail String | 63 |
| 2 | 17 | E-mail String | 63 |
| 3 | 18 | E-mail | 63 |
| 4 | 19 | Document dated 09/24/04 | 63 |
| 5 | 20 | E-mail String | 64 |
| 6 | 21 | E-mail String | 64 |
| 7 | 22 | E-mail String | 64 |
| 8 | 23 | E-mail String | 80 |
| 9 | 24 | E-mail String | 81 |
| 10 | 25 | E-mail String | 83 |
| 11 | 26 | Letter dated 10/25/04 | 85 |
| 12 | 27 | Written Reprimand | 86 |
| 13 | 28 | Letter dated 11/29/04 | 94 |
| 14 | 29 | Document | 97 |
| 15 | 30 | Notice of Final Disposition | 97 |

## Page 3

INDEX

DEPONENT                                    PAGE
JAMESON GRACEFFA
Examination by Mr. Cohen                    4

EXHIBITS

NO.   DESCRIPTION                          PAGE
 1   Appraisal Form                         54
 2   E-mail String                          55
 3   Appraisal Form                         55
 4   Written Reprimand                      58
 5   E-mail String                          58
 6   E-mail String                          58
 7   E-mail String                          59
 8   Performance Improvement Plan           59
 9   Written Reprimand                      61
10   E-mail String                          61
11   E-mail String                          62
12   EEOC Notice                            63
13   E-mail String                          63
14   E-mail String                          63
15   Performance Expectations               63
     Document

## Page 5

PROCEEDINGS
*****

```
 3        JAMESON GRACEFFA, a witness
 4   called by counsel for the Plaintiff, having
 5   been satisfactorily identified by the
 6   production of his driver's license and
 7   having been duly sworn, testified as
 8   follows:
 9        EXAMINATION BY MR. COHEN
10   Q. Would you state your name, please.
11   A. Jameson Stephen Graceffa.
12   Q. Mr. Graceffa, my name is Sol Cohen.  I'm an
13   attorney and I represent Aalaeldin Khirawi.
14   He is the Plaintiff in this case, a case
15   called Khirawi versus Getronics, that's
16   pending at the US District Court in the
17   district of Massachusetts.
18        I'm going to ask you a series of
19   questions today.  If you don't understand
20   any questions, let me know that so I can ask
21   you a different question or rephrase it.  If
22   you don't hear a particular question, let me
23   know that so I can ask it again.  That way
24   if you answer the question, I'll assume that
```

Page 6

```
1    you heard it and that you've understood it.
2         Do you understand those instructions
3    so far?
4    A. Yes.
5    Q. Just like you did right now, allow me to
6    finish my question or allow me to finish
7    speaking before you start answering the
8    question. And also, answer verbally so our
9    stenographer can take everything down.
10   A. Yes.
11        MR. COHEN: Stipulations, Counsel?
12   Can we agree again that all objections,
13   except as to form of the question, and
14   motions to strike will be reserved until the
15   time of trial?
16        MR. WINTON: Agreed.
17        MR. COHEN: And the witness will read
18   and sign?
19        MR. WINTON: Waive the notary if
20   that's okay.
21        Mr. COHEN: Yes. And he'll read it
22   within 30 days of receipt of the transcript?
23        MR. WINTON: Yes.
24   Q. Where do you live, Mr. Graceffa?
```

Page 7

```
1    A. 1105 Lexington Street, 7-10, Waltham,
2    Massachusetts 02452.
3    Q. How long have you lived there?
4    A. Two years.
5    Q. Who do you live there with?
6    A. I live by myself.
7    Q. Before that address in Waltham, where did
8    you live?
9    A. In Nashua, New Hampshire, 28 Congress
10   Street.
11   Q. How long did you live at that address?
12   A. Approximately three years.
13   Q. Who did you live there with?
14   A. I lived by myself.
15   Q. How about before Nashua?
16   A. 31 Grove Road, Waltham, Massachusetts 02451.
17   Q. How long did you live at that address?
18   A. Five years.
19   Q. Who did you live there with?
20   A. My sister.
21   Q. What's your sister name?
22   A. Angelique, A-N-G-E-L-I-Q-U-E, Graceffa,
23   G-R-A-C-E-F-F-A.
24   Q. Did you live with anybody else except your
```

Page 8

```
1    sister at that 31 Grove Road address?
2    A. Actually, yes. I'm sorry. That is where I
3    lived -- that's where I grew up. That's
4    where I was. My family wasn't there for a
5    period of time, but that was where I grew up
6    and stayed.
7    Q. Are you married?
8    A. I am not.
9    Q. Have you been married in the past?
10   A. No.
11   Q. Do you have any kids?
12   A. No.
13   Q. Where are you from originally?
14   A. Waltham, Massachusetts.
15   Q. Have you ever had your deposition taken
16   before?
17   A. Yes.
18   Q. When was the last time you had your
19   deposition taken?
20   A. I don't recall exactly. Approximately five
21   years ago.
22   Q. Stepping back a minute, can you tell me the
23   month and year that you moved into your
24   current address in Waltham?
```

Page 9

```
1    A. August 2003.
2    Q. In what case had you had your deposition
3    taken about five years ago?
4    A. I don't understand. With whom or...
5    Q. What was the case name?
6    A. Belmont Springs versus Hill.
7    Q. Versus Hill, H-I-L-L?
8    A. H-I-L-L.
9    Q. Were you a party in that case, plaintiff or
10   defendant?
11   A. Yes.
12   Q. Were you a plaintiff or a defendant?
13   A. I was a defendant.
14   Q. Can you tell me a little bit about what that
15   case was about?
16   A. To the best of my recollection, it was a
17   short-term disability claim. That's really
18   quite a while ago.
19   Q. Who was the plaintiff?
20   A. Robert Hill.
21   Q. Were you an employee of Belmont Springs?
22   A. Yes.
23   Q. When did you work for Belmont Springs?
24   A. April of 1998 to August of 2000.
```

G&M Court Reporters
800-655-3663  -  www.gmcourtreporters.com

Page 10

1  Q. What was your position there?
2  A. Human resources manager.
3  Q. What was the address of Belmont Springs
4     where you worked?
5  A. One Cranberry Hill in Lexington,
6     Massachusetts.
7  Q. How was that case resolved, if at all?
8  A. I don't recall.
9  Q. Did you have an attorney representing you?
10 A. Yes.
11 Q. Was there an attorney representing you
12    individually?
13 A. No.
14 Q. Was there an attorney representing Belmont
15    Springs?
16 A. Yes.
17 Q. Who was the attorney representing Belmont
18    Springs?
19 A. Bill Colvel.
20 Q. C-O-L --
21 A. I don't know.
22 Q. Were you a named defendant, if you know?
23 A. I don't recall.
24 Q. Did you have responsibilities within your

Page 11

1     capacity as human resources manager at
2     Belmont Springs to administer any short-term
3     disability policies?
4  A. Can you repeat the question?  I'm not sure I
5     understand.
6  Q. Were part of your responsibilities at
7     Belmont Springs to administer short-term
8     disability policies?
9  A. I would administer the paperwork.
10 Q. Do you remember who the disability insurance
11    company was?
12 A. I don't recall exactly.  Possibly Liberty
13    Mutual.
14 Q. Do you have an understanding of what the
15    plaintiff's claim was?
16 A. I don't recall exactly.
17 Q. Do you think it had to do with a claim for
18    short-term disability?
19 A. Yes.  There was an HR manager that really
20    handled that, my boss.  I was really the
21    administer (sic) of the paperwork.
22 Q. Who was your boss?
23 A. Frank Budzik, B-U-D-Z-I-K.
24 Q. What court was that case held in?

Page 12

1  A. I don't know.
2  Q. Did you testify in court in that case as
3     well as a deposition?
4  A. No.
5  Q. Other than that occasion where you testified
6     at a deposition approximately five years
7     ago, have you had your deposition taken
8     before?
9  A. No.
10 Q. Have you ever given testimony in a court
11    proceeding?
12 A. No.
13 Q. Did you meet with anybody to help you to
14    prepare for today's deposition?
15 A. Yes.
16 Q. Who did you meet with?
17 A. Marthe Stanek.
18 Q. When did you meet with Ms. Stanek?
19 A. We met a little bit yesterday, sometime
20    briefly a week and a half ago -- I don't
21    recall exactly -- maybe for a couple of
22    hours.
23 Q. How long did you meet for yesterday?
24 A. I don't recall exactly how long it was.

Page 13

1  Q. Did you meet with anybody else to help you
2     to prepare for today's deposition?
3  A. I also met with Erik.
4  Q. When was that?
5  A. I don't recall exactly.  Approximately a
6     week and a half ago, two weeks ago.  Not
7     sure exactly.
8  Q. Where was that?
9  A. My recollection it was Erik's law firm.
10 Q. Was Ms. Stanek there as well?
11 A. Yes, she was.
12 Q. Was that the meeting you told me about where
13    you met with Ms. Stanek about a week or a
14    week and a half ago?
15 A. Yes.
16 Q. Other than Mr. Winton and Ms. Stanek, have
17    you spoken to anybody to help you prepare
18    for today's deposition?
19 A. No.
20 Q. Did you review any documents to help you
21    prepare for today's deposition?
22 A. I reviewed my -- the section that pertained
23    to me of, to the best of my recollection, a
24    position statement.  Not sure what document

4 (Pages 10 to 13)

Page 14

1    it was really.
2    Q. Did you review any other documents?
3    A. Not that I can think of.
4    Q. Did you review any e-mails to help you
5        prepare for today's deposition?
6    A. Not that I can think of.
7    Q. Did you do anything else that we haven't
8        discussed already to help you prepare for
9        today's deposition?
10   A. Not that I can think of.
11   Q. Other than with Mr. Winton and Ms. Stanek,
12       have you discussed today's deposition with
13       anyone?
14   A. This deposition?
15   Q. Yes.
16   A. No, not that I can recall.
17   Q. Other than with Mr. Winton and Ms. Stanek,
18       have you discussed this lawsuit with
19       anybody?
20   A. Not that I can recall right now.
21   Q. Are you currently employed?
22   A. No.
23   Q. How do you support yourself now?
24   A. I have my own money and my partner has -- is

Page 15

1    currently employed.
2    Q. Are we talking about a business partner?
3    A. No.  My life partner.
4    Q. What is his or her name?
5    A. Robert Nazzal, N-A-Z-Z-A-L.
6    Q. How long has Mr. Nazzal been your life
7        partner?
8    A. Three years.
9    Q. But you don't live with Mr. Nazzal?
10   A. No, not officially.  I still retain my space
11       in Waltham.
12   Q. But you don't derive any salary or earnings
13       from Mr. Nazzal's business?
14   A. No.
15   Q. How long have you been unemployed?
16   A. One month.
17   Q. Where did you work last?
18   A. Getronics.
19   Q. What location?
20   A. Billerica, Massachusetts, Concord Road.
21   Q. What was your position there when your
22       employment ended there?
23   A. Human resources manager.
24   Q. When did you begin there?

Page 16

1    A. August 2000.
2    Q. Did you always work out of the Billerica
3        office for Getronics?
4    A. Primarily, yes.
5    Q. From where else did you work?
6    A. I would occasionally visit the Tewksbury
7        location, and for a period of time I had an
8        office there.
9    Q. What was the period of time that you had an
10       office at Tewksbury?
11   A. I don't recall exactly.  Approximately 2000
12       to 2002 or so.  Space was limited and I
13       wasn't there too often.
14   Q. How did your employment end at Getronics?
15   A. I voluntarily resigned.
16   Q. Why?
17   A. To pursue other opportunities and interests.
18   Q. Have you collected unemployment?
19   A. No.
20   Q. Other than what you told me already, do you
21       have any other sources of support or income?
22   A. No, that I recall.
23   Q. Did you hold any other positions with
24       Getronics aside from the human resources

Page 17

1    manager position?
2    A. No.
3    Q. What were your duties as a human resources
4        manager?
5    A. Employee relations, salary planning, work
6        force planning, succession planning,
7        recruiting, general HR business line support
8        functions.
9    Q. To whom did you report?
10   A. Karen Regan.
11   Q. What was her position?
12   A. Director of human resources.
13   Q. Was she the director of human resources for
14       the entire time that you worked at
15       Getronics?
16   A. Yes.
17   Q. When you say salary planning, can you give
18       me a little bit more detail about what that
19       means?
20   A. We would plan increases, promotions, for the
21       coming year from a salary standpoint.
22   Q. Does each position at Getronics have salary
23       ranges?
24   A. Almost all positions, to the best of my

5 (Pages 14 to 17)

Page 18

1    recollection, have salary ranges.
2    Q. For most positions there's a minimum salary
3       and a maximum salary as to that position?
4       MR. WINTON: Objection as to form.
5    A. Yes. There's a guideline that we use that
6       has an entry and a high-end.
7    Q. Have you seen any employees enter a position
8       underneath the entry point?
9    A. I can't exactly recall who, but I'm sure
10      it's out there that we have people below.
11   Q. You don't have any recollection as to any
12      specific examples of that?
13   A. I do not have any recollection at this time.
14   Q. What sort of factors would cause someone to
15      come in to a particular position underneath
16      the entry point as far as salary?
17   A. Comparatories (sic), experience.
18   Q. Anything else?
19   A. Not that I can recall.
20   Q. Would educational background be a factor?
21   A. Perhaps.
22   Q. Would the fact that somebody was part of an
23      internal promotion versus hired from outside
24      be a factor in where that person came in on

Page 19

1    the salary range?
2       MR. WINTON: Objection as to form.
3    A. I don't really understand.
4    Q. Sometimes people are promoted internally at
5       Getronics?
6    A. Right.
7    Q. Sometimes people are hired from the outside
8       to a particular position, correct?
9    A. Yes.
10   Q. Is there a distinction made with respect to
11      where this particular individual comes in on
12      the salary range; is the fact that someone
13      is an internal promotion versus an external
14      hire a factor in where that person comes in
15      on the salary range?
16      MR. WINTON: Objection as to form.
17   A. It's really difficult to say. We look at
18      many things. It could be that we'd have to look
19      at the individual and the situation.
20   Q. Is there anything else you can tell me other
21      than you said comparatories (sic),
22      experience, educational background possibly;
23      is there anything else that encompasses
24      these many things that will determine

Page 20

1    someone's salary?
2    A. None that I can think of right now.
3    Q. As of the year 2004, approximately how many
4       employees were you providing human resources
5       services for?
6    A. This is a guess. Approximately 600, 700.
7    Q. Just stepping back a minute, back to the
8       salary ranges; you said one of the factors
9       is comparatories (sic). Can you tell me a
10      little bit more what you mean by that?
11      MR. WINTON: Objection as to form.
12   A. We would look at employees that are in
13      similar positions, look at their salary
14      ranges, from -- to be fair, to make sure we
15      were in the guidelines.
16   Q. You're talking about other employees within
17      Getronics?
18   A. Yes.
19   Q. As a human resources manager, let's say in
20      2004, did you have the authority to fire
21      somebody, terminate someone's employment?
22   A. No, not solely my decision.
23   Q. You had the authority to recommend someone's
24      termination?

Page 21

1    A. Yes.
2    Q. Before Getronics where did you work?
3    A. Belmont Springs Water Company.
4    Q. Again, you were a human resources manager
5       there?
6    A. Yes.
7    Q. From when to when did you work there?
8    A. April of '98, August of 2000.
9    Q. Why did you leave there, or how did your
10      employment end at Belmont Springs?
11   A. I voluntarily left.
12   Q. Why?
13   A. I was offered a position with Getronics.
14   Q. What were your duties at Belmont Springs as
15      the HR manager?
16   A. Employee relations, recruiting, work force
17      planning to a point, salary increases.
18   Q. Anything else?
19   A. Not that I can recall.
20   Q. What about before Belmont Springs, where did
21      you work?
22   A. Pizzeria Uno's.
23   Q. What did you did for Pizzeria Uno's?
24   A. Trainer.

6 (Pages 18 to 21)

Page 22

1  Q. Was it a particular location?
2  A. Yes.
3  Q. Which location was that?
4  A. Burlington, Massachusetts.  I also waited
5     tables and bartended as well.
6  Q. And did some recruiting for that particular
7     store?
8  A. Restaurant.
9  Q. How long did you work for Uno's?
10 A. To the best of my recollection -- it was a
11    while ago -- the summer of 1993 until
12    sometime 2001 maybe.  I was still there part
13    time.  I don't recall exactly the dates.
14 Q. You were there part-time while you were at
15    Belmont Springs for a while?
16 A. Yes.
17 Q. During your employment at Getronics, did you
18    have any training relative to company
19    policies or laws regarding discrimination in
20    the workplace?
21 A. Prior to Getronics, yes.
22 Q. How about during Getronics?
23 A. Yes.
24 Q. When was the last time you had any sort of

Page 23

1     training or education at Getronics regarding
2     discrimination in the workplace?
3  A. I don't recall exactly.  Within one year.
4     We also have it on-line on our Getronet, our
5     internal Internet, and we also receive home
6     mailings about that.
7  Q. When you say "within one year," do you mean
8     within one year of your beginning date in
9     2000?
10 A. No.  I mean within one year of now.
11 Q. That training approximately a year ago, what
12    did that consist of?
13 A. The prevention of sexual harassment in the
14    workplace, discrimination in the workplace.
15    I don't remember the rest, but those were
16    the ones that stand out in my mind right
17    now.
18 Q. Where did that take place?
19 A. The one I attended was in the Billerica
20    office.
21 Q. Was there a particular individual making a
22    presentation?
23 A. Yes.  I don't recall if was just an
24    individual but yes.

Page 24

1  Q. Do you remember who made a presentation or
2     presentations?
3  A. Yes.
4  Q. Who was it?
5  A. It was Marthe and I don't know -- I don't
6     recall if there was anybody else that gave
7     that with her.
8  Q. That was approximately summer of 2005?
9  A. I don't know exactly the date.
10 Q. Who else attended, if you can recall?
11 A. I don't recall.
12 Q. Where there other people attending?
13 A. Yes.
14 Q. Approximately how many people attended?
15 A. I can't guess.  I don't recall.
16 Q. Was it more than 10?
17 A. I would say yes.
18 Q. Was it more than 50?
19 A. I don't recall.
20 Q. Were all the attendees part of the human
21    resources department for Getronics?
22 A. To the best of my recollection, there were
23    other managers outside of HR there.
24 Q. There may have been members of the

Page 25

1     management as well as members of the HR
2     department?
3  A. Yes.
4  Q. Were there any videos shown?
5  A. Not that I can recall.
6  Q. Do you recall whether there were any
7     documents passed out?
8  A. Yes, I believe there were documents passed
9     out.
10 Q. Do you remember what they were?
11 A. To the best of my recollection, case
12    scenarios.
13 Q. Do you still have those?
14 A. I believe I may still have those but I don't
15    know.
16 Q. Where are they if you have them?
17 A. They'd be in a box that I took from my
18    office.
19 Q. Before that training session a year ago, had
20    you had any other training regarding
21    discrimination in the workplace at
22    Getronics?
23 A. Yes.
24 Q. When was the time before that time a year

7 (Pages 22 to 25)

Page 26

1    ago?
2    A. I really don't recall.
3    Q. How many times would you say you had any
4      sort of formal training sessions relative to
5      discrimination in the workplace at
6      Getronics?
7    A. I don't know exactly.
8    Q. Was it more than two?
9    A. I don't know exactly.
10   Q. Do you have any specific recollection of
11     attending any training session other than
12     the one a year ago?
13   A. Yes.
14   Q. Approximately how long ago was that one?
15   A. To the best of my recollection, maybe two
16     years or so ago.
17   Q. Was that also in Billerica?
18   A. I believe that one was in Tewksbury,
19     Massachusetts.
20   Q. How many people attended, approximately?
21   A. I don't know exactly but there were a lot of
22     folks there. There was a big forum.
23   Q. Did the people that attended consist of more
24     than just management and HR representatives?

Page 27

1    A. To the best of my recollection, yes.
2    Q. Who made a presentation, if anyone?
3    A. To best of my recollection, at this
4      particular seminar it was Joan Anderson.
5    Q. Who is Joan Anderson?
6    A. She is a human resources consultant.
7    Q. Can you recall any of the substance of
8      either the presentation or any documents
9      that were passed out?
10   A. I recall overhead slides. The content was
11     the prevention of sexual harassment in the
12     workplace, our nondiscrimination policy. We
13     reinforced that we do not discriminate. I
14     don't recall the other stuff. I know we
15     gave examples that were in the overheads,
16     but I don't recall exactly the rest of the
17     content.
18   Q. Did you have any responsibility for
19     providing training relative to
20     discrimination?
21   A. No, not that I can recall.
22   Q. You think this last one that we were just
23     talking about occurred approximately the
24     summer of 2004?

Page 28

1    A. I don't recall if it was the summer of 2004.
2      The one we were just talking about?
3    Q. Yes.
4    A. I don't recall exactly when it was.
5    Q. You think it was in the year 2004 however?
6    A. I don't know exactly but if I were to guess
7      it's possible but I don't know for sure.
8    Q. Do you have any specific recollections of
9      any other formal training sessions relative
10     to discrimination at Getronics?
11   A. Not that I can recall at this time but I'm
12     sure there were others.
13   Q. Did any of the training that you had at
14     Getronics relative to discrimination include
15     any training on how to respond to an
16     employee's complaint of discrimination?
17   A. To the best of my recollection, yes.
18   Q. Can you recall what that training was about,
19     the substance?
20   A. You always want the employees to communicate
21     with our managers if you have a problem.
22   Q. Is that the sum total of what you can recall
23     about that aspect of the training that you
24     had?

Page 29

1    A. I recall they are encouraged to talk to
2      their manager and that's really -- there is
3      more to it. I just can't recall what it is
4      at this time.
5    Q. Did any of the training that you had
6      relative to discrimination at Getronics
7      include any training with respect to company
8      policy or laws relative specifically to
9      retaliation for an employee's report of
10     discrimination?
11   A. Yes.
12   Q. What can you recall about the substance of
13     that specific training?
14   A. That Getronics as a company and managers
15     will not retaliate against anybody who
16     raises a concern in the workplace.
17   Q. Is there anything else you can remember?
18   A. Not at this time.
19        MR. WINTON:  Can we take a break?
20        MR. COHEN:  Sure.
21        (Recess)
22   Q. In any capacity other than with your
23     employment with Getronics, have you had any
24     training relative to company policies or

8 (Pages 26 to 29)

## Page 30

1  laws regarding discrimination in the
2  workplace?
3  A. Yes.
4  Q. Before Getronics when was the last time that
5     you can recall that you had any training
6     relative to discrimination?
7  A. It was at Belmont Springs Water Company.
8  Q. How many times did you have any sort of
9     formal training sessions at Belmont Springs
10    relative to discrimination?
11 A. I don't recall exactly how many.
12 Q. Can you recall when any of them occurred?
13 A. Not at this time. It was a long time ago.
14 Q. Can you recall any of the substance of what
15    was presented at any of those training
16    sessions at Belmont Springs?
17 A. The prevention of sexual harassment and
18    discrimination in the workplace. I don't
19    recall the other content at this time. I'm
20    sorry. It was a while ago.
21 Q. Are you familiar with Aalaeldin Khirawi?
22 A. Yes.
23 Q. When did you first meet him?
24 A. To the best of my recollection, it was in

## Page 31

1  August of 2004.
2  Q. Under what circumstances did you first meet
3     Mr. Khirawi?
4  A. We met so I could give him a performance
5     improvement and expectations document.
6  Q. Do you remember the date of that meeting?
7  A. I don't recall the date, the exact date.
8  Q. Does August 19, 2004, sound correct?
9  A. If you have something with that, I'd like to
10    look at it, but I don't want to guess.
11 Q. Without looking at any documents you don't
12    recall the date?
13 A. Yes, I don't recall the date.
14 Q. That meeting for the purpose of giving him
15    the performance expectations document was
16    the first time that you met with Mr.
17    Khirawi?
18 A. Yes, that was the first time I met with him.
19 Q. Did you meet with him in person?
20 A. Yes.
21 Q. Was that in Tewksbury?
22 A. Yes.
23 Q. Did you have any involvement in Mr. Khirawi
24    in 1999 as a temporary employee?

## Page 32

1  A. No, I didn't.
2  Q. Did you have any involvement in Mr.
3     Khirawi's hire as a permanent employment in
4     2000?
5  A. No, I didn't.
6  Q. Did you have any involvement in Getronics'
7     promotion of Mr. Khirawi in 2003?
8  A. No.
9  Q. Do you have any knowledge about the
10    circumstances leading to that promotion in
11    2003?
12 A. No.
13 Q. Do you have any knowledge about the
14    circumstances of the promotion itself in
15    2003?
16 A. No.
17 Q. How did it come about that you came to meet
18    Mr. Khirawi?
19 A. Can you be a little bit more specific,
20    please?
21 Q. Did you have a conversation with anybody
22    about Mr. Khirawi before the date that you
23    actually met?
24 A. Yes.

## Page 33

1  Q. Who did you speak with?
2  A. I don't recall exactly but my boss Karen
3     Regan.
4  Q. Where was Karen Regan's office?
5  A. In Billerica, Mass.
6  Q. Was that a conversation in person that you
7     had with her?
8  A. Yes.
9  Q. Approximately when was that?
10 A. I don't recall. I'm not positive.
11 Q. Do you think it was sometime approximately
12    in August of 2004?
13 A. I don't recall.
14 Q. Do you recall when the first time you became
15    aware any human resources issues relative to
16    Mr. Khirawi existed?
17 A. I don't recall.
18 Q. What did Ms. Regan tell you when you first
19    spoke to her about Mr. Khirawi?
20 A. I don't recall her exact words. She thought
21    I could help an employee situation.
22 Q. How did she think you could help?
23 A. I have a background in mediation, conflict
24    resolution, and I was local.

9 (Pages 30 to 33)

Page 34

1  Q. Can you tell me about your background in
2     mediation and conflict resolution.
3  A. I took a mediation certification course
4     through Community Dispute Settlement Center,
5     and I had a certificate program at Cambridge
6     College for negotiation and conflict
7     resolution.
8  Q. Did Ms. Regan give you any sort of history
9     of what the facts were surrounding Mr.
10    Khirawi at the time that she first spoke to
11    you about him?
12 A. Not that I can recall.
13 Q. That conversation with Ms. Regan was the
14    first time that you began any involvement
15    relative to Mr. Khirawi?
16 A. I don't recall if that was the first time.
17 Q. You don't recall anything else specifically
18    that brought Mr. Khirawi to your attention
19    before that conversation with Ms. Regan?
20 A. Not that I can think of right now.
21 Q. Where were you when spoke to Ms. Regan
22    during that conversation?
23 A. To the best of my recollection, it was in
24    her office two doors down from mine.

Page 35

1  Q. Can you recall anything else that she told
2     you during that conversation?
3  A. Not at this time.
4  Q. Was anybody else present?
5  A. No.
6  Q. After that conversation with Ms. Regan, did
7     you speak to anyone else about Mr. Khirawi
8     before you actually met with him in August
9     of 2004?
10       MR. WINTON: To the extent you're
11    asking him questions that would require him
12    to reveal attorney/client privilege
13    communication, I'm going to instruct the
14    witness not to answer.
15 A. I can't answer the question.
16 Q. You can't answer the question without
17    revealing any attorney/client
18    communications?
19 A. Yes.
20 Q. Without telling me the substance of any
21    communications, did you speak or meet with
22    anybody in between the time that you spoke
23    with Ms. Regan and the time that you met
24    with Mr. Khirawi for the first time?

Page 36

1  A. Yes.
2  Q. Who did you meet with or speak with?
3  A. Marthe Stanek.
4  Q. Where did you meet with Ms. Stanek?
5  A. To the best of my recollection, was in her
6     office.
7  Q. That's in Billerica?
8  A. Yes.
9  Q. Was anybody else present during that
10    meeting?
11 A. Not that I can recall.
12 Q. Approximately how long was that meeting?
13 A. I don't know exactly.
14 Q. The meeting with Ms. Stanek occurred after
15    the meeting with Ms. Regan?
16 A. I don't recall exactly. I don't recall
17    exactly.
18 Q. What's the next thing you can recall about
19    either someone you met with or something you
20    did relative to Mr. Khirawi before you met
21    with him for the first time?
22 A. I wanted to set up a time to meet with him
23    and Jim Hoffman via the telephone to hand
24    him the performance expectations document.

Page 37

1  Q. Who is Jim Hoffman?
2  A. To the best of my recollection, he is Ruby
3     Miles' manager.
4  Q. What did you do in order to arrange for a
5     meeting with Mr. Khirawi and Mr. Hoffman?
6  A. To the best of my recollection, I sent it
7     via an e-mail request, a meeting request.
8  Q. To Mr. Khirawi?
9  A. Yes, as well as Mr. Hoffman.
10 Q. Did you do anything else or speak to anybody
11    else before you actually met with Mr.
12    Khirawi?
13 A. Not that I can recall right now.
14 Q. You actually sat down, I think you said, in
15    person with Mr. Khirawi, correct?
16 A. Yes, in Tewksbury.
17 Q. Was Mr. Hoffman present?
18 A. No.
19 Q. Did Mr. Hoffman dial into the meeting?
20 A. Yes, he did, or we called him. I'm not sure
21    exactly how it happened.
22 Q. That was the first time you met in person
23    with Mr. Khirawi, correct?
24 A. That's correct.

10 (Pages 34 to 37)

Page 38

1   Q. The performance expectations document that
2      you wanted to give him, was that something
3      that you drafted?
4   A. I participated in that document.
5   Q. You mean you participated in the creation of
6      that document?
7   A. Yes.
8   Q. Was it prepared on your computer?
9   A. Not that I can recall.
10  Q. Do you remember who prepared the first draft
11     of it?
12        MR. WINTON:  Objection as to form.
13  A. I don't recall who prepared it.
14  Q. Did you speak to Mr. Hoffman before the
15     meeting with Mr. Khirawi in August of 2004?
16  A. To the best of my recollection, I did.
17  Q. That was over the telephone?
18  A. Yes.
19  Q. What was said in that conversation?
20        MR. WINTON:  Before you answer that
21     question, to the extent what you're asking
22     involved attorney/client privilege -- I
23     don't know who else was a part of the
24     conversation -- I'm instructing you not to

Page 39

1      answer.
2   Q. Was anyone else a party to that conversation
3      on the phone?
4   A. Not that I can recall.
5   Q. Can you tell me what was said in that
6      conversation?
7   A. I just wanted to let him know that we were
8      going to meet Mr. Khirawi to present the
9      document to him and that who would call
10     whom.  I'm not sure exactly how.
11  Q. Did you discuss any of the substance of what
12     had occurred up to this point with Mr.
13     Khirawi?
14  A. Not that I can recall.
15  Q. Did you speak to Ms. Miles at all before
16     your first meeting with Mr. Khirawi?
17  A. Not that I can recall.
18  Q. Ruby Miles was Mr. Khirawi's direct
19     supervisor?
20  A. To the best of my recollection, yes.
21  Q. Other than Mr. Hoffman and Ms. Regan and
22     perhaps counsel, did you speak to anybody
23     else about Mr. Khirawi before you met with
24     him for the first time?

Page 40

1   A. Not that I can recall.
2   Q. Did you review any documents before you met
3      with Mr. Khirawi for the first time?
4   A. I reviewed the performance expectations and
5      improvement document.
6   Q. Do you remember from what date that was?
7   A. I don't remember.  For the date of my
8      initial meeting?
9   Q. Yes.
10  A. I read that document for the August meeting.
11  Q. You're talking about the document that you
12     were going to go give Mr. Khirawi at the
13     meeting, correct?
14  A. Yes, the document I gave him.
15  Q. The document you did give him in the August
16     2004 meeting?
17  A. Yes.
18  Q. You read that performance expectations
19     document?
20  A. Yes.
21  Q. You read that performance expectations
22     document, the same document that you gave
23     him in the August 2004 meeting, before you
24     met with him in August 2004?

Page 41

1   A. Yes.
2   Q. Did you review any other documents before
3      you met with Mr. Khirawi in August of 2004?
4        MR. WINTON:  Objection.  I'm just
5      going to ask for clarification.  Are you
6      asking ever reviewing documents or just in
7      preparation for that?
8        MR. COHEN:  In preparation for that.
9        MR. WINTON:  Why don't you ask that
10     again.
11  Q. Other than the performance expectations
12     document that you gave Mr. Khirawi in the
13     August 2004 meeting, did you review any
14     other documents in preparation for that
15     August 2004 meeting with Mr. Khirawi?
16  A. I may have but I don't recall.
17  Q. Were you aware of any prior performance
18     expectations documents that had been given
19     to Mr. Khirawi before you met with him in
20     August of 2004?
21  A. Yes, I was aware.
22  Q. But you can't recall whether you actually
23     reviewed them before you met with Mr.
24     Khirawi in 2004?

11 (Pages 38 to 41)

Page 42

1    MR. WINTON: In August 2004 for the
2    purpose of preparing for the meeting?
3    A. Can you repeat the question?
4    Q. Other than the performance expectations
5      document that you gave Mr. Khirawi in 2004,
6      you can't recall reviewing any other
7      documents in preparation for the August 2004
8      meeting with Mr. Khirawi?
9    A. I can't recall. I may have but I can't
10     recall right now.
11   Q. Were there any other reasons that you can
12     recall that you were given as to why you
13     were being assigned to help with the human
14     resources issues that Mr. Khirawi was
15     having?
16     MR. WINTON: I'm going to object and
17     instruct the witness not to answer to the
18     extent his answer will reveal
19     attorney/client privileged communication.
20   A. I can't answer that question.
21   Q. You can't answer that question without
22     revealing attorney/client communications?
23   A. Yes.
24   Q. Just so I'm clear, other than what you told

Page 43

1      me already when you were first given this
2      assignment to assist with Mr. Khirawi's
3      human resources issues, did you do any
4      background research into his history at
5      Getronics?
6      MR. WINTON: Objection as to form.
7      You can answer.
8    A. No, not that I recall.
9    Q. Since the meeting in August of 2004 with Mr.
10     Khirawi, have you reviewed any documents
11     within his personnel file?
12   A. Not that I recall from his personnel file.
13   Q. You didn't review any performance appraisals
14     of his since the meeting in August of 2004?
15   A. Not that I recall.
16   Q. Since that August 2004 meeting, can you
17     recall having reviewed any documents even
18     outside his personnel file relating to Mr.
19     Khirawi's history at Getronics?
20     MR. WINTON: When you said the
21     meeting in 2002, you're still talking about
22     the one meeting we've talked about?
23     MR. COHEN: Yes.
24   A. Can you repeat the question?

Page 44

1    Q. Sure.
2      Since that August 2004 meeting where
3      you first met with Mr. Khirawi, have you
4      reviewed any documents related to Mr.
5      Khirawi's history? I know you told me
6      recently you went over the position
7      statement, or what you thought was a
8      position statement. Were there any other
9      documents since the August 2004 meeting that
10     you reviewed that related in any way to Mr.
11     Khirawi's history at Getronics?
12     MR. WINTON: Objection to the form of
13     the question. You can answer.
14   A. I may have but I can't recall exactly.
15   Q. Are you aware that Mr. Khirawi made a
16     complaint of discrimination internally on a
17     request for a religious accommodation in
18     2000?
19   A. To the best of my recollection --
20     MR. WINTON: He's asking if you're
21     aware today.
22   A. I am aware today.
23     MR. WINTON: That's what he's asking.
24   Q. When did you first become aware of that?

Page 45

1    A. I really don't remember. I don't recall.
2    Q. How did you first become aware of that?
3    A. I don't remember right now how I became
4      aware of that.
5    Q. Do you recall having reviewed any documents
6      related to that, Mr. Khirawi's complaints of
7      discrimination back in 2000?
8    A. I don't recall reading anything. I don't
9      know right now.
10   Q. Did you speak to anyone about Mr. Khirawi's
11     complaint of discrimination back in 2000?
12     MR. WINTON: Objection as to form.
13     Do you mean did he speak back in 2000 or did
14     he speak withone any about the complaint in
15     2000?
16   Q. I'm trying to find out how you became aware
17     of it and who you spoke to about it in
18     becoming aware of it.
19   A. I don't recall how I became aware of -- if I
20     even do know. I know I reviewed documents.
21     I just don't know what they were at some
22     point in time.
23   Q. Say, within the last six months from today
24     have you reviewed any documents related to

12 (Pages 42 to 45)

Page 46

1    Mr. Khirawi's complaint in 2000?
2  A. Not that I can recall.
3  Q. Are you aware that Mr. Khirawi claims that
4     he was instructed to take a leave from
5     Getronics after the attacks of September 11,
6     2001?
7        MR. WINTON:  Objection as to form.
8     You can answer.
9  A. I don't recollect hearing anything about
10    that.
11 Q. Are you aware that Mr. Khirawi claims that
12    he was removed from a project named AERO,
13    capital A-E-R-O, soon after the attack of
14    September 11, 2001?
15 A. I don't recall knowing that information,
16    hearing about it.
17 Q. At the time that you first met with Mr.
18    Khirawi in August 2000, were you aware at
19    that time of any issues surrounding the
20    length of time between an offer for the
21    promotion made to him and the time that he
22    was actually given the position of quality
23    representative?
24 A. I don't recall being made aware of that.

Page 47

1  Q. Are you aware of those issues surrounding
2     the length of time between the offer of the
3     promotion to quality rep and the time that
4     Mr. Khirawi actually began working as the
5     quality rep, today as you sit here?
6        MR. WINTON:  Objection as to form.
7  A. I don't recall that information.
8  Q. This is the first time you heard of any
9     issues surrounding a delay in his promotion?
10 A. I don't recollect hearing about any of that.
11 Q. At the time that you met with Mr. Khirawi in
12    August of 2004 for the first time, were you
13    aware of any issues surrounding the amount
14    of salary Mr. Khirawi was to receive for the
15    position of quality rep?
16       MR. WINTON:  Objection as to form.
17 A. I don't recall being made aware of any
18    salary with Mr. Khirawi.
19 Q. Is that true as of today as well?
20 A. I don't recall -- I don't know what his
21    salary is or was.  I don't recall seeing any
22    of that.
23 Q. Have you ever been involved in any disputes
24    at Getronics or any issues surrounding

Page 48

1     employees who were making less than the low
2     salary range for their position?
3        MR. WINTON:  Objection as to form.
4  A. I don't really understand your question.
5     Can you reframe it, please?
6  Q. Sure.
7        Do you recall having had any
8     involvement with any employees who
9     complained that their salary was lower than
10    the low salary range entry point for their
11    position?
12       MR. WINTON:  Objection as to form.
13 A. I don't recall specifically any situation
14    right now.
15 Q. The first time that you met Mr. Khirawi for
16    the first time in August of 2004, were you
17    aware of his internal complaint of
18    discrimination made in December 2003 and
19    January 2004?
20 A. I don't recall if I was aware at that time
21    or not.
22 Q. How about now, are you now aware of any of
23    the facts or claims surrounding his internal
24    complaint of discrimination in December '03

Page 49

1     and January '04?
2  A. I don't recall exactly.  I may be if it was
3     in one of the statements I reviewed and
4     signed but I don't recall exactly.
5  Q. When you met Mr. Khirawi in August of 2004
6     for the first time, were you aware of his
7     June 2004 complaint of discrimination made
8     with the EEOC?
9  A. I don't recall being made aware of that.  I
10    don't recall.
11 Q. As of August 2004 when you first met with
12    Mr. Khirawi, had you been made aware of any
13    reports or complaints at all that Mr.
14    Khirawi had about discrimination?
15 A. I don't remember exactly if I was or not.
16    It was a while ago.  I don't recall right
17    now.
18 Q. Can you recall what the issues were for
19    which you were first asked to help with the
20    HR issues with Mr. Khirawi?
21 A. I don't recall exactly.  I know there was
22    insubordination from -- to the best of my
23    recollection, there was insubordination from
24    his manager.  I don't recall the details.

13 (Pages 46 to 49)

Page 50

1   Q. Is there anything else that you can recall
2      as you sit here relative to what the issues
3      were for which you were going to go help
4      with Mr. Khirawi? I'm talking about in
5      August of 2004.
6   A. Not at this time. I don't recollect the
7      whole document about what we were going to
8      present to him.
9   Q. Do you recall that there were some issues at
10     the time with insubordination between Mr.
11     Khirawi and Ms. Miles, his manager?
12  A. I recall that was part of the issues.
13  Q. Were you aware at the time of any other
14     performance problems or issues with
15     insubordination with respect to any manager
16     other than Ms. Miles?
17  A. Not that I can remember but I believe there
18     were other people involved, but I don't know
19     exactly who.
20  Q. Mr. Khirawi was terminated, correct?
21  A. Yes.
22  Q. Why was he terminated?
23  A. Blatant insubordination. He was incredibly
24     rude the last time I spoke with him on his

Page 51

1      last day.
2   Q. Is there anything else you can tell me as to
3      the reason for his termination?
4   A. Not that I can recall right now.
5   Q. Do you know when it was that Mr. Khirawi
6      came to be supervised by Ms. Miles?
7   A. I don't know.
8   Q. Do you have any knowledge as to whether he
9      had any performance problems up to the point
10     in time when he began to be supervised by
11     Ms. Miles?
12  A. Not that I can think of.
13  Q. Do you have any knowledge as to whether
14     there were any incidents involving
15     insubordination Mr. Khirawi up to the point
16     in time when he began to work for Ms. Miles?
17  A. Not that I know of.
18  Q. Do you know whether Mr. Khirawi had any
19     difficulty getting along with coworkers
20     anytime before December 2003?
21  A. I don't know that.
22  Q. At the time that you first met Mr. Khirawi
23     in August of 2004, were you aware that Mr.
24     Khirawi claimed that Ms. Miles told him that

Page 52

1      the delay in his promotion was due to racial
2      factors?
3         MR. WINTON: Objection as to form.
4   A. I don't recall hearing that.
5   Q. Is that true as of today as well? Are you
6      aware of that as of today?
7   A. Not that I can recall.
8   Q. Mr. Graceffa, is it fair to say you weren't
9      told or made aware of any of the allegations
10     that Mr. Khirawi had made about his claim
11     that he had been discriminated against
12     before you met with him for the first time
13     in August of 2004?
14        MR. WINTON: I'm going to instruct
15     the witness not to answer to the extent the
16     answer were to require him to disclose
17     attorney/client privilege communication.
18  A. I can't answer that question.
19  Q. You can't answer the question without
20     revealing attorney/client communications?
21  A. That is correct.
22  Q. Have you had any communications with either
23     Ms. Miles or Mr. Hoffman about Mr. Khirawi's
24     allegations that he had been discriminated

Page 53

1      against?
2   A. Not that I can recall.
3   Q. Mr. Graceffa, are you aware as you sit here
4      now of any problem Mr. Khirawi had accepting
5      the opinions of others up to March of 2004?
6   A. I don't recall knowing that information.
7   Q. Are you aware of any problems Mr. Khirawi
8      had seeking input from others up to March of
9      2004?
10  A. Not that I can recall.
11  Q. Are you aware of any problems Mr. Khirawi
12     had being open to feedback from other people
13     up to March of 2004?
14  A. Not that I can recall.
15  Q. Are you aware of any problems that Mr.
16     Khirawi had demonstrating respect for all
17     coworkers up to March of 2004?
18  A. Not that I can recall.
19  Q. Are you aware of any problems that Mr.
20     Khirawi had establishing good working
21     relationships with others up to March of
22     2004?
23  A. Not that I can recall.
24  Q. Are you aware of any problems that Mr.

14 (Pages 50 to 53)

Page 54

1    Khirawi had evaluating feedback from others
2    and replying in a professional manner up to
3    March of 2004?
4  A. Not that I can recall.
5  Q. Are you aware of any incident involving a
6    Houston coworker named Tiffany Anderson
7    Jones and another Houston coworker named
8    Patrick McHenry in February 2004?
9  A. Not that I can recall.
10 Q. Did you ever review any e-mails related to
11    any incident involving Mr. Khirawi, Ms.
12    Anderson Jones, and Mr. McHenry from
13    February 2004?
14 A. Not that I can recall.
15    (Appraisal Form marked as Exhibit
16    No. 1)
17 Q. I just put a document in front of you marked
18    Exhibit No. 1. Just take a look at that and
19    tell me whether you've seen that before
20    today.
21 A. I can't recall seeing this document.
22    (E-mail String marked as Exhibit
23    No. 2)
24 Q. We have put another document in front of you

Page 55

1    marked Exhibit No. 2. It's a four-page
2    document consisting of copies of an e-mail
3    string from February of 2004. If you can
4    just tell me whether you've seen that before
5    today.
6  A. I don't recall seeing this document.
7    MR. COHEN: I'm just going to take a
8    break for about one minute.
9    (Recess)
10    (Appraisal Form marked as Exhibit
11    No. 3)
12    MR. COHEN: Just for the record, we
13    marked Exhibit No. 3, which is the same
14    document as Exhibit No. 1, although they
15    have different Bates numbers. They are the
16    same document.
17 Q. Take a look, again, Mr. Graceffa, at Exhibit
18    No. 1. Will you tell me what that document
19    is.
20 A. This appears to be the Getronics PMP Form,
21    Performance Management Process.
22 Q. Is this the standard form that Getronics
23    used for performance appraisals in 2004?
24 A. Yes, it appears to be.

Page 56

1  Q. How many different locations or offices does
2    Getronics have?
3  A. We have several locations. Our major
4    locations are Houston, Tewksbury, Billerica,
5    Tampa, Spokane, Washington, that I can
6    recall.
7  Q. Back in 2004 was it common for Getronics
8    employees to interact with other employees
9    from different locations or offices from
10    their own?
11 A. Yes. People communicated from different
12    offices.
13 Q. Do the performance appraisals include
14    aspects of their interaction and working
15    relationships with employees outside their
16    specific work site, if they have any such
17    interaction?
18    MR. WINTON: Objection as to form.
19 A. Yes. There's a trust and respect aspect of
20    the performance document.
21 Q. That would include trust and respect and
22    interaction with employees outside the
23    particular employee's specific location,
24    correct?

Page 57

1  A. Yes. We like to treat everybody, no matter
2    where they are, with respect.
3  Q. Isn't it true then that this appraisal that
4    we marked Exhibit No. 1 is an evaluation of
5    Mr. Khirawi's overall work performance in
6    the stated period, which included
7    interaction with Getronics employees outside
8    Tewksbury?
9    MR. WINTON: Objection as to form.
10 A. I didn't write this so I don't know exactly
11    what the intent was when Ruby wrote it.
12 Q. What's your assumption when you read this as
13    far as whether it includes performance and
14    interaction with Getronics employees outside
15    Tewksbury?
16    MR. WINTON: Objection as to form.
17 A. I'm going to read it, if that's okay.
18 Q. Sure.
19 A. Can you repeat the question?
20 Q. What's your assumption when you read this?
21    Isn't it true that you would assume that
22    this performance appraisal is an evaluation
23    of Mr. Khirawi's overall work performance in
24    the stated period, which includes

15  (Pages 54 to 57)

Page 58

1    interaction with Getronics employees outside
2    Tewksbury?
3        MR. WINTON: Objection as to form.
4    A. At this moment in time when this is written,
5    I would assume yes.
6        (Written Reprimand marked as Exhibit
7        No. 4)
8    Q. I'm going to put a document in front of you
9    marked Exhibit No. 4. If you can take a
10   look at this and first just tell me whether
11   you've seen it before today.
12   A. Is it okay if I read the whole thing? They
13   all look similar.
14   Q. Of course.
15   A. I don't recall seeing this.
16       (E-mail String marked as Exhibit
17       No. 5)
18   Q. Take a look at what we've put in front of
19   you marked Exhibit No. 5. Once you've
20   looked at it, just let me know whether
21   you've seen it before.
22   A. Sure.
23       I don't recall exactly.
24       (E-mail String marked as Exhibit

Page 59

1        No. 6)
2    Q. Exhibit 6, same question. Let me know if
3    you've seen it before.
4    A. I believe this is the same document but I'll
5    read through to make sure.
6        MR. WINTON: You just gave me
7    something different than you gave him.
8        MR. COHEN: We'll just put on the
9    record that 5 and 6 are the same.
10       (E-mail String marked as Exhibit
11       No. 7)
12   Q. Take a look at what we marked as Exhibit No.
13   7. This is a four-page stapled document
14   that are copies of an e-mail string. The
15   top pages are an e-mail from Aalaeldin
16   Khirawi dated Saturday, March 20, 2004. I'm
17   just looking to know whether you've seen
18   this before today.
19   A. I don't recall seeing this.
20       (Performance Improvement Plan marked
21       as Exhibit No. 8)
22   Q. We've marked Exhibit No. 8, which is a
23   Performance Improvement Plan dated March 22,
24   2004. Take a look at that and tell me

Page 60

1    whether you've seen it before.
2    A. I don't recall seeing this exact document.
3    Q. Are you aware that there was ever an issue
4    with Mr. Khirawi's reporting of his hours?
5    A. Was I ever aware?
6    Q. Yes.
7    A. Yes.
8    Q. When did you first become aware of that
9    issue?
10   A. To the best of my recollection is when we
11   were creating the performance expectations
12   document.
13   Q. Was that in August of 2004?
14   A. Yes.
15   Q. How did you become aware of that?
16       MR. WINTON: I'm going to instruct
17   you that you not answer the question to the
18   extent you're required to reveal
19   attorney/client privilege.
20   A. I can't answer the question.
21   Q. You can't answer that without revealing
22   attorney/client communications?
23   A. That is correct.
24   Q. Are you aware that Ms. Miles had asked Paul

Page 61

1    Galipault and Sevarini Puglisi to keep an
2    eye on Mr. Khirawi's arrival and departure
3    times?
4        MR. WINTON: Objection as to form.
5    A. I don't recall exactly.
6    Q. Have you ever been involved in a situation
7    where there's an allegation that an employee
8    is misreporting his hours? I'm talking
9    about at Getronics.
10   A. I can't recall exactly but I'm sure I have
11   been. I just don't recall right now.
12   Q. Can you recall any manager doing anything to
13   monitor the employee's comings and goings
14   and hours actually in the office?
15   A. Not at this time.
16       (Written Reprimand marked as Exhibit
17       No. 9)
18   Q. We put another document in front of you
19   that's marked Exhibit No. 9. It's a written
20   reprimand dated May 21, 2004. Again, can
21   you take a look at this and let me know
22   whether you've seen it before today.
23   A. I don't recall seeing this.
24       (E-mail String marked as Exhibit

16 (Pages 58 to 61)

Page 62

```
 1      No. 10)
 2  Q. If you can take a look at what we marked
 3     Exhibit No. 10. It's a five-page document,
 4     a copy of an e-mail string, the top page
 5     being an e-mail from Aalaeldin Khirawi dated
 6     Tuesday, May 18, 2004, at 1:16 p.m.
 7         Again, if you can take a look at that
 8     and tell me whether you've seen that before
 9     today.
10  A. I don't recall seeing this e-mail chain.
11  Q. Were you ever made aware that there was some
12     issue involving Mr. Khirawi's having one of
13     Getronics' laptop computers?
14         MR. WINTON: I'm going to instruct
15     the witness not to answer to the extent his
16     answer requires disclosure of privileged
17     communications.
18  A. I can't answer the question.
19  Q. You can't answer it without revealing
20     attorney/client communications?
21  A. That's correct.
22         (E-mail String marked as Exhibit
23         No. 11)
24  Q. I'll hand you another document marked
```

Page 63

```
 1     Exhibit No. 11. If you can take a look at
 2     that, it's a five-page copy of an e-mail
 3     string, the top page and the top e-mail
 4     being one from Aalaeldin Khirawi dated
 5     Wednesday, May 26, 2004, at 10:56 a.m.
 6         Take a look at that and tell me
 7     whether you've seen it before today.
 8  A. I don't recall seeing this.
 9         (Recess)
10         (EEOC Notice marked as Exhibit
11         No. 12)
12         (E-mail String marked as Exhibit
13         No. 13)
14         (E-mail String marked as Exhibit
15         No. 14)
16         (Performance Expectations Document
17         marked as Exhibit No. 15)
18         (E-mail String marked as Exhibit
19         No. 16)
20         (E-mail String marked as Exhibit
21         No. 17)
22         (E-mail marked as Exhibit No. 18)
23         (Document dated 09/24/04 marked as
24         Exhibit No. 19)
```

Page 64

```
 1         (E-mail String marked as Exhibit
 2         No. 20)
 3         (E-mail String marked as Exhibit
 4         No. 21)
 5         (E-mail String marked as Exhibit
 6         No. 22)
 7  Q. Mr. Graceffa, I think we said earlier that
 8     as of the time that you first met Mr.
 9     Khirawi in August of 2004 you cannot recall
10     being aware of that he had filed a complaint
11     of discrimination with the EEOC in June of
12     2004; is that correct?
13  A. At the time I met him, that is correct.
14  Q. I'll show you what we marked Exhibit No. 12.
15     Take a look at that and tell me whether
16     you've seen that before today.
17  A. I don't recall seeing this document.
18  Q. Were you involved in any sort of internal
19     investigation related to any complaint that
20     Mr. Khirawi filed in 2004 with the EEOC?
21  A. Not that I can recall.
22  Q. Was there a mediation effort to try to
23     resolve Mr. Khirawi's complaint with the
24     EEOC, if you were are aware of it, in August
```

Page 65

```
 1     of 2004?
 2  A. I don't know exactly if there was or not.
 3  Q. You didn't attend any sort of EEOC mediation
 4     at the EEOC in August of 2004?
 5  A. Not that I recall. I don't think I did.
 6  Q. Are you aware of any sort of incident in
 7     which Mr. Khirawi failed to respond to a
 8     voicemail message left by Tiffany Anderson
 9     Jones, his counterpart in Houston, in August
10     of 2004?
11  A. I don't recall that specifically. I know
12     the name Tiffany -- heard of it, but I don't
13     know of that specific event.
14  Q. Are you aware that Mr. Khirawi had asked
15     that a ticket be opened to investigate
16     whether his voicemail was operating properly
17     in August of 2004?
18  A. I don't recall. I may have. I don't recall
19     specifically.
20  Q. I'll put another document in front of you
21     that's marked No. 13. This is, again, an
22     e-mail string that begins with the top page
23     -- they're Bates numbers 433 through 438.
24     Just take a look at that and tell me whether
```

17 (Pages 62 to 65)

Page 66

1    you've seen it before today.
2    A. I'll take a look.
3        I don't recall seeing this exact
4    document.
5    Q. I'll put Exhibit No. 14 in front of you.
6    It's a one-page e-mail string with the top
7    one being an e-mail from Aalaeldin Khirawi
8    dated Wednesday, August 18, 2004, at 1:25
9    p.m.
10       This is an e-mail string between you
11   and Mr. Khirawi, correct?
12   A. That is correct.
13   Q. The bottom e-mail is from yourself to Mr.
14   Khirawi with a cc to Mr. Hoffman. Was that
15   the e-mail that you had described to me
16   earlier where you were trying to set up a
17   meeting to give him the performance
18   expectations document in August of 2004?
19   A. I don't recall exactly. There may have been
20   a calendar meeting request as well, but I
21   don't recall if this was it.
22   Q. You hadn't met him before these e-mails,
23   correct?
24   A. I had not met him before this e-mail,

Page 67

1    correct.
2    Q. You see your e-mail says, "Aalaeldin, I have
3    scheduled the New Hampshire conference room,
4    located on the second floor, for our meeting
5    tomorrow at 2:00. Once there, we'll call
6    Jim."
7        Is that where you met with Mr.
8    Khirawi the first time, the New Hampshire
9    conference room?
10   A. To the best of my recollection, yes, it is.
11   Q. Does it refresh your memory as to whether it
12   was August 19, 2004, the date of your first
13   meeting with Mr. Khirawi?
14   A. It does but I don't -- I don't know if I was
15   saying, I'll see you tomorrow. But on or
16   around that date is when I met him, 19th or
17   so.
18       "Tomorrow." Yes. Sorry. Just read
19   it. Right.
20   Q. Does that refresh your memory as to whether
21   August 19 was the first time you met Mr.
22   Khirawi?
23   A. Yes, it does.
24   Q. If you can take a look at what we marked

Page 68

1    Exhibit No. 15 and tell me whether you
2    recognize that.
3    A. Yes, I recognize this.
4    Q. You met with Mr. Khirawi on August 19, 2004,
5    to go over this document, correct?
6    A. Yes.
7    Q. And also to give it to him?
8    A. Yes.
9    Q. Up to that point it's true that you hadn't
10   been made aware of any past complaints of
11   discrimination on the part of Mr. Khirawi?
12   And I'm talking about your awareness as of
13   the time of this document.
14       MR. WINTON: Objection as to form.
15   To the extent you need to disclose
16   attorney/client privilege, I'm going to
17   instruct you not to answer.
18   A. I can't answer that question.
19   Q. You can't answer the question without
20   revealing attorney/client privilege
21   communications?
22   A. That's correct.
23   Q. You met with Mr. Khirawi on August 19. And
24   it was just yourself and him in the

Page 69

1    conference room, correct?
2    A. Yes.
3    Q. Mr. Hoffman attended by telephone, correct?
4    A. Yes. To the best of my recollection after
5    reading that e-mail, we called him once we
6    were in the conference room.
7    Q. This came about as a result of Ms. Regan
8    assigning you to assist with Mr. Khirawi's
9    HR issues, correct?
10   A. That's correct.
11   Q. How long were you sitting in the meeting
12   with Mr. Khirawi?
13   A. I don't recall exactly how long.
14   Q. But there was nobody else in the room?
15   A. There was nobody else in the room.
16   Q. Did anybody other than Mr. Hoffman attend by
17   telephone?
18   A. No. Just Mr. Hoffman.
19   Q. Are you aware if there was anybody in the
20   room with Mr. Hoffman on the other end of
21   the phone?
22   A. To the best of my recollection, it was just
23   him alone wherever he was calling from.
24   Q. Was the door closed in the conference room

18 (Pages 66 to 69)

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

**Page 70**

1  where you met Mr. Khirawi?
2  A. Yes.
3  Q. Other than what you may have told me already
4  today, did you discuss this upcoming meeting
5  in advance of the meeting?
6  A. I believe I informed Marthe I was having the
7  meeting --
8      MR. WINTON: I'm not going to let you
9  answer a question that's going to disclose
10  what you informed your counsel.
11  Q. Without revealing any communications with
12  the company's attorney, can you tell me if
13  you discussed the upcoming meeting with
14  anybody before the meeting occurred aside
15  from you already told me?
16  A. Not that I can recall.
17  Q. Without revealing any communications with
18  the company's attorneys, can you tell me
19  whether you discussed the meeting with Mr.
20  Khirawi on August 19, 2004, after the
21  meeting occurred?
22  A. Not that I can recall.
23  Q. I think you testified earlier that you
24  participated in the drafting of this

**Page 71**

1  document that we marked Exhibit 15, correct?
2  A. That's correct.
3  Q. Do you have a specific recollection in your
4  mind today as you sit here of sitting down
5  with Mr. Khirawi on August 19, 2004?
6  A. I remember the meeting with Mr. Khirawi.
7  Q. Did you provide Mr. Khirawi with a copy of
8  this document that we marked Exhibit 15?
9  A. Yes. I handed him a hard copy of the
10  document.
11  Q. Did he sign it to acknowledge that he
12  received it?
13  A. He did not.
14  Q. Did you ask him to?
15  A. Yes.
16  Q. What did he say?
17  A. That he did not want to sign at that time;
18  he'd like to take it home and review it.
19  Q. Can you tell me what was said during the
20  meeting?
21  A. I don't recall exactly what was said at the
22  meeting.
23  Q. Are you able to recall any sort of a summary
24  of what was discussed during that meeting?

**Page 72**

1  A. Mr. Hoffman went through the document. He
2  -- to the best of my recollection, I soft
3  copied it to Jim, he went through it at the
4  time of the meeting. That's the best of my
5  recollection, that nuts and bolts of it.
6  Q. Is there anything else that you can recall
7  about what occurred during that meeting?
8  A. Specifics I can't recall right now.
9  Q. I see on Page 2 of this under B, Performance
10  Requirements, 2, Weekly Status Report, is my
11  understanding correct that Mr. Khirawi was
12  to submit to you a status report every week
13  regarding the job requirements listed
14  underneath that A through F over to the next
15  page?
16  A. Yes.
17  Q. Did he do that?
18  A. I recall receiving status reports.
19  Q. You did receive them?
20  A. I did receive some. I don't recall if I got
21  them regularly.
22  Q. Is it your testimony that you can't recall
23  whether Mr. Khirawi complied with that
24  requirement of this performance expectation

**Page 73**

1  document?
2  A. I recall receiving a status report. I don't
3  recall how many.
4  Q. My question is, did he comply with that
5  requirement to submit weekly status reports?
6  A. I don't recall exactly.
7  Q. What was Mr. Khirawi's demeanor during the
8  meeting on August 19?
9  A. I would say he was friendly toward me.
10  Q. He didn't lose his temper?
11  A. I don't recall him losing his temper in that
12  meeting.
13  Q. Looking at what we marked Exhibit 16, this
14  is two e-mails between yourself and Mr.
15  Khirawi, correct?
16  A. Correct.
17  Q. It appears that Mr. Khirawi, on August 25,
18  submitted a status report to you, correct?
19  A. Correct.
20  Q. Can you recall whether there was any issue
21  with the status report that he submitted on
22  that date, August 25?
23  A. I don't recall.
24  Q. If you can take a look at Exhibit 17 and let

19 (Pages 70 to 73)

Page 74

1    me know if you recognize that.
2    A. I recognize this.
3    Q. What is that?
4    A. It's an e-mail.
5    Q. An e-mail string between yourself and Ruby
6      Miles, correct?
7    A. That's correct.
8    Q. Tell me how this would work with the weekly
9      status reports; Mr. Khirawi would send you
10     the report, correct?
11   A. Correct.
12   Q. And then would you review it yourself?
13   A. I would review it.
14   Q. Would you forward it to anybody?
15   A. Yes.
16   Q. Who did you forward it to?
17   A. To the best of my recollection, Ruby.
18   Q. For what purpose?
19   A. For content.
20   Q. What do you mean "for content"?
21   A. Being in human resources, I'm not sure what
22     these file numbers are.
23   Q. You were asking Ruby whether Mr. Khirawi was
24     complying with the requirement that he

Page 75

1    submit his weekly reports properly?
2       MR. WINTON: Objection as to form.
3    A. I was asking if it was acceptable to her
4      what he was getting to me.
5    Q. I'll put No. 18 in front of you. Can you
6      take a look at that and let me know if you
7      recognize it.
8    A. Yes, I recognize this.
9    Q. What is this?
10   A. This refers to Mr. Khirawi letting me know
11     when he's coming and of his goings.
12   Q. Is it your testimony that Mr. Khirawi failed
13     to send you e-mails upon his arrival and
14     departure?
15   A. To the best of my recollection, yes.
16   Q. How many times did that happen?
17   A. I don't recall exactly.
18   Q. Was it more than once?
19   A. I don't recall.
20   Q. Do you remember the specifics of the
21     instance that precipitated this e-mail from
22     you to Mr. Khirawi?
23   A. I don't recall the specifics.
24   Q. Looking at what we marked No. 19, tell me

Page 76

1    whether you've seen this before.
2    A. I may have seen this. I don't recall
3      exactly.
4    Q. Do you know whether you participated in the
5      creation of that document?
6    A. I may have. I don't recall exactly.
7    Q. Take a look at No. 20 and just tell me
8      whether you recognize that. It's a one-page
9      e-mail string between yourself and Mr.
10     Khirawi.
11   A. I recognize this e-mail.
12   Q. In Mr. Khirawi's e-mail at the top, it
13     indicates that he didn't receive any
14     document, which I believe he's referring to
15     the August 19 performance expectation
16     document. Was that the first time that you
17     became aware that Mr. Khirawi was claiming
18     that he didn't receive that August 19
19     performance expectation document?
20   A. I don't recall if that was the first time I
21     became aware.
22   Q. Do you remember how you first became aware
23     that he was claiming that he didn't receive
24     that August 19 performance expectation

Page 77

1    document?
2    A. To the best of my recollection, it was an
3      e-mail. I just don't recall when.
4    Q. What did you do in response once you found
5      out he was claiming he didn't get that
6      August 19, 2004, performance expectation
7      document?
8    A. I don't recall exactly. I was pretty
9      shocked to hear that, that he didn't receive
10     the document. To the best of my
11     recollection, I provided him with a soft
12     copy, but again, I handed him a copy in
13     Tewksbury.
14   Q. When you say you provided him with a soft
15     copy, you mean a digital copy through e-mail
16     or something like that?
17   A. To the best that I can recollect, after I
18     learned that he told me he didn't receive
19     the document, to the best of my recollection
20     I gave him a soft copy as well.
21   Q. A soft copy is something --
22   A. Through e-mail.
23   Q. I'll show you a document we marked Exhibit
24     21. It's a four-page e-mail string with the

20 (Pages 74 to 77)

Page 78

1    top page starting with an e-mail from
2    yourself to Mr. Khirawi dated September 28,
3    2004, at 5:01 p.m.
4        I just want to find out whether you
5    recognize this.
6    A. I recognize this e-mail.
7    Q. This is an e-mail string between yourself
8    and Mr. Khirawi, correct?
9    A. That is correct.
10   Q. Up to this point in time, "this" being
11   September 28, 2004, other than the meeting
12   that you had in person with Mr. Khirawi, had
13   you had any conversations with him aside
14   from e-mails?
15   A. I don't recall exactly but I'm sure there
16   were conversations.
17   Q. You can't recall any specific conversations?
18   A. Not at this time.
19   Q. Can you recall any of the substance of what
20   was said between yourself and Mr. Khirawi in
21   any of those conversations between the
22   August 19, 2004, meeting and this date,
23   September 28, 2004?
24   A. I can't recall exactly. To the best of my

Page 79

1    recollection, I was just shocked that he
2    claimed he never got the document.
3    Q. Did you speak to anybody else in between the
4    meeting with Mr. Khirawi and Mr. Hoffman by
5    telephone and this date, September 28, 2004,
6    did you speak to anybody else relative to
7    the situation or the HR issues with Mr.
8    Khirawi?
9        MR. WINTON: I'll instruct you not to
10   answer to the extent you need to disclose
11   attorney/client privilege. If you can
12   answer the question without disclosing such,
13   you can.
14   A. I can't answer the question.
15   Q. You can't answer the question without
16   telling me the substance of conversations or
17   communications with Getronics' attorney?
18   A. Correct.
19   Q. Can you tell me whether you met with Ms.
20   Stanek or any other attorney on behalf of
21   Getronics relative to Mr. Khirawi between
22   the August 19 meeting with Mr. Khirawi and
23   this date, September 28, 2004, without
24   revealing the substance of those

Page 80

1    communications?
2        MR. WINTON: I'm going to object.
3    Sol, I think the way you asked the question,
4    I don't think he can when you're saying what
5    the meeting is relative to. That talks
6    about the substance of the conversation.
7    Q. Did you meet with Ms. Stanek at all between
8    August 19 and September 28, 2004?
9    A. I don't recall exactly if I did.
10   Q. Did you speak with Ms. Stanek in between
11   those dates, August 19, 2004, and September
12   28, 2004?
13   A. I don't recall exactly. I may have but I
14   don't recall exactly when.
15   Q. I'll give you what's marked No. 22. Just
16   let me know whether you recognize this.
17   A. I recognize this.
18   Q. This is an e-mail between yourself and Mr.
19   Khirawi, correct?
20   A. Correct.
21       (E-mail String marked as Exhibit
22       No. 23)
23   Q. We put a document marked No. 23 in front of
24   you. It's a four-page e-mail string, the

Page 81

1    top e-mail first page being one from Mr.
2    Khirawi dated Thursday, September 30, 2004,
3    at 2:55. And again, if you can tell me
4    whether you've seen this before.
5    A. I recognize this.
6    Q. That's an e-mail string between yourself and
7    Mr. Khirawi, correct?
8    A. Correct.
9        (E-mail String marked as Exhibit
10       No. 24)
11   Q. We put a document that we marked Exhibit No.
12   24 in front of you. It's a two-page e-mail
13   string between yourself and Mr. Khirawi, the
14   top one being one from Mr. Khirawi dated
15   Tuesday, October 12, 2004, at 2:06 p.m.
16       Just take a look and let me know if
17   you recognize that.
18   A. I recognize this e-mail.
19   Q. Those are e-mails between yourself and Mr.
20   Khirawi, correct?
21   A. Correct.
22   Q. These e-mails seem to reference a meeting
23   that you intended to hold with Mr. Khirawi
24   in October 2004, correct?

21 (Pages 78 to 81)

## Page 82

1  A. Correct.
2  Q. At some point in October did you intend to
3    hold a meeting with Mr. Khirawi?
4  A. Yes.
5  Q. Why was that?
6  A. To the best of my recollection, he was not
7    adhering to the document that I gave him in
8    August.
9  Q. In what respects?
10 A. I don't recall exactly.
11 Q. Do you recall anything about what he wasn't
12   complying with?
13 A. Just looking at a prior e-mail, e-mailing me
14   his ins and outs.
15 Q. He failed to e-mail you the ins and outs?
16 A. He wasn't consistent.
17 Q. Anything else that you can recall that he
18   wasn't complying with?
19 A. To the best of my recollection, his refusal
20   to stop arguing with me in e-mail. I don't
21   recall specifics.
22 Q. You don't recall any specifics of the topics
23   in which he was arguing?
24 A. The primary one was that he -- telling me he

## Page 83

1    didn't receive the document that I handed
2    him.
3  Q. Anything else?
4  A. Not that I can recall right now.
5      (Recess)
6  Q. Mr. Graceffa, you told me that the reason
7    for setting up the October meeting with Mr.
8    Khirawi that he wasn't complying with the
9    August 19 performance expectations document,
10   correct?
11 A. Yes.
12 Q. Other than what you told me about that to
13   this point, is there any other reason why
14   you set up that meeting in October with Mr.
15   Khirawi?
16 A. Not that I can recall.
17     (E-mail String marked as Exhibit
18     No. 25)
19 Q. Showing you a document that we marked
20   Exhibit 25, if you can take a look at that.
21   It's an e-mail string with the top e-mail
22   being one from you dated Wednesday, October
23   20, 2004. Take a look at that and just tell
24   me if you recognize it.

## Page 84

1  A. I recognize the first page. I may have seen
2    the second page. I don't recall but yes,
3    it's possible.
4  Q. The first page you're referring to setting
5    up the October meeting with Mr. Khirawi,
6    correct?
7  A. Correct.
8  Q. It appeared that Mr. Khirawi wanted or asked
9    that the meeting be digitally recorded,
10   correct?
11 A. Correct.
12 Q. You denied his request for a recorded
13   session, correct?
14 A. Correct.
15 Q. Why didn't you want to have a recorded
16   session for the meeting?
17 A. I don't know if I can answer that question.
18     MR. WINTON: To the extent it's
19   attorney/client privilege communications,
20   I'm going to instruct him not to answer.
21 A. I can't answer that question.
22 Q. Can you answer the question without
23   revealing attorney/client communications?
24 A. No, I can't.

## Page 85

1  Q. After you received the middle e-mail from
2    Mr. Khirawi asking that the meeting be
3    recorded, did you speak with Ms. Stanek?
4  A. The best of my recollection is yes.
5  Q. Was that meeting in October with Mr. Khirawi
6    recorded?
7  A. To the best of my knowledge, no.
8  Q. Did you yourself think it would be a good
9    idea to record the meeting given that Mr.
10   Khirawi had denied that he had received the
11   August 19 performance expectation document
12   during the August meeting?
13 A. I don't recall really having an opinion
14   either way.
15     (Letter dated 10/25/04 marked as
16     Exhibit No. 26)
17 Q. Take a look at what we marked Exhibit 26.
18   Do you recognize it?
19 A. I don't recognize it offhand, but it's
20   possible that I've seen this. I don't know
21   how I got it.
22 Q. Do you receiving a request from Mr. Khirawi
23   for a copy of his personnel file?
24 A. To the best of my knowledge, I believe there

22 (Pages 82 to 85)

Page 86

1   was something like that, yes.  I don't know
2   if this was the document that I saw.
3   Q. Do you see the "Stanley Cohen"?  Do you know
4      who that is?
5   A. No, I don't.
6   Q. Do you know who Farha Mowlana is?
7   A. I don't.
8   Q. Do you remember approximately when it was
9      that you received a request for his
10     personnel file?
11  A. I don't recall the approximate date.
12        (Written Reprimand marked as Exhibit
13        No. 27)
14  Q. If you can take a look at what we marked
15     Exhibit 27 and let me know whether you
16     recognize it.
17  A. Yes, I recognize this.
18  Q. This is a written reprimand issued to Mr.
19     Khirawi, correct?
20  A. Correct.
21  Q. Did you participate in drafting this
22     document?
23  A. Yes.
24  Q. Did you actually draft this?

Page 87

1   A. I participated in this document.
2   Q. Did you type it up?
3   A. I don't recall so.
4   Q. Stepping back, did you end up having a
5      meeting with Mr. Khirawi in October of 2004?
6   A. Yes.
7   Q. You met with Mr. Khirawi in person?
8   A. No.  It was over the phone.
9   Q. You were in Billerica?
10  A. Yes.
11  Q. Was anyone in the room with you when you had
12     the meeting with Mr. Khirawi?
13  A. No.
14  Q. Do you know if anyone was in the room with
15     Mr. Khirawi at the time?
16  A. I don't know.
17  Q. Do you know where he was?
18  A. I don't know exactly where he was.  I had
19     asked him to secure a conference room for
20     privacy, but I don't recall him going there.
21  Q. Was anybody else a party to that
22     conversation during that meeting?
23  A. On my end, no.
24  Q. You're not aware of anyone else other than

Page 88

1   yourself and Mr. Khirawi being a party to
2   that conversation?
3   A. Correct for me.  I don't know who was around
4      him when he was speaking.  Again, I don't
5      believe he was in the conference room.  I
6      can speak for myself.
7   Q. Can you tell me what was said during the
8      telephone meeting with Mr. Khirawi in
9      October 2004?
10  A. Are you talking about the meeting when I was
11     going to give him this document?
12  Q. How many meetings did you have with him in
13     October 2004?
14  A. I don't recall any meetings so this is the
15     one.  I just wanted to make sure of the -- I
16     started the conversation by telling him I'd
17     like to go through this document and he
18     would have an opportunity to respond
19     afterwards.  It never happened.
20  Q. What happened after you told him that you'd
21     like to go through it and that he'd have an
22     opportunity to respond?
23  A. He said, Okay.  And then I started to read
24     it and he interrupted me.  I also recall him

Page 89

1   calling me a liar several times.  I said,
2   Al, please let me finish and then you may
3   respond.  He said, Okay.
4        I started to go through the document
5   again and he interrupted me and said, I will
6   not listen to your lies, or something to
7   that effect, called me a liar several times.
8   He told me something to the effect that I
9   would have to live with myself, these lies,
10  something to the effect that he is Muslim
11  and he will not hear these lies.
12        He repeated that I was a liar over
13  and over again.  I was pretty surprised.
14  I've never -- I don't recall encountering
15  anything like that in my career, so I was a
16  little surprised.  I again reminded him,
17  Please let me finish.  You can respond.  I
18  just couldn't speak.  He would not allow me
19  to speak.
20  Q. Is there anything else that you can recall
21     that was said during that telephone meeting?
22  A. The other thing I said was -- because I
23     couldn't finish the document -- is that I
24     would end the call now and respond to him in

23  (Pages 86 to 89)

Page 90

1    writing. And then he hung up on me before I
2    was -- ended the call. And that's what I
3    recall from that conversation right now.
4    Q. Did he raise his voice?
5    A. To the best of my recollection, he did.
6    Q. You have no idea who was around him, so you
7       wouldn't know whether anyone heard him,
8       correct?
9    A. Correct.
10   Q. When we talked earlier about what you did to
11      prepare for today, you mentioned that you
12      reviewed some documents and perhaps a
13      position statement.
14           Did you review any documents that
15      related specifically to this telephone
16      meeting with Mr. Khirawi?
17   A. In preparation for this deposition?
18   Q. Yes.
19   A. I don't recall so.
20   Q. In the last six months have you reviewed any
21      documents that related to this telephone
22      meeting with Mr. Khirawi?
23   A. Other than the bit that may have been from a
24      position statement, no, I don't recall so.

Page 91

1    Q. You did review a bit that was in the
2       position statement?
3    A. I reviewed something that pertained to me
4       that could have been in a position
5       statement. I'm not exactly sure which
6       document I read from.
7    Q. When was that?
8    A. To the best of my recollection, it was
9       approximately a week and a half to two weeks
10      ago.
11   Q. This document that we marked No. 27, had you
12      sent this to Mr. Khirawi by e-mail before
13      your meeting in October 2004?
14   A. To the best of my knowledge, I did,
15      approximately 15 minutes or so prior to our
16      scheduled meeting.
17   Q. Was the meeting on October 26, 2004?
18   A. To the best of my recollection, yes.
19   Q. I see the top right on this document says,
20      "Date of Occurrence: September 24-30, 2004."
21      Is that accurate? In other words, is this a
22      written reprimand related to occurrences
23      between those September 24 to 30 dates?
24   A. To the best of my knowledge, yes, in

Page 92

1    addition to other actions.
2    Q. What's in addition to other actions?
3    A. I guess the primary fact is that he still
4       refused that he was handed the document.
5    Q. That refusal occurred within that time
6       frame, September 24 to 30; is that your
7       testimony?
8    A. I don't recall exactly.
9    Q. Is this written reprimand for anything that
10      occurred outside those dates, September 24
11      to 30?
12   A. I don't recall exactly.
13   Q. If the violations that are the subject of
14      this written reprimand occurred in the late
15      September, why wait until October 26 to
16      issue Mr. Khirawi this written reprimand?
17           MR. WINTON: I'm going to instruct
18      the witness not to the answer to the extent
19      that such answer would disclose
20      attorney/client privileged communications.
21      If you can answer that question without
22      doing so, please do so.
23   A. I'm not able to answer the question.
24   Q. You're not able to answer without revealing

Page 93

1    attorney/client communications?
2    A. Correct.
3    Q. Who decided to terminate Mr. Khirawi?
4    A. I am not sure exactly.
5    Q. Was there a meeting about it?
6           MR. WINTON: Again, I'm going to ask
7       that you not answer to the extent you're
8       going to be disclosing any attorney/client
9       privilege communications.
10   A. I can't answer the question.
11   Q. You can't answer the question without
12      revealing attorney/client communications?
13   A. That's correct.
14   Q. How long after the meeting with Mr. Khirawi,
15      the telephone meeting on October 26, 2004,
16      was the decision made to terminate him?
17   A. I don't know exactly.
18   Q. Was it within a day?
19   A. Best of my recollection it was that day.
20   Q. I understand that Mr. Khirawi's former
21      manager Paul Galipault informed him of the
22      decision to terminate him?
23   A. Yes.
24   Q. Did you ask Mr. Galipault to inform Mr.

24 (Pages 90 to 93)

**Page 94**

1    Khirawi about the termination?
2    A. I don't recall so.
3    Q. After the telephone meeting with Mr. Khirawi
4      but before he was terminated, did you speak
5      with Ms. Stanek?
6    A. Yes.
7    Q. Did you report the substance of what was
8      said in the meeting between you and Mr.
9      Khirawi to anybody before he was terminated,
10     not including Ms. Stanek or any other
11     attorneys for Getronics?
12        MR. WINTON: You're asking if he
13     spoke with anyone other than counsel?
14        MR. COHEN: That's correct.
15   A. I don't recall so.
16        (Letter dated 11/29/04 marked as
17        Exhibit No. 28)
18   Q. Take a look at this document that we marked
19     Exhibit 28. Just let me know whether you've
20     seen it before today.
21   A. I don't recall seeing this document.
22   Q. Do you know what TALX is?
23   A. I've seen it before but I don't know exactly
24     what they do.

**Page 95**

1    Q. I'm going to refer to the middle of the
2      middle paragraph, the paragraph that begins,
3      "The claimant was discharged." Do you see
4      that?
5    A. Yes.
6    Q. If you skip down to the fourth line of that
7      paragraph, I'm going to read a little bit of
8      it. "On 10/26/04 the claimant was receiving
9      a written warning for an inappropriate
10     e-mail when he became irate and started
11     calling everyone in the room a liar and
12     wouldn't sit down and listen."
13        That really didn't happen, did it,
14     during your meeting with Mr. Khirawi on
15     October 26?
16        MR. WINTON: Objection as to form.
17   A. I wasn't there. When he was calling me a
18     liar, there could have been other people
19     around. I don't know what was on his end.
20   Q. This says he was calling everyone in the
21     room a liar. As far as you know, was there
22     anyone in the room with Mr. Khirawi?
23   A. To the best of my knowledge, I don't know
24     who was in the room or the space with Mr.

**Page 96**

1    Khirawi, and the word "liar" was used so
2      many times -- best of my recollection, I
3      don't know. He could have used it to other
4      people.
5    Q. Did it seem to you from the conversation
6      that he was calling anyone in the room with
7      him a liar?
8    A. To the best of my recollection, I really
9      don't recall.
10   Q. It goes on to say, "The claimant continued
11     to talk over everyone in the room and would
12     not calm down." Do you know whether he was
13     talking over someone else in the room with
14     him who was trying to speak?
15   A. I don't know.
16   Q. Did it seem that way from the conversation
17     you had with him over the phone?
18   A. It really is hard to say. There was talking
19     over so much, talking over me and just so
20     many accusations about lying, I can't answer
21     that.
22   Q. But as far as you knew, there wasn't anyone
23     in the room with him that he was talking to,
24     correct?

**Page 97**

1        MR. WINTON: Objection as to form.
2    A. As far as I know, I don't know who was there
3      with him in a room, office. I don't know
4      where he was. He did not use the space I
5      asked him to use.
6        (Document marked as Exhibit No. 29)
7    Q. I'll give you a document that we marked No.
8      29. Can you take a look at that and let me
9      know whether you've seen it before.
10   A. Yes, I've seen this document.
11   Q. When was last time you've seen that
12     document?
13   A. I don't recall.
14   Q. Was this the document that you were
15     referring to when you said you reviewed a
16     portion of it that pertained to you?
17   A. I don't know exactly. It may be.
18   Q. Was this one of the documents that you
19     looked at within the past week and a half?
20   A. I don't know exactly. It could be because I
21     didn't see the cover.
22        (Notice of Final Disposition marked
23        as Exhibit No. 30)
24   Q. Take a look at that and let me know whether

25  (Pages 94 to 97)

Page 98

1    you've seen this before.
2  A. I don't recall seeing this but I may have.
3        MR. WINTON: That's Exhibit 30?
4        MR. COHEN: Yes.
5  Q. Were you made aware that Mr. Khirawi's June
6    2004 complaint of discrimination to the EEOC
7    had been dismissed?
8        MR. WINTON: Objection. At any time?
9        MR. COHEN: Yes.
10 A. I don't recall exactly. I may have learned
11   somewhere in the process that it was. I
12   don't recall exactly.
13 Q. Do you remember whether you were informed of
14   it before Mr. Khirawi was terminated?
15 A. I don't recall.
16 Q. Are there any incidents of insubordination
17   on the part of Mr. Khirawi of which you're
18   aware which we haven't discussed today?
19 A. I don't recall right now. I'm sure there
20   were; I just can't recall right now.
21 Q. Are there any documents that you're aware of
22   that might refresh your memory as to whether
23   there are any incidents of insubordination
24   that you're aware of which we haven't

Page 99

1    discussed today?
2  A. There may be. I don't know exactly.
3  Q. Nothing stands out in your mind as you sit
4    here now?
5  A. Not right now. If you have something, I'm
6    happy to look, but I can't think of anything
7    right now.
8  Q. I just want your memory is what I'm looking
9    for.
10       Are there any reasons for Mr.
11   Khirawi's termination that you're aware of
12   that we haven't discussed today?
13 A. Not that I can recall right now.
14 Q. Do you know who replaced Mr. Khirawi?
15 A. I don't think I do, no.
16 Q. Other than with Mr. Khirawi, have you been
17   involved in any sort of complaint of
18   discrimination at Getronics in any capacity?
19 A. Not that I can recall right now but there
20   may have been. Been there for a while.
21       MR. COHEN: I think that's all I
22   have.
23       (Recess)
24       EXAMINATION BY MR. WINTON

Page 100

1  Q. Mr. Graceffa, earlier Mr. Cohen asked you
2    questions about what factors can cause
3    someone to potentially come in at a salary
4    at Getronics underneath the entry point
5    number. Do you recall those questions?
6  A. Yes.
7  Q. I think you talked about comparatories
8    (sic), experience, and perhaps education.
9    Do you recall that?
10 A. Yes.
11 Q. Are there any other factors that you believe
12   would come into play with respect to a
13   person coming in underneath an entry point?
14 A. In addition I would say current salary and
15   market data.
16 Q. By "current salary," do you mean for someone
17   who's currently employed by Getronics?
18 A. Yes.
19 Q. Mr. Cohen showed you a number of documents
20   that you testified you don't recall having
21   seen. Do you recall those questions?
22 A. Yes.
23 Q. When you say you don't recall, that doesn't
24   mean you definitely didn't see such a

Page 101

1    document; it just means that as you sit here
2    today you can't recall having seen it; is
3    that correct?
4        MR. COHEN: Objection.
5  Q. Is that correct?
6  A. That's correct.
7  Q. At the start of your October 26, 2004,
8    telephone meeting with Mr. Khirawi, did he
9    ask you to be brief in your presentation?
10 A. Yes. I left that out. I didn't recall it
11   at that time. He started the phone call by
12   saying something to the effect of, Mr.
13   Graceffa, please be brief. I have things to
14   do, something like that.
15 Q. What was Mr. Khirawi's tone like during that
16   telephone meeting on October 26, 2004?
17 A. Very disrespectful, almost menacing. It was
18   almost like he was chanting when he called
19   me a liar over and over again, and I was
20   very uncomfortable with the situation.
21       In fact, I walked out with people for
22   the rest of the week to my car when I had
23   left. It just made me very uncomfortable,
24   that whole conversation.

26 (Pages 98 to 101)

Page 102

1 Q. You were concerned for your safety?
2 A. Yes.
3 Q. Had you ever had any experience like that
4     before in human resources?
5 A. Not that I can recall right now.
6 Q. You spoke earlier about a lawsuit where you
7     were deposed involving Belmont Springs. Do
8     you recall that?
9 A. Yes.
10 Q. I think you may have said that you were a
11     party to that lawsuit. Do you know if
12     that's true or not?
13 A. I guess I didn't understand the question. I
14     was not named personally but I was on behalf
15     of the company.
16 Q. You were a witness?
17 A. Yes, a witness.
18 Q. You testified about your training you
19     received at Getronics regarding to
20     discrimination and harassment and
21     retaliation. Do you recall that?
22 A. Yes.
23 Q. I believe you told Mr. Cohen that one of the
24     things you remember learning is that

Page 103

1     Getronics wants its employees to communicate
2     with its managers if there are any problems.
3     Do you recall that testimony?
4 A. Yes.
5 Q. Do you recall anything else about that
6     specific type of concern with respect to the
7     training?
8 A. Yes. It's always instilled that if an
9     employee is having an issue with their
10     manager they are always free to come to
11     human resources. That's what we're there
12     for. We have an open door.
13 Q. In fact, they can go to human resources
14     before their manager if they want to, can't
15     they?
16 A. Yes, absolutely.
17     MR. WINTON: I don't have any further
18     questions.
19     MR. COHEN: I don't have anything
20     else.
21     (Whereupon, this deposition concluded
22     at 2:35 p.m.)
23
24

Page 104

1   C E R T I F I C A T E
2
3 COMMONWEALTH OF MASSACHUSETTS
4 MIDDLESEX, SS.
5
6     I, Melinda M. Piccirilli, a
7 Certified Shorthand Reporter and Notary Public
8 in and for the Commonwealth of Massachusetts,
9 do hereby certify that JAMESON GRACEFFA, the
10 witness whose deposition is hereinbefore set
11 forth, was duly sworn by me and that such
12 deposition is a true and accurate record, to
13 the best of my knowledge, skills, and ability,
14 of the testimony given by such witness.
15     IN WITNESS WHEREOF, I have hereunto
16 set my hand and affixed my seal of office this
17 28th Day of August, 2006.
18
19
20     Melinda M. Piccirilli, CSR
21     Notary Public
22
23 My commission expires:
24 December 5, 2008

Page 105

1 DEPONENT'S ERRATA SHEET
2 AND SIGNATURE INSTRUCTIONS
3
4     The original of the Errata Sheet
5 has been delivered to Erik J. Winton, Esq.
6     When the Errata Sheet has been
7 completed by the deponent and signed, a copy
8 thereof should be delivered to each party of
9 record and the ORIGINAL delivered to Sol J.
10 Cohen, Esq. to whom the original deposition
11 transcript was delivered.
12
13     INSTRUCTIONS TO DEPONENT
14
15     After reading this volume of your
    deposition, indicate any corrections or changes
16 to your testimony and the reasons therefor on
    the Errata Sheet supplied to you and sign it.
17 DO NOT make marks or notations on the
    transcript volume itself.
18
19 REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
20 COMPLETED AND SIGNED ERRATA SHEET WHEN
21 RECEIVED.
22
23
24

27 (Pages 102 to 105)

Page 106

1  ATTACH TO THE DEPOSITION OF JAMESON GRACEFFA
   CASE:  KHIRAWI VS. GETRONICS
2  DATE HELD:  FRIDAY, AUGUST 11, 2006
3          ERRATA SHEET
4  INSTRUCTIONS:  After reading the transcript of
   your deposition, note any change or correction
5  to your testimony and the reason therefor on
   this sheet.  DO NOT make any marks or notations
6  on the transcript volume itself.  Sign and date
   this errata sheet (before a Notary Public, if
7  required).  Refer to Page 105 of the transcript
   for errata sheet distribution instructions.
8
   PAGE  LINE
9          CHANGE:
           REASON:
10         CHANGE:
           REASON:
11         CHANGE:
           REASON:
12         CHANGE:
           REASON:
13         CHANGE:
           REASON:
14         CHANGE:
           REASON:
15         CHANGE:
           REASON:
16         CHANGE:
           REASON:
17         CHANGE:
           REASON:
18         CHANGE:
           REASON:
19
           I have read the foregoing
20 transcript of my deposition and except for any
   corrections or changes noted above, I hereby
21 subscribe to the transcript as an accurate
   record of the statements made by me.
22
23
           JAMESON GRACEFFA
24         DATE: _____

28  (Page 106)

# EXHIBIT 44

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05-11877-WGY

_____
                                              )
AALAELDIN KHIRAWI                             )
                                              )
        Plaintiff                             )
                                              )
v.                                            )
                                              )
GETRONICS WANG CO., LLC                       )
D/B/A GETRONICS                               )
                                              )
        Defendants                            )
_____)

**PLAINTIFF, AALAELDIN KHIRAWI'S AFFIDAVIT IN SUPPORT OF HIS
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

        NOW COMES the Plaintiff, Aalaeldin Khirawi, and hereby states and deposes as

follows:

1.      My name is Aalaeldin Khirawi.  I am a United States citizen originally from the Sudan.  I

am an African Muslim.  I reside with my wife and three children in Manchester New Hampshire.

2.      I began employment with the defendant, Getronics Wang Company, LLC (hereinafter

"Getronics"), in approximately May, 1999, as a temporary employee.

3.      Getronics hired a Caucasian temporary employee named Gerald Tracy as a permanent

employee despite that Mr. Tracy began his temporary employment four months after me.

4.      After more than one year of temporary employment during which my supervisors

provided me with positive feedback, I began to suspect that Getronics's failure to hire me as a

permanent employee was race and religion based; therefore, in August, 2000, I enlisted aid from

a Washington based lobbying group, Council on American-Islamic Relations, to communicate to

Getronics my suspicion to Getronics.

5.    I did not receive any warnings or other personnel actions for insubordination or failing to communicate with my superiors or co-workers in an unprofessional manner at anytime between my May 1999 hire as a temporary employee and early 2004, over four and one-half years later.

6.    In May, 2001, Getronics chose me and others for an off site project called the "AERO" project. I began to train for this project then.

7.    Within weeks of the terrorist attack of September 11, 2001, Getronics removed me from the AERO project, under highly disputed circumstances.

8.    Without explanation from Getronics, I remained without a place to work for a period of approximately seven weeks in the fall of 2001, in essence, a paid leave of absence.

9.    I suspected that Getronics's decisions to remove me from the AERO project and to maintain me on leave of absence soon after the events of September 11, 2001, were based on my Muslim religion and ethnicity.

10.    In mid 2002, Paul Galipeau, Mr. Khirawi's manager, recommended me for a promotion to a Quality Assurance Representative position.

11.    In October 2002, Ruby Miles, a Houston based Quality Manager for Getronics, met with me at Getronics's Tewksbury, Massachusetts office (where I worked), for the purpose of interviewing me for a position of Quality Assurance Representative.

12.    Ms. Miles offered me the position of Quality Assurance Representative during her meeting with me in October, 2002, at an annual salary of $40,000.00; I accepted the position.

13.    In February, 2003, Getronics, via Mr. Galipeau, my manager in Tewksbury, asked me to begin performing the duties of the Quality Assurance Representative position.

14.    I agreed to perform the duties of the Quality Assurance Representative position despite that my salary would remain at $27,000.00, in order to assist Getronics and to help further my

career with Getronics.  I performed those duties at my $27,000 salary from February, 2003 until September, 2003.

15.     On March 19, 2003, in the context of e-mails between myself and Ms. Miles about the status of my delayed promotion, Ms. Miles, an African American woman, told me that she could identify and feel my pain, having been born and raised in the 1950's, 60's and 70's;  I understood this to mean that the delay in my promotion may have been somehow linked to my race and religion

16.     In June, 2003, I discussed the ongoing delay in my promotion (seven months since the offer as of that time) with Ms. Miles during a Tewksbury training session that we both attended; Ms. Miles told me that she thought that the delay in his promotion and salary raise was due to racial factors, saying something like "it is all racial Aalaeldin, it is because you are black, welcome to the club."

17.     At the time of Ms. Miles's comment in June, 2003, I was unsure whether Ms. Miles was simply commiserating with me in an effort to make me feel better, or whether Ms. Miles had actual knowledge of race based action on the part of Getronics upper management; therefore, I did not immediately report the comment to any superiors or Human Resources.

18.     In December 2003, I submitted a request for tuition reimbursement for IT classes that I took, which I felt were subject to reimbursement under Getronics's policy and fringe benefits package.

19.     Ms. Miles and Terrence Freeman, a Human Resources manager, denied my request for tuition benefits. Ms. Miles directed me to Human Resources manager Gayla George if I wanted to discuss the issue further.

20.     Again faced with unclear reasons for negative personnel action, I suspected that my race and religion were a factor in the denial of his tuition reimbursement because of the history I had at Getronics, including the long period of temporary employment as compared with an equivalent Caucasian employee; the removal of me from the AERO project following the events of September 11, 2001; the virtually unexplained forced leave of absence following the events of September 11, 2001; the eleven month delay in my promotion after being offered the position; and my manager's comment that the delay in my promotion was race based.

21.     In December 2003 and January 2004, Joan Anderson, a Tewksbury based Human Resources representative for Getronics, investigated my complaint of discrimination.

22.     On January 22, 2004, Ms. Anderson held a meeting with myself, Ms. Miles, and Ms. George, during which Ms. Miles admitted that she had told me that the delay in my promotion may have been race based, but that she 'did not mean it.'  (Ex. 44: Khirawi aff.).

23.     In late February, 2004, Ms. Miles assigned me to lead a February 23, 2004 conference call meeting with Patrick McHenry and Tiffany Anderson-Jones, co-workers based in Houston, relative to a project designed to improve their quality assurance process.  Ms. Miles did not tell me that Mr. McHenry (with whom I had never previously interacted), was actually supposed to lead the project and the meeting.

24.     When I tried to take the lead in the meeting with Mr. McHenry and Ms. Anderson-Jones, I met unexplained resistance.  The meeting turned into something of a power struggle, and ultimately Mr. McHenry told me to "shut up."  We then ended the conference call.

25.     On March 4, 2004, without advanced notice of the time that she would send it and without waiting for any confirmation from me, Ms. Miles faxed a Written Reprimand relative to

the events surrounding the February 23, 2004 conference call with Mr. McHenry and Ms. Anderson-Jones, to a fax machine to which other employees had access.

26.     I received the March 1, 2004 Written Reprimand when an unknown individual left the document on my desk with a note saying "bad boy."  I was embarrassed.

27.     Throughout my employment at Getronics, I never worked from home during my regular work hours.

28.     Ms. Miles and I had regular Monday morning meetings on the telephone to discuss the upcoming week's agenda, generally initiated when Ms. Miles would place a call to me on my office phone.  We had such a meeting on Monday, March 15, 2004.

29.     On Thursday, March 18, 2004, Ms. Miles sent an e-mail to me asking me whether I was working from home Mondays.

30.     Ms. Miles's inquiry into whether I was working from home Mondays confused me, given that we regularly communicated on my office phone on Mondays, and that I had never had any history of working from home.  I replied to Ms. Miles's inquiry by asking why she was asking whether I was working at home Mondays.   Ms. Miles refused to answer my question.  I suspected that Ms. Miles was setting me up by accusing me of working from home without permission.

31.     Human Resources representative Jimmy Thomas's March 19, 2004 e-mail to me left me unclear on what rights I had to report discrimination or retaliation to Getronics.  Getronics did not clarify this despite my requests.

32.     On May 21, 2004, Ms. Miles e-mailed me that I will no longer be allowed a four day work week, as the rest of her subordinate employees were permitted to work, and as she had offered me in March, 2003.

33.     On August 4, 2004, the EEOC held a mediation session to attempt to resolve the dispute surrounding my June 8, 2004 EEOC charge.  The mediation was not successful.

34.     In August 2004, Getronics assigned Jamie Graceffa, a Human Resources manager, to handle my ongoing personnel issues.

35.     On August 19, 2004, I met with Mr. Graceffa in person and with Mr. Hoffman by telephone, to go over a plan for me to submit weekly reports of my work, to maintain daily activity logs, and to e-mail Mr. Graceffa my daily arrival and departure information.  Graceffa did not present me with Performance Improvement Plan documentation.

36.     I submitted weekly reports of my work, maintained daily activity logs, and e-mailed Mr. Graceffa my daily arrival and departure information in compliance with all requests made during the meeting on August 19, 2004.

37.     I did comply with the requirement that I e-mail Mr. Graceffa my arrival and departure, but that I did so pursuant to the verbal instructions given to me on August 19, 2004, as I did not receive any Performance Expectations document that day.

38.     I met with Mr. Graceffa again on October 26, 2004.  During that meeting, Mr. Graceffa was rude, belligerent, and was yelling at me.  I stayed calm, but did deny Mr. Graceffa's repeated assertions that he gave me the August 19, 2004 Performance Expectations document on August 19, 2004.

Signed under the pains and penalties of perjury this 4th day of April, 2007.


/s/ Aalaeldin Khirawi
Aalaeldin Khirawi

# EXHIBIT 45

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05-11877-WGY

_____
                                                    )
AALAELDIN KHIRAWI                                   )
                                                    )
          Plaintiff                                 )
                                                    )
v.                                                  )
                                                    )
GETRONICS WANG CO., LLC                             )
D/B/A GETRONICS                                     )
                                                    )
          Defendants                                )
_____)

**AFFIDAVIT OF ATTORNEY SOL J. COHEN IN SUPPORT OF THE PLAINTIFF'S OPPOSITION TO DEFENDANT'S SUMMARY JUDGMENT**

NOW COMES Sol J. Cohen, attorney for the plaintiff, Aalaeldin Khirawi in the above matter, and respectfully states and deposes as follows:

1. I am a licensed attorney in the Commonwealth of Massachusetts. I represent the plaintiff in this action.

2. I have conducted or been present for all depositions taken in this matter.

3. I have had a direct role in the exchange of all written discovery exchanges between the parties.

4. All exhibits attached to the Plaintiff's Opposition to the Defendant's Motion for Summary Judgment are true copies of deposition transcripts, affidavits, and documents exchanged in discovery during the litigation of this case.

Signed under the pains and penalties of perjury this 5th day of April, 2007.

/s/      Sol J. Cohen
Sol J. Cohen
BBO # 630776
COHEN & SALES
43 Thorndike Street
Cambridge, MA 02141
(617) 621-1151

# EXHIBIT 46

COMMONWEALTH OF MASSACHUSETTS
MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

AALAELDIN KHIRAWI,

        Complainant,

v.

GETRONICS WANG CO., LLC

        Respondent.

MCAD Docket # 05BEM01078

## RESPONDENT'S STATEMENT OF POSITION

This following constitutes the position statement for Respondent Getronics Wang Co., LLC, d/b/a Getronics ("Getronics," "Respondent" or "the Company") in the above-referenced matter.[1] Complainant alleges that Respondent retaliated against him. In a word, he is wrong. It is Getronics' position that any and all allegations of retaliation contained in Aalaeldin Khirawi's ("Khirawi or "Complainant") charge are wholly without merit. In response to Complainant's specific allegations, Getronics submits the following position statement.

In summary, from the inception of his temporary placement with the Company, Complainant exhibited the fact that he is quick to anger and confrontational to his co-workers and supervisors. Complainant is easily excitable and unduly thin-skinned when coached or counseled. Indeed, he seems virtually incapable of accepting any viewpoint other than his own. Initially, Respondent's managers considered Complainant as having

---

[1] The statement of facts and position set forth herein is based upon the undersigned's knowledge of the facts at the time of this statement of position and is provided in an attempt to mediate, conciliate, settle or otherwise resolve the captioned charge. Respondent in no way waives its right to present new or additional facts or arguments based upon subsequently acquired information or evidence. Further, this statement of position, although believed to be true and correct in all respects, does not constitute an affidavit and is not intended to be used as evidence of any kind in any Commission or court proceeding.

simply a strong personality. The passage of time, however, revealed that Complainant is impenetrable to criticism or professional challenge to such a degree that outright defiance and rudeness became his routine. Obviously, Complainant was disciplined on such conduct.

Perhaps due to Complainant's utter inability to understand that others may not agree with him or view him in the way he regards himself, he concludes that the only possible reason for Company or managerial decisions or requirements that frustrate him is discriminatorily-based. Yet in each instance, there is absolutely no evidence, suggestion or proof of discrimination. There is no law protecting an employee's "right" to behave obstreperously, rudely and obnoxiously in the workplace. There is no legitimate basis for the way in which Complainant comported himself toward his supervisor: hanging up the telephone on her, telling her she is "weak," calling her a liar repeatedly, refusing to abide her simple requests and inquiries, and attempting to end-run and challenge her authority. This was wholly unacceptable and Getronics could not tolerate it any longer. Therefore, after reaching the culmination of Complainant's obstreperous and offensive behavior on October 26, 2004, Respondent terminated his employment for legitimate, non-pretextual reasons.

Each and every time he encountered frustration in the workplace or did not get his way, he leveled a baseless allegation of discrimination. He has done this again with his current allegation that his termination from employment with Getronics was in retaliation for his protected action of filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Getronics flatly denies the allegation. Respondent's reasons for his termination are well-founded. As the following narrative will demonstrate, it is Complainant who wronged his employer—not the other way around.

## I. **INTRODUCTION**

Respondent Getronics is an Information and Communications Technology ("ICT") company. The Company's solutions offerings are split up into several different business lines. The IT Sourcing Services Group, of which Complainant was a member, provides enterprise, networking and technical support services for client ICT systems. An aspect to this service delivery consists of the managing of client technical inquiries via telephone. Training of technicians who field such inquiries involves assessment of recorded calls between Getronics technicians and client end users. Complainant's role at the time of his termination was directly related to technician training. Specifically, he was employed as a Quality Representative, who was responsible for assessing and scoring service desk analysts calls. Other duties included identifying the coaching/training needs of service desk analysts and other assessors (and conducting training as needed), identifying opportunities for improvement of service delivery and performance improvement, preparing monthly metric/trending reports for service desk management, working closely with the Training group to design/write documentation to enhance contract/account performance and calibrating call assessments between Houston and Tewksbury to ensure consistency between assessors.

- 2 -

Getronics, headquartered in Billerica, Massachusetts, is an Equal Opportunity Employer. The Company also has an Affirmative Action Policy. The Getronics Equal Employment Opportunity and Affirmative Action Policy, which is adhered to and enforced by Getronics states in pertinent part:

"This policy...applies to all employees of Getronics and its affiliates and wholly-owned subsidiaries within the United States....It is the policy of Getronics to provide equal employment opportunity for all employees and to take affirmative action to ensure that employment, training, compensation, transfer, promotion, and other terms and conditions of employment are provided without regard to . . . race, religion, national origin." Complainant's managers and human resources team were familiar with the Company's EEO policy. The Complainant would have received a copy of the company's Standard of Ethics and Business Conduct brochure, which referenced the policy. The policy is also discussed in the employee handbook, which is accessible to all employees on the Company's intranet.

Further, the Getronics Policy Against Sexual Harassment And Other Workplace Harassment forbids retaliation. The policy states, "It is also unlawful and expressly against Company policy to retaliate against an employee for filing a complaint of harassment." Importantly, Complainant's managers and the Human Resources department were very familiar with Getronics' policies.

The Complainant would have received the EEO and Harassment policy statements on a regular basis as part of email distribution to all employees. See EEO policy, Policy Prohibiting Harassment, Standards of Ethics and Business Conduct, EEO Policy Statement and Policy Prohibiting Harassment Policy Statement, attached as Exhibit A.

## II.  CHRONOLOGY OF EVENTS.

### A.  Complainant's Temporary Position and Ultimate Full-Time Hiring.

Complainant began with Getronics as a temporary agency employee, employed by Tech Aid from approximately May 1999 through August 2000. Prior to Complainant's placement with Getronics, several other non-Muslim candidates were placed with Getronics by Tech Aid. Complainant started in the Call Planning department along with several other temporary employees. Soon after he started at Getronics, he requested time off each Friday to attend prayer services. Management informed Complainant that his current department, Call Planning, was unable to accommodate his request, as the phones needed to be covered at all times. However, Complainant was told that the Escalation department would be able to accommodate his requested schedule change. Thus, he was offered a position in the Escalation department (still as a temporary agency employee). Complainant accepted the position and was granted the religious accommodation.

Although Complainant and the other temporaries may have hoped to be placed in full-time positions, the technology market, which obviously impacted Getronics, was experiencing significant challenges and managing employee costs was and is a continuing struggle.

Complainant continued to press his managers for full-time employment, yet they were powerless to create an opening due to the aforementioned realities.

That said, once the opening became funded and available, Complainant was offered and accepted a full-time position as Customer Service Representative II, on or about August 28, 2000. Throughout the course of Complainant's tenure as a temporary and full-time employee, Respondent did not question his ability to perform the technical aspects of his job. In fact, Complainant received good performance review scores.

Respondent was, however, utterly dissatisfied with Complainant's interpersonal skills. In fact, Respondent was deeply disappointed with Complainant's behavior in the workplace, his obstreperous and disrespectful attitude toward his manager, his unprofessional communication style and his failure to abide his manager's directives.

### B.    Complainant's First Internal Complaint.

On August 8, 2000, via a letter from the Council on American-Islamic Relations, Mr. Khirawi made an internal complaint of religious discrimination. Respondent promptly began an investigation into Complainant's allegations and found no evidence of religious discrimination.

In his first complaint, Complainant alleged that Getronics did not grant him the religious accommodation he requested. This is untrue. As stated above, once he was moved into a group that could accommodate an alternative schedule, Complainant was afforded a schedule that allowed for Friday afternoon prayer.

Respondent is committed to fostering diversity in the workplace. Respondent has a long history of accommodating the Islamic faith in the workplace. Although absolute data points are not available since employee religion information is not collected by Respondent, Getronics does have a significant Muslim population employed in its Houston office. Getronics has established prayer rooms and accommodated the need for pre-prayer foot washing in the bathrooms. Further, Getronics does its best to balance the specialized needs of employees of various faiths during important times.

Further, Complainant alleged that Respondent harassed him purportedly because of religious discrimination. Again, this is untrue. While there may have been some friction and disagreements between Complainant and some of his co-workers, Respondent denies that these disputes constituted a hostile work environment or religious discrimination. Rather, any work environment will contain a balance of personalities and competing interests and viewpoints. Most anyone is familiar with that basic fact.

- 4 -

Complainant alleged that Respondent failed to give him a "promotion" to regular employee status within the allegedly promised six (6) months. Respondent denies that he was "promised" a promotion, nor an offer of regular employee status, within a certain time period. Budgetary restrictions, not religion-based animus, were responsible for the length of time Complainant remained in temporary status. Indeed, there were several other non-Muslim co-workers who remained in temporary status for an extended--indeed longer--period of time as well. The delay in extending regular employment offers related to budgetary constraints alone.

While the internal complaint was pending, Respondent made an offer of regular employment to Mr. Khirawi. His regular employment with Getronics, as a Customer Service Representative II, began on or about August 28, 2000. *Indeed, if Respondent were operating under religion-based animus or retaliation, for that matter, it certainly would not have hired Mr. Khirawi, particularly while an (ultimately baseless) internal complaint was pending.*

Regrettably, Mr. Khirawi's employment history was pockmarked with internal complaints and baseless allegations when he did not get what he wanted. By case in point, Complainant made allegations of religion discrimination because he was not promptly hired as a regular employee. But in fact, Complainant, along with other temporary employees, was not hired as regular employees due to budgetary constraints. In later instances, he made allegations of discrimination when there was a delay in his hire into a new position, when he did not receive a salary increase, when he did not qualify for tuition reimbursement and so on.

Getronics considers Complainant's conduct an affront to persons who have bona fide claims that would be protected by the very important state and federal statutes prohibiting discrimination. Complainant took advantage of the internal complaint procedure by making false allegations when he encountered any resistance whatsoever to his demands. Respondent submits that no employee has the right to demand money, power, title, reporting relationship, and special allowances from his employer. The privileges of employment and continued employment must be earned.

### C.    Complainant's Promotion.

Effective September 1, 2003, Complainant was promoted to the position of Quality Representative, reporting to Ruby Miles, a black female.[2] Getronics must submit, yet again, that if it were motivated by race, national origin or retaliation or other untoward basis, which Getronics vigorously denies, it most certainly would not have continued to advance Complainant's career at this juncture or any other. Yet, the fact remains: Getronics did just that; Complaint was promoted. Notwithstanding the fact that he ultimately did obtain what he coveted, Complainant continued to take issue with the amount of time required for his promotion to take place. Again, the Company must

---

[2] Please note that Mr. Khirawi worked in Tewksbury, Massachusetts and Ms. Miles works in Houston, Texas. Ms. Miles managed Complainant on a remote basis.

move cautiously in the then and current economic climate. And, hiring and promotion decisions continued to be scrutinized carefully by upper management before approvals may obtain. Although Ms. Miles may have wished she could have proceeded more quickly, at a certain point, she was powerless to shake loose a decision from a Company that must remain sharply focused on the bottom line.

With regard to the time it took to hire Complainant to the Quality Representative position, he alleged that Ms. Miles explained the delay by stating, "Because it is all racial Alladin, its because you are black....welcome to the club of suffering." *Respondent fervently denies this statement.* Ms. Miles did not say this to Complainant and Respondent was not and is not motivated by race, religion, or any other inappropriate basis. Yet, Complainant continued to insist that this statement was made, he called Ruby Miles a liar and continued to announce and claim that such a remark was made. His conduct in this regard was childish, to say the least, and, in a word, slanderous.

Complainant also alleged that he was promised a certain salary range when he was offered the Quality Representative position. This is untrue as well. Respondent denies that Ms. Miles or his former manager, Paul Galipeau, promised Complainant a certain salary, or any other types of compensation. Complainant discussed with management the various types of compensation available, but *at no point* did Ms. Miles or Mr. Galipeau promise anything specific to Complainant.

Importantly, when Complainant was promoted into the Quality Representative position, he did receive a promotion increase of 15% and an added pay adjustment of 18.1%, for a total increase of thirty-three percent (33%)! Obviously, this is a large increase in pay, particularly in light of the economic climate at issue.

### D. Complainant's Second Internal Complaint.

On or about December 18, 2003, Complainant lodged a second internal complaint with Getronics Human Resources. This complaint stemmed from the denial of Mr. Khirawi's request for tuition reimbursement. On December 18, 2003, Complainant emailed his Human Resources representative, Terence Freeman, to inquire further about why Ms. Miles had rejected his request for tuition reimbursement. Please note that Ms. Miles had already told Complainant that the denial was due to budgetary constraints. Mr. Freeman responded to Complainant, stating that his reimbursement request was denied because the courses were not job-related and because of budgetary constraints. Please note that this denial was fully in accordance with Getronics' policy on tuition reimbursement. The policy is uniformly and consistently enforced. But, because Complainant did not get his way, he once again attributed his failure to prevail to untoward bases.

Complainant made an internal complaint that Mr. Freeman, a black male, had treated him with "unexplained hostility and bias." His complaint then ballooned to include allegations regarding Ms. Miles and his employment status in general. He requested that Gayla George, Human Resources Director, launch an investigation of the

- 6 -

matter because "discrimination and bias based on [his] national origin and religion have been part of [his] history with Getronics." As with his first internal complaint, Complainant made allegations of discrimination when he did not get his way (i.e. tuition reimbursement).

In the context of his second internal complaint, Complainant alleged that the delay in his hiring into the Quality Representative position was due to religion and race discrimination. This is completely untrue. In general, all requisitions move slowly through the approval process. Notably, after Mr. Khirawi applied for the position, there was a shift in upper management which caused a hiring freeze. All open requisitions were frozen until the new management evaluated the going-forward needs of the business. Unfortunately, the position for which Complainant applied was one of the requisitions that were put on hold. Respondent absolutely denies that this delay was because of Mr. Khirawi's religion or race, or any other inappropriate basis.

Respondent dispatched local Human Resources representative, Joan Anderson, to conduct an investigation of Complainant's allegations. Ms. Anderson conducted a full and exhaustive inquiry into numerous issues raised by Complainant. Respondent found no evidence of discrimination or bias against Mr. Khirawi and reported such findings to Complainant in a memo dated January 15, 2004.

Consistent with Mr. Khirawi's unrelenting and unprofessional manner, in an increasingly shrill manner, he pressed Human Resources on his issues and continued to dispute the findings. Yet the investigation was legitimately and well-researched by Getronics. During the course of the Company's investigation, Complainant continued to call Ms. Miles a liar and would not relent in his hostility toward her.

On or about January 26, 2004, Ms. Anderson and Ms. George mediated a session between Mr. Khirawi and Ms. Miles in an attempt to establish a reasonable working relationship between the two. Mr. Khirawi refused to accept her authority over him and bickered with her over unnecessary and draining email exchanges. His interpersonal performance spiraled downward from this point forward.

### E.    Complainant's First Written Warning.

On February 23, 2004, Complainant sent an email to the team in which he demanded an apology from a co-worker. His tone in the email was disrespectful and rude. Ms. Miles responded to the team on behalf of Complainant, apologizing for his inappropriate email. Rather than move forward, Complainant responded to the team again, using the same disrespectful, inappropriate tone. Please see email exchange, attached hereto as Exhibit B. His communication style has consistently been inappropriate, unprofessional, and blatantly rude. He constantly overused the exclamation point, bold font and underlining in his email communications.

As a result of this incident, Complainant received a written reprimand dated March 1, 2004. Please see written reprimand, attached as Exhibit C. When Ms. Miles

sent Complainant an email to schedule the meeting to discuss the written warning, *he declined the meeting*. Obviously, this was another act of unacceptable insubordination. Ms. Miles emailed Complainant stating that she was proceeding with the meeting. Complainant then accused Ms. Miles of deliberately faxing his written warning to a fax machine in a public area. When Ms. Miles asked Complainant to confirm that she had his correct fax number, he did not respond. She took his silence as an acknowledgement that she had the correct fax number. This was not an intentional retaliatory gesture in response to Complainant's internal allegations of discrimination, as he has suggested.

In response to his written warning, Mr. Khirawi sent a rebuttal via email. Please see attached Exhibit D, which is the inappropriate and rude email sent by a subordinate, Mr. Khirawi, to his superior, Ms. Miles. Respondent was appalled by his lack of respect and professionalism.

### F.    Respondent's Cease and Desist Request.

Over the course of the next weeks and months, Mr. Khirawi continued his deluge of combative and disrespectful email to his manager, his manager's manager and the Human Resources department (up to and including the Vice President of Human Resources). Within his relentless flood of email to the Company, he demanded additional internal investigations of his concerns, he demanded a transfer out from under Ms. Miles' supervision, and he reiterated his alleged concerns again and again. The documentary record of this case is replete with wholly unacceptable, frankly unbelievable, exchanges that drained this organization and its managers beyond reason.

Respondent commends the investigator's attention to Exhibit E, which is a March 18, 2004 email exchange between Complainant and Ms. Miles. Complainant refused to answer a *simple* question from his manager, "Are you working from home on Mondays?" Again, Ms. Miles was located in Houston and Complainant's unwillingness to assist her remote management of him resulted in ridiculous and wasteful cycles of communication, or lack thereof. This style of communication, blatant disrespect for his manager and failure to abide his manager's directives could not be tolerated. The most prevalent theme in Complainant's tenure with Getronics was his inability to accept the authority of Ruby Miles. He simply would not abide his manager.

On March 19, 2004, HR Manager Jimmy Thomas issued a cease and desist request to Complainant. Respondent directed Complainant to answer Ms. Miles' basic question immediately. Respondent requested that Complainant stop his deluge of insubordinate, unprofessional, repetitive and disrespectful email to his manager. Further, he was asked to cease his abuse of Respondent's complaint procedures. Respondent conducted a thorough investigation of Complainant's concerns and concluded that there was no evidence of retaliation. Mr. Khirawi would not be permitted to level allegations of discrimination, retaliation or harassment at his manager with abandon.

The request specifically stated, "Do not respond to this email. We will be in contact with you to issue disciplinary steps and to outline our expectations and

- 8 -

requirements for your workplace conduct." Rather than heed Respondent's request, Complainant proceeded to send several emails in response to the email over the following weekend. The entirety of this email exchange is contained in Exhibit F, which is a stunning example of the vitriol and games-playing at issue in this matter.

### G.    Complainant's Performance Improvement Plan.

As promised in the cease and desist request, Respondent disciplined Complainant and imposed certain expectations and requirements on his workplace conduct. He was placed on a Performance Improvement Plan ("PIP") dated March 22, 2004. The PIP stated that Complainant failed to abide the terms of his written reprimand issued on March 4, 2004, in addition to the specific performance expectations which had been spelled out in the interim. Please see the PIP, which is attached hereto as Exhibit G. Ms. George and Jim Hoffman (Ms. Miles' manager) presented the PIP to Complainant on March 23, 2004. Mr. Khirawi declined to sign the PIP.

The PIP quite reasonably required Complainant to:  (a) attend all meetings requested by his manager; (b) respond immediately and politely to all requests and directives from his manager; (c) cease and desist from his deluge of email; (d) use discretion, care and caution when using the words "retaliation," "discrimination" or "harassment;" (e) take care to not abuse the complaint procedures; (f) answer his manager's question regarding whether or not he works from home on Mondays; (g) communicate with his manager in a professional and measured manner; and (h) focus on his job without anger.

### H.    Complainant's Second Written Warning.

Regrettably, the PIP did not produce the required performance improvement and Complainant continued on his rampage. Notably, on May 18, 2004, Complainant was again insubordinate and disrespectful toward his manager. Ms. Miles sent Mr. Khirawi an email regarding the reporting of his time. He was asked not to respond to her email, as the matter was closed. Instead, in defiance of Ms. Miles' directive, Complainant responded in an unacceptable and disrespectful tone. On May 21, 2004, Complainant met with Mr. Freeman, Mr. Hoffman and Ms. Miles. He was presented a written reprimand. Please see attached email exchange and written warning at Exhibit H.

At the meeting, Ms. Miles and Mr. Hoffman reminded Mr. Khirawi that he was on a PIP. Therefore, the scrutiny of his workplace conduct would be increased. In an effort to manage the performance of an employee who had displayed such unacceptable performance, Ms. Miles detailed very specific expectations for Mr. Khirawi. He was instructed to return the Company's laptop, as he no longer would be working from home. He was instructed that his new work schedule would be Monday through Friday, from 8:00-5:00. As Ms. Miles was managing Complainant remotely, she directed him to email her upon his arrival to and departure from work each day. Also, Mr. Khirawi was asked to complete a weekly status report based on a list of tasks provided by Ms. Miles each week.

As with previous disciplinary memos, Mr. Khirawi refused to sign the written warning.

## I.    Complainant's Religious Accommodation Request.

In an email following the meeting on May 21, 2004, Complainant requested an accommodation of two (2) hours off each Friday to attend religious services. This accommodation was granted on May 24, 2004. For the second time during his tenure with Getronics, he was afforded an alternate work schedule that accommodated his time away from the office on Fridays. If Respondent was biased against Complainant because of his religious beliefs, it would not have been so willing to grant his accommodation request.

## J.    Complainant's Failure to Adhere to the PIP and Written Warning.

Complainant did not adhere to the requirements and expectations laid out in the meeting on May 21, 2004. He did not send his status reports to Ms. Miles in a timely fashion. This caused numerous and unnecessary emails to be exchanged between Complainant and Ms. Miles. Also, he did not consistently send the a̶ ̶ ̶ ̶ emails to Ms. Miles. Further, as discussed in the meeting and as evic task list from Ms. Miles, Complainant was to contact his counterpart Anderson-Jones, on a regular basis. Not only did Complainant not in Anderson-Jones, but Complainant would not return Ms. Anderson-Joi insisting on use of email contrary to his colleague's and manager's req

With respect to the directive that Complainant return the laptop exhibited his insubordination and unwillingness to accept Ms. Miles' authority. In the meeting on May 21, 2004, Ms. Miles told Mr. Khirawi that she submitted a help desk ticket requesting that the laptop be picked up from Mr. Khirawi (as he would no longer be working from home). When Respondent attempted to retrieve the laptop from Complainant, he stated that it was a mistake and he would resolve the matter with Mr. Galipeau. He claimed that since he received the laptop from Mr. Galipeau, Ms. Miles could not demand for its return. Mr. Khirawi went to Mr. Galipeau and asked him if he needed the laptop back. Mr. Galipeau, having no involvement in this matter, told Complainant that he did not need the laptop back. Eventually, and only following unnecessary cycles of the handling of this manner, the laptop was returned to its rightful owner: Respondent.

No matter how many times Respondent reiterated the point to Complainant, he would not accept that Ms. Miles is his manager and he should abide her requests. This is simply another exhaustive example of Complainant's insubordination and utter disrespect for his manager, Respondent and the disciplinary/performance management process.

- 10 -

### K.   Complainant Files Formal Charge of Discrimination.

On or about June 8, 2004, Complainant filed a formal charge of discrimination with the EEOC. The EEOC contacted Respondent on June 18, 2004 to inquire whether or not Respondent wished to participate in mediation. Respondent received the official notice of the charge on or about June 22, 2004.

As evidenced in this position statement, Respondent's management and discipline of this employee began significantly before he filed a charge of discrimination. The increased scrutiny of his performance was a result of his disobedience, not a retaliatory gesture following his filing the charge of discrimination.

### L.   Complainant's Continued Failure to Adhere to the PIP and Written Warning.

On August 5, 2004, Complainant sent an email to Ms. Miles with a suggestion for monthly meetings. Ms. Miles responded to Complainant, stating that he needed to focus on her pending requests that he continued to ignore, rather than suggesting new items. After detailing her pending requests yet again, Ms. Miles wrote, "Please do not respond to this email. That is a directive. I will not tolerate back and forth discussion on these or any other directives." Complainant did not heed this warning and continued to respond repeatedly to Ms. Miles' email, questioning her directives. Complainant wrote, "I do not understand that you keep giving me directive after directive…This kind of communication can not be acceptable in such an environment and nature of business…We need to work and find a way to communicate better than this…" Why couldn't Complainant simply acknowledge that such is exactly what Ms. Miles and Respondent were trying to achieve? Why did Complainant relentlessly inquire as to Ms. Miles' intentions, rather than abide the directives she, as a manager, was giving to her employee? Indeed, management of Complainant was more than frustrating. He plain and simply rejected Ms. Miles' authority, arguing academic and irrelevant points, rather than producing and performing according to clearly identified process and standards.

### M.   Complainant's Receipt of Performance Expectations Document.

Complainant continued to resist his manager's authority and her directives. He failed to meet the expectations that had been set for him in the past. In Respondent's continued effort to manage this difficult employee's performance, Respondent increased the scrutiny of Complainant's performance again.

On August 19, 2004, Complainant met with Jamie Graceffa, Human Resources Manager, and management, at the Company's request. As Ms. Miles was on a leave of absence, Mr. Hoffman (her manager) represented management in this meeting with Complainant. As Complainant had not worked effectively with other Human Resources personnel, Respondent assigned Mr. Graceffa to handle Complainant's human resources direction and support. In the meeting, Mr. Graceffa and Mr. Hoffman presented to Complainant a Performance Expectations document which outlined the requirements

placed on him going forward. Please see attached Performance Expectations, which is at Exhibit I.

Mr. Hoffman explained the following to Complainant. Ms. Miles had been requesting certain things of Complainant for an exhaustive period of time. Although Complainant had been counseled, coached, disciplined and warned repeatedly, his compliance with Ms. Miles' directives and requirements was unsatisfactory. Complainant needed to respect his manager's authority. Complainant was directed to stop arguing back and forth with her over email.

Complainant was informed that his job is in jeopardy. He was advised that his performance, time and work product would be tightly managed and scrutinized. Since he had not proven to Respondent that he could follow the rules, the rules were being tightened. The Performance Expectations document clearly spelled out the requirements and expectations for Complainant going forward.

In addition to the expectations of professional workplace conduct that had been reiterated to Complainant on countless occasions, Mr. Hoffman and Mr. Graceffa advised Complainant of the following requirements. Mr. Khirawi was to send arrival/departure emails to Mr. Graceffa. Mr. Khirawi was to send his weekly status reports to Mr. Graceffa. Mr. Khirawi was to complete a log of his daily work activity on an hourly basis.

Yet again, Complainant was not fully abiding the plainly articulated requirements. He remained unwilling or unable to follow clear and simple instructions. Respondent continued to endeavor to extract acceptable performance from him. The road was long and excruciating.

### N.    Dismissal of Complainant's Charge of Discrimination.

Following an unsuccessful mediation session at the EEOC between Respondent and Mr. Khirawi, Respondent submitted its position statement to the EEOC on or about September 24, 2004. On or about October 13, 2004, Respondent received the Dismissal and Notice of Rights from the EEOC, advising that based on its investigation, it could not conclude that the information obtained established violations of the statutes. On or about October 26, 2004, Respondent received the Notice of Final Disposition from the Massachusetts Commission Against Discrimination ("MCAD"), advising of the EEOC's lack of probable cause finding.

### O.    Complainant's Third Written Warning.

Complainant failed miserably to abide the terms of the Performance Expectations document. Therefore, he was issued a third written warning. Mr. Graceffa set an appointment with Mr. Khirawi on October 26, 2004 at 10:00 a.m.

The written warning addressed the following performance issues: (a) Complainant's denial of the existence of a "performance expectations" document, which was presented to him during the above-referenced meeting on August 19, 2004; (b) Mr. Khirawi's unwillingness and/or inability to acknowledge a differing viewpoint; (c) his unwillingness and/or inability to cease an argument and stop his relentless cycles of email even after explicitly being directed to do so; and (d) his argumentative, rude and disrespectful communication style. Please see attached Written Warning, which is at Exhibit J.

At approximately 9:45 a.m. on October 26, 2004, Mr. Graceffa forwarded this third written warning to Complainant via email. In his email, Mr. Graceffa requested that Complainant print the written warning and bring it with him to the conference room reserved for Mr. Khirawi's call to Mr. Graceffa, scheduled for 10:00 a.m.[3]

At approximately 10:02 a.m., Complainant called Mr. Graceffa from his desk, notwithstanding Mr. Graceffa's explicit request that he call from a conference room (so as to protect Complainant's own privacy). Following receipt of assurance that Complainant wished to speak from his work area rather than in a conference room, Mr. Graceffa proceeded with the meeting. Mr. Graceffa attempted to present the written warning to Complainant. However, Complainant would not even permit Mr. Graceffa to speak. He immediately interrupted with a most inappropriate comment, "Mr. Graceffa, please try to be brief. I have work to do." And, Complainant continued to interject and chant at Mr. Graceffa stating words to the effect of, "I will not listen to your lies. You are a liar, Mr. Graceffa. I swear by my God I am not going to listen to lies," and "You are a human being and have to live with yourself." Also, he chanted, in a menacing fashion, "You are a liar, Mr. Graceffa, you are a liar. A liar. A liar. I am a Muslim and I will not accept your fabrications. You are a liar. You are a liar..."

Indeed, the entirety of the warning to be issued was based on repeated occurrences of thoroughly documented events of Complainant's unacceptable behavior. Rather than acknowledge his own countless failings, Complainant sought to diffuse the issue with his suggestion of religious superiority, his ludicrous denials, and his slanderous and menacing statements to Mr. Graceffa.

After several unsuccessful attempts to make his points, Mr. Graceffa asked Complainant if he was going to sign the document. As with past disciplinary actions, he refused to sign it. It was clear that Complainant would not listen to Mr. Graceffa. It was a highly uncomfortable situation for Mr. Graceffa because Complainant's behavior was quite disturbing. Therefore, Mr. Graceffa stated, "I will communicate the rest of this meeting to you via written word. I am going to end the call." Mr. Khirawi hung up while Mr. Graceffa was still on the line.

---

[3] At 10:01 a.m., Complainant replied to Mr. Graceffa's 9:46 a.m. email. Mr. Graceffa did not read this email prior to the meeting, as it was sent after the meeting was scheduled to commence. Complainant's email is attached as Exhibit K.

### P.    Complainant's Termination.

Complainant's unwillingness to accept a viewpoint other than his own and his extreme conduct rendered him unemployable at Getronics. Complainant's unprofessional, disrespectful and disturbing behavior was completely unacceptable for an employee of Getronics. Complainant's exchange with Mr. Graceffa constituted that absolute last straw. Respondent could not tolerate his deplorable behavior any longer. Indeed, there was no law protecting Complainant's employment at this point in time.

Respondent made the decision to terminate Complainant's employment immediately, on the basis of flagrant and continued lack of professionalism. Complainant's former manager Mr. Galipeau, with whom Complainant had a good relationship in the past, communicated the fact of Complainant's termination to him. On the same day, Respondent sent a letter to Complainant confirming his termination effective October 27, 2004 and enclosing Complainant's final pay and termination packet.

Because of security concerns following Complainant's irrational and disturbing behavior in the meeting with Mr. Graceffa, and his volatile temper exhibited throughout his tenure with Getronics, Respondent instituted several precautionary measures upon his departure.

The reason for Complainant's termination is simple. Getronics could no longer endure the level of obnoxiousness, unprofessionalism and denial of responsibility from this employee. Respondent tolerated Complainant's unacceptable behavior for long enough, in an exhaustive effort to reach and manage this employee into having acceptable interactions and respect for authority in the workplace. Plain and simply, Complainant was terminated for his continued and flagrant inappropriate conduct. He was *not* terminated because of his race, religion or national origin. He was *not* terminated in retaliation for his filing of various internal complaints or his filing of a charge of discrimination with the EEOC. Based on the duration of disciplinary and management efforts alone, Complainant cannot succeed with such spurious claims. Indeed, the record is replete with incidents of termination-qualifying conduct. At the end of the day, Getronics has the right to insist: enough!

### Q.    Complainant's Second Charge of Discrimination.

On or about April 11, 2005, Complainant filed a charge of discrimination with the MCAD. Respondent received notice of this charge on April 25, 2005. This position statement serves as Getronics' response to this second charge of discrimination, which contains the allegation that Getronics terminated his employment in retaliation for his engaging in a protected activity (filing his original charge of discrimination with the EEOC).

### III.    SUMMARY

Getronics is more convinced in this case than any other to date that no act of discrimination or retaliation has occurred. Indeed, Complainant taxed this Company and its Human Resources team to its breaking point with his correspondence and confrontational attitude. Following several internal allegations and countless complaints by this employee, Getronics is confident and clear in the sufficiency of its exhaustive investigations into his concerns. The conclusions were and continue to be: he was treated fairly. In no way, shape or form was Complainant's termination attributable to retaliation or other untoward basis. Complainant was terminated as a direct result of his continued and blatant lack of professionalism, which culminated in the events of October 26, 2004. Getronics has no obligation to tolerate such rude behavior from any of its employees. In fact, Getronics went above and beyond the call of duty in enduring his behavior for such a long period of time, while its management and HR teams endeavored to work with Complainant and the challenging situation at hand.

Again, this matter is brought by an individual who has not and cannot process information beyond that of his own and insular viewpoint. But one man's zealous pursuit of his own interests does not a discrimination or retaliation case make.

In closing, as demonstrated by the chronology of events laid out in this position statement, Respondent tried hard to make this relationship work. However, Complainant failed to abide the basics of supervisor and subordinate relationship and professional respect for the viewpoints and needs of others. Therefore, he was rightfully terminated.

### IV.    RESPONDENT'S AFFIRMATIVE DEFENSES

Respondent also asserts the following affirmative defenses to the allegations contained in the Complainant's charge of discrimination:

1.    Complainant has failed to establish a prima facie case of retaliation.

2.    Complainant fails to state a claim upon which relief can be granted.

3.    Complainant's allegations are barred, in whole or in part, by the applicable limitations period.

4.    Every action Respondent took with respect to Complainant's employment was taken for legitimate business reasons and was consistent with principles of law.

5.    Complainant's claim is barred by the doctrines of unclean hands, waiver, estoppel and/or laches.

6.  Complainant has suffered no damages. To the extent Complainant can establish damages, Complainant's claims are barred, in whole or in part, by his failure effectively to mitigate his damages.

7.  Complainant suffered no adverse action.

8.  Complainant has failed to take advantage of the preventative and/or correction opportunities provided by Getronics and otherwise to avoid harm.

9.  Respondents reserve the right to assert additional affirmative defenses should they become aware of additional defenses during the course of these proceedings.

10. To the extent any allegations of discrimination or retaliation are not specifically denied above, they are hereby denied.

## V.  CONCLUSION

As the foregoing demonstrates, Getronics terminated Complainant for well-documented, legitimate reasons. It could no longer bear the unreasonable burden of Complainant's egregious behavior. It did not terminate him in retaliation for his filing of internal complaints and a formal charge of discrimination with the EEOC. Nor were Respondent's articulated reasons pretext for discriminatory animus. Therefore, Complainant's charge of discrimination should be dismissed.

Please feel free to contact me if you require any additional information to complete your investigation.

Respectfully submitted,

Marthe C. Stanek

Notary Public:

My Commission Expires:

Marthe Stanek _____ personally appeared before me, and proved his/her identification through satisfactory evidence, which were MA Drivers Lic to be the person whose name is signed on the preceding or attached document in my presence on this 27 day of May 05.

Alisha A. Rochon    Commonwealth of Massachusetts
Notary Public    My Commission Expires November 17, 2006

- 16 -

## AFFIRMATION

I, Jamie Graceffa, Human Resources Manager, being duly sworn, depose and say that I am an authorized agent of Respondent Getronics, and that I verify and affirm Respondent's Position Statement for and on behalf of Respondent, and am duly authorized to do so. I further state that the matters stated herein are not within my personal knowledge; that the facts stated herein have been assembled by authorized employees and counsel of Respondent, and I am informed that the facts stated therein are true.

Signed under the pains and penalties of perjury this 27th day of May, 2005.

_____
Jamie Graceffa
Human Resources Manager

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above document was served on Complainant's attorney, Sol J. Cohen, Cohen & Sales, 43 Thorndike Street, Cambridge, MA 02141, by U.S. Certified Mail, Return Receipt Requested, on this 27th day of May, 2005.

_____
Marthe C. Stanek

- 17 -

# EXHIBIT 47



**Getronics**

290 Concord Road

Billerica, MA 01821-4130

Telephone: 978-625-5230

Fax: 978-625-522⏐

E-mail: marthe.stanek@getronics.com

www.getronics .com

Marthe C. Stanek
Associate General Counsel, Employment

September 24, 2004

**VIA OVERNIGHT MAIL**

Kenneth An, Investigator
Equal Employment Opportunity Commission
John F. Kennedy Federal Building
Government Center, Room 475
Boston, MA  02203

RE:  **Aalaeldin Khirawi, EEOC Charge No. 161-2004-00285**

Dear Mr. An:

This letter will serve as the position statement for Respondent GetronicsWang Co., LLC, d/b/a Getronics ("Getronics," "Respondent" or "the Company") in the above-referenced matter.[1]  Complainant alleges that Respondent discriminated against him on the basis of his religion and race, and retaliated against him.  In a word, he is wrong.  It is Getronics' position that any and all allegations of discrimination and retaliation contained in Aalaeldin Khirawi's ("Khirawi" or "Complainant") charge are wholly without merit.  In response to Complainant's specific allegations, Getronics submits the following position statement.

In summary, from the inception of his temporary placement with the Company, Complainant exhibited the fact that he is quick to anger and confrontational to his co-

---

[1]  The statement of facts and position set forth herein is based upon the undersigned's knowledge of the facts at the time of this statement of position and is provided in an attempt to mediate, conciliate, settle or otherwise resolve the captioned charge. Respondent in no way waives its right to present new or additional facts or arguments based upon subsequently acquired information or evidence.  Further, this statement of position, although believed to be true and correct in all respects, does not constitute an affidavit and is not intended to be used as evidence of any kind in any Commission or court proceeding.

Kenneth An
September 24, 2004
Page 2 of 14

workers and supervisors. Complainant is easily excitable and unduly thin-skinned when coached or counseled. Indeed, he seems virtually incapable of accepting any viewpoint other than his own. Initially, Respondent's managers considered Complainant as having simply a strong personality. The passage of time, however, has revealed that Complainant is impenetrable to criticism or professional challenge to such a degree that outright defiance and rudeness became his routine. Obviously, Complainant has been and continues to be disciplined on such conduct. Each and every time he encounters frustration in the workplace or does not get his way, he levels a baseless allegation of discrimination.

Perhaps due to his utter inability to understand that others may not agree with him or view him in the way he regards himself, he concludes that the only possible reason for Company or managerial decisions or requirements that frustrate him is discriminatorily-based. Yet in each instance, there is absolutely no evidence, suggestion or proof of discrimination. There is no law protecting an employee's "right" to behave obstreperously and rudely and obnoxiously in the workplace. There is no legitimate basis for the way in which Complainant has comported himself toward his supervisor: hanging up the telephone on her, telling her she is "weak," calling her a liar repeatedly, refusing to abide her simple requests and inquiries, and attempting to end-run and challenge her authority. This is wholly unacceptable and Getronics will not tolerate it. As the following narrative will demonstrate, it is Complainant who has wronged his employer— not the other way around—and Complainant must re-earn the trust and faith of this Respondent. That is the remedy Respondent respectfully submits is warranted here.

## I.  INTRODUCTION

Respondent Getronics is an Information and Communications Technology ("ICT") company. The Company's solutions offerings are split up into several different business lines. The IT Sourcing Services Group, of which Complainant is a member, provides enterprise, networking and technical support services for client ICT systems. An aspect to this service delivery consists of the managing of client technical inquiries via telephone. Training of technicians who field such inquiries involves assessment of recorded calls between Getronics technicians and client end users. Complainant's current role is directly related to technician training. Specifically, he is employed as a Quality Representative, who is responsible for assessing and scoring service desk analysts calls. Other duties include identifying the coaching/training needs of service desk analysts and other assessors (and conducting training as needed), identifying opportunities for improvement of service delivery and performance improvement, preparing monthly metric/trending reports for service desk management, working closely with the Training group to design/write documentation to enhance contract/account performance and calibrating call assessments between Houston and Tewksbury to ensure consistency between assessors.

Getronics, headquartered in Billerica, Massachusetts, is an Equal Opportunity Employer. The Company also has an Affirmative Action Policy. The Getronics Equal

GETR0155

Kenneth An
September 24, 2004
Page 3 of 14

Employment Opportunity and Affirmative Action Policy, which is adhered to and
enforced by Getronics states in pertinent part:

> "This policy…applies to all employees of Getronics and its affiliates and wholly-
> owned subsidiaries within the United States.…It is the policy of Getronics to provide
> equal employment opportunity for all employees and to take affirmative action to ensure
> that employment, training, compensation, transfer, promotion, and other terms and
> conditions of employment are provided without regard to . . . race, religion, national
> origin."

Complainant's managers and human resources team were familiar with the
Company's EEO policy.  The Complainant would have received a copy of the company's
Standard of Ethics and Business Conduct brochure, which referenced the policy.

Further, the Getronics Policy Against Sexual Harassment And Other Workplace
Harassment forbids retaliation. The Complainant would have received the EEO and
Harassment policy statements on a regular basis as part of email distribution to all
employees.  See EEO policy, Policy Prohibiting Harassment, Standards of Ethics and
Business Conduct, EEO Policy Statement and Policy Prohibiting Harassment Policy
Statement, attached as Exhibit A.

## II.  CHRONOLOGY OF EVENTS.

### A.    Complainant's Temporary Position and Ultimate Full-Time Hiring.

Complainant began with Getronics as a temporary agency employee, employed
by Tech Aid from approximately May 1999 through August 2000.  Prior to
Complainant's placement with Getronics, several other non-Muslim candidates were
placed with Getronics by Tech Aid.  Complainant started in the Call Planning department
along with several other temporary employees.  Soon after he started at Getronics, he
requested time off each Friday to attend prayer services.  Management informed
Complainant that his current department, Call Planning, was unable to accommodate his
request, as the phones needed to be covered at all times.  However, Complainant was told
that the Escalation department would be able to accommodate his requested schedule
change.  Thus, he was offered a position in the Escalation department (still as a
temporary agency employee).  Complainant accepted the position and was granted the
religious accommodation.

Although Complainant and the other temporaries may have hoped to be placed in
full-time positions, the technology market, which obviously impacted Getronics, was
experiencing significant challenges and managing employee costs was and is a
continuing struggle.

Complainant continued to press his managers for full-time employment, yet they
were powerless to create an opening due to the aforementioned realities.

Kenneth An
September 24, 2004
Page 4 of 14

That said, once the opening became funded and available, Complainant was offered and accepted a full-time position as Customer Service Representative II, on or about August 28, 2000. Throughout the course of Complainant's tenure as a temporary and full-time employee, Respondent has not questioned his ability to perform the technical aspects of his job. In fact, Complainant has received good performance review scores.

Respondent is, however, utterly dissatisfied with Complainant's interpersonal skills. In fact, Respondent is deeply disappointed with Complainant's behavior in the workplace, his obstreperous and disrespectful attitude toward his manager, his unprofessional communication style and his failure to abide his manager's directives.

**B.      Complainant's First Internal Complaint.**

On August 8, 2000, via a letter from the Council on American-Islamic Relations, Mr. Khirawi made an internal complaint of religious discrimination. Respondent promptly began an investigation into Complainant's allegations and found no evidence of religious discrimination.

In his first complaint, Complainant alleged that Getronics did not grant him the religious accommodation he requested. This is untrue. As stated above, once he was moved into a group that could accommodate an alternative schedule, Complainant was afforded a schedule that allowed for Friday afternoon prayer.

Respondent is committed to fostering diversity in the workplace. Respondent has a long history of accommodating the Islamic faith in the workplace. Although absolute data points are not available since employee religion information is not collected by Respondent, Getronics does have a significant Muslim population employed in its Houston office. Getronics has established prayer rooms and accommodated the need for pre-prayer foot washing in the bathrooms. Further, Getronics does its best to balance the specialized needs of employees of various faiths during important times.

Further, Complainant alleged that Respondent harassed him purportedly because of religious discrimination. Again, this is untrue. While there may have been some friction and disagreements between Complainant and some of his co-workers, Respondent denies that these disputes constituted a hostile work environment or religious discrimination. Rather, any work environment will contain a balance of personalities and competing interests and viewpoints. Most anyone is familiar with that basic fact.

Complainant alleged that Respondent failed to give him a "promotion" to regular employee status within the allegedly promised six (6) months. Respondent denies that he was "promised" a promotion, nor an offer of regular employee status within a certain time period. Budgetary restrictions, not religion-based animus, were responsible for the length of time Complainant remained in temporary status. Indeed, there were several other non-

Kenneth An
September 24, 2004
Page 5 of 14

Muslim co-workers who remained in temporary status for an extended--indeed longer--period of time as well. The delay in extending regular employment offers related to budgetary constraints alone.

While the internal complaint was pending, Respondent made an offer of regular employment to Mr. Khirawi. His regular employment with Getronics, as a Customer Service Representative II, began on or about August 28, 2000. *Indeed, if Respondent were operating under religion-based animus or retaliation, for that matter, it certainly would not have hired Mr. Khirawi, particularly while an (ultimately baseless) internal complaint was pending.*

Regrettably, Mr. Khirawi's employment history is pockmarked with internal complaints and baseless allegations when he does not get what he wants. By case in point, Complainant made allegations of religion discrimination because he was not promptly hired as a regular employee. But in fact, Complainant, along with other temporary employees, was not hired as regular employees due to budgetary constraints. In later instances, he made allegations of discrimination when there was a delay in his hire into a new position, when he did not receive a salary increase, when he did not qualify for tuition reimbursement and so on.

Getronics considers such conduct an affront to persons who have bona fide claims that would be protected by the very important state and federal statutes prohibiting discrimination. Complainant has taken advantage of the internal complaint procedure by making false allegations when he encounters any resistance whatsoever to his demands. Respondent submits that no employee has the right to demand money, power, title, reporting relationship, and special allowances from his employer. The privileges of employment and continued employment must be earned.

## C.    Complainant's Promotion.

Effective September 1, 2003, Complainant was promoted to the position of Quality Representative, reporting to Ruby Miles, a black female. Getronics must submit, yet again, that if it were motivated by race, national origin or retaliation, which Getronics vigorously denies, it most certainly would not have continued to advance Complainant's career at this juncture or any other. Yet, the fact remains: Getronics did just that; Complaint was promoted. Notwithstanding the fact that he ultimately did get his way in this instance, Complainant continued to take issue with the amount of time required for his promotion to take place. Again, the Company must move cautiously in the then and current economic climate. And, hiring and promotion decisions continued to be scrutinized deeply by upper management before approvals may obtain. Although Ms. Miles may have wished she could have proceeded more quickly, at a certain point, she was powerless to shake loose a decision from a Company that must remain sharply focused on the bottom line.

GETR0158

Kenneth An
September 24, 2004
Page 6 of 14

Please note that Mr. Khirawi works in Tewksbury, Massachusetts and Ms. Miles works in Houston, Texas. Ms. Miles must manage Complainant on a remote basis.

With regard to the time it took to hire Complainant to the Quality Representative position, he alleged that Ms. Miles explained the delay by stating, "Because it is all racial Alladin, its because you are black….welcome to the club of suffering." *Respondent fervently denies this statement.* Ms. Miles did not say this to Complainant and Respondent is not motivated by race, religion, or any other untoward basis. Yet, Complainant continues to insist that this statement was made to such an extent that he has called Ruby Miles a liar and continues to announce and claim that such a remark was made. His conduct in this regard is childish, to say the least, and, in a word, slanderous.

Complainant has also alleged that he was promised a certain salary range when he was offered the Quality Representative position. This is untrue as well. Respondent denies that Ms. Miles or his former manager, Paul Galipeau, promised Complainant a certain salary, or any other types of compensation. Complainant discussed with management the various types of compensation available, but *at no point* did Ms. Miles or Mr. Galipeau promise anything specific to Complainant.

Importantly, when Complainant was promoted into the Quality Representative position, he did receive a promotion increase of 15% and an adjustment of 18.1%, for a total increase of thirty-three percent (33%)! Obviously, this is a large increase in pay, particularly in light of the economic climate at issue.

###    D.    Complainant's Second Internal Complaint.

On or about December 18, 2003, Complainant lodged a second internal complaint with Getronics Human Resources. This complaint stemmed from the denial of Mr. Khirawi's request for tuition reimbursement. On December 18, 2003, Complainant emailed his Human Resources representative, Terence Freeman, to inquire further about why Ms. Miles had rejected his request for tuition reimbursement. Please note that Ms. Miles had already told Complainant that the denial was due to budgetary constraints. Mr. Freeman responded to Complainant, stating that his reimbursement request was denied because the courses were not job-related and because of budgetary constraints. Please note that this denial was in accordance with Getronics' policy on tuition reimbursement. The policy is uniformly and consistently enforced. But, because Complainant did not get his way, he once again attributes his failure to prevail to untoward bases.

Complainant made an internal complaint that Mr. Freeman, a black male, had treated him with "unexplained hostility and bias." His complaint then ballooned to include allegations regarding Ms. Miles and his employment status in general. He requested that Gayla George, Human Resources Director, launch an investigation of the matter because "discrimination and bias based on [his] national origin and religion have been part of [his] history with Getronics." As with his first internal complaint,

GETR0159

Kenneth An
September 24, 2004
Page 7 of 14

Complainant made allegations of discrimination when he did not get his way (i.e. tuition
reimbursement).

In the context of his second internal complaint, Complainant alleged that the
delay in his hiring into the Quality Representative position was due to religion and race
discrimination. This is completely untrue. In general, all requisitions move slowly
through the approval process. Notably, after Mr. Khirawi applied for the position, there
was a shift in upper management which caused a hiring freeze. All open requisitions
were frozen until the new management evaluated the going-forward needs of the
business. Unfortunately, the position for which Complainant applied was one of the
requisitions that were put on hold. Respondent absolutely denies that this delay was
because of Mr. Khirawi's religion or race, or any other inappropriate basis.

Respondent dispatched local Human Resources representative, Joan Anderson, to
conduct an investigation of Complainant's allegations. Ms. Anderson conducted a full
and exhaustive inquiry into numerous issues raised by Complainant. Respondent found
no evidence of discrimination or bias against Mr. Khirawi and reported such findings to
Complainant in a memo dated January 15, 2004.

Consistent with Mr. Khirawi's unrelenting and unprofessional manner, in an
increasingly shrill manner, he pressed Human Resources on his issues and continued to
dispute the findings. Yet the investigation was legitimately and well-researched by
Getronics. During the course of the Company's investigation, Complainant continued to
call Ms. Miles a liar and would not relent in his hostility toward her.

On or about January 26, 2004, Ms. Anderson and Ms. George mediated a session
between Mr. Khirawi and Ms. Miles in an attempt to establish a reasonable working
relationship between the two. Mr. Khirwari refused to accept her authority over him and
bickered with her over unnecessary and draining email exchanges. His interpersonal·
performance spiraled downward from this point forward.

### E.    Complainant's First Written Warning.

On February 23, 2004, Complainant sent an email to the team in which he
demanded an apology from a co-worker. His tone in the email was disrespectful and
rude. Ms. Miles responded to the team on behalf of Complainant, apologizing for his
inappropriate email. Rather than move forward, Complainant responded to the team
again, using the same disrespectful, inappropriate tone. Please see email exchange,
attached hereto as Exhibit B. His communication style has consistently been
inappropriate, unprofessional, and blatantly rude. He constantly overuses the
exclamation point, bold font and underlining in his email communications.

As a result of this incident, Complainant received a written reprimand dated
March 1, 2004. Please see written reprimand, attached as Exhibit C. When Ms. Miles
sent Complainant an email to schedule the meeting to discuss the written warning, *he*

GETR0160

Kenneth An
September 24, 2004
Page 8 of 14

*declined the meeting.* Obviously, this was another act of unacceptable insubordination.
Ms. Miles emailed Complainant stating that she was proceeding with the meeting.
Complainant then accused Ms. Miles of deliberately faxing his written warning to a fax
machine in a public area. When Ms. Miles asked Complainant to confirm that she had
his correct fax number, he did not respond. She took his silence as an acknowledgement
that she had the correct fax number. This was not an intentional retaliatory gesture in
response to Complainant's internal allegations of discrimination, as he has suggested.

In response to his written warning, Mr. Khirawi sent a rebuttal via email. Please
see attached Exhibit D, which is the inappropriate and rude email sent by an employee,
Mr. Khirawi, to his manager, Ms. Miles. Respondent is appalled at his lack of respect
and professionalism.

### F.    Respondent's Cease and Desist Request.

Over the course of the next weeks and months, Mr. Khirawi continued his deluge
of combative and disrespectful email to his manager, his manager's manager and the
Human Resources department (up to and including the Vice President of Human
Resources). Within his relentless flood of email to the Company, he demanded
additional internal investigations of his concerns, he demanded a transfer out from under
Ms. Miles' supervision, and he reiterated his alleged concerns again and again. The
documentary record of this case is replete with wholly unacceptable, frankly
unbelievable, exchanges that drained this organization and its managers beyond reason.

Respondent commends the investigator's attention to Exhibit E, which is a March
18, 2004 email exchange between Complainant and Ms. Miles. Complainant refused to
answer a *simple* question from his manager, "Are you working from home on Mondays?"
This style of communication, blatant disrespect for his manager and failure to abide his
manager's directives could not and cannot be tolerated at Getronics. The most prevalent
theme in Complainant's tenure with Getronics is his inability to accept the authority of
his supervisor. He simply will not abide his manager.

On March 19, 2004, Jimmy Thomas, on behalf of Gayla George, Human
Resources Director, issued a cease and desist request to Complainant. Respondent
directed Complainant to answer Ms. Miles' basic question immediately. Respondent
requested that Complainant stop his deluge of insubordinate, unprofessional, repetitive
and disrespectful email to his manager. Further, he was asked to cease his abuse of
Respondent's complaint procedures. Respondent conducted a thorough investigation of
Complainant's concerns and concluded that there was no evidence of retaliation. Mr.
Khirawi would not be permitted to level allegations of discrimination, retaliation or
harassment at his manager with abandon.

The request specifically stated, "Do not respond to this email. We will be in
contact with you to issue disciplinary steps and to outline our expectations and
requirements for your workplace conduct." Rather than heed Respondent's request,

GETR0161

Kenneth An
September 24, 2004
Page 9 of 14

Complainant proceeded to send several emails in response to the email over the following
weekend. The entirety of this email exchange is contained in Exhibit F, which is a
stunning example of the vitriol and games-playing at issue in this matter.

### G.    Complainant's Performance Improvement Plan.

As promised in the cease and desist request, Respondent disciplined Complainant
and imposed certain expectations and requirements on his workplace conduct. He was
placed on a Performance Improvement Plan ("PIP") dated March 22, 2004. The PIP
stated that Complainant failed to abide the terms of his written reprimand issued on
March 4, 2004, in addition to the specific performance expectations which had been
spelled out in the interim. Please see the PIP, which is attached hereto as Exhibit G. Ms.
George and Jim Hoffman (Ms. Miles' manager) presented the PIP to Complainant on
March 23, 2004. Mr. Khirawi declined to sign the PIP.

The PIP quite reasonably required Complainant to:  (a) attend all meetings
requested by his manager; (b) respond immediately and politely to all requests and
directives from his manager; (c) cease and desist from his deluge of email; (d) use
discretion, care and caution when using the words "retaliation," "discrimination" or
"harassment;" (e) take care to not abuse the complaint procedures; (f) answer his
manager's question regarding whether or not he works from home on Mondays; (g)
communicate with his manager in a professional and measured manner; and (h) focus on
his job without anger.

### H.    Complainant's Second Written Warning.

Regrettably, the PIP did not produce the required performance improvement and
Complainant continued on his rampage. Notably, on May 18, 2004, Complainant was
again insubordinate and disrespectful toward his manager. Ms. Miles sent Mr. Khirawi
an email regarding the reporting of his time. He was asked not to respond to her email, as
the matter was closed. Instead, in defiance of Ms. Miles' directive, Complainant
responded in an unacceptable and disrespectful tone. On May 21, 2004, Complainant
met with Mr. Freeman, Mr. Hoffman and Ms. Miles. He was presented a written
reprimand. Please see attached email exchange and written warning at Exhibit H.

At the meeting, Ms. Miles and Mr. Hoffman reminded Mr. Khirawi that he was
on a PIP. Therefore, the scrutiny of his workplace conduct would be increased. In an
effort to manage the performance of an employee who had displayed such unacceptable
performance, Ms. Miles detailed very specific expectations for Mr. Khirawi. He was
instructed to return his laptop, as he no longer would be working from home. He was
instructed that his new work schedule would be Monday through Friday, from 8:00-5:00.
As Ms. Miles was managing Complainant remotely, she directed him to email her upon
his arrival to and departure from work each day. Also, Mr. Khirawi was asked to
complete a weekly status report based on a list of tasks provided by Ms. Miles each week.

GETR0162

Kenneth An
September 24, 2004
Page 10 of 14

As with previous disciplinary memos, Mr. Khirawi refused to sign the written warning.

### I.    Complainant's Religious Accommodation Request.

In an email following the meeting on May 21, 2004, Complainant requested an accommodation of two (2) hours off each Friday to attend religious services. This accommodation was granted on May 24, 2004. For the second time during his tenure with Getronics, he was afforded an alternate work schedule that accommodated his time away from the office on Fridays. If Respondent was biased against Complainant because of his religious beliefs, it would not have been so willing to grant his accommodation request.

### J.    Complainant's Failure to Adhere to the PIP and Written Warning.

Complainant did not adhere to the requirements and expectations laid out in the meeting on May 21, 2004. He did not send his status reports to Ms. Miles in a timely fashion. This caused numerous unnecessary emails to be exchanged between Complainant and Ms. Miles. Also, he did not consistently send the arrival and departure emails to Ms. Miles. Further, as discussed in the meeting and as evidenced in the weekly task list from Ms. Miles, Complainant was to contact his counterpart in Houston, Tiffiny Anderson-Jones, on a regular basis. Not only did Complainant not initiate calls to Ms. Anderson-Jones, but Complainant would not return Ms. Anderson-Jones' calls, instead preferring to respond via email. Throughout the on-going process of managing Complainant's performance, he has continually failed in this regard.

With respect to the directive that Complainant return the laptop, he again exhibited his insubordination and unwillingness to accept Ms. Miles' authority. In the meeting on May 21, 2004, Ms. Miles told Mr. Khirawi that she submitted a help desk ticket requesting that the laptop be picked up from Mr. Khirawi (as he would no longer be working from home). When Respondent attempted to retrieve the laptop from Complainant, he stated that it was a mistake and he would resolve the matter with Mr. Galipeau. He claimed that since he received the laptop from Mr. Galipeau, Ms. Miles could not demand for its return. Mr. Khirawi went to Mr. Galipeau and asked him if he needed the laptop back. Mr. Galipeau, having no involvement in this matter, told Complainant that he did not need the laptop back. Eventually, the laptop was returned to its rightful owner: Respondent.

No matter how many times Respondent reiterated it to Complainant, he would not accept that Ms. Miles is his manager and he should abide her requests. This is simply another exhaustive example of Complainant's insubordination and utter disrespect for his manager, Respondent and the disciplinary/performance management process.

GETR0163

Kenneth An
September 24, 2004
Page 11 of 14

### K.    Complainant Files Formal Charge of Discrimination.

Unbeknownst to Respondent, on June 8, 2004, Complainant filed a formal charge of discrimination with the Equal Employment Opportunity Commission. The EEOC contacted Respondent on June 18, 2004 to inquire whether or not Respondent wished to participate in mediation. Respondent received the official notice of the charge on or about June 22, 2004.

As evidenced in this position statement, Respondent's management and discipline of this employee began significantly before he filed a charge of discrimination. The increased scrutiny of his performance was a result of his disobedience, not a retalitatory gesture following his filing the charge of discrimination.

### L.    Complainant's Continued Failure to Adhere to the PIP and Written Warning.

On August 5, 2004, Complainant sent an email to Ms. Miles with a suggestion for monthly meetings. Ms. Miles responded to Complainant, stating that he needed to focus on her pending requests that he continued to ignore, rather than suggesting new items. After detailing her pending requests yet again, Ms. Miles wrote, "Please do not respond to this email. That is a directive. I will not tolerate back and forth discussion on these or any other directives." Complainant did not heed this warning and continued to respond repeatedly to Ms. Miles' email, questioning her directives. Complainant wrote, "I do not understand that you keep giving me directive after directive...This kind of communication can not be acceptable in such an environment and nature of business...We need to work and find a way to communicate better than this..." Why cannot Complainant realize that is exactly what Ms. Miles and Respondent are trying to achieve? Why does Complainant relentlessly inquire as to Ms. Miles' intentions, rather than abide the directives she, as a manager, is giving to her employee?

### M.    Complainant's Receipt of Performance Expectations Document.

Complainant continued to resist his manager's authority and her directives. He failed to meet the expectations that had been set for him in the past. In Respondent's continued effort to manage this difficult employee's performance, Respondent increased the scrutiny of Complainant's performance again.

On August 19, 2004, Complainant met with Jamie Graceffa, Human Resources Manager, and management. As Ms. Miles was on a leave of absence, Mr. Hoffman (her manager) represented management in this meeting with Complainant. As Complainant had not worked effectively with other Human Resources personnel, Respondent assigned Mr. Graceffa to handle Complainant's human resources direction and support. In the meeting, Mr. Graceffa and Mr. Hoffman presented to Complainant a Performance Expectations document which outlined the requirements placed on him going forward. Please see attached Performance Expectations, which is at Exhibit I.

GETR0164

Kenneth An
September 24, 2004
Page 12 of 14

Mr. Hoffman explained the following to Complainant. Ms. Miles had been requesting certain things of Complainant for an exhaustive period of time. Although Complainant had been counseled, coached, disciplined and warned repeatedly, his compliance with Ms. Miles' directives and requirements was unsatisfactory. Complainant needed to respect his manager's authority. Complainant was directed to stop arguing back and forth with her over email.

In essence, Complainant was told that his job is in jeopardy. He was advised that his performance, time and work product would be tightly managed and scrutinized. Since he had not proven to Respondent that he could follow the rules, the rules were being tightened. The Performance Expectations document clearly spelled out the requirements and expectations for Complainant going forward.

In addition to the expectations of professional workplace conduct that had been reiterated to Complainant on countless occasions, Mr. Hoffman and Mr. Graceffa advised Complainant of the following requirements. Mr. Khirawi is to send arrival/departure emails to Mr. Graceffa. Mr. Khirawi is to send his weekly status reports to Mr. Graceffa. Mr. Khirawi is to complete a log of his daily work activity on an hourly basis.

Yet again, Complainant is not fully abiding the plainly articulated requirements. He remains unwilling or unable to follow clear and simple instructions. Respondent continues to endeavor to extract acceptable performance from him. The road has been long and excruciating.

### III.   SUMMARY

Getronics is more confident in this case than any other to date that no act of discrimination has occurred. Indeed, Complainant has taxed this Company and its Human Resources team to its breaking point with his correspondence. Following several internal allegations and countless complaints by this employee, Getronics is confident and clear in the sufficiency of its exhaustive investigations into his concerns. The conclusions were and continue to be: he has been treated fairly. In no way, shape or form are any of Complainant's workplace concerns attributable to his race or national origin or in retaliation or other untoward basis.

Again, this matter is brought by an individual who has not and cannot process information beyond that of his own and insular viewpoint. But one man's zealous pursuit of his own interests does not a discrimination case make.

In closing, Respondent has tried hard to make this relationship work and understands that it is, as yet, a work in progress. In order for the employment relationship to continue, Respondent respectfully requires that Complainant abide the basics of supervisor and subordinate relationship and professional respect for the viewpoints and needs of others.

Kenneth An
September 24, 2004
Page 13 of 14

## IV.    RESPONDENT'S AFFIRMATIVE DEFENSES

### AFFIRMATIVE DEFENSES

Respondent also assert the following affirmative defenses to the allegations contained in the Complainant's charge of discrimination:

1.    Complainant has failed to establish a prima facie case of discrimination.

2.    Complainant fails to state a claim upon which relief can be granted.

3.    Complainant's allegations are barred, in whole or in part, by the applicable limitations period.

4.    Every action Respondent took with respect to Complainant's employment was taken for legitimate business reasons and was consistent with principles of law.

5.    Complainant's claim is barred by the doctrines of unclean hands, waiver, estoppel and/or laches.

6.    Complainant has suffered no damages.  To the extent Complainant can establish damages, Complainant's claims are barred, in whole or in part, by his failure effectively to mitigate his damages.

7.    Complainant suffered no adverse action.

8.    Complainant has failed to take advantage of the preventative and/or correction opportunities provided by Getronics and otherwise to avoid harm.

9.    Respondents reserve the right to assert additional affirmative defenses should they become aware of additional defenses during the course of these proceedings.

10.   To the extent any allegations of discrimination are not specifically denied above, they are hereby denied.

GETR0166

Kenneth An
September 24, 2004
Page 14 of 14

## V.    <u>CONCLUSION</u>

Getronics and its managers have treated Complainant fairly, and without discrimination, throughout his employment.  Complainant's claims that he was discriminated against because of his race, national origin, or in retaliation for complaining of discrimination are frivolous and should be dismissed.

Please feel free to contact me if you require any additional information to complete your investigation.

Very truly yours,

Marthe C. Stanek

MCS/stm

# EXHIBIT 48

# TALX COPY UCeXpress℠



EXHIBIT 28
J. Graffa
8-11-06
M. PICCIRILLI

November 29, 2004

MASS. DIVISION OF EMPLOYMENT & TRAINING  TEL CLAIMS CENTER            OFFICE 13
P.O. BOX 826
NORTH ANDOVER  MA  01845

FAX (617) 727-4536

RE:  AALAEDI KHIRAWI              Account:  82-89665-0
SS:  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                 Employer:  GETRONICS ENTERPRISE MANAGED
SERVICES LLC

Dear State Representative:

This is in reference to form 0124-M, Notice to Employer of Approved Claim, dated
November 18, 2004 which allows benefits to the above individual.  We wish to appeal
the determination based on the following.

The claimant was discharged for violation of a reasonable and known policy
regarding conduct in the workplace. The claimant had been issued several warnings
and was working with HR closely to improve his conduct/ attitude in the workplace.
On 10-26-04 the claimant was receiving a written warning for an inappropriate email
when he became irate and started calling everyone in the room a lair and wouldn't
sit down and listen. The claimant continued to talk over everyone in the room and
would not calm down, and was sent home for the rest of the day and terminated upon
arrival on 10-27-04. Attached are documents regarding the claimants behavior and
previous warnings. The employer wishes to use them as exhibits in the upcoming
hearing. The employer also request a phone hearing be scheduled.

Be advised, TALX UCM Services, Inc., UC eXpress(SM) is a duly authorized agent
empowered to act on behalf of the above employer.  Any correspondence related to
this individual should be mailed to: P.O. Box 283, St. Louis, MO 63166-0283.

For additional information, please contact me at (800) 848-0287, ext. 3263 or (614)
658-3263 or you can reach me via email at mdavis@talx.com or fax (866) 820-4319.

Thank you for your time and consideration.

Sincerely,

Michelle Davis
Lead Claims Service Representative

ATTACHMENT
P, PM, MS

GETR0093